IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 6:08-cv-03760-GRA |
| | ) | |
| JOHN HOWARD ALEXANDER, a/k/a | ) | |
| HOWARD IRA SMALL, INDIVIDUALLY | ) | |
| and AS TRUSTEE OF THE ALEXANDER | ) | |
| FAMILY TRUST | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES'**
**MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

I.  Statement of Material Facts ..................................................... 2

  A.  Jurisdiction and Property  ..................................................... 2

  B.  Alexander's Section 6700 penalty conduct and the assessments made against him ........... 2

  C.  Alexander's unpaid income taxes and the assessments made against him ......................... 8

  D.  Alexander's ownership of the subject property .................................................. 9

II.  Statement of Issues Presented ............................................ 11

III.  Standard of Review .................................................... 12

IV.  Argument .................................................... 12

  A.  Alexander engaged in penalty conduct under 26 U.S.C. § 6700 and the assessments made against him for such conduct should be reduced to judgment. ................................ 13

    1.  Alexander engaged in penalty conduct through his organization and selling of membership to the Aware Group and Freedom Trust Group. ............................. 13

2.  Because Alexander engaged in penalty conduct and he has shown no evidence to the contrary, he should be assessed $1,000 per transaction. ....................................................... 21

B.  Alexander owes unpaid income taxes for 1990-1995 and the income tax assessments against him should be reduced to judgment. ............................................................................ 22

C.  The Court should order the foreclosure of federal tax liens encumbering Alexander's property and interests in property, including the subject property. ......................................... 24

1.  The federal tax liens encumbering Alexander's property and interests in property should be foreclosed. ...................................................................................................................... 24

2.  Under South Carolina and federal law, Alexander has an interest in the subject property because he is the true owner of the subject property though it is nominally owned by the Alexander Family Trust. .................................................................................................... 25

D.  Alexander may not seek declaratory relief against the United States concerning his  tax liabilities. .............................................................................................................................. 30

V.  Conclusion  ............................................................................................................................ 30

**Table of Authorities**

Cases

*In re Alexander (f/k/a Howard Ira Small)*, Bankr. No. 91-6201 (Bankr. S.D. Cal.) 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) 12

*Bowen v. Bowen*, 575 S.E. 2d 553 (S.C. 2003) 25, 26

*Campbell v. Campbell*, 386 S.E. 2d 305 (S.C. App. 1989) 26, 27

*Cloaninger ex. rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324 (4th Cir. 2009) 12

*Coleman v. Commissioner*, 791 F.2d 68 (7th Cir. 1986) 1

*Drye v. United States*, 528 U.S. 49 (1999) 25, 28

*G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977) ............................25

*Hanson v. Commissioner*, 696 F.2d 1232 (9th Cir. 1983) ............................17

*Holman v. United States*, 728 F.3d 462 (10th Cir. 1984) ............................17

*Holman v. United States*, 505 F.3d 1060 (10th Cir. 2007) ............................29

*Lane v. United States*, 328 F.2d 602 (5th Cir. 1964) ............................23

*In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996) ............................30

*Lollis v. Lollis*, 354 S.E. 2d 559 (S.C. 1987) ............................28

*Lucas v. Earl*, 281 U.S. 111 (1930) ............................17

*McHan v. Commissioner*, 558 F.3d 326 (4th Cir. 2009) ............................23

*Monroe v. Beard*, 536 F.3d 198 (3d Cir. 2008) ............................18

*Noske v. United States*, 1993 WL 78311 (D. Minn. 1993) ............................21

*O'Donnell v. Commissioner*, 726 F.2d 679 (11th Cir. 1984) ............................17

*Othentec Ltd. v. Phelan*, 526 F.3d 135 (4th Cir. 2008) ............................12

*Oxford Capital Corp. v. United States*, 211 F.3d 280 (5th Cir. 2000) ............................29

*Pollard v. Commissioner*, 786 F.2d 1063 (11th Cir. 1986) ............................23

*Schulz v. Commissioner*, 686 F.2d 490 (7th Cir. 1982) ............................17

*Spotts v. United States*, 429 F.3d 248 (6th Cir. 2005) ............................29

*Tinsman v. Commissioner*, 12 Fed. Appx. 431 (8th Cir. 2001) ............................23

*United States v. Alexander*, Case No. 6:06-cv-01862-HFF (D.S.C.) ............................15

*United States v. Bayse*, 410 U.S. 441 (1937) ............................17

*United States v. Benson*, 561 F.3d 718 (7th Cir. 2009) ............................13

*United States v. Bowers*, 920 F.2d 220 (4th Cir. 1990) ............................22

*United States v. Buttorff*, 761 F.2d 1056 (5th Cir. 1985) ............................17, 20

*United States v. Campbell*, 897 F.2d 1317 (5th Cir. 1990) ............................................20

*United States v. Estate Pres. Servs.*, 202 F.3d 1093 (9th Cir. 2000) ...................14, 19

*United States v. Gleason*, 432 F.3d 678 (6th Cir. 2005) ...............................................20

*United States v. Kahn*, 2004 WL 1089116 (M.D. Fla., Mar. 30, 2004) ...................19

*United States v. Krall*, 835 F.2d 711 (8th Cir. 1987) ....................................................17

*United States v. McMullin*, 948 F.3d 1188 (10th Cir. 1991) ......................................23

*United States v. Raymond*, 228 F.3d 804 (7th Cir. 2000) ...................................14, 19

*United States v. Rodgers*, 461 U.S. 677 (1983) ..............................................................24

*United States v. Sarubin*, 507 F.3d 811 (4th Cir. 2007) .............................................22

*United States v. Schulz*, 529 F. Supp. 2d 341 (N.D.N.Y. 2007) ....................15, 19, 20

*United States v. Vermont*, 377 U.S. 351 (1964) .............................................................24

*United States v. White*, 769 F.2d 511 (8th Cir. 1985) ..................................................14

*Vnuk v. Commissioner*, 621 F.2d 1318 (8th Cir. 1980) ...............................................17

*Wheeler v. United States*, 768 F.2d 1333 (Fed. Cir. 1985) ........................................17

*Zmuda v. Commissioner*, 73 T.C. 1235 (1982) ..............................................................17

Statutes

26 U.S.C. § 1 ..............................................................................................................................22

26 U.S.C. § 61 ...........................................................................................................................22

26 U.S.C. § 6020 .....................................................................................................................22

26 U.S.C. § 6203 .....................................................................................................................22

26 U.S.C. § 6321 ..............................................................................................................24, 29

26 U.S.C. § 6322 .....................................................................................................................24

26 U.S.C. § 6502 .....................................................................................................................22

26 U.S.C. § 6700 .............................................................................. *passim*

26 U.S.C. § 6703 .............................................................................. 13

26 U.S.C. § 7402 .............................................................................. 22

26 U.S.C. § 7403 .............................................................................. 24, 25

28 U.S.C. § 2210 .............................................................................. 30

Other Authority

Kathleen Bicek Bezdichek, Annotation, *Construction and Application of § 6700 of the Internal Revenue Code (26 U.S.C.A. § 6700) Imposing Civil Penalties for Promoting Abusive Tax Shelters*, 2006 A.L.R. Fed. 2d 23 (2006) .................................................. 21

William D. Elliot, <u>Federal Tax Collections, Liens and Levies,</u> ¶9.10[2] (2d Ed. 2000) .............................................................................. 29

Restatement (Third ) of Trust § 7 .............................................................. 25

"Some people believe with great fervor preposterous things that just happen to coincide with their self-interest. 'Tax protesters' have convinced themselves that wages are not income, that only gold is money, that the Sixteenth Amendment is unconstitutional, and so on.  These beliefs all lead – so tax protesters think – to the elimination of their obligation to pay taxes." *Coleman v. Commissioner*, 791 F.2d 68, 69 (7th Cir. 1986).  John Howard Alexander furnished the means for tax protestors to act on Judge Easterbrook's observation in *Coleman* and the IRS penalized him accordingly.  Through his companies, the Aware Group and the Freedom Trust Group, Alexander provided materials destined to aid his paying customers in attempts to evade their tax obligations.  The IRS assessed Alexander for civil penalties for promoting these abusive tax schemes under 26 U.S.C. § 6700.  Alexander also failed to file his own tax returns or pay income taxes and the IRS subsequently made income tax assessments against him.

Because no genuine issue of material fact exists and it is entitled to judgment as a matter of law, the United States moves for summary judgment against Alexander: 1) to reduce to judgment the tax and penalty assessments made against him and 2) to foreclose tax liens encumbering his interests in certain real property located in Greenville County, South Carolina. Specifically, the United States seeks: 1) judgment against Alexander and in favor of the United States in the amount of $1,152,000, plus statutory interest and additions accruing since the dates of assessment for unpaid civil penalties made pursuant to 26 U.S.C. § 6700; 2) judgment against Alexander and in favor of the United States in the amount of $46,628.47, plus statutory interest and additions accruing since the dates of assessment for his unpaid income taxes; 3) a determination that pursuant to South Carolina and federal law, Alexander has a property interest in the subject real property; 4) a determination that the Alexander Family Trust's nominal

ownership of that real property should be disregarded because it is Alexander's nominee, and; 5) an order foreclosing the federal tax liens encumbering Alexander's property interests.

## I.  Statement of Material Facts

### A.  Jurisdiction and Property

1.  The defendant, John Howard Alexander, resides in Greenville County, South Carolina, within this judicial district.  (Compl. ¶ 5; Answer ¶ 6).

2.  The parcel of real property at issue is located within this judicial district in Greenville County, South Carolina with a legal description of:

> ALL that certain piece, parcel, or lot of land, situate, lying and being in the State of South Carolina, County of Greenville, being known and designated as Lot No. 1 and a part of Lot No. 2 on a plat of Farmington Acres recorded in the Office of the Register of Deeds for Greenville County, South Carolina, in Plat Book GGG at Page 183 and on a more recent survey prepared by Freeland & Associates dated October 25, 1979 and recorded in Plat Book 7-K at Page 92, reference to said plat is hereby craved for a complete metes and bounds description.
>
> THIS BEING the same property conveyed unto Miriam Getz by deed of Jackie Lee Hammack dated November 3, 1995 and recorded November 4, 1994 in the Register of Deeds Office for Greenville County South Carolina in Book 1588 at Page 816.

(Gov't Ex. 4; Alexander Dep. Tr. p. 4, ll. 5-7).

3.  The subject real property is held in the name of the Alexander Family Trust.  John Howard Alexander is the sole trustee of the Alexander Family Trust.  (Alexander Dep. Tr. p. 9; ll. 23-25).

### B.  Alexander's Section 6700 penalty conduct and the assessments made against him

4.  John Howard Alexander founded the Aware Group and the Freedom Trust Group and operated the same out of his home (the real property described in paragraph 2) through 2004. (Alexander Dep. Tr. p. 23, ll. 12-19).

5.  The business of the Freedom Trust Group and the Aware Group was to sell an array of materials in written, audio and video form researched and furnished by Alexander and to sell membership into the Aware Group.  (Alexander Dep. Tr. p. 21, ll. 6-8; p. 29, ll. 1-15, p. 36, ll. 6-12).

6.  Alexander's then-wife, Heather Ferguson acted as manager for the day-to-day operations of the businesses with responsibilities including maintaining customer information, keeping the books, and other administrative duties.  (Ferguson Dep. Tr. p. 12, ll. 1-15).

7.  Through the Freedom Trust Group, Alexander sold software which consisted of forms, materials, and step-by-step instructions so customers could set up so-called "pure trusts." (Alexander Dep. Tr. 21, ll. 6-8).

8.  Alexander also provided a book entitled "Your Privacy and Asset Accumulation Guide" from the Freedom Trust Group.  In that material, Alexander claimed that "pure trusts" were "created under the common law right of contract as guaranteed in Article 1, Section 10 of the U.S. Constitution."  (Alexander Dep. Tr. p. 77-78; Gov't Ex. 6).

9.  Again, in "Your Privacy and Asset Accumulation Guide" from the Freedom Trust Group, Alexander claimed that "in our research we scrutinized hundreds of court decisions to find out what qualities made certain types of Trusts un-penetrable by judges, the IRS and other creditors.  The Trusts have been structured after Contracts of Trust that have been challenged and tested to withstand the most intense scrutiny of the Courts, the IRS and Creditors and still remain intact."  (Gov't Ex. 5).

10.  Again, in "Your Privacy and Asset Accumulation Guide" from the Freedom Trust Group, Alexander stated "if you are going to transfer assets out of your possession, into a Trust, for reasons of avoiding present creditors, you will need to show that your 'transfer' was an

attempt to settle a debt with a creditor.  It's not your fault there's not enough assets to go around to settle up with all the creditors.  If there were, you wouldn't be in this predicament?  You need to arrange to have another Trust to place a lien against your assets with a monetary value that will exceed the value of merchandise being transferred.  This will clearly show that your transfer was in attempt to clear a lien."  (Gov't Ex. 5).

11.  Along with "Your Privacy and Asset Accumulation Guide," purchasers of Freedom Trust Group software or members of the Aware Group received templates and step-by-step instructions to create so-called "pure trusts" known as Family Trusts, Management Trusts, Banking Trusts and Holding Trusts.  (Gov't Ex. 7-10).

12.  According to Alexander's Freedom Trust Group materials, pure trusts could benefit those who purchased his materials by providing liability protection, estate planning (avoidance of probate and estate taxes), privacy and tax reduction.  (Gov't Ex. 6).

13.  In materials furnished by the Aware Group, "proper implementation of a Pure Trust" could result in: 1) the assets not being subject to probate or estate taxes; 2) making the individual judgment proof; 3) allowing flexibility of dividing up properties between trusts to provide further protection; 4) "substantial tax savings. through the legal method of tax avoidance;" and; 5) privacy for his business and personal operations with limited disclosure requirements.  (Gov't Ex. 11).

14.  Alexander provided that customers wishing further details on achieving personal financial reorganization through the use of pure trusts could contact those who provided the materials or the Aware Group directly.  (Gov't Ex. 11).  He also advertised in his newsletter that individuals seeking more information about pure trusts should contact the Aware Group.  (Gov't Ex. 12).

15.  Alexander's customers also purchased memberships into the Aware Group, which entitled them to access to an array of materials purportedly researched and furnished by Alexander.  (Alexander Dep. Tr. p. 37, ll. 1-13).

16.  Upon joining the Aware Group, each member received a CD entitled "Freedom Files," which consisted of a variety of materials, step-by-step instructions, and templates. (Alexander Dep. Tr. p. 37, ll. 1-13, Gov't Ex. 13).

17.  The "Freedom Files" included the "asset protection software" sold by Freedom Trust Group discussed above.  (Gov't Ex. 13; Alexander Dep. Tr. p. 77, ll. 12-15).

18.  The "Freedom Files" also included a set of materials called the "Redemption Manual."  The Aware Group provided the Redemption Manual to its customers.  (Gov't Ex. 13; Alexander Dep. Tr. p. 67-69, ll. 6-25, 1-25, 1-12).

19.  The Redemption Manual provided a "comprehensive study guide [that] includes an 80-page glossary, step-by-step instructions, an overview, history, filing letters and forms, court cases, security agreements and instructions for handling commercial presentments."  (Gov't Ex. 13).

20.  The Redemption Manual consisted of materials on how to begin the "Accepted for Value" Process and to activate a so-called "Treasury Direct Account (TDA)" in Washington, D.C.  The process began by requesting materials about a "straw man," then mailing materials to the Secretary of Treasury and filing a UCC-1 and UCC-3 with a state Secretary of State's Office. (Gov't Ex. 14).

21.  If the customer fulfilled the requirements, the materials furnished by Alexander stated that the end result of the Accepted for Value process was that "upon receipt of any Commercial Presentment, *e.g.* . . . IRS demand for payment . . . you have ten (10) days to either

accept or rebut the Presentment."  If the customer followed the procedure outlined, then they could possibly avoid the liability.  (Gov't Ex. 14).

22.  The materials provided by Alexander in the Freedom Files to his customers included other materials including the Reliance Manual, which Aware Group marketed as reliable tax information and included a Levy Release Package.  (Gov't Ex. 13).

23.  Alexander also provided information on so-called "land patents."  The Aware Group marketed land patents as "a comprehensive step-by-step guide on how to secure, defend and maintain your Land Patent" along with "easy to fill in forms."  According to Aware Group's marketing materials, "with patented land, your land can't be taken from you for debts or taxes." (Gov't Ex. 13).

24.  On November 16, 2006, the United States District Court for the District of South Carolina entered an order finding that the tax-fraud schemes promoted by Alexander violated various provisions of the Internal Revenue Code and further enjoined Alexander from continuing to promote tax-fraud schemes or making false or fraudulent representations concerning material tax matters.  *See United States v John Howard Alexander*, Case No. 6:06-cv-01862-HFF.

25.  During the course of the IRS's investigation, in or about July or August of 2005, Heather Ferguson voluntarily provided a CD containing customer information for the Aware Group and the Freedom Trust Group.  (Declaration of Phyllis Bingham ¶ 3).

26.  The CD provided by Ferguson had a database of contact information consisting of names and addresses dating back to the early 1990s of people who had inquired about the Aware Group and/or the Freedom Trust Group, some of whom then  purchased membership into the Aware Group and/or bought materials from the Aware Group or the Freedom Trust Group.  The database also included contacts for people who were not paid subscribers of the Aware Group or

who had not bought materials from the Freedom Trust Group. (Bingham Decl. ¶ 4; Ferguson Dep. Tr. p. 29, ll. 3-7).

    27. Ferguson voluntarily created a second CD that consisted of only the members of the Aware Group or of people who had bought materials from the Freedom Trust Group and/or Aware Group. The IRS took the information on the CDs provided by Ferguson and separated customers by the year that they joined the Aware Group or had purchased materials from the Freedom Trust Group. (Bingham Decl. ¶ 5; Gov't Ex. 1).

    28. Based on the customer and purchase information provided by Ferguson, the IRS determined that the Aware Group and the Freedom Trust Group made the following number of transactions between 2000 and 2004:

Number of Transactions

| Year | |
|------|------|
| 2000 | 123 |
| 2001 | 320 |
| 2002 | 421 |
| 2003 | 245 |
| 2004 | 43 |

(Bingham Decl. ¶ 7).

29.  On June 25, 2007, the IRS assessed a civil penalty against John Howard Alexander under 26 U.S.C. § 6700 in the amount of $123,000 for tax year 2000.  (Gov't Ex. G).

30.  On July 30, 2007, the IRS assessed civil penalties against John Howard Alexander under 26 U.S.C. § 6700 in the following amounts for the following tax years:

| Year | Amount Assessed |
|------|-----------------|
| 2001 | $320,000 |
| 2002 | $421,000 |
| 2003 | $245,000 |
| 2004 | $43,000 |

(Gov't Ex. H-K).

31.  The IRS gave timely notice of each assessment described in the preceding two paragraphs to Alexander and made demand for payment.  (Gov't Ex. G-K).

*C.  Alexander's unpaid income taxes and the assessments made against him*

32.  Alexander did not file federal income tax returns from at least 1990 through 1995. (Alexander Dep. Tr. p. 101, ll. 3-5).

33.  The IRS had previously mailed a notice of deficiency to John Howard Alexander explaining its income examination on May 20, 1998.  (Gov't Ex. L).

34.  In computing Alexander's income, the IRS based its income amounts in part on statistics obtained from the Bureau of Labor Statistics.  (Gov't Ex. L).

35.  In 1991, John Howard Alexander filed for Chapter 7 bankruptcy in the Southern District of California.  *In re John Howard Alexander (formerly known as Howard Ira Small)*, Bankr. No. 91-06201 (Bankr. S.D. Cal.)

36.  On November 23, 1998, the IRS assessed John Howard Alexander for federal income taxes in the amount of $4,518.00 and penalties and interest in the amount of $6,518.42 for tax year 1990.  (Gov't Ex. A).

37.  On November 16, 1998, the IRS made the following assessments of federal income tax against John Howard Alexander:

| Year | Assessed Amount | Penalties and Interest Assessed |
| --- | --- | --- |
| 1991 | $4,656.00 | $5,588.75 |
| 1992 | $4,925.00 | $5,139.53 |
| 1993 | $4,906.00 | $4,448.06 |
| 1994 | $5,020.00 | $3,849.80 |
| 1995 | $5,001.00 | $3,094.33 |

(Gov't Ex. B-F).

38.  The IRS gave timely notice of each assessment described in the preceding two paragraphs to Alexander and made demand for payment.  (Gov't Ex. A-F).

39.  Alexander cannot provide evidence documenting his financial condition between 1990 and 1995.  (Alexander Resp. to Interrogatories No. 3).

*D.  Alexander's ownership of the subject property*

40.  Alexander's mother, Miriam Getz made the down payment on the property in 1994 and assumed a mortgage already existing on the property.  The property was titled in her name. (Alexander Dep. Tr. p. 8, l. 10; Gov't Ex. 2-4).

41.  Since his mother purchased the property, Alexander has continuously resided on the subject real property.  He has paid the property taxes on the property.  Along with his mother, he made mortgage payments on the property.  He also improved the property since he moved there by adding a pool, a deck, and a fence among other improvements.  (Alexander Dep. Tr. p. 8, ll. 5-7; p. 9, ll 3-17; p. 14, ll. 7-9).

42.  In 2001 or 2002, Alexander and his mother transferred the property to the Alexander Family Trust.  He and his mother used a template from the Freedom Trust Group's materials to create the Alexander Family Trust.  (Alexander Dep. Tr. p. 10, ll. 1-12, p. 11, ll. 1-4).

43.  On October 16, 2003, by quitclaim deed, Miriam Getz conveyed the subject real property to John-Howard Alexander as Trustee for The Alexander Family Trust for consideration of "Five and 00/100 ($5.00) Dollars Love and Affection."  (Gov't Ex. 4).

44.  On October 16, 2003, to secure the improvements made on the property, Alexander's mother executed a mortgage in favor of John-Howard Alexander.  The Alexander Family Trust was not a party to the mortgage.  (Gov't Ex. 2).

45.  Alexander filed a satisfaction of the new mortgage reference in paragraph 41 on July 27, 2006.  (Gov't Ex. 3).

46.  Getz died September 7, 2006.  (Alexander Dep. Tr. p. 11, ll. 20).

47.  The IRS filed a notice of federal tax lien in Greenville County, South Carolina relating to the taxpayer's income tax liabilities for 1990, 1991, 1992, 1993, 1994, and 1995 on February 17, 2005.  The IRS filed an amended notice of federal tax lien concerning the taxpayer's income tax liabilities on June 4, 2008.  (Gov't Ex. M, N).

48.   The IRS filed a notice of federal tax lien in Greenville County, South Carolina relating to the taxpayer's 26 U.S.C. § 6700 civil penalty liability for 2000 on October 1, 2007. (Gov't Ex. O).

49.   The IRS filed a notice of federal tax lien in Greenville County, South Carolina relating to the taxpayer's 26 U.S.C. § 6700 civil penalty liabilities for 2001, 2002, 2003, and 2004 on October 22, 2007.  (Gov't Ex. P).

50.   The IRS filed a notice of federal tax lien against John-Howard Alexander, as Trustee of The Alexander Family Trust, nominee of John Howard Alexander in Greenville County, South Carolina relating to both the taxpayer's income tax liabilities for 1990, 1991, 1992, 1993, 1994, and 1995 and the taxpayer's 26 U.S.C. § 6700 civil penalty liabilities for 2000, 2001, 2002, 2003, and 2004 on May 20, 2008.  (Gov't Ex. Q).

## II.  Statement of Issues Presented

1.   Section 6700 of the Internal Revenue Code penalizes individuals who: 1) organize or sell, or participate in the organization or sale of, a plan or arrangement; 2) make or furnish false or fraudulent statements concerning the tax benefits to be derived from a plan or arrangement; 3) know or have reason to know that the statements are false or fraudulent, and 4) the false or fraudulent statements pertain to a material tax matter.  Through his companies, the Aware Group and the Freedom Trust Group, John Howard Alexander furnished materials and instructional guides to members on so-called "pure trusts" and "reliance manuals" amongst other materials designed to evade paying income taxes.  Should the penalty assessments made against Alexander be reduced to judgment?

2.   Income tax assessments are entitled to a presumption of correctness and the burden lies on the taxpayer to prove that the assessments are arbitrary and capricious.  The IRS assessed

John Howard Alexander for unpaid income taxes for 1990-1995. Alexander has not presented evidence rebutting the income tax assessments made against him. Should the 1990-1995 income tax assessments made against Alexander be reduced to judgment?

3. Upon assessment, a lien arises in favor of the United States against all property and interests in property belonging to the delinquent taxpayer. The lien also extends to any property held by a third party as the nominee or alter ego of the taxpayer. The United States has identified real property in Greenville County, South Carolina nominally held in the name of the Alexander Family Trust but beneficially owned by John Howard Alexander. Should summary judgment be ordered foreclosing the tax liens encumbering Alexander's real property in Greenville County?

4. In a counterclaim, Alexander seeks a declaratory judgment that the Government has no legal basis to assess income taxes or civil penalties against him. The Declaratory Judgment Act, 28 U.S.C. § 2201, has a tax exception that deprives courts of jurisdiction to provide declaratory relief on most tax-related matters. Should summary judgment be granted for the United States on Alexander's counterclaim?

## III. Standard of Review

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the Court must examine the evidence in the light most favorable to the nonmoving party, that party must identify sufficient evidence that would necessitate trial. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986); *Cloaninger ex. rel. Est. of Cloaninger v McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009). The nonmoving party may not rely on the allegations or denials in his

pleading to establish a genuine issue of fact, but must come forward with an affirmative showing of evidence. *Anderson*, 477 U.S. at 250; *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).

## IV. Argument

The United States brought this action, seeking to reduce to judgment two sets of tax assessments made against John Alexander: 1) assessments for civil penalties under 26 U.S.C. § 6700 for promoting a fraudulent tax scheme from 2000 through 2004 and 2) assessments for unpaid income taxes for 1990 through 1995.  Because no genuine issue of material fact exists that Alexander engaged in penalty conduct and also owes unpaid income taxes, summary judgment should be granted.  To partially satisfy the judgment, the United States further seeks summary judgment to foreclose the tax liens encumbering Alexander's property interests.  Also, the tax exception to the Declaratory Judgment Act bars Alexander's counterclaim.

### *A.  Alexander engaged in penalty conduct under 26 U.S.C. § 6700 and the assessments made against him for such conduct should be reduced to judgment.*

Section 6700 of the Internal Revenue Code penalizes those who promote fraudulent tax schemes.  The IRS assessed $1,152,000 in civil penalties against John Alexander for violations of 26 U.S.C. § 6700 for 2000-2004.  Through his businesses, the Aware Group and the Freedom Trust Group, Alexander provided step-by-step guides and templates for individuals seeking to evade the IRS and the payment of federal taxes.  Thus, summary judgment should be granted and the penalty assessments reduced to judgment.

#### 1.  Alexander engaged in penalty conduct through his organization and selling of membership to the Aware Group and Freedom Trust Group.

To establish liability under 26 U.S.C. § 6700, the Government must prove four elements, namely that Alexander: 1) organized or sold, or participated in the organization or sale of, a plan

or arrangement; 2) made or furnished false or fraudulent statements concerning the tax benefits to be derived from the plan or arrangement; 3) knew or had reason to know that the statements were false or fraudulent, and 4) the false or fraudulent statements pertained to a material matter. 26 U.S.C. §§ 6700(a), 6703(a); *see also United States v. Benson*, 561 F.3d 718, 721-22 (7th Cir. 2009).  The elements are manifest here.

### a. Alexander organized a plan and participated in the sale of the Aware Group and the Freedom Trust Group.

Alexander's ownership and operation of the Aware Group and the Freedom Trust Group constitutes a plan under 26 U.S.C. § 6700(a)(1)(A)(iii).  Part of Alexander's scheme was to sell memberships to the Aware Group.  One of the touted benefits of joining the Aware Group was that each participant received a CD of materials from it called the Freedom Files, a compendium of tax defier materials, including tax-related instructional manuals designed to help its members and customers evade taxes and the IRS (customers who were not members could also purchase other materials separately).  Additionally, through the Freedom Trust Group, Alexander also sold "trust packages," which again were templates and instructional guides on how to use so-called "pure trusts" to conceal assets and income from the IRS.  Thus, each is a "plan or arrangement" within the meaning of 26 U.S.C. § 6700(a)(1)(A)(iii).  *United States v. Raymond*, 228 F.3d 804, 811 (7th Cir. 2000) (26 U.S.C. § 6700 encompasses "any 'plan or arrangement' having some connection to taxes").

Alexander, as the founder and director of the Aware Group and the Freedom Trust Group, engaged in the organization, promotion, and sale of these groups, along with the array of materials in written, audio, and video form they sold.  Alexander has claimed that he did not

write the materials and that he only proffered research material to Aware Group's membership.

Whether Alexander personally wrote the Aware Group's materials is irrelevant though, because

§ 6700 encompasses those who <u>directly or indirectly</u> participate in the organization, promotion,

and sale of tax-fraud schemes.  26 U.S.C. § 6700(a)(1)(B); *see also United States v. Estate Pres.*

*Servs.*, 202 F.3d 1093, 1099 (9th Cir. 2000) ("Section 6700(a)(2)(A) penalizes *promoters*";

original emphasis); *Raymond*, 228 F.3d at 811 (holding that "[p]rogram purported to provide

step-by-step instructions for "removing" the purchaser from the federal income and social

security tax systems" was plan or arrangement under § 6700); *United States v. White*, 769 F.2d

511, 515 (8th Cir. 1985) (same, where "appellant had 'organized' . . . a tax avoidance plan or

arrangement"); *United States v. Schulz*, 529 F. Supp. 2d 341, 348 (N.D.N.Y. 2007) (offer to

"provide a 'customized legal opinion letter'" constituted part of a "plan"), *aff'd,* 517 F.3d 606,

607 (2d Cir. 2008) (holding that it was affirming the judgment "for substantially the reasons set

forth in the district court's decision").  Alexander's role in organizing, promoting, and selling the

Aware Group's and the Freedom Trust Group's tax-fraud schemes give rise to the violation of 26

U.S.C. § 6700 here and thus qualify as plans.

> *b.  Alexander furnished false or fraudulent statements with respect to purported tax benefits.*

Through the Freedom Files that the Aware Group provided to its members, Alexander

furnished step-by-step guides and templates for individuals to use in attempting to utilize oft-

rejected tax-defier positions.  In 2006, the United States District Court for the District of South

Carolina enjoined Alexander from further promoting numerous plans, finding "that the tax-fraud

schemes promoted by Alexander violate various provisions of the Internal Revenue Code."

*United States v. Alexander*, Case No. 6:06-cv-01862-HFF (D.S.C.).  Alexander consented to the

injunction and even a cursory review of the materials he sold reveals several false and fraudulent statements about tax benefits.  As described above, Aware Group membership automatically entitled the participant to a copy of the Freedom Files that contained Asset Protection Software and the Redemption Manual amongst other equally frivolous materials.  He also marketed "asset protection software" through the Freedom Trust Group.  Thus, every participant received materials containing false and fraudulent statements about purported tax benefits.

Through the Freedom Trust Group and the Aware Group, Alexander sold so-called "asset protection software," which in turn promoted the utilization of "pure trusts" to shield customers' income and assets from creditors, including the IRS.  The materials therein provided several pages of frivolous claims and "research" on the purported benefits of "pure trusts," namely – 1) liability protection from judgments and liens; 2) avoid probate and estate taxes; 3) privacy, and; 4) tax reduction.  His customers also received templates to create their own pure trusts with titles such as "family trust," "management trust," "holding trust," and "banking trust."  To set up a "pure trust," the customer needed to establish a series of trusts, set himself up as trustee of the trust, and then assign his income and assets to the trusts.  Because the "pure trust" is a purported common law contract, guaranteed by the Contract Clause of the Constitution (Art. I, Sec. 10).  According to Alexander, by following these steps, the trust takes legal title to the property and income while beneficial ownership remains with the trustee, *i.e.* "if the TRUST holds ownership to certain assets, those assets belong to the TRUST and not to any of the Trustees, individually.  The Pure Trust is never liable for the personal debts of Trustees.  While the Trust holds title to the assets, [the trustee] exercise[s] complete, practical control over the assets."  The Aware Group also advertised its own assistance in setting up pure trusts for its customers: "For further

details on how you can achieve your personal financial reorganization through Pure Trusts,

contact the representative who gave you this booklet or The AWARE Group."

As promoted by the Aware Group and Freedom Trust Group, the problem with a "pure

trust" is that it does not have the purported benefits advocated by Alexander that have been

rejected by the courts and by statute.  First, the claim that "[t]axation of income attributed to a

trust, which is a form of contract, violates the constitutional prohibition against impairment of

contracts" has been identified by the IRS as a "frivolous position" that can result in a penalty of

$5,000 when asserted in a tax return or included in certain collection-related submissions. I.R.S.

Notice 2007-30.  As a practical matter though, Alexander's trusts fail.  Alexander claims that his

customers may assign their own wages or salaries to trusts and then assert that the income is the

income of the trust and not the wage earner's. However, earned income (wages, salaries, and

other compensation for services) is always taxable to the person that earned the income, and any

attempt to assign income before it is earned will be ineffective for income tax purposes even if

valid under state law.  *Lucas v. Earl*, 281 U.S. 111 (1930); *United States v. Bayse*, 410 U.S. 441

(1937); *see also Wheeler v. United States*, 768 F.2d 1333 (Fed. Cir. 1985) (held that taxpayer is

taxable on assigned income even if the income is paid directly to a trust).  Moreover, for

example, 26 U.S.C. § 677 provides that a grantor shall be considered to be the owner of any trust

for federal income tax purposes (meaning that the trust is disregarded) if the grantor continues to

receive income from the trust, or the income is accumulated for possible distribution to or for the

benefit of the grantor (or the grantor's spouse).  *See, e.g.*, *United States v. Krall*, 835 F.2d 711,

714 (8th Cir. 1987); *United States v. Buttorff*, 761 F.2d 1056, 1060-61 (5th Cir. 1985).

The overarching problem with the trusts marketed by Alexander is that they are shams

lacking any real economic existence except to frustrate collection efforts.  The courts have long

held (since before Alexander formed his businesses) that a trust will be considered a "sham" and disregarded for federal income tax purposes if the creation of the trust has no real economic effect and alters no economic relationships, even if the trust is recognized under state law and regardless of the form of the entity. *See, e.g.*, *Zmuda v. Commissioner*, 73 T.C. 1235, 1241 (1982), *aff'd* 731 F.2d 1417 (9th Cir. 1984); *Holman v. United States*, 728 F.2d 462, 464 (10th Cir. 1984); *O'Donnell v. Commissioner*, 726 F.2d 679, 681-82 (11th Cir. 1984); *Hanson v. Commissioner*, 696 F.2d 1232, 1234 (9th Cir. 1983); *Schulz v. Commissioner*, 686 F.2d 490, 495 (7th Cir. 1982), *Vnuk v. Commissioner*, 621 F.2d 1318, 1320-21 (8th Cir. 1980). In all of the cited cases, the taxpayers set up "family trusts" using forms, materials, and step-by-step instructions bought from promoters of trust schemes. The parties attempted to avoid all income taxes by transferring both their properties and their future earnings to the trusts, which they controlled as trustees and from which they were entitled to all the income. In other words, the taxpayers claimed to transfer title to the income and property to the trust, but as a practical matter the taxpayers continued to use the property and spend the income. The courts rejected the use of these "family trusts" and found the trustees liable for unpaid income taxes. Thus, the claims regarding "pure trusts" furnished by Alexander in promoting these arrangements were false and fraudulent statements within the meaning of 26 U.S.C. § 6700.

In the Freedom Files provided to Aware Group members, Alexander also provided a package of "research," instructions, and templates called the Redemption Manual, which purported to help individuals divorce themselves from their "strawman" under the Uniform Commercial Code and access a secret account with the Department of the Treasury. Redemption stems from the belief that the "straw man" came into being when the Government removed itself from the gold standard in 1933 and that the government only has control over the "strawman,"

not over the other "free man." *See, e.g., Monroe v. Beard*, 536 F.3d 198, 203 n. 4 (3d Cir. 2008) (explaining "redemptionist theory" in considering prison's bar on confiscating book "Cracking the Code"). Here, Alexander furnished materials to his customers designed "to 'activate' [their] Treasury Direct Account (TDA) in Washington, DC." The so-called Accepted for Value process began by filing UCC forms on behalf of the "straw man" and then sending forms to the Department of the Treasury and the customer's state Secretary of State's Office. The end result of the Accepted for Value process is that "upon receipt of any Commercial Presentment, *e.g.* . . . IRS demand for payment . . . you have ten (10) days to either accept or rebut the Presentment." If the customer followed the procedure outlined, then they could avoid the liability. The theory of redemption is frivolous on its face, long rejected by the courts. *See, e.g., United States v. Kahn*, 2004 WL 1089116, *1 (M.D. Fla., Mar. 30, 2004) (court held defendants in contempt of injunction that arose from defendants' promotion of abusive tax schemes including "outlandish mechanisms" such as using counterfeit bonds and checks to draw on fictitious treasury accounts supposedly in their customer's name).

>    *c. Alexander knew or had reason to know that the statements he furnished in the Freedom Files or through the Freedom Trust Group were false or fraudulent.*

In determining whether Alexander meets the scienter requirement of 26 U.S.C. § 6700, this Court should consider the extent of his reliance upon knowledgeable professionals, his level of sophistication and education, and his familiarity with tax matters. *Estate Pres. Servs.*, 202 F.3d at 1102-03 (citing *Kaun*, 827 F.2d at 1149). Here, Alexander admittedly did not rely on knowledgeable professionals; instead he conducted his own research on the matters presented to him by others and consulted with other members of the tax protestor community. Indeed, like the defendant in *Schulz*, 529 F. Supp. 2d at 350, he "relied on fringe opinions of [a] known tax

protestor[] whose theories have repeatedly been rejected by courts across the country." If Alexander had consulted with a knowledgeable professional, he would have learned that the statements he furnished to his members were bunk.

Of course, not only those with expertise in tax law, but also the millions of laypersons who comply with their federal tax obligations, would recognize Alexander's false statements as tax-defier propaganda. Any reasonable person in Alexander's subjective position would have discovered the falsity of the statements in the tax-avoidance products at issue. Under the "reason to know" standard, that is all that is required. *See Estate Pres. Servs.*, 202 F.3d at 1103 (discussing legislative history of § 6700); *Raymond*, 228 F.3d at 812 ("We attribute to both appellants a basic knowledge of the law such that they should reasonably be aware that their personal belief that paying taxes is a voluntary activity does not represent the current state of the law"); *Schulz*, 529 F. Supp. 2d at 350 ("the obligation to pay taxes is common knowledge"). For a person who claimed to conduct as much research as Alexander, it is reasonable that he should have found authority that showed that Aware Group's and Freedom Trust Group's materials contained false and fraudulent statements about purported tax benefits.

### d. The false statements pertained to a material tax matter.

A false statement pertains to a material matter in the context of 26 U.S.C. § 6700 if it would have "a 'substantial impact' on the decision to purchase a tax package." *United States v. Gleason*, 432 F.3d 678, 683 (6th Cir. 2005) (quoting *Buttorff*, 761 F.2d at 1056). The inquiry is objective. *United States v. Campbell*, 897 F.2d 1317, 1320 (5th Cir. 1990) ("Material matters are those which would have a substantial impact on the decision-making process of a reasonably prudent investor and include matters relevant to the availability of a tax benefit"; citing S. Rep. No. 97-494, at 267, *reprinted in* 1982 U.S.C.C.A.N. 781, 1015)); *Schulz*, 529 F. Supp. 2d at 351-

52 (quoting Fifth Circuit opinion in *Campbell*).  Alexander's promotional materials tout the

materials therein as a way for taxpayers to stop filing tax returns and immunize themselves from

involuntary civil collection.  It strains credulity to suppose that taxpayers would pay hundreds of

dollars for membership into the Aware Group or to purchase materials from the Freedom Trust

Group unless they were buying into his promise of freedom from tax.  Thus, the materiality

requirement (the fourth and final element of a violation of 26 U.S.C. § 6700) was met.

><u>2.  Because Alexander engaged in penalty conduct and he has shown no evidence
>to the contrary, he should be assessed $1,000 per transaction.</u>

The amount of the Section 6700 penalty assessment against Alexander is correct.  The

flush language in 26 U.S.C. § 6700(a) imposes a civil penalty "with respect to each activity . . . a

penalty equal to the $1,000 or, <u>if the person establishes that it is lesser</u>, 100 percent of the gross

income derived (or to be derived) by such person from such activity."  (emphasis added).  The

fixed penalty amount is calculated on a per transaction basis.  *See Noske v. United States*, 1993

WL 78311, * 4, n. 6 (D. Minn. 1993), *aff'd on other grounds*, 998 F.2d 1018 (8th Cir. 1993)

("Congress amended section 6700 to make it clear that penalties under this section could be

assessed on a 'per transaction' basis"); Kathleen Bicek Bezdichek, Annotation, *Construction and*

*Application of § 6700 of the Internal Revenue Code (26 U.S.C.A. § 6700) Imposing Civil*

*Penalties for Promoting Abusive Tax Shelters*, 2006 A.L.R. Fed. 2d 23 (2006).  Thus, once the

Government establishes that the promoter sold a certain number of materials, the promoter then

bears the burden to prove the income derived from that activity was less than $1,000 per

transaction.

During the IRS's investigation of them, Heather Ferguson, Alexander's ex-wife and the

business manager of their organizations, provided a CD that contained the information detailing

the transactions entered into by the Freedom Trust Group and the Aware Group.  Ferguson exclusively handled the business side of the Aware Group and the Freedom Trust Group since the late 1990s and continuing beyond her divorce from Alexander in 2004.  The IRS used the material on that CD to determine the number of individual transactions between the Aware Group, the Freedom Trust Group and its customers between 2000 and 2004.  Based on that material, the IRS was able to determine that the Freedom Trust Group and Aware Group conducted 123 transactions in 2000; 320 in 2001; 421 in 2002; 245 in 2003, and; 43 in 2004 (for a total of 1,152).  Because each customer received false statements in connection with the Aware Group and the Freedom Trust Group, Alexander violated 26 U.S.C. § 6700 each time he made a sale.  Thus, the IRS assessed a total penalty of $1,152,000 against Alexander.  He has been unable or unwilling to offer evidence that the gross income derived from his activities was less than the amount of the civil penalties assessed against him.  Thus, the Court should enter judgment against Alexander and for the United States in the amount of $1,152,000, plus statutory penalties and interests that continue to accrue.

### B.  Alexander owes unpaid income taxes for 1990-1995 and the income tax assessments against him should be reduced to judgment.

The Internal Revenue Code required John Alexander to file federal income tax returns for Tax Years 1990 through 1995.  26 U.S.C. §§ 1, 61, 6012.  Because Alexander failed to file tax returns, the IRS computed his income tax liabilities for him.  26 U.S.C. § 6020(b).  The IRS assessed the income taxes against Alexander on November 16 and November 23, 1998 in accordance with 26 U.S.C. § 6203.  The United States brought a timely action to reduce Alexander's income tax assessments to judgment on November 12, 2008.  (Doc. # 1).  26 U.S.C.

§§ 7402(a) (jurisdiction of district court to issue judgments); 6502(a) (action must be brought within ten years of the assessment).

The determination of Alexander's income tax deficiency is entitled to a presumption of correctness. In support of its assessments, the Government produced Certificates of Assessment, which reflect when and in what amount the IRS assessed taxes, interest, and penalties in addition to reflecting any collection activities or payments, that in turn are presumed correct.[1]  *United States v. Sarubin*, 507 F.3d 811, 816 (4th Cir. 2007). The burden shifts to the taxpayer to prove that the assessments are arbitrary or erroneous. *McHan v. Commissioner*, 558 F.3d 326, 332 (4th Cir. 2009). Here, the IRS based its income computations in part on statistics obtained from the Bureau of Labor Statistics.[2] Other circuits have accepted the use of statistical data as a reasonable method of income reconstruction. *E.g., United States v. McMullin,* 948 F.2d 1188, 1192 n. 3 (10th Cir. 1991); *Pollard v. Commissioner,* 786 F.2d 1063, 1066 (11th Cir. 1986). Therefore, the income tax assessments against Alexander are entitled to a presumption of correctness. *McHan*, 558 F.3d at 332.

To avoid summary judgment on the income tax assessments, Alexander must now come forward with evidence disputing the validity of the tax assessments made against him. If he does

---

[1] As Government Exhibits A-F, the United States has attached Certificates of Assessment from the IRS concerning the defendant's tax liabilities for 1990 through 1995. Certificates of Assessment are self-authenticating under Fed. R. Evid. 902(1) and admissible under Fed. R. Evid. 803(10). *United States v. Bowers*, 920 F.2d 220, 223 (4th Cir. 1990). The certificates would also be admissible under Fed. R. Evid. 803(8).

[2] For examinations commenced after July 22, 1998, the United States bears the burden of proof "with respect to any item of income which was reconstructed by the [IRS] solely through the use of statistical information on unrelated taxpayers." 26 U.S.C. § 7491(b). *See also* P.L. 105-206, § 3001(a). Here though, the IRS's examination of Alexander had concluded before May 20, 1998, when the IRS mailed notices of deficiency to Alexander so he continues to bear the burden of proof. *See Tinsman v. Commissioner*, 12 Fed. Appx. 431, 432 n. 2 (8th Cir. 2001).

not produce any countervailing evidence that the assessments are incorrect, then the trial court is "required . . . to enter a summary judgment for the amount of taxes to be due." *Lane v. United States*, 328 F.2d 602, 603 (5th Cir. 1964). Alexander has only asserted that he filed for Chapter 7 bankruptcy in 1991 and that his mother supported him during the years in question. Alexander has been unable to produce any evidence, other than his self-serving assertions however, that the income tax assessments are erroneous. While the Government does not dispute that Alexander filed for bankruptcy, filing for bankruptcy does not in and of itself prove that he did not have income or was not required to pay taxes. *See In re John Howard Alexander (formerly known as Howard Ira Small)*, Bankr. No. 91-06201 (Bankr. S.D. Cal.). Alexander has failed to provide any evidence to rebut the United States' income tax assessments and judgment should be entered against him.

### C.  The Court should order the foreclosure of federal tax liens encumbering Alexander's property and interests in property, including the subject property.

#### 1.  The federal tax liens encumbering Alexander's property and interests in property should be foreclosed.

Because valid statutory liens pursuant to 26 U.S.C. § 6321 exist against Alexander, the Court should also foreclose tax liens encumbering his property and interests in property, including specifically, the subject real property located in Greenville County, South Carolina. A lien on the taxpayer's property and rights to property arises in the United States' favor when the taxpayer is liable for federal taxes and refuses to pay that obligation after demand is made. 26 U.S.C. § 6321. Federal tax liens arise at the time of assessment and continue until the liabilities are satisfied or become unenforceable. 26 U.S.C. § 6322. A tax lien is perfected upon assessment and no further action by the IRS is required. *United States v. Vermont*, 377 U.S. 351, 352 (1964). Thus, on November 16, 1998; November 23, 1998; June 25, 2007, and; July 30,

2007, the dates of the assessments listed in the Certificates of Assessments and Payments, federal tax liens arose and attached to all of Alexander's property and rights to property under 26 U.S.C. §§ 6321 and 6322.

While 26 U.S.C. § 7403(c) permits the Court limited discretion in deciding whether to order a judicial lien foreclosure, the Supreme Court has stated that "we can think of virtually no circumstances, for example, in which it would be permissible to refuse to authorize a sale simply to protect the interests of the delinquent taxpayer himself or herself." *United States v. Rodgers*, 461 U.S. 677, 709 (1983). As explained below, Alexander owns the subject property and no other individuals have an interest in the property so the Court need not consider whether to exercise its discretion under 26 U.S.C. § 7403(c). Therefore, the Court should order the sale of the properties to satisfy (or to partially satisfy) Alexander's tax liabilities.

> 2.  Under South Carolina and federal law, Alexander has an interest in the subject property because he is the true owner of the subject property though it is nominally owned by the Alexander Family Trust.

The United States has identified the subject real property in Greenville, South Carolina, as actually being owned by Alexander although it is nominally owned by the Alexander Family Trust, which Alexander serves as sole trustee. The United States seeks to enforce a nominee lien against Alexander. Section 6321 includes not only any property owned by the delinquent taxpayer but also any property held by a third party if the Court determines that the third party is holding the property as a nominee or alter ego of the delinquent taxpayer. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977). To make that determination, the Court must look to South Carolina law first to determine if Alexander has rights to the subject real property; if he possesses such rights, then federal law dictates whether it qualifies as property for purposes of the federal tax lien under 26 U.S.C. § 6321. *Drye v. United States*, 528 U.S. 49, 58 (1999).

South Carolina law recognizes a "resulting trust" in which a party (the Alexander Family Trust) holds legal title in trust for the true beneficial owner (Alexander). A "resulting trust" arises when the intent behind the disposition or other facts and circumstances create an inference that the beneficial interest does not run with the legal title. *Bowen v. Bowen*, 575 S.E.2d 553, 556 (S.C. 2003); *see also* Restatement (Third) of Trusts § 7, cmt. a.[3] When real estate is conveyed to one person and the consideration paid by another, a presumption arises that the persons who pay the purchase money intended a benefit to himself or herself. *Id.* Alexander's mother paid the initial down payment on the subject property in 1994 but Alexander, not his mother, moved onto the property then (his mother never formally lived on the property). The property was titled in Alexander's mother's name and she assumed the mortgage on the property. Thereafter however, Alexander and his mother would both make payments on the mortgage so both paid the consideration on the property.

In 2001 or 2002, Alexander and his mother decided to transfer her titled interest in the property to the Alexander Family Trust (using one of the templates distributed by the Freedom Trust Group) with Alexander as the sole trustee. Although Alexander and his mother purported to give legal title to the Alexander Family Trust, the beneficial interest in the property never changed. Alexander continued to reside on the property, made improvements to the property, and operated his businesses from there. Because both Alexander and his mother paid the

---

[3] Comment a to the Restatement (Third) of Trusts § 7 states in part: "A resulting trust arises when a person (the 'transferor') makes or causes to be made a disposition of property under circumstances (i) in which some or all of the transferor's beneficial interest is not effectively transferred to others (and yet not *expressly* retained by the transferor) and (ii) which raise an unrebutted presumption that the transferor does not intend the one who receives the property (the 'transferee') to have the remaining beneficial interest."

consideration on the property, a presumption should arise that a resulting trust formed in both of them.

*Campbell v. Campbell*, 386 S.E. 2d 305 (S.C. App. 1989) is illustrative of why a resulting trust arises. David Campbell acquired property in Aiken County with the help of his nephew William; the parties intended to give David a place to live. *Id.* at 305. David and William each gave $1,000 as a down payment and William arranged a loan for the remainder of the purchase price because David could not get one. *Id.* at 306. William signed a mortgage to secure the loan. *Id.* at 305. David made the majority of the mortgage payments and insurance premiums on the property although William also made some until they satisfied the mortgage. *Id.* at 306. After purchasing the property, David signed a deed giving him a life estate in the property with a remainder interest to William. *Id.* at 305. Despite the deed purporting to give David only a life estate, the trial judge concluded that David had proven a resulting trust and gave him the right to purchase William's interest in the property. *Id.* at 306. The South Carolina Court of Appeals held that a resulting trust arose to David because the parties agreed at the time of purchase that David had obligated himself to William to pay for the property, equating the situation to a loan from William to David. *Id.* William though maintained a security in the property because he had contributed 20 percent of the purchase price, obligating David to repay that portion. *Id.*

The situation in *Campbell* is similar to the situation in this case. Alexander's mother made the initial payment on the property on Alexander's behalf in 1994. As Alexander was able to get the money to make the mortgage payments, he did so; when he could not, his mother did. Alexander and his mother in time satisfied the mortgage. Under the analysis in *Campbell*, both would have had a claim on the property against each other to the extent that he or she contributed to the purchase price (although Alexander's interest in the property may have

increased because he made improvements to the property, including adding a deck, a pool and a fence). Thus, his mother's purported transfer of the property in 2001 or 2002 to the Alexander Family Trust does not defeat a finding that Alexander had an equitable interest in the property.

Moreover, even though Alexander and his mother purportedly transferred her title of the property to the Alexander Family Trust in 2001 or 2002, Alexander and Getz continued to act as the true owners of the property. Although they purportedly transferred the property to the Alexander Family Trust on the same day, Alexander's mother executed a mortgage in favor of John-Howard Alexander to secure the improvements made on the property on October 16, 2003. The Alexander Family Trust was not a party to the mortgage. Before his mother died in 2006, Alexander filed a satisfaction of that mortgage. If she had transferred the property to the trust as Alexander claims, then she had no interest in the property to mortgage later. After his mother's death, Alexander has continued to pay the property taxes on the property – not the Alexander Family Trust. The intent behind the transfer of the property to the Alexander Family Trust was to frustrate any collection efforts even though the beneficial title has remained with Alexander and/or his mother since 1994. Thus, the Court should impose a resulting trust in favor of Alexander and find that he has rights to the property under South Carolina law.

South Carolina also recognizes constructive trusts. A constructive trust "arises whenever the circumstances under which property was acquired make it inequitable that it should be retained by the one holding the legal title." *Lollis v Lollis*, 354 S.E.2d 559, 561 (S.C. 1987). Constructive trusts arise from "fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution." *Id.* Fraud is an "essential element" of a constructive trust though it need not be actual fraud. *Id.* The evidence supporting a finding of a constructive trust "must be clear, definite, and unequivocal." *Id.* Here, as so many

taxpayers have done in creating family trusts, the parties created the Alexander Family Trust to frustrate efforts of creditors to attach to the property. The parties continued to treat the property as though they owned it. The Alexander Family Trust was nothing more than a legal fiction to place the property. Alexander set himself up as the sole trustee of the property with the intention of retaining beneficial interest in the property but keep it out of the supposed reach of creditors, including the IRS. Thus, he also has a property interest as recognized under South Carolina law under a theory of constructive trust.

Because Alexander possesses rights to the subject property under state law, federal law dictates whether the property is subject to the federal tax lien under 26 U.S.C. § 6321. *Drye*, 528 U.S. at 67. The IRS filed a nominee lien in Greenville County against Alexander as trustee of the Alexander Family Trust on May 20, 2008. The United States seeks to enforce that lien. In determining whether to enforce a nominee lien, the Sixth and Tenth Circuits have stated that:

> Many courts use six factors in evaluating nominee questions: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*Holman v. United States*, 505 F.3d 1060, 1065 n. 1 (10th Cir. 2007) (quoting *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005)); *see also Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000) ("nominee theory involves the determination of the true beneficial ownership of the property"; quoting William D. Elliot, Federal Tax Collections, Liens and Levies, ¶ 9.10[2] (2d Ed. 2000)). Although not all of the factors apply here, the factors present weigh in favor of enforcement. The Alexander Family Trust paid minimal consideration to acquire legal title to the property. Alexander's mother transferred the property and recorded that

conveyance but she conveyed the property to a trust whose sole trustee was her son; thus, a close relationship between transferor and nominee existed.  No change in the actual possession of the property occurred.  Alexander continued to reside at the property both before and after the transfer.  Getz and later Alexander continued to enjoy the benefits of the transferred property.  Because the Alexander Family Trust is the nominee of John Howard Alexander, the property should be subject to the federal tax lien under 26 U.S.C. § 6321.

      *D.  Alexander may not seek declaratory relief against the United States concerning his tax liabilities.*

Alexander seeks a declaratory judgment that "there is no legal basis for the Secretary of the Treasury to assess any tax assessments against [Alexander] for unpaid federal income taxes nor is there any basis for the [Government] to seek any penalties against him."  (Doc. # 8, ¶ 16).  Alexander is unclear what relief he seeks through this counterclaim.  The present lawsuit will resolve whether Alexander owes the taxes and penalties at issue.  If Alexander is seeking a declaratory judgment for other penalty conduct or taxes not at issue in this lawsuit, then the Declaratory Judgment Act, 28 U.S.C. § 2201, bars the Court from granting relief because it excepts most federal tax disputes.  *See also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583-84 (4th Cir. 1996).  Thus, insofar as Alexander is claiming that the United States does not have a legal basis to ever again assess <u>any</u> taxes or penalties against him, the tax exception to the Declaratory Judgment Act applies.  Summary judgment should be granted in favor of the United States on Alexander's counterclaim.

**V.  Conclusion**

For the foregoing reasons, the Court should enter summary judgment in favor of the United States and against the defendant, John Howard Alexander.  Specifically, the Court should

enter judgment in favor of the United States and against Alexander for the amounts of both the

Section 6700 and the income tax assessments, plus interest and penalties accruing pursuant to

law.  As a result of the assessments, the United States has valid tax liens attaching to

Alexander's interest in the subject real property located in Greenville County, South Carolina,

and therefore, the Court should foreclose upon that property and enter an order of sale enforcing

this judgment.

       Dated: September 25, 2009.

                        Respectfully submitted,

                        W. WALTER WILKINS III
                        United States Attorney

_____

 GEORGE J. CONITS
Assistant United States Attorney
District Bar No. 234
District of South Carolina
P.O. Box 10067
Greenville, SC  29603
Telephone: (864) 282-2116
Email: george.conits@usdoj.gov

JAMES C. STRONG
U.S. Department of Justice, Tax Division
P.O. Box 7238, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 514-9953
Facsimile: (202) 514-6770
Email: james.c.strong@usdoj.gov

Attorneys for Plaintiff, United States

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that the foregoing **MEMORANDUM OF LAW IN SUPPORT OF UNITED STATES' MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court electronically today, **September 25, 2009,** such that a service copy was sent by way of the electronic filing system to the plaintiff and all counsel who have arranged for electronic service of filings.

_____
GEORGE J. CONITS
Assistant United States Attorney
District Bar No. 234
District of South Carolina
P.O. Box 10067
Greenville, SC  29603
Telephone: (864) 282-2116
Email: george.conits@usdoj.gov