IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 6:08-cv-03760-GRA |
| | ) | |
| JOHN HOWARD ALEXANDER, a/k/a | ) | |
| HOWARD IRA SMALL, INDIVIDUALLY | ) | |
| and AS TRUSTEE OF THE ALEXANDER | ) | |
| FAMILY TRUST | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JAMES C. STRONG**

1. I am a trial attorney with the Tax Division at the Department of Justice, representing the United States in this action. I was admitted *pro hac vice* to this Court on November 21, 2008. (Doc. # 6).

2. Attached to this Declaration is a true and correct copy of the deposition transcript of John Howard Alexander, taken on July 27, 2009.

3. Attached to this Declaration is a true and correct copy of the deposition transcript of Heather Ferguson, taken on July 27, 2009.

4. Attached to this Declaration as Exhibit 2 is a true and correct copy of a document entitled Mortgage of Real Estate, filed on October 16, 2003 in Greenville County, South Carolina.

5. Attached to this Declaration as Exhibit 3 is a true and correct copy of a document entitled Mortgage of Real Estate, filed on July 27, 2006 in Greenville County, South Carolina.

6. Attached to this Declaration as Exhibit 4 is a true and correct copy of a document entitled Title to Real Estate, filed on October 16, 2003 in Greenville County, South Carolina.

7. Attached to this Declaration as Exhibit 5 is a true and correct copy of a document entitled "Your Privacy and Asset Accumulation Guide – by FTG Version 10/00." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 15.

8. Attached to this Declaration as Exhibit 6 is a true and correct copy of a separate document entitled "Your Privacy and Asset Accumulation Guide – by FTG Version 10/00." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 16.

9. Attached to this Declaration as Exhibit 7 is a true and correct copy of a document entitled "Family Trust." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 17.

10. Attached to this Declaration as Exhibit 8 is a true and correct copy of a document entitled "Management Trust." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 18.

11. Attached to this Declaration as Exhibit 9 is a true and correct copy of a document entitled "Banking Trusts." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 20.

12. Attached to this Declaration as Exhibit 10 is a true and correct copy of a document entitled "Holding Trusts." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 19.

13.  Attached to this Declaration as Exhibit 11 is a true and correct copy of a document that is a Table of Contents for "Aware Management Administrative Trusts." The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 22.

14.  Attached to this Declaration as Exhibit 12 is a true and correct copy of a newsletter entitled "Aware American" and dated September 1996.  The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 23.

15.  Attached to this Declaration as Exhibit 13 is a true and correct copy of a document entitled "The Aware Group's Referral Program."  The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 8.

16.  Attached to this Declaration as Exhibit 14 is a true and correct copy of a document entitled "Getting Started."  The document was attached to the deposition of John Howard Alexander as Plaintiff's Deposition Exhibit 13.

17.  Attached to this Declaration as Exhibits A-F are true and correct copies of IRS Forms 4340, Certificate of Assessments reflecting the assessments made against John Howard Alexander for unpaid income taxes for Tax Years 1990-1995.

18.  Attached to this Declaration as Exhibits G-K are true and correct copies of IRS Forms 4340, Certificate of Assessments reflecting the assessments made against John Howard Alexander for civil penalties under 26 U.S.C. § 6700 for Tax Years 2000-2004.

19.  Attached to this Declaration as Exhibit L is a true and correct copy of a Notice of Deficiency issued to John Howard Alexander on May 20, 1998.

20. Attached to this Declaration as Exhibit M is a true and correct copy of a Notice of Federal Tax Lien filed in Greenville County, South Carolina on February 17, 2005.

21. Attached to this Declaration as Exhibit N is a true and correct copy of an Amended Notice of Federal Tax Lien filed in Greenville County, South Carolina on June 4, 2008.

22. Attached to this Declaration as Exhibit O is a true and correct copy of a Notice of Federal Tax Lien filed in Greenville County, South Carolina on October 1, 2007.

23. Attached to this Declaration as Exhibit P is a true and correct copy of a Notice of Federal Tax Lien filed in Greenville County, South Carolina on October 22, 2007.

24. Attached to this Declaration as Exhibit Q is a true and correct copy of a Notice of Federal Tax Lien filed in Greenville County, South Carolina on May 20, 2008.

25. Attached to this Declaration is a true and correct copy of the Court's unpublished opinion in *Noske v. United States*, 1993 WL 78311 (D. Minn. Jan. 14, 1993).

26. Attached to this Declaration is a true and correct copy of the Court's unpublished opinion in *United States v. Kahn*, 2004 WL 1089116 (M.D. Fla. Mar. 30, 2004).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 25, 2009.

JAMES C. STRONG

John Howard Alexander                    July 27, 2009

                    IN THE UNITED STATES DISTRICT COURT
                        DISTRICT OF SOUTH CAROLINA
                        C.A. NO. 6:08-CV-3760


        UNITED STATES OF AMERICA,

                PLAINTIFF,

                    VERSUS

        JOHN HOWARD ALEXANDER,

                DEFENDANT.


                    DEPOSITION OF JOHN HOWARD ALEXANDER

                PURSUANT TO NOTICE AND/OR AGREEMENT, THE

        DEPOSITION OF JOHN HOWARD ALEXANDER WAS CALLED BY THE

        PLAINTIFF ON THE 27TH DAY OF JULY, 2009, COMMENCING AT

        THE HOUR OF 12:54 P.M., AT THE OFFICE OF THE UNITED

        STATES ATTORNEY, 105 NORTH SPRING STREET, GREENVILLE,

        SOUTH CAROLINA, ATTENDED BY COUNSEL AS FOLLOWS:


                        JILL BISHOP EDWARDS

                        VERBATIM REPORTER

John Howard Alexander                    July 27, 2009

---

### Page 2

```
 1
 2
 3
 4
 5
 6                    APPEARANCES
 7
 8
 9
10      JAMES C. STRONG, ESQUIRE, OF THE
11      UNITED STATES DEPARTMENT OF JUSTICE
12      POST OFFICE BOX 7238
13      BEN FRANKLIN STATION
14      WASHINGTON, DISTRICT OF COLUMBIA  20044
15      james.c.strong@usdoj.gov
16
17          ATTORNEY FOR THE PLAINTIFF,
18
19
20      BRADLEY BENNETT, ESQUIRE, OF THE FIRM
21      SALVINI AND BENNETT
22      101 WEST PARK STREET
23      GREENVILLE, SOUTH CAROLINA  29601
24
25          ATTORNEY FOR THE DEFENDANT.
```

### Page 4

```
 1      PLAINTIFF'S EXHIBIT NUMBER 16, MARKED,
        YOUR PRIVACY AND ASSET ACCUMULATION GUIDE,
 2      ATTACHED................................. 77
 3      PLAINTIFF'S EXHIBIT NUMBER 17, MARKED,
        DOCUMENT, ATTACHED....................... 81
 4
        PLAINTIFF'S EXHIBIT NUMBER 18, MARKED,
 5      MANAGEMENT TRUSTS, ATTACHED............... 82
 6      PLAINTIFF'S EXHIBIT NUMBER 19, MARKED,
        HOLDING TRUSTS, ATTACHED................. 82
 7
        PLAINTIFF'S EXHIBIT NUMBER 20, MARKED,
 8      BANKING TRUSTS, ATTACHED................. 82
 9      PLAINTIFF'S EXHIBIT NUMBER 21, MARKED,
        OFFSHORE TRUSTS, ATTACHED................ 82
10
        PLAINTIFF'S EXHIBIT NUMBER 22, MARKED,
11      PURE TRUST INFORMATION, ATTACHED......... 84
12      PLAINTIFF'S EXHIBIT NUMBER 23, MARKED,
        NEWSLETTER, ATTACHED..................... 89
13
        PLAINTIFF'S EXHIBIT NUMBER 24, MARKED,
14      NEWSLETTER, ATTACHED..................... 90
15      PLAINTIFF'S EXHIBIT NUMBER 25, MARKED,
        NEWSLETTER, ATTACHED..................... 91
16
        PLAINTIFF'S EXHIBIT NUMBER 26, MARKED,
17      CHECKS AND BANK STATEMENTS, ATTACHED...... 93
18
19      OBJECTIONS:
20          BY MR. BENNETT.....................76,101,101
21
22
23
24
25
```

### Page 3

```
 1                 I N D E X
 2
                                          PAGE
 3
        NON-WAIVER AND STIPULATIONS............... 5
 4
        EXAMINATION BY MR. STRONG................. 5
 5
        CERTIFICATE OF NOTARY PUBLIC............. 105
 6
 7      EXHIBITS:
        PLAINTIFF'S EXHIBIT NUMBER THREE, MARKED,
 8      MORTGAGE, ATTACHED...................... 11
 9      PLAINTIFF'S EXHIBIT NUMBER FOUR, MARKED,
        MORTGAGE, ATTACHED...................... 14
10
        PLAINTIFF'S EXHIBIT NUMBER FIVE, MARKED,
11      APPRAISAL, ATTACHED..................... 16
12      PLAINTIFF'S EXHIBIT NUMBER SIX, MARKED,
        LETTER, ATTACHED........................ 17
13
        PLAINTIFF'S EXHIBIT NUMBER SEVEN, MARKED,
14      CHECKS AND BANK STATEMENTS, ATTACHED...... 21
15      PLAINTIFF'S EXHIBIT NUMBER EIGHT, MARKED,
        FREEDOM FILES, ATTACHED................. 36
16
        PLAINTIFF'S EXHIBIT NUMBER NINE, MARKED,
17      NEWSLETTER, ATTACHED.................... 48
18      PLAINTIFF'S EXHIBIT NUMBER TEN, MARKED,
        DO YOU OWN YOUR LAND?, ATTACHED......... 59
19
        PLAINTIFF'S EXHIBIT NUMBER 11, MARKED,
20      STEPS TO SECURE A LAND PATENT CLAIM,
        ATTACHED................................ 61
21
        PLAINTIFF'S EXHIBIT NUMBER 12, MARKED,
22      LAND PATENTS, EJECTMENTS AND ESTOPPEL,
        ATTACHED................................ 65
23
        PLAINTIFF'S EXHIBIT NUMBER 13, MARKED,
24      GETTING STARTED, ATTACHED............... 67
25      PLAINTIFF'S EXHIBIT NUMBER 14, MARKED,
        FORMS AND TEMPLATES, ATTACHED........... 67
26
        PLAINTIFF'S EXHIBIT NUMBER 15, MARKED,
27      BENEFITS OF A PURE TRUST, ATTACHED....... 74
```

### Page 5

```
 1          PURSUANT TO NOTICE AND/OR AGREEMENT TO TAKE
 2      DEPOSITIONS, THE WITHIN VIDEOTAPED DEPOSITION WAS
 3      TAKEN BY THE ABOVE-NAMED COURT REPORTER, A NOTARY
 4      PUBLIC FOR THE STATE OF SOUTH CAROLINA, BY CONSENT
 5      OF ALL PARTIES AT THE OFFICE OF THE UNITED STATES
 6      ATTORNEY, GREENVILLE, SOUTH CAROLINA.
 7          * * * *   * * * *   * * * *
 8      STIPULATIONS:
 9          IT IS AGREED BY AND BETWEEN COUNSEL FOR THE PARTIES
10      AS FOLLOWS:
11          1.  THE DEPOSITION IS BEING TAKEN PURSUANT TO THE
12              FEDERAL RULES OF CIVIL PROCEDURE.
13          2.  THE READING AND SIGNING OF THE DEPOSITION
14              TRANSCRIPT ARE RESERVED BY THE WITNESS AND THE
15              PARTIES.
16          * * * *   * * * *   * * * *
17          THE WITNESS WAS DULY SWORN TO TELL THE TRUTH, THE
18      WHOLE TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE
19      MATTER HEREIN:
20          * * * *   * * * *   * * * *
21              JOHN HOWARD ALEXANDER,
22      BEING FIRST DULY SWORN, TESTIFIED ON HIS OATH AS
23      FOLLOWS:EXAMINATION BY MR. STRONG:
24      Q.  GOOD MORNING, MR. ALEXANDER.
25      A.  GOOD MORNING.  GOOD AFTERNOON.
```

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

Page 6

1  Q. GOOD AFTERNOON. I APOLOGIZE. WE'RE HERE TODAY ON
2     NOTICE TO TAKE THE DEPOSITION, TO TAKE YOUR
3     DEPOSITION TODAY IN THE CASE STYLED U.S.A. VERSUS
4     ALEXANDER IN THE U.S. DISTRICT COURT FOR THE
5     DISTRICT OF SOUTH CAROLINA. IN THE ROOM TODAY, WE
6     HAVE YOUR ATTORNEY, MR. BENNETT; YOURSELF; THE COURT
7     REPORTER; AND ME, JAMES STRONG. HAVE YOU EVER HAD
8     YOUR DEPOSITION TAKEN BEFORE, MR. ALEXANDER?
9  A. NO.
10 Q. OKAY. WELL, LET ME EXPLAIN A LITTLE BIT ABOUT
11    WHAT'S GOING TO HAPPEN. I'M GOING TO ASK YOU SOME
12    QUESTIONS AND YOU'LL ANSWER. IF AT ANY TIME I'M NOT
13    MAKING MYSELF CLEAR OR IF YOU'RE CONFUSED BY WHAT I
14    SAY, OR YOU KNOW, IF YOU NEED ME TO EXPLAIN
15    SOMETHING, PLEASE ASK ME TO CLARIFY. DO YOU
16    UNDERSTAND?
17 A. YES.
18 Q. IF YOU NEED AT ANY TIME TO TAKE A BREAK OR YOU NEED
19    TO USE THE REST ROOM, YOU KNOW, OR GET A GLASS OF
20    WATER, JUST LET ME KNOW. DO YOU UNDERSTAND?
21 A. OKAY.
22 Q. ALSO, REMEMBER TO GIVE YOUR ANSWERS OUT VERBALLY.
23    THE COURT REPORTER CAN'T UNDERSTAND HEAD SHAKES AND
24    HEAD NODS AND SO FORTH. SO, WE'VE GOT TO REMEMBER
25    TO SAY YES AND NO.

Page 7

1  A. OKAY.
2  Q. OKAY. MR. ALEXANDER, WHEN DID YOU FIRST MOVE TO
3     SOUTH CAROLINA?
4  A. I THINK IT WAS IN '91 OR '92, SOMETHING LIKE THAT.
5  Q. AND HAVE YOU ALWAYS LIVED IN GREENVILLE SINCE YOU
6     MOVED TO SOUTH CAROLINA?
7  A. NO.
8  Q. WHERE ELSE HAVE YOU LIVED?
9  A. I WENT BACK TO CALIFORNIA FOR A YEAR.
10 Q. WHEN WAS THAT?
11 A. IT WAS EITHER '92 OR '93. IT'S ---
12 Q. OKAY. WELL, WHY DON'T WE JUST START AND LET'S MAYBE
13    WORK OUR WAY FORWARD AND TRY TO SET UP A TIMELINE
14    HERE. IN '91, YOU MOVED TO SOUTH CAROLINA?
15 A. '91 OR '92. I'M NOT SURE EXACTLY WHAT THE TIME WAS.
16 Q. AND YOU MOVED TO GREENVILLE?
17 A. TO GREENVILLE, YES.
18 Q. OKAY. AND THEN, IN '92 OR '93, YOU MOVED BACK TO
19    CALIFORNIA FOR A SPELL?
20 A. ONE YEAR.
21 Q. AND THEN, AFTER THAT YEAR, WHERE DID YOU MOVE THEN?
22 A. BACK TO GREENVILLE.
23 Q. AND HAVE YOU BEEN IN GREENVILLE SINCE THEN?
24 A. YES.
25 Q. WHERE HAVE YOU -- WHERE HAVE YOU LIVED IN

Page 8

1     GREENVILLE?
2  A. WHEN?
3  Q. WELL, LET'S START WITH THE PRESENT. WHERE DO YOU
4     LIVE NOW?
5  A. AT 6350 WHITE HORSE ROAD.
6  Q. WHEN DID YOU MOVE TO 6350 WHITE HORSE ROAD?
7  A. I THINK IT WAS LATE 1994.
8  Q. DID YOU RENT THE PROPERTY, PURCHASE THE PROPERTY,
9     THE 6350 WHITE HORSE ROAD?
10 A. MY MOTHER PURCHASED THE PROPERTY.
11 Q. OKAY. BEFORE 1994, WHERE WERE YOU LIVING?
12 A. I HAD AN APARTMENT IN CALIFORNIA.
13 Q. AND IN '91, '92, WHEN YOU WERE HERE IN GREENVILLE?
14 A. I HAD AN APARTMENT IN GREENVILLE.
15 Q. I'D LIKE TO ASK YOU A LITTLE BIT ABOUT 6350 WHITE
16    HORSE ROAD. YOU SAID YOUR MOTHER PURCHASED THE
17    PROPERTY. WHEN WAS THAT?
18 A. IT WAS, I THINK, IN '94.
19 Q. AND YOU MOVED IN -- BUT YOU MOVED INTO THE HOUSE?
20 A. RIGHT.
21 Q. DID YOUR MOM MOVE IN WITH YOU?
22 A. NO, MY MOM HAD A HOUSE, HER OWN HOUSE.
23 Q. AND WHEN YOU SAY SHE PURCHASED THE HOUSE, WHAT DO
24    YOU MEAN BY THAT?
25 A. SHE BOUGHT THE HOUSE.

Page 9

1  Q. DID SHE BUY THE HOUSE IN FULL OR DID SHE TAKE OUT A
2     MORTGAGE?
3  A. SHE BOUGHT THE HOUSE FROM A GENTLEMAN THAT HAD A
4     MORTGAGE ON IT, AND SHE JUST PAID HIM A CERTAIN
5     AMOUNT OF MONEY AND TOOK OVER THE MORTGAGE.
6  Q. OKAY. AND THEN, WHO PAID THE MORTGAGE FROM THERE
7     ON?
8  A. IF I HAD THE MONEY TO GIVE TO MY MOTHER TO PAY, I
9     WOULD, OR SHE WOULD PAY IT. ONE OR THE OTHER.
10 Q. SO, YOU MADE SOME MORTGAGE PAYMENTS DURING THIS
11    TIME?
12 A. WELL, I PAID HER. SHE PRETTY MUCH TOOK CARE OF THE
13    MORTGAGE.
14 Q. BUT SOME OF THE FUNDS THAT ARE BEING USED TO PAY THE
15    MORTGAGE WERE BEING SUPPLIED BY YOU DURING THIS
16    TIME?
17 A. SOMETIMES. IF I HAD IT.
18 Q. OKAY. DOES YOUR MOTHER STILL OWN THE PROPERTY?
19 A. NO.
20 Q. WHO OWNS IT?
21 A. IT'S OWNED BY THE ALEXANDER FAMILY TRUST.
22 Q. AND WHAT IS THE ALEXANDER FAMILY TRUST?
23 A. IT'S A FAMILY TRUST THAT WAS ESTABLISHED WITH MY
24    MOTHER AS THE SETTLER AND ESTABLISHED WITH ME AS THE
25    TRUSTEE TO TAKE CARE OF THE ASSETS IN THE TRUST.

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

---

**Page 10**

1 Q. AND WHEN WAS THIS ESTABLISHED?
2 A. THERE'S TOO MANY NUMBERS HERE. APPROXIMATELY 2002
3    OR 2001, SOMEWHERE IN THERE.
4 Q. AND WHO CREATED IT?
5 A. WHO CREATED ---
6 Q. WHO DRAFTED THE PAPERS?
7 A. MY THEN WIFE HEATHER.
8 Q. AND WHERE -- ARE THERE ANY TRUST DOCUMENTS EXISTING
9    TO THIS DAY, SHOWING THE ESTABLISHMENT OF THE TRUST?
10 A. YES.
11 Q. AND WHO HAS THOSE?
12 A. I HAVE THE ORIGINAL COPY.
13 Q. I'M SORRY.
14 BY MR. BENNETT:
15    WE'LL GET IT TO YOU.
16 BY MR. STRONG:
17    OKAY.
18 EXAMINATION RESUMED BY MR. STRONG:
19 Q. I HAVEN'T SEEN IT. THAT'S WHY I'M ASKING. DID YOU
20    GET ANY HELP IN CREATING THE TRUST, OTHER THAN FROM
21    HEATHER?
22 A. HOW DO YOU MEAN THAT?
23 Q. DID A LAWYER REVIEW IT?
24 A. NO, IT WAS A PRIVATE PARTY CONTRACT. MY MOTHER --
25    MY MOTHER REVIEWED IT. I REVIEWED IT. HEATHER

---

**Page 11**

1    REVIEWED IT.
2 Q. IS IT SIMILAR TO THE TRUSTS THAT YOU ARE SELLING
3    THROUGH THE FREEDOM TRUST GROUP?
4 A. IT WAS TAKEN OFF THE TEMPLATE, YES.
5 Q. OKAY. WHY DID YOU CREATE THE ALEXANDER FAMILY
6    TRUST?
7 A. IT WAS MY MOTHER'S AND MY IDEA. WE MUTUALLY CAME TO
8    AGREEMENT THAT THAT NEEDED TO BE DONE.
9 Q. WHY?
10 A. I CAN'T SAY THE EXACT REASONS WHY. I DON'T RECALL.
11    SHE WAS LOOKING FOR PROTECTION.
12 Q. PROTECTION FROM WHAT?
13 A. SHE WAS GETTING OLD.
14 Q. AND WHY DO YOU KEEP IT IN THE, THE PROPERTY IN THE
15    TITLE OF THE ALEXANDER FAMILY TRUST?
16 A. BECAUSE THAT WAS MY MOTHER'S WISHES.
17 Q. SHE'S PASSED AWAY. IS THAT CORRECT?
18 A. YES.
19 Q. WHEN WAS THAT, ABOUT?
20 A. THAT WAS SEPTEMBER 7, 2006.
21 Q. I'M GOING TO HAND YOU WHAT I WILL ASK THE COURT
22    REPORTER TO MARK AS PLAINTIFF'S EXHIBIT THREE.
23 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER THREE,
24 MORTGAGE, ATTACHED.)
25 EXAMINATION RESUMED BY MR. STRONG:

---

**Page 12**

1 Q. AND PLEASE LET THE RECORD REFLECT I'M ALSO HANDING A
2    COPY TO MR. BENNETT.
3 BY MR. BENNETT:
4    THANK YOU.
5 EXAMINATION RESUMED BY MR. STRONG:
6 Q. TAKE A MOMENT AND REVIEW THAT DOCUMENT, AND WHEN
7    YOU'RE READY, LET ME KNOW.
8 A. IS THIS FOR ME TO KEEP?
9 Q. IT WILL BE GIVEN BACK TO THE COURT REPORTER.
10 A. OH.
11 Q. BUT YOUR ATTORNEY HAS A COPY NOW.
12 A. OH, OKAY.
13 Q. DO YOU RECOGNIZE THIS DOCUMENT?
14 A. YES.
15 Q. WHAT IS IT?
16 A. IT'S A MORTGAGE.
17 Q. FROM WHOM TO WHOM?
18 A. I DON'T KNOW WHICH WAY IT TURNS, BUT IT SHOWS THAT
19    THE MORTGAGE IS IN FAVOR OF ME.
20 Q. OKAY. SO, HELP ME UNDERSTAND WHAT -- AND I'M SORRY.
21    THIS IS FROM 2003. IS THAT CORRECT?
22 A. YES.
23 Q. OKAY. SO, BACK IN 2003, YOUR MOTHER TOOK OUT A
24    MORTGAGE ON THE PROPERTY TO YOU?
25 A. SHE DIDN'T TAKE OUT A MORTGAGE. SHE AGREED TO ALLOW

---

**Page 13**

1    ME TO PUT THE MORTGAGE ON IT.
2 Q. OKAY. BUT SO, FROM THAT TIME FORWARD, SHE WAS
3    PAYING YOU A MONTHLY MORTGAGE ON THE PROPERTY?
4 A. NO.
5 Q. MAYBE I'M CONFUSED. SO, YOU ALLOWED HER -- SHE
6    ALLOWED YOU TO PUT A MORTGAGE ON THE PROPERTY, OR
7    SHE TOOK OUT A MORTGAGE ON THE PROPERTY, BUT SHE
8    WASN'T MAKING ANY PAYMENTS TO YOU?
9 A. THAT'S CORRECT.
10 Q. OKAY. WHY DID YOU -- WHY DID SHE TAKE OUT A -- WHY
11    DID YOU TAKE OUT A MORTGAGE ON THE -- OR WHY DID SHE
12    TAKE OUT A MORTGAGE ON THE PROPERTY?
13 A. IT'S NOT THAT SHE TOOK OUT A MORTGAGE ON THE
14    PROPERTY. TO BEST ANSWER YOUR QUESTION, HEATHER HAD
15    TABULATED HOW MUCH IMPROVEMENTS WE HAD DONE ON THE
16    PROPERTY AND WAS CONCERNED THAT IT WAS SECURED
17    SOMEHOW. AND I AGREED. MY MOTHER AGREED, AND THIS
18    IS A RESULT OF IT.
19 Q. OKAY. SO, WHAT DID YOU AND YOUR MOTHER INTEND TO DO
20    WITH THE MORTGAGE, THEN, IF SHE WASN'T GOING TO MAKE
21    PAYMENTS ON IT?
22 A. THERE WAS NO INTENT.
23 Q. SO, YOU WERE JUST IN THE BUSINESS OF PUTTING OUT A
24    DOCUMENT OUT THERE WITHOUT AN INTENT TO DO SO?
25 A. NO, IT WAS TO -- FROM HEATHER'S STANDPOINT, IT WAS

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                July 27, 2009

Page 14

1  TO PROTECT WHAT SHE FELT WAS WHAT WE HAD IMPROVED
2  THE PROPERTY ON FOR THE TIME THAT WE WERE THERE.
3  Q.  YOU'RE STILL THERE, IF I'M NOT MISTAKEN, CORRECT?
4  A.  YEAH.  THAT'S CORRECT.
5  Q.  WHAT KIND OF IMPROVEMENTS DID YOU MAKE ON THE
6  PROPERTY?
7  A.  FENCES, POOL, DECK, PAINT, WALLPAPER, I DON'T KNOW.
8  HEATHER HAD A LONG LIST OF WHATEVER IT WAS THAT SHE
9  PRESENTED TO ME.
10  Q.  I'LL HAND YOU WHAT I'M GOING TO MARK AS PLAINTIFF'S
11  EXHIBIT FOUR.
12  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER FOUR,
13  MORTGAGE, ATTACHED.)
14  EXAMINATION RESUMED BY MR. STRONG:
15  Q.  DID -- WELL, I'LL GIVE YOU A MINUTE AND WHEN YOU'RE
16  READY, LET ME KNOW.
17  A.  WHAT'S THE DATE ON THIS?  OKAY.
18  Q.  IS THAT YOUR SIGNATURE IN THE MIDDLE OF THE PAGE OF
19  PAGE ONE?
20  A.  MY ACTUAL SIGNATURE?  NO, IT'S A COPY OF MY
21  SIGNATURE.
22  Q.  AND IS IT DATED JULY 27, 2006?
23  A.  UH-HUH.
24  Q.  OKAY.
25  A.  ISN'T TODAY -- YES.

Page 15

1  Q.  IS THIS YOUR HANDWRITING WHERE IT SAID PAID THIS
2  JULY 27, 2006?
3  A.  YEAH, IT'S A RELEASE.
4  Q.  OKAY.
5  A.  I DON'T REMEMBER EVEN DOING THIS, BUT IT MAKES
6  SENSE.
7  Q.  OKAY.  SO, WHAT DOES THIS DOCUMENT SIGNIFY TO YOU?
8  A.  THAT THE MORTGAGE IS BEING RELEASED.
9  Q.  SO, AFTER THREE YEARS, THE MORTGAGE WAS RELEASED.
10  WHAT CHANGED THAT CAUSED IT TO BE RELEASED?
11  A.  DIDN'T SEE THE NEED FOR IT.
12  Q.  WELL, OKAY.  YOU SAW THE -- SOMEBODY SAW THE NEED
13  FOR IT IN 2003.  YOU DIDN'T SEE THE NEED FOR IT IN
14  2006.  WHAT CHANGED?
15  A.  JUST CHANGE OF MIND, CHANGE OF HEART.
16  Q.  BUT NO SIGNIFICANT EVENT CAUSED YOU TO RELEASE THE
17  ---
18  A.  NO, THE DATE DOESN'T MEAN ANYTHING.  JUST
19  COINCIDENTALLY, IT'S TODAY'S DATE.
20  Q.  WHAT CAUSED YOU TO RELEASE THE MORTGAGE ON THE
21  PROPERTY?
22  A.  UH-UH.
23  Q.  DID THE SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION
24  EVER TAKE AN INTEREST IN THE PROPERTY, IN 6350 WHITE
25  HORSE ROAD?

Page 16

1  A.  YES.
2  Q.  ABOUT WHEN?
3  A.  I CAN'T SAY FOR SURE WHAT THE DATE WAS.  I'M NOT
4  EVEN SURE WHAT THE YEAR WAS.  SOMEWHERE AFTER THE
5  TURN OF THE MILLENNIUM.
6  Q.  LET ME SHOW YOU NUMBER FIVE, AND MR. BENNETT IS ALSO
7  GETTING A COPY OF THIS.
8  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER FIVE,
9  APPRAISAL, ATTACHED.)
10  EXAMINATION RESUMED BY MR. STRONG:
11  Q.  DO YOU RECOGNIZE THIS DOCUMENT?
12  A.  I'VE SEEN IT, YES.
13  Q.  AND WHAT IS THIS DOCUMENT?
14  A.  I CAN'T BE SURE, BECAUSE IT HAS 108 ENCHANTED CIRCLE
15  ON HERE.
16  Q.  WHAT IS 108 ENCHANTED CIRCLE?
17  A.  THAT WAS MY, WHERE MY MOTHER LIVED.
18  Q.  THE FAX, THE BEGINNING FAX SHEET IS DATED IN 2001.
19  DOES THIS HELP YOUR MEMORY AS TO WHEN THE DEPARTMENT
20  OF TRANSPORTATION HAD AN INTEREST IN THE PROPERTY?
21  A.  IF THAT'S WHEN IT WAS, THAT'S WHEN IT WAS.  I'M A
22  LITTLE -- WAIT A MINUTE.  I DON'T KNOW IF THIS IS AN
23  APPRAISAL OR NOT OF MY MOTHER'S HOUSE ON ENCHANTED
24  CIRCLE OR THE ONE ON WHITE HORSE ROAD.  I'M NOT SURE
25  WHAT THIS IS.  OKAY.

Page 17

1  Q.  DID YOU EVER MEET WITH ANY OF THE REPRESENTATIVES
2  FROM THE DEPARTMENT OF TRANSPORTATION?
3  A.  I MET WITH THEM AND MY MOTHER, BOTH.
4  Q.  FOR WHAT PURPOSE?
5  A.  TO NEGOTIATE LAND THAT THEY WANTED TO TAKE.  IT WAS
6  NO NEGOTIATION.  IT WAS PRETTY CUT AND DRY.
7  Q.  BUT YOU WERE INVOLVED IN THESE NEGOTIATIONS?
8  A.  I WAS THERE TO HELP MY MOTHER.
9  Q.  I'LL HAND THESE COPIES TO YOU.
10  A.  DOES SHE NEED TO ---
11  Q.  SHE NEEDS TO, YEAH, MARK EXHIBIT SIX.
12  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER SIX,
13  LETTER, ATTACHED.)
14  EXAMINATION RESUMED BY MR. STRONG:
15  Q.  THIS IS PLAINTIFF'S EXHIBIT SIX.  I'VE ALSO PROVIDED
16  A COPY TO MR. BENNETT.  DO YOU RECALL RECEIVING THIS
17  LETTER?
18  A.  NO.
19  Q.  BUT IT IS ADDRESSED TO YOU?
20  A.  NO.
21  Q.  IT'S NOT ADDRESSED IN CARE OF YOU AT 2435 NORTH
22  STREET?
23  A.  IT'S ADDRESSED TO MIRIAM GETZ, 108 ENCHANTED CIRCLE,
24  CARE OF JOHN HOWARD ALEXANDER AT 2435 EAST NORTH
25  STREET.

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                            July 27, 2009

**Page 18**

1  Q.  OKAY.  THIS IS A LETTER FROM CRIDER AND ASSOCIATES
2     REGARDING THE VALUE OF THE PROPERTY ON YOUR HOUSE?
3  A.  UH-HUH.
4  Q.  SO, YOU WERE AT LEAST, AT LEAST THEY ADDRESSED
5     LETTERS TO YOU AS WELL AS YOUR MOTHER CONCERNING THE
6     VALUE OF THE PROPERTY OF THIS HOUSE?
7  A.  APPARENTLY SO.
8  Q.  OKAY.  AND YOU WERE LIVING AT 6350 WHITE HORSE ROAD
9     DURING THIS TIME?
10 A.  AT THE TIME, YES.
11 Q.  DURING THIS TIME, LET'S SAY FROM WHEN THE HOUSE WAS
12    PURCHASED IN 1994 UNTIL YOUR MOTHER'S PASSING AWAY,
13    WHO PAID THE UTILITIES ON THE PROPERTY?
14 A.  I PAID FOR MOST OF THE UTILITIES.
15 Q.  THE POWER BILL?
16 A.  YES.
17 Q.  WATER BILL?
18 A.  YES.
19 Q.  PHONE BILL?
20 A.  WHEN THERE WAS A PHONE.
21 Q.  PROPERTY TAXES?
22 A.  SOMETIMES.
23 Q.  DID YOU PAY THE PROPERTY TAXES -- AFTER YOUR
24    MOTHER'S PASSING AWAY, DO YOU PAY THE PROPERTY TAXES
25    NOW?

**Page 19**

1  A.  IF I NEED TO, YES.
2  Q.  WHAT DO YOU MEAN IF YOU NEED TO?
3  A.  IF THEY NEED TO BE PAID, THEY NEED TO BE PAID.
4     EITHER I PAY OR I MAKE OTHER ARRANGEMENTS.
5  Q.  WHAT OTHER ARRANGEMENTS MIGHT YOU MAKE?
6  A.  IF I CAN GET SOMEBODY ELSE TO PAY, IF I CAN GET YOU
7     TO PAY, I WOULD BE HAPPY TO HAVE YOU PAY THAT.
8  Q.  HAVE YOU BEEN SUCCESSFUL IN GETTING SOMEBODY OTHER
9     THAN YOURSELF TO PAY THE PROPERTY TAXES?
10 A.  NOT YET.
11 Q.  AND DO YOU PAY THE UTILITIES ON THAT, ON THE
12    PROPERTY NOW?
13 A.  CORRECT.
14 Q.  AND WHERE ARE THE -- WHERE DO YOU GET THE MONEY TO
15    PAY FOR THE PROPERTY TAXES AND THE UTILITIES?
16 A.  I HAD SOME.
17 Q.  SOME WHAT?
18 A.  I HAD SOME MONEY.
19 Q.  AND WHERE DID -- HOW DID YOU GET THIS MONEY?
20 A.  IT'S HARD TO SAY.
21 Q.  YOU DON'T KNOW WHERE YOU'RE GETTING YOUR MONEY?
22 A.  HOW DO I ANSWER?  SOMETIMES I'LL TALK WITH PEOPLE IN
23    EXCHANGE FOR MY TIME, MY SERVICE.
24 Q.  AND WHAT ARE YOU TALKING TO THESE PEOPLE ABOUT?
25 A.  DEPENDS ON THE PEOPLE, WHAT THEY WANT TO TALK ABOUT.

**Page 20**

1     WHAT I'M MOST KNOWN FOR IS TALKING ABOUT THE
2     ECONOMY.
3  Q.  AND WHAT WOULD YOU TELL THEM?  I MEAN, WHAT SERVICES
4     ARE YOU PROVIDING IN WHICH THEY ARE GIVING YOU MONEY
5     FOR?
6  A.  GIVING THEM INFORMATION.
7  Q.  INFORMATION ABOUT WHAT?
8  A.  THE ECONOMY, MONEY, HISTORY.
9  Q.  WELL, WHAT ABOUT THE ECONOMY?
10 A.  CAN YOU BE MORE SPECIFIC?
11 Q.  UNFORTUNATELY, NO.  I MEAN, YOU'RE TELLING ME YOU'RE
12    TALKING TO THEM ABOUT THE ECONOMY.  WHAT TOPICS
13    ABOUT THE ECONOMY ARE YOU TALKING TO THEM ABOUT?
14 A.  THE GENERAL CONDITION OF THE ECONOMY.
15 Q.  AND WHAT IS THE GENERAL CONDITION OF THE ECONOMY?  I
16    MEAN, WHAT SPECIFICALLY ARE YOU TALKING TO THEM
17    ABOUT?
18 A.  YOU MEAN LIKE NOW?
19 Q.  SURE.
20 A.  THE ECONOMY'S IN VERY BAD SHAPE.
21 Q.  OKAY.  BETWEEN 2000 AND 2005, WERE YOU ALSO TALKING
22    TO PEOPLE IN EXCHANGE FOR MONEY?
23 A.  I'VE BEEN WARNING PEOPLE FOR A LONG TIME ABOUT THE
24    ECONOMY, THAT WE WOULD GET WHERE WE ARE NOW.
25 Q.  OKAY.  THE ADDRESS THAT'S ON THERE, THIS 2435 EAST

**Page 21**

1     NORTH STREET, WHAT TYPE OF ADDRESS IS THAT?
2  A.  IT'S A MAILBOXES, ET CETERA.  A UPS STORE NOW.  IT
3     USED TO BE A MAILBOXES, ET CETERA.
4  Q.  OKAY.  OKAY.  YOU OPERATED A GROUP CALLED THE
5     FREEDOM TRUST GROUP?
6  A.  FREEDOM TRUST GROUP WAS JUST A NAME OF A COMPANY
7     THAT WE CREATED JUST TO SELL SOFTWARE.  IT WASN'T AN
8     OPERATION.
9  Q.  WHO CREATED IT?
10 A.  HEATHER AND I.
11 Q.  WHAT WAS YOUR ROLE AT THE FREEDOM TRUST GROUP?
12 A.  MY ROLE WAS TO HELP PUT THE PROGRAM TOGETHER, AND
13    ONCE THE PROGRAM WAS PUT TOGETHER, TO SEE IF IT
14    COULD BE MARKETED AND MARKET IT.
15 Q.  COULD YOU MARKET IT?
16 A.  IT WAS MARKETED, NOT AS GOOD AS WE THOUGHT, BUT IT
17    WAS MARKETED.
18 Q.  OKAY.
19 BY MR. BENNETT:
20    CAN WE TAKE A QUICK BREAK TO GRAB SOME WATER?
21 BY MR. STRONG:
22    OKAY.
23    (OFF THE RECORD  1:21 P.M. - 1:23 P.M.)
24 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER SEVEN,
25 CHECKS AND BANK STATEMENTS, ATTACHED.)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                              July 27, 2009

## Page 22

1  EXAMINATION RESUMED BY MR. STRONG:
2  Q. I'LL HAND YOU NOW WHAT'S BEEN PREVIOUSLY MARKED AS
3      PLAINTIFF'S EXHIBIT NUMBER SEVEN, WHICH I'VE ALSO
4      HANDED A COPY TO YOUR COUNSEL. WHY DON'T YOU TAKE A
5      MINUTE AND LOOK THROUGH THIS? THIS IS A COLLECTION
6      OF CHECKS AND BANK STATEMENTS.
7  BY MR. BENNETT:
8          CAN WE GO OFF THE RECORD FOR JUST ONE SECOND?
9  BY MR. STRONG:
10         OKAY.
11         (OFF THE RECORD  1:27 P.M. - 1:28 P.M.)
12  EXAMINATION RESUMED BY MR. STRONG:
13  Q. OKAY. HAVE YOU HAD AN OPPORTUNITY TO REVIEW THIS
14      PACKET OF MATERIALS I PUT IN FRONT OF YOU?
15  A. NOT COMPLETELY.
16  Q. I WILL POINT YOU OUT HERE. DID THE FREEDOM TRUST
17      GROUP HAVE A CHECKING ACCOUNT?
18  A. YES.
19  Q. AND YOU WERE A SIGNATORY TO THAT ACCOUNT?
20  A. YES.
21  Q. SO, THIS SIGNATURE ON THE FIRST PAGE HERE, IS THAT
22      YOUR SIGNATURE?
23  A. THAT'S A PHOTOCOPY OF MY SIGNATURE.
24  Q. OKAY. AND THAT'S YOUR SOCIAL SECURITY NUMBER?
25  A. YES.

## Page 23

1  Q. OKAY. AND THAT'S YOUR DRIVER'S LICENSE NUMBER AT
2      THE TIME?
3  A. YES.
4  Q. IF YOU LOOK ON PAGE TWO, IT'S STATED THAT HEATHER
5      WAS REMOVED AS A SIGNER ON THIS ACCOUNT, AND THAT
6      JOHN HOWARD ALEXANDER IS THE ONLY AUTHORIZED SIGNER
7      ON THIS ACCOUNT NOW.
8  A. OKAY.
9  Q. WHY WAS THAT DONE?
10  A. HEATHER AND I SPLIT, AND SHE LEFT US, FREEDOM TRUST
11      GROUP WITH ME.
12  Q. AND IF WE LOOK ON PAGE THREE, THAT STATES THERE THAT
13      YOU'RE THE DIRECTOR OF THE FREEDOM TRUST GROUP?
14  A. YES.
15  Q. WHAT IS THE ROLE OF THE DIRECTOR, AS DIRECTOR OF
16      FREEDOM TRUST GROUP?
17  A. TO DIRECT.
18  Q. DIRECT WHAT?
19  A. TO DIRECT OPERATIONS, MARKETING.
20  Q. OKAY. LET'S TAKE A LOOK AT -- WE'RE LOOKING FOR
21      CHECK 2259, WHICH IS ABOUT THE -- IT'S JUST ACTUALLY
22      ON THE NEXT PAGE. IT'S KIND OF THE SECOND COLUMN,
23      THE SECOND CHECK FROM THE TOP THERE. IS THAT A ---
24  A. UH-HUH.
25  Q. --- PHOTOCOPY OF YOUR SIGNATURE ON THE CHECK?

## Page 24

1  A. THAT'S A PHOTOCOPY OF MY SIGNATURE.
2  Q. OKAY. AND WHO IS IT MADE OUT TO?
3  A. EXCEL TELECOMMUNICATIONS.
4  Q. AND WHAT IS EXCEL TELECOMMUNICATIONS?
5  A. THAT'S WHO WE HAD FOR TELEPHONE SERVICE.
6  Q. AND WHERE WOULD THIS TELEPHONE HAVE BEEN LOCATED?
7  A. EXCUSE ME?
8  Q. WHERE WOULD THE TELEPHONE ACCOUNT HAVE BEEN? WHAT
9      PROPERTY?
10  A. THE TELEPHONE ACCOUNT?
11  Q. RIGHT.
12  A. YOU MEAN THE PHONE ITSELF, PHYSICALLY, OR THE PHONE
13      COMPANY?
14  Q. WHAT WOULD BE THE ADDRESS AT THE -- WHERE WOULD THE
15      PHONE THAT, THE PHONE THAT WAS BEING PAID FOR HERE,
16      WHERE WAS THAT PHONE?
17  A. THAT WAS AT 6350.
18  Q. OKAY. AND ALONG THE SIDE HERE, THERE'S A SET OF
19      DEPOSIT SLIPS ALL DATED IN FEBRUARY OF 2004. WHERE
20      WOULD THE MONEY THAT WAS BEING DEPOSITED, WHERE
21      WOULD THAT HAVE COME FROM?
22  A. NO IDEA. IT DOESN'T SAY.
23  Q. DO YOU USE THE NOTATION M.O. TO MEAN MONEY ORDER?
24      IF YOU LOOK AT THE BOTTOM ONE AND THE THIRD ONE
25      DOWN?

## Page 25

1  A. YEAH.
2  Q. AND THE SECOND ONE DOWN SAYS I.B.S. WHAT IS I.B.S.?
3  A. I.B.S. IS A CORPORATION.
4  Q. WHAT DOES IT STAND FOR?
5  A. I THINK IT'S INTERNATIONAL BUSINESS SYSTEM.
6  Q. AND WHO FORMED INTERNATIONAL BUSINESS SYSTEM?
7  A. HEATHER AND I FORMED THAT.
8  Q. AND WHERE WAS IT FORMED?
9  A. I BELIEVE IT WAS NEVIS.
10  Q. AND WHAT WAS THE PURPOSE OF I.B.S.?
11  A. I DON'T REMEMBER.
12  Q. DO YOU RECALL IF IT HAD A ---
13  A. GO AHEAD.
14  Q. DO YOU RECALL IF IT HAD A MERCHANT ACCOUNT WITH CARD
15      SERVICES INTERNATIONAL?
16  A. YEAH, THAT WAS THE PURPOSE OF IT. I HAD FORGOTTEN
17      ABOUT THAT ONE.
18  Q. AND WHY DID YOU -- WHY DID I.B.S. NEED A MERCHANT
19      ACCOUNT?
20  A. BECAUSE WE WERE GOING TO GET READY TO DO SOME
21      SERIOUS MARKETING.
22  Q. MARKETING OF WHAT?
23  A. OF EITHER THE TRUST SOFTWARE OR ANY OTHER SOFTWARE
24      WE WERE GETTING INTO, UNDERSTANDING THE SOFTWARE
25      BUSINESS, AND THAT WAS THE DIRECTION THAT WE WANTED

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

---

### Page 26

1    TO GO.
2  Q. SO, EXPLAIN TO ME HOW IT WOULD HAVE WORKED WITH
3    I.B.S., THEN. I'M A LITTLE UNCLEAR AS TO ---
4  A. I CAN'T DO THAT BECAUSE I WASN'T INVOLVED WITH
5    I.B.S.
6  Q. BUT YOU HELPED CREATE IT?
7  A. I DISCUSSED IT WITH HEATHER, AND SHE DID THE SET UP
8    AND SHE RAN I.B.S., BASICALLY.
9  Q. WELL, WHAT DID YOU GUYS DISCUSS, THOUGH, IN DECIDING
10    TO DO THIS?
11  A. THAT WE NEEDED A MERCHANT ACCOUNT AND THAT WAS THE
12    WAY TO GO.
13  Q. OKAY. AND WHAT WAS THE PURPOSE OF THE MERCHANT
14    ACCOUNT?
15  A. THE PURPOSE OF THE -- THE NORMAL PURPOSE OF A
16    MERCHANT ACCOUNT IS TO ACCEPT CREDIT CARDS.
17  Q. SO, IF YOU MADE A DEPOSIT FROM I.B.S, THEN IT'S SAFE
18    TO ASSUME THAT SOMEBODY PAID FOR SOMETHING WITH A
19    CREDIT CARD AND THAT MONEY WAS BEING DEPOSITED INTO
20    THE FREEDOM TRUST GROUP?
21  A. I CAN'T ANSWER THAT, BECAUSE YOU'RE TALKING ABOUT
22    ACCOUNTING AND PAPER WORK AND THAT'S NOT MY AREA OF
23    EXPERTISE AT ALL.
24  Q. IF YOU TURN A FEW PAGES IN, WE'RE LOOKING FOR CHECK
25    NUMBER 2319. ACTUALLY, THERE IS GOING TO BE A

### Page 27

1    BALANCE STATEMENT BEFORE THAT, A BANK STATEMENT
2    BEFORE THAT DATED SEPTEMBER 30, 2004, RIGHT THERE.
3  A. WHAT PAGE?
4  Q. THESE AREN'T CONSECUTIVELY NUMBERED, SO IT'S KIND OF
5    HARD TO ---
6  A. LET ME MATCH YOURS UP. OKAY.
7  Q. OKAY. YOU'RE LOOKING AT A STATEMENT DATED SEPTEMBER
8    30, 2004, IN THE UPPER RIGHT-HAND CORNER?
9  A. RIGHT.
10  Q. I NOTICED A NUMBER OF DEPOSITS ON HERE FOR $400,
11    $300, $790, $1,840. DO YOU KNOW WHERE THIS MONEY
12    WAS COMING FROM TO BE DEPOSITED IN THERE?
13  A. I CAN'T BE SURE, NO.
14  Q. IF YOU SPECULATED, WHERE DO YOU THINK IT WOULD COME
15    FROM?
16  A. I CAN'T SPECULATE ON THAT.
17  Q. SO, YOU OWN THIS ACCOUNT, BUT YOU DON'T KNOW WHERE
18    THE MONEY, HOW THE MONEY IS COMING INTO IT?
19  A. I HAVE NO INFORMATION ON IT. HOW COULD I?
20  Q. YOU'RE THE OPERATOR OF THE ACCOUNT, I MEAN. BUT
21    SUFFICE IT TO SAY THAT FREEDOM TRUST GROUP WAS
22    RECEIVING MONEY IN THIS TIME, AND ON THIS PARTICULAR
23    STATEMENT, IT SAYS THAT THEY'RE RECEIVING CREDITS OF
24    $8,177 DURING THAT, DURING THAT TIME, DURING THAT
25    MONTH.

### Page 28

1  A. OKAY.
2  Q. SO, IT'S SAFE TO SAY THAT FREEDOM TRUST GROUP WAS
3    RECEIVING A LITTLE OVER $8,000 DURING THAT ONE
4    MONTH?
5  A. DURING THAT MONTH, YEAH. THAT WOULD BE SAFE TO SAY
6    THAT.
7  Q. BUT YOU DON'T KNOW WHERE THAT MONEY'S COMING FROM?
8  A. YOU MEAN INDIVIDUALLY OR ---
9  Q. IN THE AGGREGATE, TOTAL. I MEAN, HOW WERE YOU
10    MAKING YOUR MONEY AT THAT, OR HOW WAS FREEDOM TRUST
11    GROUP MAKING ITS MONEY?
12  A. THAT WOULD BE FROM SOFTWARE.
13  Q. SALES OF SOFTWARE?
14  A. SALES OF SOFTWARE.
15  Q. OKAY.
16  A. ARE WE THROUGH WITH THAT PAGE?
17  Q. IF WE KEEP GOING, SKIP OVER THE NEXT PAGE OF CHECKS,
18    AND ON THE -- I'LL CALL IT PAGE FOUR. I THINK
19    YOU'VE GOT IT THERE. I'M LOOKING AT THE BOTTOM
20    RIGHT, CHECK NUMBER 2319.
21  A. UH-HUH.
22  Q. IS THAT YOUR SIGNATURE ON THE BOTTOM OF THAT CHECK?
23  A. A COPY OF MY SIGNATURE, YES.
24  Q. OKAY. AND DO YOU KNOW WHAT THIS CHECK WAS FOR?
25  A. IT SAYS REFUND IN THE FOR SECTION.

### Page 29

1  Q. WHAT WOULD YOU HAVE BEEN REFUNDING?
2  A. PROBABLY THE SOFTWARE.
3  Q. OKAY. AND WHEN YOU SAY SOFTWARE, WHAT SOFTWARE DO
4    YOU MEAN?
5  A. THE FREEDOM TRUST GROUP SOFTWARE.
6  Q. AND WHAT IS THE FREEDOM TRUST GROUP SOFTWARE? WHAT
7    IS -- WHAT DOES THAT ALL ENTAIL?
8  A. IT'S A CD WITH CONTRACTS, TEMPLATES, CONTRACT
9    TEMPLATES.
10  Q. FILL IN THE FORM TYPE OF THINGS?
11  A. RIGHT.
12  Q. WHAT KIND OF FORMS WOULD THEY HAVE BEEN FILLING OUT?
13  A. THEY WERE CONTRACTS, TRUST CONTRACTS.
14  Q. SO, IT WOULD HAVE BEEN TO CREATE A TRUST?
15  A. TO CREATE THEIR OWN TRUST.
16  Q. AND ABOUT, I'M SKIPPING OVER SEVEN PAGES HERE. THE
17    TOP OF IT WILL SAY PAGE TWO, AND I'M SPECIFICALLY
18    LOOKING AT CHECK NUMBER 2352. I THINK IT'S ---
19  A. OKAY.
20  Q. OKAY. AND AGAIN, THAT'S YOUR SIGNATURE ON THE, ON
21    THE CHECK?
22  A. IT'S A COPY OF MY SIGNATURE, YES.
23  Q. AND WHO IS THIS MADE OUT TO?
24  A. IT'S MADE OUT TO THE SECRETARY OF STATE.
25  Q. AND WHY WERE YOU WRITING A CHECK TO THE SECRETARY OF

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                        July 27, 2009

## Page 30

1  STATE?
2  A.  I CAN'T READ THAT, WHAT IT SAYS.
3  Q.  I MEAN, THERE IS ONE WORD HERE I CAN'T READ, BUT I
4    BELIEVE IT SAYS LIST OF OFFICERS, ONE CERTIFIED
5    COPY.  I CAN'T READ THE WORD BEFORE LIST, BUT DOES
6    THAT LOOK CORRECT?
7  BY MR. BENNETT:
8    THE RECORD, I BELIEVE IT SAYS INITIAL LIST OF
9    OFFICERS, ONE CERTIFIED COPY.
10 BY MR. STRONG:
11   OKAY.
12 BY THE WITNESS:
13   THAT'S NOT EVEN MY HANDWRITING.
14 EXAMINATION RESUMED BY MR. STRONG:
15 Q.  BUT THAT'S YOUR SIGNATURE ON THE CHECK?
16 A.  UH-HUH.
17 Q.  OKAY.  DO YOU KNOW WHY YOU WOULD HAVE BEEN ASKING
18   FOR A LIST OFFICERS FROM THE SECRETARY OF STATE?
19 A.  I HAVE NO IDEA WHAT THAT IS.  THAT'S MY SIGNATURE ON
20   THE CHECK, BUT IT'S NOT MY HANDWRITING ON THAT
21   CHECK.
22 Q.  FOR THE SAKE OF EASE, I'M JUST GOING TO SHOW YOU
23   FOLKS THE NEXT PAGE I'M GOING TO LOOK AT, AND I'M
24   SPECIFICALLY LOOKING AT PAGE 2358, OR CHECK NUMBER
25   2368, SO JUST GO AHEAD AND TAKE A LOOK, KEEP A

## Page 31

1    GANDER AT THAT AND I'LL ---
2  A.  2368?
3  BY MR. BENNETT:
4    HE'S JUST LETTING YOU KEEP IT FOR A SECOND.
5  EXAMINATION RESUMED BY MR. STRONG:
6  Q.  I'M JUST GOING TO LET YOU TAKE A LOOK AT THIS FOR A
7    SECOND SO WE DON'T HAVE TO ---
8  A.  YEAH, BUT WHY DON'T I HAVE IT HERE?
9  Q.  I THINK IF YOU SKIP OVER TO THE NEXT ONE, THE NEXT
10   PAGE OF CHECKS, IT WILL BE THERE.  AGAIN, THAT'S A
11   COPY OF YOUR SIGNATURE ON THE CHECK?
12 A.  A COPY OF MY SIGNATURE, YES.
13 Q.  AND IT'S MADE OUT TO THE SECRETARY OF STATE AGAIN?
14 A.  YES.
15 Q.  AND THAT'S YOUR HANDWRITING?
16 A.  THAT IS MY HANDWRITING.
17 Q.  OKAY.
18 A.  IT APPEARS TO BE.
19 Q.  IS THERE, IN THE MEMO BOX, IT SAYS RESERVE NAME
20   F.T.G.
21 A.  UH-HUH.
22 Q.  WHAT ARE YOU RESERVING?  WHAT WERE YOU RESERVING?
23 A.  I HAVE NO IDEA.
24 Q.  F.T.G., YOU BELIEVE, WOULD REFER TO THE FREEDOM
25   TRUST GROUP?

## Page 32

1  A.  THAT'S FOR FREEDOM TRUST GROUP, BUT I DON'T KNOW
2    WHAT THAT MEANS, WHAT THIS IS FOR.
3  Q.  OKAY.  IS IT -- IN THE DEPOSIT CHECKS ABOVE WHERE
4    THAT CHECK IS, IN THE DEPOSIT SLIPS, RATHER, IS THAT
5    YOUR HANDWRITING IN THOSE?
6  A.  IT APPEARS TO BE.
7  Q.  SHOWING DEPOSITS BEGINNING JANUARY 31ST TO FEBRUARY
8    17TH OF 2005 IN THE AMOUNTS OF $400, $300, $725, AND
9    $132.65?
10 A.  UH-HUH.
11 Q.  OKAY.  AND THOSE ARE, AGAIN, MONIES THAT YOU'RE
12   RECEIVING FROM SALES OF FREEDOM TRUST GROUP
13   SOFTWARE?
14 A.  IT MIGHT HAVE BEEN.
15 Q.  WHAT ELSE MIGHT IT HAVE BEEN?
16 A.  I HAVE NO IDEA.
17 Q.  WELL, WHAT OTHER -- WHAT OTHER PRODUCTS DID FREEDOM
18   TRUST GROUP SELL?
19 A.  FREEDOM TRUST GROUP HAD ONE PRODUCT.
20 Q.  OKAY.  DID YOU OPERATE ANY OTHER COMPANIES DURING
21   THIS TIME?
22 A.  DID I DO WHAT?
23 Q.  WERE YOU A PART OF ANY OTHER COMPANIES DURING THIS
24   TIME?
25 A.  NO.

## Page 33

1  Q.  WERE YOU A PART OF ---
2  A.  I DON'T THINK SO.
3  Q.  --- A COMPANY CALLED THE AWARE GROUP?
4  A.  NO, NOT AT THIS TIME.
5  Q.  OKAY.  WHEN DID YOU CEASE BEING PART OF THE AWARE
6    GROUP?
7  A.  WHEN HEATHER DIVORCED ME.
8  Q.  WHICH WAS WHEN?
9  A.  I DON'T REMEMBER THE DATE.
10 Q.  THE YEAR?
11 A.  I DON'T REMEMBER THE YEAR.
12 Q.  COULD IT HAVE BEEN 2004?
13 A.  IT COULD HAVE BEEN.
14 Q.  OKAY.
15 A.  COULD HAVE BEEN 2002, 2003, I DON'T KNOW.
16 Q.  OKAY.  WELL, WHY DON'T WE START -- I'LL START ASKING
17   SOME QUESTIONS NOW ABOUT THE AWARE GROUP, THE
18   FREEDOM TRUST GROUP, AND SOME OF THESE OTHER
19   ENTITIES THAT YOU WERE INVOLVED IN.  AND YOU CAN
20   TELL ME, YOU KNOW, WHEN AND WHERE, WHEN IT STARTED,
21   AND WHEN IT ENDED.  SO, LET'S BEGIN WITH -- LET'S
22   BEGIN WITH THE AWARE GROUP.  WHEN WAS IT ORGANIZED?
23 A.  AWARE GROUP WASN'T ORGANIZED INITIALLY.  WHEN
24   HEATHER MOVED IN WITH ME, THAT'S WHEN IT BECAME MORE
25   HOW YOU SAY ORGANIZED.

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                              July 27, 2009

---

Page 34

1  Q.  WHAT WAS IT BEFORE HEATHER MOVED IN WITH YOU?
2  A.  BEFORE THAT, IT WAS JUST RESEARCH.  ME AND PEOPLE
3      ALL OVER THE COUNTRY WERE SHARING RESEARCH WITH EACH
4      OTHER.  THAT'S ALL THE AWARE GROUP WAS MEANT TO BE.
5  Q.  AND WAS ANY OF THIS RESEARCH SOLD?
6  A.  AFTER AWARE GOT FORMALIZED.
7  Q.  OKAY.  AND WHO OPERATED THE AWARE GROUP?
8  A.  HEATHER AND I.
9  Q.  AND CAN YOU JUST GIVE ME AN OVERVIEW OF WHAT AWARE
10     GROUP WAS ORGANIZED TO DO?
11 A.  TO BRING OUR RESEARCH TO THE AMERICAN PEOPLE, WHAT
12     WE AND THE OTHER MEMBERS IN THE AWARE GROUP FIND IN
13     THE LAW LIBRARIES AND THE DEPOSITORIES.
14 Q.  AND DID AWARE GROUP DO THIS FOR FREE?
15 A.  INITIALLY, YEAH.
16 Q.  WHEN DID IT STOP DOING IT FOR FREE?
17 A.  WHEN HEATHER CAME ON.
18 Q.  OKAY.  WHEN DID YOU AND HEATHER -- WHEN DID HEATHER
19     COME ON?
20 A.  I DON'T REMEMBER THE YEAR.  YOU MEAN WHEN I MET HER?
21     I DON'T REMEMBER THE YEAR.
22 Q.  WAS IT ---
23 A.  IT WAS ABOUT TWO YEARS BEFORE WE GOT MARRIED, AND I
24     DON'T REMEMBER THAT YEAR, EITHER.
25 Q.  OKAY.  DID YOU GET MARRIED BEFORE THE YEAR 2000?

---

Page 35

1  A.  YEAH, I BELIEVE SO.
2  Q.  MARRIED BEFORE 1998?
3  A.  I DON'T REMEMBER.
4  Q.  OKAY.  BUT IT WAS BEFORE 2000?
5  A.  IT WAS BEFORE 2000.
6  Q.  OKAY.  SO, YOU HAD MET HER -- AND YOU MET HER A
7      COUPLE YEARS BEFORE THAT?
8  A.  SOMEWHERE, YEAH, SOMEWHERE IN THE '90s, MID TO LATE
9      '90s.  I'M NOT SURE WHEN.
10 Q.  OKAY.  AND AT THIS TIME, THIS IS WHEN YOU GUYS BEGAN
11     FORMALIZING THE AWARE GROUP, WAS IN THE LATE '90s,
12     THEN?
13 A.  ABOUT THE MID '90s.
14 Q.  OKAY.
15 A.  PAST '95.
16 Q.  SO, MID TO LATE '90s, THEN ---
17 A.  I THINK.
18 Q.  --- YOU'RE ORGANIZING THE AWARE GROUP.  AND SO, NOW,
19     WHEN I -- I ASKED YOU IF YOU WERE SELLING MATERIALS
20     WITH THE AWARE GROUP, AND YOU SAID THAT BEGAN AFTER
21     YOU FORMALIZED IT.  HOW DID THAT -- HOW DID THAT
22     WORK?
23 A.  BE MORE SPECIFIC.  WHAT DO YOU MEAN, HOW DID THAT
24     WORK?
25 Q.  WHAT WERE YOU SELLING?

---

Page 36

1  A.  WE WERE COLLECTING INFORMATION.
2  Q.  OKAY.
3  A.  AND WE WERE TRYING TO RECIRCULATE THAT INFORMATION
4      AND RECOVER ANY EXPENSES THAT WE HAD IN DOING SO.
5  Q.  AND HOW WOULD YOU RECOVER THOSE EXPENSES?
6  A.  WE WOULD SELL REPORTS.  WE HAD TAPES THAT WE
7      RECEIVED FROM SOURCES.  WE WOULD SELL THAT.
8  Q.  WOULD YOU SELL MEMBERSHIP INTO THE AWARE GROUP?
9  A.  YES.
10 Q.  AND ABOUT WHAT DID THAT RUN?
11 A.  PROBABLY ABOUT 250, SOMETHING LIKE THAT.  I DON'T
12     REMEMBER.  IT VARIED.
13 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER EIGHT,
14 FREEDOM FILES, ATTACHED.)
15 EXAMINATION RESUMED BY MR. STRONG:
16 Q.  I'LL HAND YOU NOW WHAT I'VE MARKED AS EXHIBIT EIGHT.
17     I'VE GIVEN A COPY TO YOUR LAWYER.  TAKE A LOOK AT
18     THIS FOR A MOMENT.
19 A.  ARE WE DONE WITH THIS, OR DO YOU WANT TO KEEP THIS
20     OUT?
21 Q.  WELL, IT'S GOING TO GO BACK TO HER IN A MINUTE.
22 A.  OKAY.  OKAY.  I'M JUST GOING THROUGH TO SEE WHAT THE
23     REST OF THIS IS.
24 Q.  READY?
25 A.  YEAH.

---

Page 37

1  Q.  OKAY.  SO, THE AWARE GROUP SOLD SOMETHING CALLED THE
2      FREEDOM FILES SOFTWARE.  IS THAT CORRECT?
3  A.  NO, AS A RESULT OF JOINING THE AWARE GROUP, THEY
4      RECEIVED IT.
5  Q.  OKAY.  SO, THEY SPENT MONEY, BOUGHT A MEMBERSHIP
6      INTO THE AWARE GROUP, CORRECT?
7  A.  RIGHT.
8  Q.  AND WITH THAT, THEN, CAME A CD OF MATERIALS CALLED
9      THE FREEDOM FILES?
10 A.  YEAH.
11 Q.  OKAY.  PAGES ONE THROUGH FOUR, IS THAT A PRETTY --
12     IS THAT A COMPLETE LIST OF THE MATERIALS THAT WERE
13     INCLUDED IN THE FREEDOM FILES?
14 A.  I CAN'T SAY IT'S COMPLETE, BUT IT LOOKS SIMILAR TO
15     WHAT I THINK WAS ON THERE.
16 Q.  OKAY.  NOW, JUST TO BACK UP A BIT, DID YOU PREPARE
17     THIS DOCUMENT?
18 A.  NO.
19 Q.  WHO WOULD?
20 A.  THIS DOCUMENT?
21 Q.  YES, THE FIRST FOUR PAGES.
22 A.  NO, THIS WAS A MUTUAL EFFORT WITH HEATHER AND I.
23     ALL I COULD DO WAS GIVE HER IDEAS, BUT THIS WAS DONE
24     ON A COMPUTER.
25 Q.  BUT YOU WOULD HAVE -- YOU WOULD HAVE HELPED IN THE

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                      July 27, 2009

---

Page 38

1    PREPARATION OF IT INSOFAR AS PROVIDING INFORMATION
2    TO ---
3  A.  THE MARKET ---
4  Q.  INFORMATION TO INCLUDE?
5  A.  THIS IS A MARKETING PIECE.
6  Q.  OKAY.
7  A.  VERY CLEARLY, IT'S A MARKETING PIECE.
8  Q.  AND THIS IS A MARKETING PIECE PUT OUT BY THE AWARE
9    GROUP?
10  A.  AND -- YEAH.
11  Q.  OKAY. I'VE RECEIVED MOST OF THESE MATERIALS, BUT I
12    DID WANT TO ASK ABOUT SOME THAT I HAVEN'T RECEIVED.
13    AND LET'S START WITH THE RELIANCE MANUAL, WHICH IS
14    ON PAGE TWO. WHAT IS THE RELIANCE MANUAL?
15  A.  YOU WANT ME TO READ THE LIST ON HERE?
16  Q.  I WANT YOU TO TELL ME -- I MEAN, YOU WERE GETTING A
17    CD OF MATERIALS WITH SOMETHING CALLED THE RELIANCE
18    MANUAL. WHAT DID YOU -- WHAT DID YOU THINK THE
19    RELIANCE MANUAL WAS?
20  A.  I BELIEVE THAT TO BE INFORMATION THAT PEOPLE COULD
21    RELY ON, WHATEVER IT WAS THAT IT WAS RELIABLE
22    INFORMATION.
23  Q.  RELIABLE INFORMATION ABOUT WHAT?
24  A.  WHATEVER THE TOPIC WAS. PICK ONE OF THE TOPICS.
25  Q.  OKAY. WELL, LET'S START WITH LETTERS TO SENATORS,

---

Page 39

1    WHAT WAS THAT?
2  A.  I DON'T KNOW. I'D HAVE TO SEE THAT. I'M FAMILIAR
3    WITH THE CONKLIN LETTER AND ---
4  Q.  OKAY. WELL, WHY DON'T WE SKIP TO THE CONKLIN
5    LETTER? WHAT IS THAT?
6  A.  THERE WERE SEVERAL LETTERS THAT WE HAD FROM PEOPLE
7    THAT WE BELIEVED TO BE, THAT WE BELIEVED TO BE
8    RELIABLE SOURCES AND WE PASSED THOSE LETTERS ON TO
9    OTHER PEOPLE.
10  Q.  WHAT WAS THE CONTENT OF THE CONKLIN LETTER?
11  A.  I COULDN'T TELL YOU. I DON'T KNOW. I'D HAVE TO SEE
12    THE CONKLIN LETTER, WHICH IS -- THERE'S NO DATE ON
13    HERE, BUT IT'S -- IT'S OLD.
14  Q.  DO YOU STILL HAVE COPIES OF THE FREEDOM FILES CD?
15  A.  NO, I DON'T.
16  Q.  ALL RIGHT. LET'S SKIP TO THE CURTIS AND CURTIS
17    LETTERS ON LIABILITY. WHAT DO YOU THINK -- WHAT
18    DOES LIABILITY MEAN THERE? IN FACT, IT SAYS
19    LIABILITY TO FILE. IT'S ---
20  A.  YEAH, I SEE THAT, BUT I WOULD HAVE TO -- I WOULD
21    HAVE TO SEE THE LETTER. IT'S NOT POSSIBLE FOR ME TO
22    COMMENT ON WHAT I THINK IT WOULD BE UNLESS I SEE IT.
23  Q.  WELL, YOU SOLD THIS MATERIAL, CORRECT? OR YOU WERE
24    PROVIDING THIS MATERIAL?
25  A.  COUNSEL, BUT THIS WAS FIVE YEARS AGO, MAYBE SIX

---

Page 40

1    YEARS AGO. I DON'T EVEN SEE THE DATE ON HERE, BUT
2    IT'S AT LEAST THAT LONG. AND I DON'T HAVE ACCESS TO
3    THESE FILES.
4  Q.  DO YOU HAVE ANY GENERAL SENSE OF WHAT THESE LETTERS
5    WERE REGARDING?
6  A.  GENERAL SENSE? YES.
7  Q.  WHAT IS THAT?
8  A.  GENERAL SENSE WAS OPINIONS OF DIFFERENT PEOPLE,
9    THESE VARIOUS PEOPLE, THESE VARIOUS INDIVIDUALS ON
10    THEIR STUDIES. THIS PARTICULAR CASE, ON THE TAX
11    ISSUE.
12  Q.  WHAT DO YOU MEAN BY THE TAX ISSUE?
13  A.  TO HELP PEOPLE WITH THEIR UNDERSTANDING OF THE TAX
14    ISSUE.
15  Q.  CAN YOU CLARIFY WHAT YOU MEAN WHEN YOU SAY THE TAX
16    ISSUE?
17  A.  TO HELP PEOPLE WITH THEIR UNDERSTANDING OF THE
18    I.R.S.'S TAX.
19  Q.  OKAY. WHAT UNDERSTANDING IS THAT?
20  A.  THEY HAVE TO DRAW THEIR OWN CONCLUSIONS.
21  Q.  WELL, HOW WOULD THESE LETTERS ASSIST THEM IN DRAWING
22    THOSE CONCLUSIONS?
23  A.  DOESN'T NECESSARILY ASSIST THEM IN DRAWING A
24    CONCLUSION. WHAT IT DOES IS IT OPENS THEIR MINDS TO
25    OTHER POSSIBILITIES.

---

Page 41

1  Q.  OKAY. WHAT OTHER POSSIBILITIES?
2  A.  THAT NOT ALL IS AS APPEARS TO BE.
3  Q.  WHAT DO YOU MEAN BY THAT?
4  A.  I THINK THOSE WORDS ARE SELF-EVIDENT.
5  Q.  WELL, CAN YOU EXPLAIN THEM IN A LITTLE BIT MORE
6    DETAIL? I MEAN, WHAT IS THERE NOT ALL THAT THERE
7    APPEARS -- WHAT IS -- WHAT IS THE APPEARANCE?
8  A.  I DON'T REALLY KNOW HOW TO ANSWER THAT.
9  Q.  WOULD IT BE DISCUSSING WHETHER INDIVIDUALS ARE
10    REQUIRED TO FILE INCOME TAX RETURNS?
11  A.  THAT WOULD PROBABLY BE BASED ON THEIR OWN ASSESSMENT
12    OF WHAT THE FACTS WERE FOR THEIR OWN INDIVIDUAL CASE
13    FOR THEMSELVES.
14  Q.  AND WHAT FACTS ARE WE TALKING ABOUT HERE?
15  A.  IT'S AS VARIABLE AS FINGERPRINTS. EVERYBODY'S
16    DIFFERENT. I CAN'T MAKE A STATEMENT ON THAT.
17  Q.  BUT HOW DO THESE LETTERS ASSIST THEM IN LEARNING
18    WHAT THESE FACTS ARE?
19  A.  BECAUSE IT DREW A LOT OF POINTS OF LAW. IT DREW A
20    LOT OF INFORMATION FROM DIFFERENT CASES.
21  Q.  WELL, WHAT POINTS OF LAW?
22  A.  AGAIN, I DON'T HAVE THE LETTERS. HOW CAN I MAKE A
23    COMMENT ON THAT?
24  Q.  WELL, YOU SOLD -- BUT YOU WERE PROVIDING THESE
25    MATERIALS TO FOLKS. CERTAINLY, YOU'VE READ THEM.

---

11 (Pages 38 to 41)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                July 27, 2009

---

Page 42

1  A.  BUT IT DOESN'T MEAN THAT I HAVE TO REMEMBER
2     EVERYTHING AND IT DOESN'T -- HOW MANY PAGES ARE IN
3     HERE?  THIS RELIANCE MANUAL, THAT'S 510 PAGES BY
4     ITSELF.  THAT'S A LOT OF MEMORY.  AND COUNSELOR ---
5  Q.  WHEN YOU WERE WORKING WITH THE AWARE GROUP, WOULD
6     PEOPLE CALL YOU AND ASK TO GET INFORMATION?
7  A.  YES.
8  Q.  AND SO, YOU WOULD PROVIDE INFORMATION REGARDING SOME
9     OF THESE MATERIALS.
10 A.  IT DEPENDS ON WHAT THEY WOULD ASK.  SOMETIMES THEY
11    WOULD ASK FOR SOMETHING THAT I HAVE NO KNOWLEDGE OF
12    OR NO IDEA OF.
13 Q.  BUT SOMETIMES THEY WOULD ASK YOU FOR INFORMATION
14    ABOUT THESE MATERIALS?
15 A.  SOMETIMES THEY WOULD.
16 Q.  SO, YOU WOULD PROVIDE THEM INFORMATION REGARDING,
17    SAY, WHAT'S IN THE RELIANCE MANUAL?
18 A.  YOU MEAN IF THEY WANTED THE MATERIALS THEMSELVES OR
19    CALLING TO QUESTION ME ABOUT IT?
20 Q.  NO, IF THEY HAD QUESTIONS ABOUT IT.
21 A.  OH, MISUNDERSTANDING WITH ME, NO.  I DIDN'T DISCUSS
22    THOSE LETTERS WITH THEM.
23 Q.  WHAT IS YOUR UNDERSTANDING OF WHAT IS REQUIRED BY
24    THE I.R.S.?
25 A.  MY UNDERSTANDING WOULD BE THAT THEY WANT EVERYBODY

---

Page 43

1     TO BE IN COMPLIANCE AND DO AS THEY ARE TOLD.
2  Q.  HOW WOULD ONE BE IN COMPLIANCE?
3  A.  BY DOING WHAT THEY ARE TOLD.
4  Q.  AND WHAT IS THAT?
5  A.  WHATEVER THEY TELL.
6  Q.  WHAT ARE THEY TELLING?
7  A.  WHATEVER THEY TELL.  YOU DON'T ARGUE WITH POWER.
8  Q.  LET'S -- IF YOU ACTUALLY WILL TURN TO PAGE TEN OF
9     THIS MATERIAL, MAYBE THIS WILL HELP ANSWER SOME
10    QUESTIONS.  I HAVE NUMBERED THEM MYSELF.  ON THE
11    TOP, IT SAYS YOU WILL RECEIVE FREE SOFTWARE THAT
12    SHOWS YOU ---
13 A.  OKAY. LET ME ---
14 Q.  YOU WILL RECEIVE FREE SOFTWARE THAT SHOWS YOU HOW TO
15    GET THE GOVERNMENT OFF YOUR BACK AND OUT OF YOUR
16    LIFE.  AND I WANT TO BACK UP HERE.  THIS IS -- THIS
17    IS A LETTER THAT, IF I'M NOT MISTAKEN, THIS IS PART
18    OF THE LETTER THAT YOU WERE OR THE AWARE GROUP WAS
19    ENCOURAGING MEMBERS TO SEND OUT TO OTHER PEOPLE TO
20    ENCOURAGE THEM TO JOIN MEMBERSHIP WITHIN THE AWARE
21    GROUP.
22 A.  SAY THAT AGAIN, PLEASE.
23 Q.  THIS IS A REFERRAL -- THIS IS MY UNDERSTANDING THAT
24    THIS IS A REFERRAL LETTER, WHERE YOU WOULD ENCOURAGE
25    CURRENT MEMBERS OF THE AWARE GROUP TO SEND OUT TO

---

Page 44

1     OTHERS ASKING THEM TO JOIN THE AWARE GROUP.
2  A.  OKAY.  NOW, I UNDERSTAND.  YOU'RE ASKING ME IF
3     THAT'S WHAT THIS IS?
4  Q.  IF THIS IS PART OF THAT LETTER AND IF THAT IS THE
5     PURPOSE OF THAT LETTER.
6  A.  CAN YOU REPHRASE YOUR QUESTION?  ARE YOU SAYING IS
7     THIS LETTER ASKING FOR REFERRALS?
8  Q.  WHY DON'T I JUST ASK A MORE GENERAL QUESTION.  WHAT
9     IS THIS LETTER?
10 A.  THAT'S A LITTLE TOO GENERAL.  IT'S LIKE I ALREADY
11    ANSWERED THAT.  IT WAS A MARKETING PIECE.
12 Q.  DID THE AWARE GROUP ASK ITS MEMBERS TO SEND OUT THIS
13    LETTER TO OTHERS?
14 A.  CAN'T SAY YES OR NO.  SOUNDS LIKE -- SOUNDS
15    REASONABLE TO ME.
16 Q.  IF YOU LOOK AT THE FIRST PAGE, IT SAYS WE HAVE
17    INCLUDED A LETTER AT THE END OF THIS SECTION.
18 A.  OKAY.
19 Q.  SO, BASED ON THAT SENTENCE, IS IT REASONABLE TO
20    BELIEVE THAT THE AWARE GROUP WAS ENCOURAGING ITS
21    MEMBERS TO SEND OUT THIS LETTER TO OTHERS TO
22    ENCOURAGE THEM TO JOIN THE AWARE GROUP?
23 BY MR. BENNETT:
24    YOU NEED TO ANSWER OUT LOUD.
25 BY THE WITNESS:

---

Page 45

1     I'M SORRY.  YES.
2  EXAMINATION RESUMED BY MR. STRONG:
3  Q.  NOW, LET'S TURN BACK TO THE PAGE THAT WE WERE
4     LOOKING AT BEFORE.  AND I'M SPECIFICALLY LOOKING
5     UNDER WHERE IT SAYS RELIANCE.
6  A.  OKAY.
7  Q.  OKAY.  TAKE A MINUTE AND READ THAT PARAGRAPH IN A
8     MINUTE HERE.
9  A.  OKAY.
10 Q.  OKAY.  BASED ON YOUR UNDERSTANDING OF WHAT WAS IN
11    THE RELIANCE PACKAGE, IS THAT PARAGRAPH UNDERNEATH
12    RELIANCE ACCURATE AS TO WHAT MATERIALS THEREIN
13    CONTAINED?
14 A.  YOU MEAN LETTERS FROM PROFESSIONALS, ACCOUNTANTS
15    PARALEGALS, I.R.S. AGENTS, FORMER MAGISTRATES,
16    FORMER JUDGES?
17 Q.  YES.
18 A.  EVEN INCLUDING A U.S. SENATE LETTERHEAD.
19 Q.  SO, THAT'S -- OKAY.  SO, THAT'S -- THE LETTERS ARE
20    WHAT WERE INCLUDED WITHIN THAT RELIANCE MANUAL,
21    CORRECT?
22 A.  YES.
23 Q.  AND NOW, THE NEXT SENTENCE SAYS THE CONCLUSION TO
24    ALL THESE LETTERS IS THE SAME AND ANSWERS THE
25    QUESTION OF WHAT MAKES ONE LIABLE TO FILE AND PAY

---

12 (Pages 42 to 45)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

## Page 46

1    THE INCOME TAX.
2  A.  OKAY. THAT'S THE QUESTION?
3  Q.  BUT YOU AGREE THAT -- DO YOU KNOW WHAT THE ANSWER TO
4      THAT QUESTION WAS?
5  A.  THEY KIND OF POINT IN ONE DIRECTION, BUT IT'S --
6      EVERYBODY HAS TO MAKE UP THEIR OWN MIND.
7  Q.  WELL, WHAT DIRECTION DOES IT POINT?
8  A.  THESE PEOPLE WERE ALL OF THE OPINION -- THESE ARE
9      OPINION LETTERS, IS WHAT THEY WERE CALLED. THESE
10     OPINION LETTERS WERE OF THEIR OPINION THAT THERE IS
11     NOTHING THAT SPECIFICALLY AND UNEQUIVOCALLY MAKES
12     ONE LIABLE.
13 Q.  AND WHY IS THAT?
14 A.  YOU'RE ASKING FOR CONJECTURE OR WHAT?
15 Q.  WELL, I'M ASKING YOU WHAT MAKES ONE, YOU KNOW, WHAT
16     WERE THEIR CONCLUSIONS AS TO WHY ONE WOULD NOT BE
17     LIABLE FOR THE INCOME TAX?
18 A.  I WOULD HAVE TO HAVE ALL THEIR LETTERS AND READ THEM
19     THAT THEY HAD -- THEY HAD ALL DIFFERENT -- THEY HAD
20     ALL DIFFERENT REASONS, DIFFERENT AXES TO GRIND,
21     DIFFERENT INFORMATION. THEY WERE NOT THE SAME.
22     THEY WERE NOT -- THEY WERE NOT TEMPLATE LETTERS OR
23     STAMPED OUT LETTERS.
24 Q.  BUT AWARE GROUP DID ADVERTISE THAT YOU COULD RELY ON
25     THIS TAX INFORMATION, CORRECT?

## Page 47

1  A.  YOU CAN RELY ON THIS INFORMATION AS FAR AS THE
2      PEOPLE THAT IT'S COMING FROM. YOU KNOW, IF YOU CAN'T
3      RELY ON PROFESSIONALS, ACCOUNTANTS, PARALEGALS,
4      I.R.S. ENROLLED AGENTS, ATTORNEYS, MAGISTRATES,
5      JUDGES.
6  Q.  EVEN IF ---
7  A.  SENATE, THE SENATE MEMBERS, WHO CAN YOU RELY ON,
8      OTHER THAN GOD?
9  Q.  BUT YOU'RE SAYING WHATEVER IS IN THESE LETTERS, THAT
10     THEY COULD RELY ON THAT INFORMATION AND THEY
11     WOULDN'T NEED TO DRAW THEIR OWN CONCLUSIONS?
12 A.  NO, IT'S WORDED INTERESTINGLY, BUT THEY CAN DRAW
13     THEIR OWN CONCLUSION.
14 Q.  BUT THEY CAN ALSO RELY ON THE CONCLUSIONS OF THESE
15     OF THESE PARTICULAR FOLKS?
16 A.  THEY CAN ALWAYS RELY ON THEIR OWN CONCLUSIONS.
17     EVERYBODY DOES.
18 Q.  I DIDN'T -- THAT'S NOT THE QUESTION I ASKED, THOUGH.
19     I ASKED WHETHER THEY COULD RELY ON THE OPINIONS
20     EXPRESSED THEREIN.
21 A.  ASK IT ANOTHER WAY. ARE YOU ASKING AM I GIVING ---
22 Q.  ARE YOU -- IS THE AWARE GROUP ADVERTISING THAT YOU
23     CAN RELY ON THE INFORMATION PROVIDED BY THESE
24     PEOPLE?
25 A.  IT WASN'T OUR INTENT, NO.

## Page 48

1  Q.  BUT THAT'S WHAT YOU WROTE IN THIS LETTER?
2  A.  IT WASN'T THE INTENT. IT'S NOT WORDED THAT WAY.
3  Q.  YOU AGREE, THOUGH, IT IS WORDED YOU CAN RELY ON THIS
4      TAX INFORMATION.
5  A.  BUT IT DOESN'T SAY TO DO WHAT.
6  Q.  WHAT IS A LEVY RELEASE PACKAGE?
7  A.  WHERE DO YOU SEE THAT?
8  Q.  LAST SENTENCE OF THAT PARAGRAPH.
9  A.  OH. THAT, I DON'T KNOW.
10 Q.  WHY DON'T WE JUST TAKE A BREAK HERE FOR A SECOND?
11      (OFF THE RECORD  2:08 P.M. - 2:13 P.M.)
12 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER NINE,
13 NEWSLETTER, ATTACHED.)
14 EXAMINATION RESUMED BY MR. STRONG:
15 Q.  THE COURT REPORTER HAS PUT IN FRONT OF YOU WHAT HAS
16     BEEN MARKED AS PLAINTIFF'S EXHIBIT NUMBER NINE, AND
17     I'VE HANDED A COPY TO COUNSEL. IS THIS -- WHAT IS
18     THIS?
19 A.  IT'S A NEWSLETTER, WE'RE AMERICAN NEWSLETTER.
20 Q.  THIS IS A NEWSLETTER THAT AWARE GROUP WOULD HAVE PUT
21     OUT?
22 A.  YES.
23 Q.  OKAY. SO, YOU WOULD HAVE PUT THIS OUT?
24 A.  WELL, WHEN YOU SAY YOU, YOU MEAN ME, SPECIFICALLY,
25     OR ---

## Page 49

1  Q.  WELL, INSOFAR AS YOUR ---
2  A.  OR ME ALONG WITH THE AWARE ---
3  Q.  YOU'RE WORKING WITH THE AWARE GROUP AND ON THE AWARE
4      GROUP?
5  A.  YEAH.
6  Q.  BEFORE WE TOOK THE BREAK, WE WERE TALKING ABOUT WHAT
7      THE LEVY RELEASE PACKAGE WAS, AND I AM NOW LOOKING
8      AT PAGE SIX OF THIS, OF EXHIBIT NINE HERE. AND
9      SPECIFICALLY, IF YOU LOOK OVER ON THE RIGHT-HAND
10     SIDE WHERE IT SAYS BONUS NUMBER THREE, FREEDOM
11     FILES, IN THE SECOND PARAGRAPH DOWN.
12 A.  OKAY.
13 Q.  DOES THIS JOG YOUR MEMORY AT ALL AS TO WHAT THE LEVY
14     RELEASE PACKAGE WAS?
15 A.  NOT WITH FORMS AND STUFF, I WASN'T BIG ON FORMS. I
16     WAS -- HEATHER WOULD DO MORE OF THAT, BUT -- I'LL DO
17     THE BEST I CAN. GO AHEAD.
18 Q.  SO, WHAT WAS -- WHAT WAS THE LEVY RELEASE PACKAGE?
19 A.  FORMS AND DOCUMENTS TO HELP WITH THE RELEASE OF
20     STATE OR FEDERAL TAX LEVY, HELP IN ASSET RECOVERY,
21     USUALLY MONEY OR PAYCHECKS AND ACCOUNTS TAKEN UNDER
22     NOTICE OF LEVY.
23 Q.  DO YOU RECALL WHAT THESE FORMS PROVIDED?
24 A.  WELL, IF THEY -- IF IT SAYS AS IT IS, NINE-PAGE
25     LETTER. THAT'S -- YOU MEAN CAN I CALL UP THE FORMS

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

---

Page 50

1    AND EXACTLY WHAT WAS IN THAT PACKAGE IN MY MIND?
2    NO.
3    Q.  DO YOU KNOW WHAT THEORY THEY WOULD HAVE HELPED THEM
4    RELEASE WITH THE STATE OR FEDERAL TAX LEVY?
5    A.  WHAT THE THEORY?  YOU'RE ASKING ---
6    Q.  WHAT ---
7    A.  YOU'RE ASKING ME TO MAKE A CONJECTURE ON THAT?
8    Q.  I'M ASKING YOU WHAT YOUR REFLECTION IS, SINCE YOU
9    PROVIDED THESE FORMS, TOO.
10   A.  THAT'S -- I JUST WANT TO GET THE SAME, BE ON THE
11   SAME PAGE WITH THE WORDS.  YOU'RE ASKING ME FOR MY
12   CONJECTURE ON WHAT I BELIEVE TO BE ---
13   Q.  NO, I'M ASKING WHAT -- YOU PROVIDED THESE FORMS.
14   A.  UH-HUH.
15   Q.  TO AWARE GROUP MEMBERS, CORRECT?
16   A.  I'M SORRY.  YES.  I WON'T DO IT AGAIN.
17   Q.  BECAUSE YOU PROVIDED THESE FORMS AND DOCUMENTS, I'M
18   ASKING YOU WHAT WAS IN THESE FORMS AND DOCUMENTS
19   THAT YOU WERE PROVIDING TO THE MEMBERS OF YOUR
20   GROUP.
21   A.  OKAY.  THERE'S NO WAY I CAN TELL YOU WHAT WAS IN
22   THEM, BECAUSE I DON'T HAVE THE DOCUMENTS.
23   Q.  BUT YOU DON'T RECALL -- DO YOU RECALL WHAT WAS IN
24   THE DOCUMENTS?
25   A.  I WOULD NEED TO SEE THE DOCUMENTS TO BE ABLE TO

---

Page 51

1    RECALL THE DOCUMENTS.
2    Q.  IS IT FAIR TO SAY THAT THE CONCLUSION OF THESE
3    DOCUMENTS WOULD HAVE BEEN TO HELP TRY TO GET A LEVY
4    RELEASE?
5    A.  THAT WOULD BE FAIR TO SAY.
6    Q.  DO YOU REMEMBER WHY YOU WOULD BE, YOU WOULD BE --
7    WHY BY FILLING OUT THESE FORMS, YOU WOULD BE
8    ELIGIBLE FOR A LEVY RELEASE?
9    A.  HOW DO I ANSWER THAT?  I RECALL A DOCUMENT, A NOTICE
10   OF, I BELIEVE A NOTICE OF LIEN OR A NOTICE OF LEVY,
11   AN I.R.S. DOCUMENT, AND I REMEMBER I WAS AT A
12   SEMINAR AND THIS GUY WAS POUNDING ON THE TABLE,
13   POUNDING ON THE TABLE, BECAUSE HE WAS ASKING PEOPLE
14   TO READ THE FIRST PARAGRAPH, WHICH I CAN'T REMEMBER
15   THE GUY'S NAME.  IT HAPPENED IN CALIFORNIA.  AND IT
16   GOT PASSED AROUND TO FOUR OR FIVE PEOPLE, AND HE
17   KEPT GETTING MADDER AND MADDER AT PEOPLE, BECAUSE
18   THEY WEREN'T READING THE FIRST PARAGRAPH AND WE
19   DIDN'T UNDERSTAND WHAT HE WAS DOING.  AND THEN, HE
20   SAID, THERE IS NO FIRST PARAGRAPH ON THIS.
21   PARAGRAPH A WAS OMITTED AND THEN HE READ OUT OF THE
22   CODE PARAGRAPH A, AND IT BASICALLY DESCRIBED THAT
23   NOTICES OF LEVY WERE GOOD FOR BASICALLY GOVERNMENT
24   PEOPLE, I THINK, IS WHAT IT WAS.
25   Q.  WHAT DO YOU MEAN THEY WERE GOOD FOR GOVERNMENT

---

Page 52

1    PEOPLE?
2    A.  THAT THE I.R.S. HAD AUTHORITY TO LEVY GOVERNMENT
3    EMPLOYEES.  THERE WAS NO PROVISION IN THAT PARAGRAPH
4    A.  THAT'S WHY IT WAS DELETED.
5    Q.  I'M CONFUSED.  WHAT DO YOU MEAN THEY HAD THE
6    AUTHORITY TO LEVY ON GOVERNMENT EMPLOYEES?
7    A.  I'M JUST TELLING YOU WHAT I REMEMBER OUT OF MY HEAD.
8    Q.  OKAY.
9    A.  SO, YOU'RE ASKING ME WHAT DO I MEAN?  I WAS -- I'M
10   GIVING YOU THE CIRCUMSTANCES.
11   Q.  DID THAT -- DO YOU MEAN THAT THEY WOULDN'T, THE
12   I.R.S. WOULD NOT HAVE AUTHORITY TO LEVY ON SOMEBODY
13   WHO WAS NOT A GOVERNMENT EMPLOYEE?
14   A.  IT KIND OF GIVES THAT IMPRESSION WHEN THEY
15   DELIBERATELY LEAVE OUT PARAGRAPH A.
16   Q.  IS THAT AN IMPRESSION YOU SHARE?
17   A.  I WOULD LOOK THE COMMISSIONER RIGHT IN THE EYE AND
18   ASK WHY IS THAT LEFT OUT?  WHAT'S THE PURPOSE OF
19   LEAVING THAT OUT?
20   Q.  SO, IS THAT A YES OR A NO?
21   A.  THAT WOULD BE A YES.
22   Q.  CONTINUING ON WITH THIS, IN THIS BONUS NUMBER THREE,
23   IT DESCRIBES FOUR LETTERS.  CAN YOU JUST TAKE A
24   MINUTE THERE AND READ THAT?
25   A.  OKAY.

---

Page 53

1    Q.  HAVING READ THE DESCRIPTION OF THOSE FOUR LETTERS
2    NOW, WOULD THOSE HAVE BEEN THE KIND OF LETTERS THAT
3    YOU WOULD HAVE INCLUDED IN THE RELIANCE MANUAL THAT
4    WE WERE TALKING ABOUT EARLIER?
5    A.  YES.
6    Q.  OKAY.  AND DID YOU HAVE AN OPPORTUNITY TO READ THE
7    PARAGRAPH -- YOU RECALL -- LET ME, I'LL JUST BACK UP
8    HERE ONE SECOND.  YOU RECALL WHEN WE WERE DISCUSSING
9    WITHIN EXHIBIT NUMBER EIGHT, UNDER THE RELIANCE
10   MANUAL, THE CONCLUSION OF ALL THESE LETTERS IS THE
11   SAME AND ANSWERS THE QUESTION OF WHAT MAKES ONE
12   LIABLE TO FILE AND PAY THE INCOME TAX.
13   A.  WHAT IS YOUR QUESTION?
14   Q.  I'M -- WELL, I'M SETTING UP FOR THE QUESTION HERE.
15   WE WERE DISCUSSING THAT.  SO, NOW, THE NEXT, IN THE
16   BONUS NUMBER THREE, DID YOU HAVE AN OPPORTUNITY TO
17   READ THE NEXT, THE NEXT COUPLE OF PARAGRAPHS AFTER
18   THE DESCRIPTION OF THE LETTERS?
19   A.  YEAH, WHERE IT SAYS THE BOTTOM LINE?
20   Q.  UH-HUH.  AND IN FACT, LET'S -- I'LL BACK UP ONE
21   MORE.  THE PARAGRAPH BEFORE SAID LETTER NUMBER ONE,
22   IT SAYS FOUR OPINION LETTERS WRITTEN BY
23   PROFESSIONALS ANSWERING THE QUESTION WHERE IN THE
24   INTERNAL REVENUE CODE AM I LIABLE FOR INCOME TAXES?
25   A.  UH-HUH.

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

---

Page 54

1  Q.  WHAT IS THE BOTTOM LINE TO THESE LETTERS?
2  A.  WELL, BASED ON WHAT THESE PEOPLE SAY, THEY CLAIM
3      THAT WITH THEIR EVIDENCE AND WITH WHAT THEY HAVE,
4      THAT ONE ISN'T LIABLE.
5  Q.  OKAY.  AND THAT THE INCOME TAX IS PURELY VOLUNTARY?
6      IS THAT CORRECT?
7  A.  IT DEPENDS ON HOW YOU DEFINE THE INCOME TAX.
8  Q.  OKAY.  AND WHAT DO YOU -- WHAT DO YOU THINK OF WHEN
9      I SAY THE INCOME TAX?
10 A.  I ONLY HAVE TO ASK YOU WHAT YOU MEAN BY IT.
11 Q.  WELL, WHAT IS YOUR UNDERSTANDING OF WHAT THE INCOME
12     TAX IS?
13 A.  IT VARIES FROM INDIVIDUAL TO INDIVIDUAL, AND IT
14     VARIES FROM TIME TO TIME.
15 Q.  WHAT DO YOU MEAN BY THAT?
16 A.  ASK ME -- ASK ME THE SAME QUESTION, BUT MAYBE A
17     LITTLE DIFFERENTLY BECAUSE IT'S NOT -- IT'S NOT
18     CIRCULATING IN MY MIND, PERHAPS, THE SAME.
19 Q.  I'M ASKING YOU WHAT YOUR UNDERSTANDING OF WHAT THE
20     INCOME TAX IS.
21 A.  MY UNDERSTANDING, YOU MEAN OF TITLE 26?
22 Q.  OF THE INCOME TAX.  YOU KNOW, IF IT MEANS TITLE 26
23     TO YOU, I MEAN, WHAT ---
24 A.  ALL RIGHT.  MY -- MY UNDERSTANDING IS THAT THERE ARE
25     CERTAIN PROVISIONS WHERE PEOPLE ARE LIABLE AND THERE

---

Page 55

1      ARE CERTAIN POSITIONS WHERE PEOPLE ARE NOT LIABLE.
2  Q.  AND WHAT MAKES A PERSON LIABLE FOR THE INCOME TAX?
3  A.  DEPENDS ON THE INDIVIDUAL.  IT DEPENDS ON WHAT THEIR
4      ACTIVITIES ARE AND WHAT THEY'RE DOING.
5  Q.  OKAY.  WELL, WHAT DETERMINATIVE FACTORS ARE WE
6      LOOKING AT THAT WOULD MAKE ONE LIABLE FOR THE INCOME
7      TAX?
8  A.  DEFINITION OF THE WORD INCOME.  SOMETIMES JUST THEIR
9      SIGNATURE.
10 Q.  OKAY.  WHAT DO YOU MEAN BY THEIR SIGNATURE?
11 A.  MAKING AN ADMISSION WITH A SIGNATURE ON IT.
12 Q.  AN ADMISSION TO WHOM?
13 A.  TO THE I.R.S., AN ADMISSION OF LIABILITY.
14 Q.  WITHIN THE LETTERS THAT YOU WERE, THAT YOU SAY WERE
15     PART OF THE, OF WHAT WAS INCLUDED IN THE RELIANCE
16     MANUAL, THESE FOUR LETTERS THAT ARE DESCRIBED HERE
17     IN THIS NEWSLETTER?
18 A.  UH-HUH.
19 Q.  OKAY.  WHAT THEIR CONCLUSION, IF I'M CORRECT, IS
20     THAT A PERSON IS NOT LIABLE TO PAY AN INCOME TAX.
21     IS THAT CORRECT?
22 A.  PRETTY MUCH.
23 Q.  WHAT DO YOU MEAN, PRETTY MUCH?
24 A.  I MEAN, PRETTY MUCH.  PEOPLE WILL DRAW THEIR OWN
25     CONCLUSIONS ON IT, DEPENDING ON WHAT WAS IN THE

---

Page 56

1      LETTER AND HOW THEY PERCEIVED IT.
2  Q.  BUT YOUR QUOTE MADE -- YOU PUT A QUOTATION IN HERE,
3      YOUR INCOME TAX IS 100% VOLUNTARY TAX AND LIQUOR TAX
4      IS 100% ENFORCED TAX.
5  A.  THAT CAME OUT OF A CONGRESSIONAL REPORT, I BELIEVE,
6      OR SOMEBODY IN FRONT OF A CONGRESSIONAL COMMITTEE.
7      I THINK THAT CAME IN 1954, OR RIGHT AROUND THERE.
8  Q.  BUT THAT, AND THE CONCLUSION THAT CAN BE, THAT
9      SHOULD BE DRAWN FROM THAT IS THAT THE INCOME TAX IS
10     PURELY VOLUNTARY, CORRECT?
11 A.  THERE'S A LOT OF INFORMATION OUT THERE THAT WOULD
12     MAKE THAT APPEAR SO, IF SOMEONE STUDIES IT.
13 Q.  AND YOU PROVIDED THAT INFORMATION TO MEMBERS OF THE
14     AWARE GROUP?
15 A.  I PROVIDED THAT INFORMATION TO MEMBERS OF THE AWARE
16     GROUP, ALONG WITH MUCH INFORMATION, YES.
17 Q.  OKAY.  WITHIN THE RELIANCE MANUAL, WAS THERE
18     INFORMATION WHERE SOMEBODY COULD SEND AWAY TO GET
19     PERSONALIZED LETTERS?
20 A.  THERE -- I THINK THERE WAS.
21 Q.  WHY WOULD YOU NEED A PERSONALIZED LETTER?
22 A.  I WOULDN'T, BUT IF THEY DID, THEY COULD GET IT.
23     THEY WOULD -- THEY WOULD -- WE PUT THEM IN TOUCH
24     WITH THE PEOPLE.
25 Q.  WHY DO YOU -- WHY WOULD YOU -- WHY WOULD THEY NEED

---

Page 57

1      TO BE PUT IN TOUCH WITH THE PEOPLE?
2  A.  I HAVE NO IDEA.  YOU'D HAVE TO ASK THEM.
3  Q.  OKAY.  WELL, WHY DID YOU FEEL IT NECESSARY TO
4      INCLUDE THEIR ADDRESS SO THEY COULD CONTACT THEM?
5  A.  JUST AS A SERVICE.  MAYBE THEY WANTED TO QUESTION
6      THE LETTERS.  THERE COULD BE A LOT OF DIFFERENT
7      ANSWERS TO THAT.
8  Q.  BUT THEY WERE GETTING -- THEY WERE -- YOU WERE
9      ASKING THEM TO SEND AWAY TO GET COPIES OF THESE
10     LETTERS WITH THEIR NAME INCLUDED, RIGHT?
11 A.  UH-HUH.
12 Q.  OKAY.
13 A.  PERSONALIZED.
14 Q.  SO, THEY'RE GETTING -- BUT THEY'RE GETTING THE SAME
15     FORM LETTER?
16 A.  YEAH, IT WAS A FORM LETTER.  I MEAN, I NEVER GOT
17     ONE, SO I WOULDN'T -- I WOULDN'T MAKE A PRESUMPTION
18     THAT THAT'S WHAT THEY WERE GETTING IF THEY DID THAT.
19 Q.  DO YOU KNOW WHAT THEY WOULD USE THESE FORM LETTERS
20     FOR?
21 A.  NO, I WASN'T INVOLVED WITH THEIR, WHATEVER THAT IS,
22     IF THEY HAD AN ISSUE OR IF IT WAS THEY WERE JUST
23     WANTING TO LEARN, THEY WERE BUILDING PAPER WORK.  A
24     LOT OF PEOPLE DID THAT, JUST WANTED TO HAVE PAPER
25     WORK.

---

15 (Pages 54 to 57)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

## Page 58

1  Q.  LET'S MOVE ON TO ONE OF THE OTHER PRODUCTS THAT THE
2      AWARE GROUP SOLD INVOLVING LAND PATENTS.
3  A.  OKAY.
4  Q.  THE DESCRIPTION OF THIS IS, AGAIN, ON THIS PAGE,
5      THIS PAGE THAT WE'VE BEEN LOOKING AT RIGHT BELOW THE
6      RELIANCE ONE.  WHY DON'T YOU TAKE A MINUTE AND READ
7      THAT?
8  A.  OKAY.
9  Q.  OKAY.  IT SAYS WITH PATENTED LAND, YOUR LAND CAN'T
10     BE TAKEN FROM YOU FOR DEBTS OR TAXES.  WHAT DID YOU
11     MEAN BY THAT?
12 A.  EXACTLY WHAT IT SAYS.
13 Q.  WHY COULDN'T IT BE TAKEN?  WHAT MADE PATENTED LAND
14     SO SPECIAL?
15 A.  PATENTED LAND IS FREE HOLD LAND.
16 Q.  CAN YOU EXPLAIN THAT TO ME?
17 A.  IT MEANS IT CAN'T BE TAKEN FOR DEBTS OR TAXES.
18     THERE CAN BE NOTHING LIENED AGAINST IT.
19 Q.  WHY IS THAT?
20 A.  WELL, I'M NOT GOING TO GET INTO A DESCRIPTION OF
21     THIS.
22 Q.  WELL, I'M ASKING YOU FOR A DESCRIPTION OF THIS.
23 A.  OKAY.  IT'S BEEN LATER DISCOVERED SINCE THIS THAT
24     YOU CAN'T PATENT THE LAND.  THE LAND HAS ALREADY
25     BEEN TAKEN OVER AND COMPLETELY OWNED AND

## Page 59

1      SUBORDINATED.  AT THAT TIME, WE THOUGHT THERE WAS A
2      PROCESS WHERE WE CAN GO BACK TO HAVING PATENTED
3      LAND, AND IT WAS IMPORTANT TO UNDERSTAND THAT, THAT
4      AT SOME TIME IN THE HISTORY OF THE COUNTRY,
5      EVERYBODY LOST OWNERSHIP, TRUE OWNERSHIP OF THEIR
6      LAND.
7  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER TEN, DO
8  YOU OWN YOUR LAND?, ATTACHED.)
9  EXAMINATION RESUMED BY MR. STRONG:
10 Q.  I'LL HAND YOU NOW WHAT'S BEING MARKED AS PLAINTIFF'S
11     EXHIBIT NUMBER TEN, AND A COPY HAS BEEN PROVIDED TO
12     YOUR COUNSEL, ENTITLED DO YOU OWN YOUR LAND.  TAKE A
13     MINUTE AND ---
14 A.  UNDERSTAND I HAVEN'T READ IT ALL.  I'M JUST
15     GENERALLY LOOKING.
16 Q.  THIS IS INFORMATION THAT THE AWARE GROUP PROVIDED TO
17     PEOPLE INTERESTED IN LAND PATENTS.
18 A.  OKAY.  THIS CAME OFF THE FREEDOM FILES.
19 Q.  THIS IS INFORMATION THAT YOU FOLKS PROVIDED TO ME AS
20     PART OF MY REQUEST FOR PRODUCTION OF DOCUMENTS.
21 A.  OKAY.  I HAVE NO IDEA WHERE IT CAME FROM, BUT OKAY.
22     THAT LOOKS LIKE FREEDOM FILES, PICTURE THAT HEATHER
23     WOULD PUT IN.
24 Q.  SO, YOU WOULD AGREE THAT THIS WOULD COME OFF, THAT
25     THIS IS PROBABLY OFF THE FREEDOM FILES?

## Page 60

1  A.  YEAH, MORE THAN LIKELY, IT IS.
2  Q.  OKAY.
3  A.  LIKE I SAID, I DON'T HAVE THE FREEDOM FILES, AND I'D
4      LIKE TO GET IT SO I CAN REVIEW IT.
5  Q.  THE SENTENCE HERE AT THE BOTTOM OF THE FIRST PAGE,
6      IT SAYS, "LAND CANNOT BE TAKEN FOR DEBT OR TAXES,
7      BUT REAL ESTATE CAN BE TAKEN."  CAN YOU EXPLAIN
8      THAT?
9  A.  YEAH, A LITTLE SLIGHT OF HAND THERE.  THERE'S A
10     DIFFERENCE BETWEEN LAND AND REAL ESTATE.  REAL
11     ESTATE IS A DIFFERENT TERM.  I CAN'T RECALL EXACTLY
12     HOW TO DESCRIBE IT OR DEFINE IT, BUT THERE WAS A
13     DIFFERENCE BETWEEN THE TWO.
14 Q.  AND ONLY GOING THROUGH THIS -- AT THE TIME THAT THIS
15     WAS BEING, AT THE TIME THAT THE AWARE GROUP WAS
16     OPERATING, THERE WAS A BELIEF THAT YOU WERE SHARING
17     WITH MEMBERS OF THE AWARE GROUP THAT A LAND PATENT
18     WAS THE ONLY WAY TO SECURE PROPERTY FROM BEING
19     SUBJECT TO SEIZURE BY DEBT OR TAXES?
20 A.  LAND PATENTS WASN'T SOMETHING THAT I THOUGHT OF ON
21     MY OWN.  PEOPLE -- MANY PEOPLE WERE COMING TO ME
22     ABOUT THIS ISSUE, AND THEY WERE CONCERNED, RIGHTLY
23     SO, BECAUSE THERE WAS NO WAY TO PASS ON TO THEIR
24     POSTERITY, THEIR PROPERTY.  THEY DIDN'T FEEL THAT
25     THEY OWNED THEIR PROPERTY.  ALL THEY EVER GOT WAS A

## Page 61

1      TITLE ON THEIR PROPERTY.  IT WASN'T OWNERSHIP.  WE
2      WERE STUDYING THAT, AND THERE WERE MANY PEOPLE THAT
3      WERE STUDYING THIS.
4  Q.  AND YOU WERE PROVIDING INFORMATION ON HOW, ON WHAT A
5      LAND PATENT WAS?
6  A.  WHAT I WAS DOING WAS ACTING AS A CENTRAL POINT AND
7      RECIRCULATING THE INFORMATION COMING IN TO ME AND
8      PUTTING IT BACK OUT, ENCOURAGING MORE PEOPLE TO
9      STUDY THIS ISSUE.
10 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 11,
11 STEPS TO SECURE A LAND PATENT CLAIM, ATTACHED.)
12 EXAMINATION RESUMED BY MR. STRONG:
13 Q.  I'LL HAND YOU NOW WHAT'S BEING MARKED AS PLAINTIFF'S
14     EXHIBIT NUMBER 11, ENTITLED STEPS TO SECURE A LAND
15     PATENT CLAIM.
16 A.  OKAY.
17 Q.  WOULD THIS HAVE COME OFF THE FREEDOM FILES?
18 A.  IT COULD HAVE.  I DON'T KNOW IF IT DID.
19 Q.  WELL, LET'S REFER BACK TO MAYBE PLAINTIFF'S EXHIBIT
20     NUMBER EIGHT, WHICH WAS THE REFERRAL PROGRAM LIST.
21     I'M LOOKING AT PAGE TWO OF THAT.
22 A.  OKAY.  IT SAYS STEPS TO SECURE, BUT YEAH, SAME
23     THING.  OKAY.
24 Q.  OKAY.  AND THE FIRST ONE SAYS WHO OWNS YOUR LAND,
25     WHICH WE WERE DISCUSSING, PLAINTIFF'S EXHIBIT NUMBER

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

## Page 62

1    TEN.
2    A.  OKAY.
3    Q.  OKAY.  SO, THIS CAME OFF THE FREEDOM FILES, THEN?
4    A.  OKAY.  IT APPEARS SO.
5    Q.  OKAY.  THIS PACKET OF MATERIALS CONTAINS A NUMBER OF
6        FORMS ON HOW TO SECURE A LAND PATENT, CORRECT?
7    A.  IT'S A LOT OF INFORMATION.  WHERE, SPECIFICALLY, ARE
8        THE FORMS?
9    Q.  JUST CONTINUE THROUGH THE MIDDLE.
10   A.  OKAY, HERE.  DECLARATION.  THERE'S NO PAGE NUMBERS
11       ON HERE.  IT JUST SAYS DECLARATION OF LAND PATENT.
12       DESCRIPTION OF PROPERTY, NOTICE AND EFFECTIVE LAND
13       PATENT.
14   Q.  SO, YOU WOULD AGREE THAT YOU WERE PROVIDING FILL IN
15       THE BLANK FORMS FOR FOLKS WHO WANTED TO SECURE A
16       LAND PATENT?
17   A.  NO, THIS IS INFORMATION -- I DIDN'T CREATE THIS
18       DOCUMENT.  THIS IS INFORMATION THAT CAME IN FROM THE
19       PEOPLE THAT WE WERE STUDYING BECAUSE THAT LAND
20       PACKAGE HAD, LAND PATENT PACKAGE HAD A LOT OF STUFF
21       IN IT.  AND ALL WE WERE DOING WAS RECIRCULATING IT
22       BACK OUT AND ENCOURAGING PEOPLE TO GET TO THE BOTTOM
23       OF WHAT'S GOING ON WITH THE LAND ISSUE IN THE UNITED
24       STATES OF AMERICA.
25   Q.  WELL, NOW, THE FIRST COUPLE OF PAGES, THOUGH, ARE

## Page 63

1        INSTRUCTIONS ON HOW TO FILL OUT THESE FORMS AND TAKE
2        THE STEPS TO SECURE THIS, CORRECT?
3    A.  YES.
4    Q.  SO, YOU'RE PROVIDING INSTRUCTIONS ON HOW TO SECURE A
5        LAND PATENT CLAIM TO MEMBERS OF THE AWARE GROUP?
6    A.  JUST PROVIDING WHAT WAS SENT IN.  IT'S GOING BACK
7        OUT AGAIN.
8    Q.  BUT YOU'RE PROVIDING IT?
9    A.  WE PROVIDED IT.
10   Q.  OKAY.  WOULD YOU PROVIDE SOMETHING YOU COULDN'T RELY
11       ON?
12   A.  BAD QUESTION.  IT'S LIKE ---
13   Q.  WOULD YOU DO YOUR OWN RESEARCH BEFORE YOU WOULD
14       PROVIDE SOMETHING TO THE MEMBERS OF YOUR GROUP?
15   A.  IF I COULD.  LAND PATENTS WAS SOMETHING THAT
16       INTRIGUED ME, AND I WAS VERY INTERESTED WITH THEM.
17       AND I COULDN'T GET TO THE BOTTOM OF IT.
18   Q.  OKAY.  BUT I'M SORRY, BUT GOING BACK TO PLAINTIFF'S
19       EXHIBIT NUMBER EIGHT, WHICH WAS THE LETTER REGARDING
20       SOME OF THESE MATERIALS THAT YOU WERE MARKETING, YOU
21       STATE, BUT THIS IS THE ONLY WAY YOU CAN SECURE TRUE
22       OWNERSHIP OF YOUR LAND.  I MEAN, THIS IS -- AREN'T
23       THOSE YOUR WORDS?
24   A.  THAT -- NOT NECESSARILY.  WHOEVER TYPED UP THE
25       LETTER, BUT THAT'S -- BUT THE UNDERSTANDING AT THAT

## Page 64

1        TIME.
2    Q.  WHO COULD HAVE TYPED UP THE LETTER?  I MEAN, IT
3        WOULD HAVE BEEN YOU OR HEATHER ALEXANDER, CORRECT?
4    A.  IT COULDN'T HAVE BEEN ME, BECAUSE I DON'T WORK ON
5        KEYBOARDS AND COMPUTERS.
6    Q.  BUT YOU WERE -- THIS WAS PART OF YOUR MARKETING
7        MATERIALS?
8    A.  TRUE.
9    Q.  OKAY.  SO, YOUR MARKETING MATERIALS ARE SAYING THAT
10       THE ONLY WAY YOU CAN SECURE TRUE OWNERSHIP OF YOUR
11       LAND IS THROUGH A LAND PATENT CLAIM?
12   A.  FROM WHAT WE UNDERSTOOD AT THE TIME, YES.
13   Q.  AND AT THE TIME, YOU WERE PROVIDING STEP BY STEP
14       INSTRUCTIONS AND FILL IN THE BLANK FORMS ON HOW TO
15       DO SO?
16   A.  WE WERE RECIRCULATING INFORMATION SUCH AS THIS BACK
17       OUT TO PEOPLE.
18   Q.  UNDER THE MARKETING TOOL THAT THIS IS THE ONLY WAY
19       YOU CAN SECURE TRUE OWNERSHIP OF YOUR LAND?
20   A.  DIDN'T KNOW IF IT WAS OR NOT.
21   Q.  BUT THAT'S HOW YOU'RE ---
22   A.  YOU'RE TAKING SOMETHING OUT OF CONTEXT ---
23   Q.  --- MARKETING ---
24   A.  YOU'RE TAKING SOMETHING OUT OF CONTEXT IN ONE PLACE
25       AND PUTTING IT TO ANOTHER.

## Page 65

1    Q.  I'M TAKING WHAT YOU SAY IN YOUR MARKETING MATERIALS
2        AND APPLYING IT TO THE MATERIALS THAT YOU ARE
3        MARKETING.  IS THAT CORRECT?
4    A.  IT'S NOT AN ENDORSEMENT.
5    Q.  AND IN YOUR MARKETING MATERIALS, YOU'RE SAYING THAT
6        WITH PATENTED LAND, YOUR LAND CAN'T BE TAKEN FROM
7        YOU FOR DEBTS OR TAXES.
8    A.  IF THE LAND HAS A PATENT ON IT, YES.  WE HAVEN'T
9        DISCOVERED HOW EXCEPT TO BUY A PIECE OF LAND THAT
10       HAS STILL THE ORIGINAL PATENT ON IT.
11   Q.  BUT AT THE TIME THAT YOU WERE PROVIDING INSTRUCTIONS
12       ON WHAT YOU THOUGHT WAS A WAY TO SECURE THAT SORT OF
13       PATENT?
14   A.  IT WAS A BELIEF, YOU KNOW.  A COUPLE HUNDRED YEARS
15       AGO, WE BELIEVED THE EARTH WAS FLAT.
16   (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 12,
17   LAND PATENTS, EJECTMENTS AND ESTOPPEL, ATTACHED.)
18   EXAMINATION RESUMED BY MR. STRONG:
19   Q.  AND JUST TO WRAP UP OUR DISCUSSION OF LAND PATENTS
20       HERE, DO YOU RECOGNIZE THE DOCUMENT IN FRONT OF YOU
21       ENTITLED LAND PATENTS, EJECTMENTS, AND ESTOPPEL?
22   A.  NO.
23   Q.  OKAY.  DO YOU THINK THIS IS INFORMATION THAT WOULD
24       HAVE BEEN PROVIDED TO MEMBERS OF THE AWARE GROUP?
25   A.  THAT, I CAN'T SAY, JUST BY LOOKING AT THE TYPE.  THE

17 (Pages 62 to 65)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                              July 27, 2009

## Page 66

1    INFORMATION LOOKS OKAY.
2  Q.  DID YOU PROMOTE MATERIALS CONCERNING SOMETHING
3      CALLED, CONCERNING COMMERCIAL REDEMPTION OR
4      REDEMPTION?
5  A.  DID I WHAT MATERIALS TO WHOM?
6  Q.  PROVIDE MATERIALS.
7  A.  YES.
8  Q.  WHAT IS THE REDEMPTION PROCESS?
9  A.  AM I DONE WITH THIS?
10 Q.  YES.
11 A.  THE REDEMPTION PROCESS IS SOMETHING I DIDN'T BELIEVE
12     IN.  THE EDITOR OF AMERICA'S BULLETIN WORKED ON ME
13     FOR ABOUT A YEAR TO TAKE A LOOK AT IT.
14 Q.  UH-HUH.
15 A.  AND WHEN I DID TAKE A LOOK AT IT, I SMELLED SMOKE
16     AND WHEN I SMELL SMOKE, I LOOK FOR FIRE.
17 Q.  OKAY.  CAN YOU STILL -- WHAT IS REDEMPTION?
18 A.  THE IDEA, AT THAT TIME, OF REDEMPTION WAS THAT YOU
19     CAN REDEEM THIS FICTIONAL PERSON THAT IS CREATED IN
20     EVERYBODY'S NAME.
21 Q.  OKAY.  AND WHAT IS THAT?  HOW DOES THAT BENEFIT
22     ANYBODY?
23 A.  WELL, IF IT WOULD WORK, IT WOULD BENEFIT PEOPLE BY
24     BEING ABLE TO TAKE BACK WHAT IS RIGHTFULLY THEIRS.
25 Q.  UH-HUH.  BUT TO MEMBERS OF THE AWARE GROUP, YOU

## Page 67

1      PROVIDED SOMETHING ENTITLED THE REDEMPTION MANUAL?
2  A.  YES.
3  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 13,
4  GETTING STARTED, ATTACHED.)
5  EXAMINATION RESUMED BY MR. STRONG:
6  Q.  I'LL NOW HAND YOU WHAT'S BEING MARKED AS PLAINTIFF'S
7      EXHIBIT 13.
8  A.  ARE WE DONE WITH THESE, OR SHOULD I JUST STACK THEM
9      UP?  IT'S GOING TO BE A MESS HERE.
10 Q.  YEAH, WE CAN DO THAT.  OKAY.  THIS PACKET OF
11     MATERIALS CALLED GETTING STARTED, DOES THIS CONCERN
12     THE REDEMPTION -- AFTER YOU'VE TAKEN A MOMENT TO
13     LOOK AT IT, DOES THIS CONCERN THE REDEMPTION
14     PROCESS?
15 A.  YES.
16 Q.  AND AGAIN, THIS IS MATERIAL THAT YOU WERE PROVIDING
17     TO MEMBERS OF THE AWARE GROUP?
18 A.  CORRECT.
19 Q.  OKAY.
20 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 14,
21 FORMS AND TEMPLATES, ATTACHED.)
22 EXAMINATION RESUMED BY MR. STRONG:
23 Q.  I'LL ALSO PROVIDE YOU WHAT I'M GOING TO MARK AS
24     PLAINTIFF'S EXHIBIT ---
25 A.  FOURTEEN?

## Page 68

1  Q.  --- 14.  AND FOR THE RECORD, I HAVE PROVIDED ALSO
2      EXHIBITS 13 AND 14 TO COUNSEL.  THIS PACKET OF
3      MATERIALS, TAKE A LOOK AT IT AND LET ME KNOW WHEN
4      YOU'RE READY.
5  A.  OKAY.
6  Q.  THESE ARE, AGAIN, FORMS, FILL IN THE BLANK FORMS AND
7      TEMPLATES FOR MEMBERS OF THE AWARE GROUP TO USE IN
8      THE REDEMPTION PROCESS?
9  A.  UH-HUH.  YES.
10 Q.  THAT YOU WERE PROVIDING TO THEM?
11 A.  RIGHT.
12 Q.  SO, THEY COULD USE THESE FORMS, THEN, TO SEPARATE
13     THEMSELVES FROM THEIR STRAW MAN?
14 A.  THAT WAS THE IDEA, THAT ---
15 Q.  OKAY.  IF YOU DIDN'T BELIEVE IN IT, WHY WERE YOU
16     PROVIDING THESE TO MEMBERS OF YOUR ORGANIZATION?
17 A.  BECAUSE I WATCHED HOW HARD THE CASES AND THE
18     GOVERNMENT WAS COMING AGAINST IT, AND IT MADE ME
19     REALIZE THAT MAYBE IT HAS MORE VALIDITY THAN I
20     SUSPECTED, BUT I ALSO LOOKED AT THE TENACITY WITH
21     WHICH THEY CAME AT THESE PEOPLE.  SO, IT BROUGHT A
22     LOT OF QUESTIONS INTO MY MIND IF I WANT TO BE
23     INVOLVED WITH THIS.  I DIDN'T WANT TO BE INVOLVED
24     WITH IT IN THE BEGINNING.  WHEN I GOT INVOLVED WITH
25     IT, I DIDN'T NECESSARILY LIKE WHAT I SAW AND THEN I

## Page 69

1      STARTED GETTING UNINVOLVED WITH IT.
2  Q.  WHAT DO YOU MEAN YOU WERE GETTING UNINVOLVED WITH
3      IT?
4  A.  I MEAN I GOT UNINVOLVED WITH IT.
5  Q.  BUT YOU WERE STILL PROVIDING FILL IN THE BLANK FORMS
6      FOR YOUR MEMBERS TO ---
7  A.  IT WAS ON THE -- IT WAS ON THE FREEDOM FILES.  I HAD
8      NO CONTROL OVER HOW TO TAKE ANYTHING OFF OF THE
9      FREEDOM FILES OR PUT ANYTHING ON.
10 Q.  COULD YOU NOT CREATE NEW CDs OF -- WITHOUT SOME OF
11     THIS ---
12 A.  THE CDs WERE LOCKED UP TIGHTER THAN A DRUM.
13 Q.  NOW, THE PRODUCT THAT YOU WERE BEST KNOWN FOR WAS
14     TRUSTS, CORRECT?
15 A.  YOU MEAN THE SELLING PRODUCT, OR JUST GENERAL
16     KNOWLEDGE AND INFORMATION?
17 Q.  WELL, LET'S START WITH ONE AND THEN THE OTHER.
18     GENERAL KNOWLEDGE AND INFORMATION.
19 A.  THE ECONOMY, MONEY.
20 Q.  OKAY.  SELLING?
21 A.  YEAH, AND SELLING.
22 Q.  SO, REGARDING TRUSTS.
23 A.  OH, OKAY.  I THOUGHT -- OKAY.  I MISUNDERSTOOD YOUR
24     QUESTION.
25 Q.  YOUR PRIMARY PRODUCT THAT YOU WERE SELLING WERE

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

## Page 70

1    CALLED PURE TRUSTS?
2  A.  WAS CONTRACTS.  WE REFER TO THEM AS CONTRACTS OF
3    PURE TRUST.
4  Q.  OF PURE TRUST.  AND WHAT IS A PURE TRUST?  WHAT IS A
5    PURE TRUST?
6  A.  CONTRACT.
7  Q.  CONTRACT BETWEEN WHOM?
8  A.  WHOEVER WANTS TO START THE CONTRACT AND FINISH IT,
9    BETWEEN THE SETTLER, TRUSTEE, THE CONTRACTOR, THE
10    CONTRACTEE.  A LOT OF DIFFERENT TERMS FOR THEM.  TWO
11    SIDES TO A CONTRACT.
12  Q.  HOW WOULD IT WORK?
13  A.  IT WOULD WORK ANY WAY THEY WANT IT TO WORK.  IT'S A
14    CONTRACT.  SO LONG AS THEY'RE NOT INTERFERING WITH
15    ANYBODY ELSE'S RIGHTS, THEY CAN DO WHATEVER THEY
16    WANT IN A CONTRACT.
17  Q.  HOW IS THE PRODUCT THAT YOU SOLD, HOW IS -- HOW WAS
18    IT INTENDED TO WORK?
19  A.  IT WAS INTENDED TO WORK FOR PRIVACY.
20  Q.  WHAT DO YOU MEAN BY PRIVACY?
21  A.  KEEP PEOPLE FROM SNOOPING INTO THEIR LIVES.
22  Q.  WHO WOULD BE ABLE TO SNOOP INTO THEIR LIVES?
23  A.  THE EARLY 1980s, WHEN THE WHOLE THING WITH IDENTITY
24    THEFT STARTED, I BECAME ALARMED, NEVER EVEN
25    IMAGINING IT WOULD GROW AS BIG AS IT DID.  I COULD

## Page 71

1    NEVER HAVE THOUGHT OF THAT, BUT I SAW IT AS A
2    PROBLEM.  HOW DO YOU KEEP THAT FROM HAPPENING?  YOU
3    KEEP THAT FROM HAPPENING BY ESTABLISHING PRIVACY ANY
4    WAY YOU CAN.
5  Q.  AND SO, HOW WOULD A PURE TRUST HELP ONE TO ESTABLISH
6    PRIVACY?
7  A.  IF SOMETHING ISN'T IN YOUR NAME, THEY REALLY CAN'T
8    DETERMINE THAT YOU, THAT IT'S YOURS.
9  Q.  WOULD THE I.R.S. NOT BE ABLE TO DETERMINE THAT IT
10    WAS, THAT THE PROPERTY IN THE TRUST WAS ---
11  A.  IT DEPENDS ON THE, DEPENDS ON THE TRUST, DEPENDS ON
12    THE KIND OF PROPERTY.  THE I.R.S. HAS A LOT OF
13    FILINGS ON TRUSTS.
14  Q.  UH-HUH.  BUT IN YOUR UNDERSTANDING OF HOW THE PURE
15    TRUST THAT, YOU KNOW, THE CONTRACT TEMPLATES YOU
16    WERE FORMING, HOW WOULD IT -- WOULD THE I.R.S. BE
17    ABLE TO LOOK IN THERE?
18  A.  YEAH, I MEAN, MOST OF THE -- MOST OF THE PROPERTY IN
19    TRUST IS PROPERTY OF RECORD.  MOST OF IT'S REAL
20    ESTATE, I WOULD IMAGINE.
21  Q.  WOULD THEY BE ABLE TO -- WOULD THEY BE ABLE TO
22    ATTACH TO IT?
23  A.  DEPENDS ON WHERE THE -- DEPENDS ON THE LIABILITY.
24    WHO WAS LIABLE?  WHAT WAS LIABLE?  IF, SAY, FOR
25    EXAMPLE, A PIECE OF PROPERTY, LAND, HOME WAS IN A

## Page 72

1    TRUST AND YOU CAME OVER AND YOU JUMPED OVER THE
2    FENCE AND WAS ON THE WRONG PLACE AND YOU STUMBLE
3    BUMMED AROUND AND FELL DOWN AND BROKE YOUR NOSE,
4    YEAH, THE TRUST COULD BE LIABLE.  NO QUESTION ABOUT
5    IT.
6  Q.  WELL, YOU'RE INVOLVED IN THE ALEXANDER FAMILY TRUST,
7    RIGHT?
8  A.  I'M THE FIRST TRUSTEE.
9  Q.  OKAY.  HOW DID YOU INTEND THAT FOR YOUR TRUST TO
10    OPERATE, TO PROTECT YOUR PRIVACY?
11  A.  FIRST OF ALL, IT'S NOT MY TRUST.  IT'S MY MOTHER'S
12    TRUST.  SHE'S THE ONE THAT ESTABLISHED IT, SO WE GO
13    BACK TO THE ORIGIN.  IT'S MY MOTHER'S TRUST.
14  Q.  AND WHAT ARE YOUR ROLES AND RESPONSIBILITIES AS
15    FIRST TRUSTEE?
16  A.  TO CARE FOR THE PROPERTY OR THE CORPUS OF THE TRUST.
17  Q.  NOW THAT YOUR MOTHER HAS PASSED AWAY, HOW DID THAT
18    AFFECT THE TRUST?
19  A.  REALLY, NO EFFECT.  IT'S STILL IN EXISTENCE.
20  Q.  AND YOU'RE STILL FIRST TRUSTEE?
21  A.  I AM STILL A FIRST TRUSTEE.
22  Q.  AND HOW DOES THAT -- HOW DID THE TRUST PROTECT YOUR
23    MOTHER'S PRIVACY?
24  A.  BECAUSE UNTIL YOU BROUGHT IT UP, NOBODY ELSE KNOWS
25    SHE HAD ANYTHING TO DO WITH IT.

## Page 73

1  Q.  DOES THE -- DOES THE TRUST HELP PROTECT YOUR PRIVACY
2    IN ANY WAY?
3  A.  NO, NOT REALLY.  WASN'T MEANT TO.
4  Q.  BUT THIS IS A HOME THAT YOU NOW LIVE IN AND RESIDE
5    IN, CORRECT?
6  A.  I LIVE IN THIS HOME.
7  Q.  SO, THE TRUST HAS AND THE PERSON WHOSE PRIVACY IT
8    WAS INTENDED TO PROTECT HAS NOW PASSED AWAY.
9  A.  NO, THERE ARE OTHERS.
10  Q.  WHAT OTHERS?
11  A.  BENEFICIARY.
12  Q.  OKAY.  THE BENEFICIARY IS?
13  A.  IS MY ADOPTED DAUGHTER.
14  Q.  AND IS THE TRUST, DOES THE TRUST HAVE ANY
15    RESPONSIBILITIES TO THE INTERNAL REVENUE SERVICE?
16  A.  NO.
17  Q.  WHY NOT?
18  A.  IT'S JUST A CONTRACT WITH A HOUSE IN IT.  HOW WOULD
19    THE I.R.S. FIT INTO IT?  DOESN'T MAKE INCOME,
20    DOESN'T DO ANYTHING.
21  Q.  WHAT ARE THE BENEFITS OF OWNING A PURE TRUST?
22  A.  YOU JUST ASKED THAT QUESTION.
23  Q.  WELL, I'M ASKING IT NOW.
24  A.  PRIVACY.
25  Q.  ANY OTHER BENEFITS?

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                              July 27, 2009

---

Page 74

1  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 15,
2  BENEFITS OF A PURE TRUST, ATTACHED.)
3  EXAMINATION RESUMED BY MR. STRONG:
4  Q.  BEFORE YOU ANSWER, I'LL HAND YOU WHAT'S BEEN MARKED
5     AS PLAINTIFF'S EXHIBIT NUMBER 15, WHICH I'M ALSO
6     HANDING TO YOUR COUNSEL.
7  A.  OH, OKAY.  THAT MAKES IT EASY.
8  Q.  IS ONE OF THE BENEFITS OF A PURE TRUST THAT YOU CAN
9     PAY REDUCED TAXES?
10 A.  IN SOME CASES.
11 Q.  HOW DOES THAT WORK?
12 A.  DON'T KNOW.  DON'T HAVE THAT CASE.
13 Q.  BUT HOW WOULD IT WORK WITH OTHER CASES?
14 A.  I CAN'T ANSWER THAT QUESTION.
15 Q.  YOU'RE MARKETING IT THAT IT CAN HELP REDUCE YOUR
16    TAXES.  WHAT DID YOU MEAN WHEN YOU MARKETED IT THAT
17    WAY?
18 A.  THIS IS FIVE YEARS AGO THAT I EVEN SAW THIS.  AND
19    I'M NOT EXACTLY SURE WHAT YOU'RE SAYING OR ASKING OR
20    LOOKING FOR.
21 Q.  IS THIS DOCUMENT A MARKETING MATERIAL PUT OUT BY THE
22    FREEDOM TRUST GROUP OR THE AWARE GROUP?
23 A.  THIS LOOKS LIKE A PAGE THAT CAME OFF OF SOMETHING,
24    BUT WHERE IT CAME FROM, I'M NOT SURE.
25 Q.  ON THE TOP, IT SAYS YOUR PRIVACY AND ASSET

---

Page 75

1     ACCUMULATION GUIDE BY F.T.G. VERSION 10/00.
2  A.  OH, OKAY.  YEAH, I SEE WHERE IT CAME FROM.
3  Q.  SO, THIS IS SOMETHING FROM THE FREEDOM TRUST GROUP?
4  A.  IT WAS IN THE BOOK.
5  Q.  BUT YOU'RE ATTACHING YOUR COMPANY'S NAME TO IT?
6  A.  YEAH.
7  Q.  OKAY.  AND WITHIN THAT, YOU'RE SAYING THAT -- SO,
8     THIS IS A MARKETING TOOL, SAYING THAT A BENEFIT OF A
9     PURE TRUST IS THAT IT CAN HELP YOU PAY REDUCED
10    TAXES?
11 A.  NO, THIS WASN'T USED AS A MARKETING TOOL.  THIS WAS
12    JUST AN INFORMATIONAL BOOK, IS ALL IT WAS.
13 Q.  OKAY.  BUT THESE ARE MATERIALS THAT YOU'RE PROVIDING
14    TO PEOPLE WHO WOULD HAVE ORDERED ---
15 A.  WE PROVIDED -- WE PROVIDED THE BOOK, YES.
16 Q.  OKAY.  SINCE YOU'RE PROVIDING THIS INFORMATION,
17    THEN, I GUESS, I MEAN, THE QUESTION I HAVE FOR YOU
18    IS HOW DID IT HELP YOU REDUCE YOUR TAXES?
19 A.  I CAN'T ANSWER THAT.
20 Q.  BUT YOU ARE -- YOU'RE SELLING -- YOU ARE SELLING
21    PURE TRUSTS, CORRECT?
22 A.  NO, I WAS.
23 Q.  OKAY.  AT THE TIME, BETWEEN 2000 AND 2005, WITHIN
24    FREEDOM TRUST GROUP, YOU WERE SELLING PURE TRUSTS?
25 A.  SELLING SOFTWARE, YES.

---

Page 76

1  Q.  THAT CONTAINED INFORMATION ON HOW TO SET UP A PURE
2     TRUST?  AND ON PAGE FOUR OF THIS MATERIAL, BELOW
3     WHERE IT SAYS NUMBER EIGHT, STARTING IN OUR
4     RESEARCH, YOU SCRUTINIZED HUNDREDS OF COURT
5     DECISIONS TO FIND HOW TO MAKE CERTAIN TYPES OF
6     TRUSTS IMPENETRABLE BY JUDGES, THE I.R.S., AND OTHER
7     CREDITORS.  THE TRUSTS HAVE BEEN STRUCTURED AFTER
8     CONTRACTS OF TRUST THAT HAVE BEEN CHALLENGED AND
9     TESTED TO WITHSTAND THE MOST INTENSE SCRUTINY OF THE
10    COURTS, THE I.R.S., AND CREDITORS, AND STILL REMAIN
11    INTACT?  HOW DID THAT WORK?
12 A.  I DON'T UNDERSTAND WHAT YOU MEAN HOW DOES THAT WORK.
13 Q.  YOU'RE PROVIDING THEM INFORMATION ABOUT THE PURE
14    TRUSTS THAT THESE, AND HOW THEY'RE PURPORTEDLY
15    IMPENETRABLE BY THE I.R.S. OR OTHER CREDITORS.
16 A.  IF IT'S SET UP PROPERLY.
17 Q.  OKAY.  HOW WOULD YOU SET THEM UP PROPERLY TO DO
18    THAT?
19 BY MR. BENNETT:
20       OBJECTION.  CALLS FOR A LEGAL SPECULATION.  YOU
21    CAN ANSWER THE QUESTION AS TO PERSONAL OPINION, AND
22    I'M GOING TO KEEP THAT A RUNNING OBJECTION ON ANY OF
23    THOSE, BUT YOU CAN ANSWER THE QUESTION.
24 BY THE WITNESS:
25       WHAT WAS THE QUESTION AGAIN?  THAT THREW ME

---

Page 77

1     OFF.
2  EXAMINATION RESUMED BY MR. STRONG:
3  Q.  HOW WOULD YOU SET UP THE TRUST TO PROTECT IT FROM
4     THE I.R.S.?
5  A.  IT'S NOT A SET UP TO PROTECT FROM THE I.R.S.  AND I
6     WOULD NEVER SPECIFICALLY DO THAT, TO SET UP.
7  Q.  BUT THAT'S WHAT YOUR MATERIALS SAY CAN BE DONE.
8  A.  IT'S A BOOK.
9  Q.  MATERIALS, THOUGH, THAT YOU'RE PROVIDING.
10 A.  IT'S A BOOK.
11 Q.  AND SELLING.
12 A.  IT'S A BOOK.  I DON'T KNOW HOW MANY PAGES THERE WERE
13    ON THE FREEDOM FILES, SEVERAL THOUSAND PAGES ON THE
14    FREEDOM FILES.  IT'S NOT ALL -- IT'S NOT ALL OUR
15    MATERIAL.  WE WERE RECIRCULATING MATERIAL.
16 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 16,
17 YOUR PRIVACY AND ASSET ACCUMULATION GUIDE, ATTACHED.)
18 EXAMINATION RESUMED BY MR. STRONG:
19 Q.  I'LL HAND YOU NOW WHAT HAS BEEN MARKED AS
20    PLAINTIFF'S EXHIBIT 16, AND ONE HAS BEEN PROVIDED TO
21    COUNSEL, ENTITLED YOUR PRIVACY AND ASSET
22    ACCUMULATION GUIDE.  WHO PUBLISHED THIS BOOK?
23 A.  WE PUT THIS INFORMATION TOGETHER FROM A WIDE VARIETY
24    OF SOURCES.
25 Q.  SO, IN FACT, THEN, ON THE FRONT PAGE, IT SAYS

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                July 27, 2009

## Page 78

1     FREEDOM TRUST GROUP.
2  A.  UH-HUH.
3  Q.  ON THE FRONT.  THIS IS -- THESE ARE YOUR MATERIALS?
4  A.  YEAH, OH, YEAH.  WE CREATED -- I MEAN, WE DIDN'T
5     WRITE THE DOCUMENTS.  THIS IS A LOT OF COPY AND
6     PASTE.
7  Q.  THEN, THROUGH THIS MATERIAL, YOU'RE SELLING FOUR
8     DIFFERENT TRUSTS, CORRECT?
9  A.  I BELIEVE SO.
10 Q.  AND THE PURPOSE OF THESE TRUSTS IS TO PROTECT YOUR
11    ASSETS FROM CREDITORS?
12 A.  TO PROTECT YOUR ASSETS, BE ABLE TO PASS YOUR LEGACY
13    ON, YOU KNOW, ALL THE REASONS THAT ARE ---
14 Q.  WELL, WHO MIGHT YOU PROTECT YOUR -- WHO MIGHT YOU BE
15    PROTECTING YOUR ASSETS FROM?
16 A.  ANGRY EX-WIFE, MAYBE.
17 Q.  ANYBODY ELSE, OTHER THAN THE ANGRY EX-WIFE?
18 A.  COULD BE ALL KINDS OF THINGS.
19 Q.  SUCH AS?
20 A.  YOU GET INTO A CAR ACCIDENT.  THEY WANT TO SUE.
21    THEY GO LOOKING FOR STUFF TO TAKE.
22 Q.  COULD IT PROTECT YOU FROM THE I.R.S. IF THEY WERE TO
23    COME AFTER YOU FOR UNPAID TAXES?
24 A.  DEPENDS.
25 Q.  DEPENDS ON WHAT?

## Page 79

1  A.  DEPENDS ON IF SOMEBODY SET IT UP TO AVOID THAT ON
2     PURPOSE.  IT WOULD DEPEND ON IF THEY SET IT UP,
3     SOMEBODY ELSE SET IT UP.  I'VE SEEN INSTANCES WHERE
4     PEOPLE BOUGHT A PIECE OF PROPERTY AND THEN THEY
5     TURNED AROUND AND THEY PUT IT INTO A TRUST AND
6     BECAME THE TRUSTEE.  THAT -- MAYBE THAT WOULD BE --
7     THIS BOOK, I DON'T THINK, WAS A BOOK.  I THINK THIS
8     WAS SOFTWARE.
9  Q.  OKAY.  BUT THIS IS INFORMATION THAT YOU'RE PROVIDING
10    TO PEOPLE WHO BOUGHT THIS PARTICULAR SOFTWARE FROM
11    THE FREEDOM TRUST GROUP?
12 A.  YEAH.
13 Q.  OKAY.  AND LOOKING AT THIS PARTICULAR PAGE, I DON'T
14    THINK IT HAS THAT HAPPY FAMILY ON IT.  SO, AGAIN,
15    THIS LISTS SOME OF THE ADVANTAGES THAT CAN BE
16    DERIVED FROM OPENING A PURE TRUST, CORRECT?
17 A.  OKAY.
18 Q.  DO YOU AGREE WITH THAT?
19 A.  WITHOUT READING IT ALL.
20 Q.  TAKE YOUR TIME.
21 A.  OKAY.
22 Q.  THE QUESTION I ASKED YOU IS DOES THIS LIST SOME OF
23    THE ADVANTAGES TO OWNING A PURE TRUST.
24 A.  UH-HUH.
25 Q.  AND ON NUMBER EIGHT, IT SAYS THE PURE TRUST IS NEVER

## Page 80

1     SUBJECT TO PROBATE OR ESTATE TAXES.
2  A.  RIGHT.
3  Q.  WHAT DO YOU MEAN BY THAT?
4  A.  JUST WHAT IT SAYS, A PURE TRUST ISN'T SUBJECT TO
5     PROBATE OR ESTATE TAXES.
6  Q.  WHY NOT?
7  A.  BECAUSE IT'S AN ENTITY IN ITSELF, SIMILAR TO A
8     CORPORATION.  MEMBERS OF THE CORPORATION DIE, THE
9     CORPORATION LIVES.
10 Q.  NUMBER NINE SAYS YOU CAN USE THE PURE TRUST TO
11    CONTROL YOUR TAX LIABILITY, CORRECT?
12 A.  UH-HUH.  YES.
13 Q.  WHAT DO YOU MEAN BY THAT?
14 A.  IF YOU DIVIDE UP MONEY, YOU PUT IT IN SOME OTHER
15    ENTITY, THAT OTHER -- THAT TAX LIABILITY IS GOING TO
16    TRANSFER WITH THE MONEY.
17 Q.  SO, YOU CAN TAKE MONEY THAT YOU EARN, PUT IT INTO A
18    TRUST, AND NOT BE TAXED ON THAT INCOME BECAUSE YOU
19    PUT IT INTO A TRUST?
20 A.  THE TRUST WOULD BE TAXED FOR IT.  I MEAN, I'M NOT
21    GOING TO GET INTO TAXATION ON ANY LEVEL, BUT THERE'S
22    A WAY -- THAT'S WHAT TAX ACCOUNTANTS AND TAX
23    ATTORNEYS ARE FOR, AND I WAS CONSTANTLY GIVING
24    SPECIFIC ADVICE TO PEOPLE TO CONSULT WITH THEM.
25 Q.  PART OF THE MATERIALS THAT YOU WERE SELLING INCLUDED

## Page 81

1     PROVIDING FORMS TO FOLKS AS TO HOW TO SET UP THESE
2     TRUSTS.  IS THAT CORRECT?
3  A.  DO YOU MEAN TRUST DOCUMENTS THEMSELVES?
4  Q.  YES.
5  A.  YEAH.
6  Q.  OKAY.
7  A.  TEMPLATES.
8  Q.  THINGS THAT THEY COULD USE TO SET UP THEIR OWN
9     TRUST?
10 A.  A TEMPLATE.
11 Q.  A TEMPLATE THEY COULD USE TO SET UP THEIR OWN TRUST?
12 A.  A TEMPLATE THEY CAN USE TO ESTABLISH A CONTRACT OF
13    TRUST, YES.
14 BY MR. STRONG:
15       MAYBE THIS WOULD BE A GOOD TIME TO TAKE A BREAK
16    REAL QUICK.
17    (OFF THE RECORD  3:08 P.M. - 3:13 P.M.)
18 EXAMINATION RESUMED BY MR. STRONG:
19 Q.  I'M GOING TO HAND YOU NOW A SERIES OF EXHIBITS HERE.
20 A.  THIS HERE?
21 Q.  YOU CAN PUT THAT ASIDE FOR A MOMENT.
22    (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 17,
23    DOCUMENT, ATTACHED.)
24 EXAMINATION RESUMED BY MR. STRONG:
25 Q.  I'LL HAND YOU WHAT'S GOING TO BE MARKED AS EXHIBIT

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

---

Page 82

1    17.
2  BY MR. BENNETT:
3    THANKS.
4  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 18,
5  MANAGEMENT TRUSTS, ATTACHED.)
6  EXAMINATION RESUMED BY MR. STRONG:
7  Q.  THIS ONE IS MARKED AS EXHIBIT 18, ENTITLED
8    MANAGEMENT TRUSTS.
9  A.  OH, OKAY.  I SEE WHAT YOU'RE DOING.
10  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 19,
11  HOLDING TRUSTS, ATTACHED.)
12  EXAMINATION RESUMED BY MR. STRONG:
13  Q.  EXHIBIT 19 WILL BE ENTITLED HOLDING TRUSTS.
14  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 20,
15  BANKING TRUSTS, ATTACHED.)
16  EXAMINATION RESUMED BY MR. STRONG:
17  Q.  EXHIBIT 20 IS ENTITLED BANKING TRUSTS.
18  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 21,
19  OFFSHORE TRUSTS, ATTACHED.)
20  EXAMINATION RESUMED BY MR. STRONG:
21  Q.  AND EXHIBIT 21 IS ENTITLED OFFSHORE TRUSTS.  COPIES
22    OF THE PREVIOUS FIVE EXHIBITS HAVE BEEN PROVIDED, OR
23    -- FIVE EXHIBITS HAVE BEEN PROVIDED TO OPPOSING
24    COUNSEL, AS WELL.  TAKE A MINUTE, LOOK THROUGH
25    THOSE, AND TELL ME IF THOSE ARE INFORMATION THAT YOU

---

Page 83

1    WOULD HAVE PROVIDED THROUGH FREEDOM TRUST GROUP.
2  A.  THESE WERE COPIED EXACTLY OFF OF THE FILES?  IF THEY
3    WERE, THEY ARE.  THAT'S QUITE A BIT OF PAGES TO GO
4    THROUGH, SO.
5  Q.  THIS IS THE INFORMATION THAT WAS PROVIDED TO ME BY,
6    THROUGH MY REQUEST FOR PRODUCTION OF DOCUMENTS.  SO,
7    WE ARE ALL IN AGREEMENT ON THAT.
8  A.  OKAY.
9  Q.  THESE ARE -- SO, YOU WOULD AGREE THAT THESE ARE THE
10    MATERIALS THAT YOU PROVIDED TO ---
11  A.  ON THE CD.
12  Q.  ON THE CD, CONCERNING HOW -- GIVING THEM TEMPLATES
13    ON HOW TO FORM THESE PARTICULAR TYPES OF TRUSTS?
14  A.  RIGHT.
15  Q.  AND THEY'RE ALL -- ALL WOULD FALL UNDER THE CATEGORY
16    OF BEING A PURE TRUST, CORRECT?
17  A.  I WOULDN'T CATEGORIZE THEM -- PROBABLY.
18  Q.  I'M SORRY, BUT GOING BACK TO THE EXHIBITS THAT WE
19    WERE -- THE FIRST EXHIBIT THAT WE WERE LOOKING AT OR
20    THE -- I BELIEVE IT WAS IN THE ASSET ACCUMULATION
21    PROTECTION GUIDE -- PRIVACY AND ASSET ACCUMULATION
22    GUIDE.  WERE THEY NOT ALL LISTED AS PURE TRUSTS?
23  A.  PROBABLY.
24  Q.  SO, THIS -- OKAY.  SO, THESE ARE THE TEMPLATES THAT
25    YOU PROVIDED TO PEOPLE WHO PAID YOU FOR THE FREEDOM

---

Page 84

1    TRUST GROUP MATERIALS?
2  A.  THE SOFTWARE.
3  Q.  CORRECT.  OKAY.
4  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 22,
5  PURE TRUST INFORMATION, ATTACHED.)
6  EXAMINATION RESUMED BY MR. STRONG:
7  Q.  I'LL ALSO HAND YOU WHAT IS BEING MARKED AS
8    PLAINTIFF'S EXHIBIT 22.  OPPOSING COUNSEL HAS BEEN
9    PROVIDED A COPY, AND THIS IS INFORMATION THAT YOU
10    PROVIDED TO PEOPLE ABOUT WHAT PURE TRUSTS ARE?
11  A.  YEAH, THIS IS THE -- THIS LOOKS LIKE TO BE THE BOOK
12    YOU JUST SHOWED ME.
13  Q.  AND AT THE END HERE, THE LAST PAGE, PAGE 27, IT SAYS
14    THE MANAGEMENT TRUST COSTS $275 EACH AND HOLDING
15    TRUSTS COST $100 EACH.
16  A.  THAT'S WHAT IT SAYS, BUT I DON'T UNDERSTAND WHAT IT
17    MEANS BECAUSE WE WEREN'T SELLING INDIVIDUAL TRUSTS.
18    I NEVER WROTE ONE FOR ANYBODY.  THIS IS AN OLDER
19    DOCUMENT.  THIS HAS AN 800 NUMBER.  I DIDN'T EVEN
20    KNOW WE HAD AN 800 NUMBER.
21  Q.  BUT THAT OTHER NUMBER IN THERE, THE 864 NUMBER,
22    THAT'S -- THAT WAS THE NUMBER THAT YOU USED FOR THE
23    AWARE GROUP, RIGHT?
24  A.  1303.  THAT WAS THE NUMBER.
25  Q.  OKAY.  DID YOU EVER CONDUCT SEMINARS WHILE YOU WERE

---

Page 85

1    WORKING WITH THE AWARE GROUP?
2  A.  YEAH.
3  Q.  ABOUT HOW MANY SEMINARS?
4  A.  I COULDN'T TELL YOU EXACTLY.  PROBABLY FOUR OR FIVE,
5    MAYBE SIX.
6  Q.  ONE IN OREGON?
7  A.  OREGON WAS FOR THE AMERICANS BULLETIN, YEAH.
8  Q.  PENNSYLVANIA?
9  A.  I THINK SO.
10  Q.  ATLANTA?
11  A.  YEAH.
12  Q.  ORLANDO?
13  A.  ORLANDO.  IS THAT FOUR?
14  Q.  GREENVILLE?
15  A.  GREENVILLE, YEAH, I DID ONE IN GREENVILLE.
16  Q.  DID YOU EVER DO ONE IN NORTH CAROLINA?
17  A.  I DON'T REMEMBER NORTH CAROLINA.
18  Q.  ANYWHERE ON THE BEACH?
19  A.  YEAH, OKAY.  YEAH, I REMEMBER, YEAH.  WHAT'S THAT
20    BEACH PLACE OUT HERE?  MYRTLE BEACH.
21  Q.  ONE OUT IN MYRTLE BEACH?
22  A.  MYRTLE BEACH.  I COULDN'T REMEMBER A DATE.
23  Q.  OKAY.  SO, YOU'VE DONE ABOUT FIVE OR SIX OF THESE
24    SEMINARS?
25  A.  YEAH.

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

## Page 86

1  Q. WHAT WAS DISCUSSED AT THE SEMINARS?
2  A. WIDE, WIDE VARIETY OF SUBJECTS.
3  Q. WHAT SUBJECTS?
4  A. ANY SUBJECTS THAT CAME OUT OF THE AUDIENCE. I WOULD
5     START IMPROMPTU. MY FIRST SEMINAR I TRIED WITH
6     NOTES AND IT DIDN'T WORK.
7  Q. WELL, OKAY, YOUR FIRST SEMINAR YOU STARTED WITH
8     NOTES. WHAT DID YOU WANT TO DISCUSS?
9  A. I HAVE NO IDEA. WE'RE TALKING YEARS AND YEARS AGO,
10    BUT ALL I REMEMBER IS THE INCIDENT OF TRYING TO PLAN
11    THE TIME OUT AND IT NEVER WORKED OUT LIKE I THOUGHT
12    IT WOULD WORK OUT BECAUSE I WOULD -- I WOULD RAISE A
13    SUBJECT OR I WOULD DEFINE A WORD. I WAS BIG ON WORD
14    DEFINITIONS. DICTIONARY, I ALWAYS HAD A DICTIONARY
15    WITH ME. AND I LEFT IT OPEN TO WHOEVER WAS THERE.
16    IF YOU WANT TO, IF YOU'VE GOT AN ISSUE, RAISE YOUR
17    HAND. THEY WOULD RAISE THEIR HAND AND WE'D ASK DO
18    YOU WANT TO TALK ABOUT THAT? AND A LOT OF PEOPLE
19    WOULD JUMP IN, YES, WE DO. WE WOULD TALK ABOUT IT.
20    IF THEY WERE NOT INTERESTED, WE WOULD MOVE ON TO THE
21    NEXT. BUT A LOT OF IT WAS DEFINING WORDS AND DOING
22    CROSS DEFINITIONS OF WORDS.
23 Q. DID YOU CHARGE PEOPLE TO ATTEND THESE SEMINARS?
24 A. YEAH, OF COURSE. WE HAD -- WE PAID TO GET IN THERE
25    OURSELVES. WE HAD TO PAY FOR THE ROOMS AND

## Page 87

1     TRANSPORTATION, WHATEVER.
2  Q. DID THE SUBJECT OF THE I.R.S. EVER COME UP AT THESE
3     SEMINARS?
4  A. OCCASIONALLY.
5  Q. IN WHAT CONTEXT?
6  A. WHAT CONTEXT? IT'S REALLY SIMPLE. PEOPLE, PROBABLY
7     EVERY SEMINAR, SOMEBODY WOULD STAND UP AND SAY DO I
8     HAVE TO PAY MY TAXES? COME RIGHT OUT AND SAY IT.
9  Q. WHAT WAS THE ANSWER TO THAT?
10 A. THE ANSWER IS DO YOU HAVE TO PAY YOUR TAXES? YES,
11    YOU HAVE TO PAY YOUR TAXES. HE OWNED IT, IT'S HIS.
12    AND THAT'S AS FAR AS THAT WOULD GO.
13 Q. DID YOU PROMOTE MEMBERSHIP INTO THE AWARE GROUP AT
14    THESE SEMINARS?
15 A. OF COURSE.
16 Q. DID YOU PROMOTE THE FREEDOM TRUST GROUP AT THESE
17    SEMINARS?
18 A. I DON'T THINK WE HAD THE FREEDOM TRUST GROUP UNTIL
19    -- THERE MIGHT HAVE BEEN ONE OR TWO SEMINARS THAT WE
20    DID. I DON'T REMEMBER WHAT THE TIMELINE IS. WHEN
21    FREEDOM TRUST GROUP STARTED, WE GOT IT IN THE
22    SOFTWARE. THIS WAS -- THIS WAS A NEW BALLGAME FOR
23    ME, ALL NEW INTERESTING THINGS, THE SOFTWARE THING,
24    I'M TALKING ABOUT.
25 Q. UH-HUH. SO, YOUR FOCUS SHIFTED, THEN, BETWEEN KIND

## Page 88

1     OF CONDUCTING THE SEMINARS AND THEN ESTABLISHING THE
2     FREEDOM TRUST GROUP?
3  A. MY FOCUS WAS TO GIVE INFORMATION IF I WAS THE
4     SPEAKER. AND USUALLY, I WAS THE SPEAKER IF I DIDN'T
5     HAVE GUEST SPEAKERS, AS WELL, BUT MY -- MY MAIN
6     FOCUS WAS TO GIVE INFORMATION, AS MUCH AS I COULD AS
7     FAST AS I COULD.
8  Q. WHAT KIND OF GUEST SPEAKERS WOULD YOU HAVE?
9  A. NOT TOO PROUD OF THE FACT THAT I HAD LANE MEREDITH
10    AS ONE AT THE ONE IN MYRTLE BEACH. THERE WAS AN
11    I.R.S. AGENT IN ONE IN ATLANTA. SHE JUST CAME AS A
12    GUEST, BUT I SAW HER AND I RECOGNIZED HER AND SHE
13    CAME UP AND SHE SPOKE. I THOUGHT SHE WAS GOING TO
14    SAY HELLO, BUT SHE SPOKE FOR A WHILE.
15 Q. SPOKE ABOUT WHAT?
16 A. SPOKE ABOUT WHAT?
17 Q. YEAH.
18 A. I DON'T REMEMBER WHAT SHE SPOKE ABOUT. IT HAD TO
19    HAVE BEEN -- IT HAD TO HAVE BEEN SOMETHING WITH THE
20    I.R.S., BUT I COULDN'T TELL YOU WHAT IT WAS. I
21    DON'T HAVE TAPES OR ANYTHING OR AN EXACT RECALL, BUT
22    I REMEMBER THAT INCIDENT.
23 Q. ANY OTHERS? YOU MENTIONED MEREDITH, THIS I.R.S.
24    AGENT. WERE THERE ANY OTHER SPEAKERS?
25 A. YEAH. I DON'T REMEMBER.

## Page 89

1  Q. HOW OFTEN DID YOU DISSEMINATE NEWSLETTERS TO MEMBERS
2     OF THE AWARE GROUP?
3  A. WHEN THE MOOD WOULD STRIKE US. IF THERE WAS AN
4     EVENT.
5  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 23,
6  NEWSLETTER, ATTACHED.)
7  EXAMINATION RESUMED BY MR. STRONG:
8  Q. I'LL HAND YOU WHAT'S MARKED EXHIBIT NUMBER 23.
9  A. YEAH.
10 Q. IS THIS AN EXAMPLE OF A NEWSLETTER THAT YOU WOULD
11    ---
12 A. UH-HUH.
13 Q. --- SEND OUT? IT'S INTERESTING, CAN YOU LOOK AT
14    PAGE FOUR, PLEASE? THIS IS MATERIAL, THIS IS
15    PROMOTIONAL MATERIAL ABOUT THE BENEFITS OF A PURE
16    TRUST, CORRECT?
17 A. UH-HUH.
18 Q. AND IT LISTS IN THE LAST COLUMN YES FOR ALL OF THE,
19    WHAT BENEFITS MIGHT BE DERIVED FROM A PURE TRUST,
20    CORRECT?
21 A. RIGHT.
22 Q. INCLUDING AVOIDING I.R.S. SEIZURES?
23 A. RIGHT.
24 Q. REDUCING INCOME TAXES?
25 A. RIGHT.

23 (Pages 86 to 89)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

---

Page 90

1  Q.  AVOIDING ESTATE TAXES?
2  A.  RIGHT.
3  Q.  AND THE BOOKS AND RECORDS OF THE PURE TRUSTS WOULD
4      BE PROTECTED FROM A COURT-ORDERED SUBPOENA?
5  A.  THAT'S WHAT IT SAYS.
6  Q.  SO, YOU WERE MARKETING THE PURE TRUST AS BEING ABLE
7      TO DO ALL THESE THINGS FOR YOU?
8  A.  THAT'S WHAT WE BELIEVED AT THE TIME, YEAH.  THAT WAS
9      EARLY ON, TOO.  THERE'S NO DATE ON HERE, I NOTICE.
10     AH, SEPTEMBER OF '96, OKAY.
11 Q.  DID THE BENEFITS OF THE PURE TRUST CHANGE OVER TIME?
12 A.  NO, THE BENEFITS OF THE PURE TRUST DOESN'T CHANGE,
13     BUT OTHER THINGS CHANGE.
14 Q.  WHAT DO YOU MEAN OTHER THINGS?
15 A.  EVERYTHING CHANGES.
16 Q.  EXCEPT THE BENEFITS OF THE PURE TRUST?
17 A.  PERCEPTIONS OF IT.
18 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 24,
19 NEWSLETTER, ATTACHED.)
20 EXAMINATION RESUMED BY MR. STRONG:
21 Q.  THIS HAS BEEN MARKED AS PLAINTIFF'S EXHIBIT 24.  A
22     COPY HAS BEEN PROVIDED TO OPPOSING COUNSEL.
23 A.  9-11.
24 Q.  IS THIS ALSO A NEWSLETTER THAT THE AWARE GROUP
25     OUT?

---

Page 91

1  A.  OH, YEAH.
2  Q.  AND ON THE SECOND PAGE, IT LISTS SOME SEMINARS THAT
3      WERE UPCOMING?
4  A.  UH-HUH.
5  Q.  WAS ONE DONE IN CALIFORNIA?
6  A.  THAT ONE GOT CANCELLED.
7  Q.  WHAT ABOUT THE ONE IN FLORIDA?
8  A.  I DON'T THINK WE WENT TO TAMPA.  NO, WE DIDN'T GO TO
9      TAMPA.  YEAH, THAT SAME GUY THAT SPONSORED US FOR
10     TAMPA WAS THE GUY IN CALIFORNIA.  THAT DIDN'T
11     HAPPEN.
12 (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 25,
13 NEWSLETTER, ATTACHED.)
14 EXAMINATION RESUMED BY MR. STRONG:
15 Q.  AND JUST ONE MORE NEWSLETTER I WANT YOU TO TAKE A
16     LOOK AT.  MARK THIS AS EXHIBIT 25.  IS THIS ALSO AN
17     EXAMPLE OF A NEWSLETTER THAT THE AWARE GROUP
18     DISSEMINATED?
19 A.  UH-HUH.
20 Q.  YOU DISCUSS ADHESION CONTRACTS ON PAGE FIVE.
21 A.  OKAY.
22 Q.  IS THAT CORRECT?
23 A.  IT'S -- YEAH, I'M READING OFF THE SAME PAGE YOU ARE.
24 Q.  JUST TO CLARIFY, ARE YOU SAYING THESE ARE EXAMPLES
25     OF ADHESION CONTRACTS?

---

Page 92

1  A.  THAT WHAT ARE?
2  Q.  SOCIAL SECURITY NUMBER, 1040s, W-4 TAX FORMS, VOTER
3      REGISTRATION, DRIVER'S LICENSE AND VEHICLE
4      REGISTRATION, BANK ACCOUNTS AND CREDIT CARDS, POSTAL
5      ADDRESS, INCORPORATION PAPERS, BUSINESS LICENSES,
6      MARRIAGE LICENSES AND ---
7  A.  YEAH, THIS WAS PUBLISHED SOMEPLACE ELSE AND I LIKED
8      IT AND I READ IT AND I UNDERSTOOD IT AND I THOUGHT
9      THAT THAT WAS GOOD INFORMATION.
10 Q.  AND SO, YOU THEN DISSEMINATED IT OUT TO THE MEMBERS
11     OF THE AWARE GROUP?
12 A.  OF COURSE.
13 Q.  WHAT IS ABSOLUTE SOLUTIONS, INCORPORATED?
14 A.  ABSOLUTE SOLUTIONS WAS A CORPORATION THAT I HAD
15     ESTABLISHED JUST TO BE ABLE TO WORK UNDER
16     INCORPORATION, UNDER A CORPORATE NAME TO REDUCE
17     LIABILITY.
18 Q.  SO, YOU REGISTERED IT WITH THE SECRETARY OF STATE
19     THEN?
20 A.  WITH WHAT?
21 Q.  THE SECRETARY OF STATE?
22 A.  I DON'T KNOW IF IT'S REGISTERED IN SOUTH CAROLINA.
23     I KNOW IT'S REGISTERED IN NEVADA.
24 Q.  IN NEVADA?  DID YOU OPEN A BANK ACCOUNT IN THEIR
25     NAME?

---

Page 93

1  A.  ABSOLUTE SOLUTIONS?  I THINK SO.
2  BY MR. STRONG:
3      I THINK WE'RE ON EXHIBIT 26 NOW?
4  BY THE COURT REPORTER:
5      THAT'S RIGHT.
6  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT NUMBER 26,
7  CHECKS AND BANK STATEMENTS, ATTACHED.)
8  EXAMINATION RESUMED BY MR. STRONG:
9  Q.  COPIES TO OPPOSING COUNSEL.  THIS IS A SET OF CHECKS
10     AND BANK STATEMENTS FOR ABSOLUTE SOLUTIONS WITH THE
11     BANK OF TRAVELERS REST.
12 A.  SORRY ABOUT THAT.  I THINK YOU NEEDED A STAPLER.  IS
13     THAT THE BOTTOM OR THE TOP?
14 BY MR. BENNETT:
15     THIS IS THE TOP.  THAT'S THE BOTTOM.
16 BY THE WITNESS:
17     OKAY.  THANK YOU.
18 EXAMINATION RESUMED BY MR. STRONG:
19 Q.  WAS THIS CREATED AFTER YOUR DIVORCE FROM MS.
20     ALEXANDER OR MS. FERGUSON?  WAS ABSOLUTE SOLUTIONS,
21     NOT THE ACCOUNT?
22 A.  YEAH.  I HAVE TO SAY PROBABLY.  IT SAYS 12-7-04.  I
23     DON'T HAVE THE DATE THAT WE WERE DIVORCED.
24 Q.  OKAY.  IF I TOLD YOU YOU WERE DIVORCED IN AUGUST OF
25     '04, WOULD THAT SOUND ABOUT RIGHT?

---

24  (Pages 90 to 93)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

---

Page 94

1  A.  IF THAT'S WHAT IT WAS, YEAH, THEN IT WAS DONE AFTER.
2  Q.  I'M LOOKING AT CHECK 1002.  DID YOU FIND IT?
3  BY MR. BENNETT:
4      DO YOU HAVE IT?
5  BY THE WITNESS:
6      YEAH.
7  EXAMINATION RESUMED BY MR. STRONG:
8  Q.  THIS IS A CHECK -- IS THAT A COPY OF YOUR SIGNATURE
9      ON THE CHECK?
10 A.  YES.
11 Q.  WHAT IS F.F.U.S.A.?
12 A.  I DON'T KNOW.  IT SAYS DOWN HERE A MERCHANT ACCOUNT
13     ESTABLISHED.
14 Q.  DID YOU ESTABLISH A MERCHANT ACCOUNT?
15 A.  APPARENTLY SO.
16 Q.  DO YOU STILL HAVE THAT MERCHANT ACCOUNT?
17 A.  NO.  I DON'T HAVE ABSOLUTE SOLUTIONS, EITHER.
18 Q.  WHEN DID ABSOLUTE SOLUTIONS CEASE?
19 A.  WITHIN THE LAST FEW YEARS.  I JUST STOPPED PAYING
20     THE YEARLY ON IT AND JUST LET IT GO.  THE I.R.S.
21     TOOK MY ABSOLUTE SOLUTIONS' ACCOUNT AND MADE IT
22     DISAPPEAR, SO THERE WAS NOTHING THERE.
23 Q.  WHEN ABSOLUTE SOLUTIONS WAS OPERATING, I SEE A FEW
24     DEPOSIT SLIPS IN THERE.  WHERE WAS IT GETTING ITS
25     MONEY?

---

Page 95

1  A.  PROBABLY JUST SHIFTING IT OVER FROM ANOTHER ACCOUNT,
2      FROM PROBABLY FREEDOM TRUST GROUP.
3  Q.  AND FREEDOM TRUST GROUP, AT THIS TIME, WAS STILL
4      GETTING MONEY FROM SELLING THE FREEDOM TRUST GROUP
5      SOFTWARE?
6  A.  WE SOLD SOME SOFTWARE AFTER HEATHER LEFT, BUT I
7      CAN'T SAY FOR HOW LONG.  WE JUST KIND OF PETERED
8      OUT.  YOU KNOW WHAT I MEAN?
9  Q.  WELL, WHEN DID FREEDOM TRUST GROUP CEASE OPERATING?
10 A.  OH, GOD, IT WAS -- MEANING STOP SELLING SOFTWARE,
11     YEAH, QUITE A WHILE AGO.  THIS IS '09, SO '04, '05,
12     SOMETHING AROUND THERE.
13 Q.  AND THE -- LET'S TAKE A LOOK AT CHECK 1029.
14 A.  THE VERY BOTTOM?
15 BY MR. BENNETT:
16     JUST TAKE MINE.
17 BY THE WITNESS:
18     OKAY.
19 EXAMINATION RESUMED BY MR. STRONG:
20 Q.  IS THAT YOUR SIGNATURE ON THE CHECK?
21 A.  IT'S A COPY OF MY SIGNATURE, YES.
22 Q.  AND MADE OUT TO THE GREENVILLE COUNTY TAX COLLECTOR?
23 A.  RIGHT.
24 Q.  IS THIS CHECK PAYING THE PROPERTY TAX ON THE 6350
25     WHITE HORSE ROAD?

---

Page 96

1  A.  YES.
2  Q.  OKAY.  SO, YOU'RE PAYING THAT OUT OF FUNDS -- YOU'RE
3      PAYING THE PROPERTY TAX OUT OF FUNDS FROM ABSOLUTE
4      SOLUTIONS?
5  A.  IN THIS PARTICULAR CASE, YES.
6  Q.  LET ME JUST TIE UP A COUPLE OF LOOSE ENDS HERE, AND
7      THEN I'LL LET MR. BENNETT HAVE HIS OPPORTUNITY TO
8      ASK YOU A FEW QUESTIONS.  DID YOUR MOTHER EVER --
9      DID YOUR MOTHER EVER LIVE AT 6350 WHITE HORSE ROAD?
10 A.  SHE STAYED WITH ME FOR A SHORT PERIOD OF TIME AFTER
11     WE TOOK HER OUT OF ASSISTED LIVING.
12 Q.  AND UPON HER PASSING AWAY, HOW DID THE PROPERTY --
13     HOW DID THE PROPERTY -- WHAT HAPPENED TO THE
14     PROPERTY?
15 A.  NOTHING.  THERE HAD ALREADY BEEN A TRANSFER YEARS
16     BEFORE THAT TO THE TRUST.
17 Q.  AND DID THE FREEDOM TRUST GROUP OR THE AWARE GROUP
18     HAVE ANY OTHER EMPLOYEES OTHER THAN YOU AND HEATHER?
19 A.  NO.
20 Q.  DID YOU CONTRACT FOR ANY CONSULTING SERVICES?
21 A.  YEAH, WE CONTRACTED FOR COMPUTER WORK OR GRAPHICS.
22 Q.  WHO WOULD YOU CONTRACT WITH?
23 A.  THERE WAS -- PRIMARILY, HEATHER WOULD FIND PEOPLE.
24 Q.  AND THAT WAS JUST FOR, WHAT, SETTING UP A WEBSITE OR
25     ---

---

Page 97

1  A.  NO, ACTUALLY, SHE -- I DON'T KNOW HOW, BUT SHE SET
2      UP THE WEBSITES.  NO, WHEN WE GOT INTO THE SOFTWARE,
3      SHE WASN'T -- SHE DID THE -- SHE PUT THE FREEDOM
4      FILES TOGETHER AND SHE PUT THE SECURITY ON THE
5      FREEDOM FILES.  THE FREEDOM TRUST GROUP SOFTWARE,
6      I'M PRETTY SURE SHE DID THAT, TOO, BUT THEN WE GOT
7      INTO OTHER STUFF AND WE HAD TO CONTRACT THAT OUT TO
8      PEOPLE THAT KNEW WHAT THEY WERE DOING BECAUSE IT WAS
9      -- IT WAS BEYOND HER.
10 Q.  WHAT WERE YOUR DAY TO DAY DUTIES AT THE AWARE GROUP
11     AND THE FREEDOM TRUST GROUP?
12 A.  DO YOU REALLY WANT TO KNOW?  I WAS BITCHED AT FOR IT
13     ALL THE TIME.
14 Q.  YES.
15 A.  I WAS A VORACIOUS READER.
16 Q.  AND OTHER THAN READING, DID YOU HAVE ANY OTHER
17     DUTIES?
18 A.  I WOULD TAKE PHONE CALLS SOMETIMES.  PEOPLE WOULD
19     COME BY.
20 Q.  WHAT WOULD THEY CALL YOU ABOUT?
21 A.  WHATEVER KIND OF QUESTIONS THEY HAD, IF THEY WANTED
22     INFORMATION OR THEY WOULD CALL ME AND SHARE
23     INFORMATION WITH ME THAT THEY FOUND.
24 Q.  WHAT KIND OF LIVING DID YOU MAKE FROM SELLING THE
25     FREEDOM TRUST GROUP MATERIALS AND THE AWARE GROUP

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                                    July 27, 2009

---

**Page 98**

1 MEMBERSHIPS?
2 A.  WELL, OKAY.  IT WASN'T ANYTHING TO BUY A BRAND NEW
3    HOUSE OUT OF.  I KNOW THAT.
4 Q.  WERE YOU SCRAPING BY TO BUY GROCERIES, THOUGH?
5 A.  NO.  WE WERE GETTING BY.  WE WERE GETTING BY OKAY.
6    IT WAS COMFORTABLE.
7 Q.  YOU WERE ABLE TO MAKE IMPROVEMENTS TO THE HOUSE THAT
8    YOU WERE AT?
9 A.  YEAH.
10 Q.  SO, YOU WERE ABLE TO PUT ON A DECK, ADD NEW PAINT,
11    COMFORTABLY?
12 A.  NO, THE DECK WASN'T COMFORTABLE.  THAT WAS A
13    STRETCH.
14 Q.  ABOUT HOW MANY MEMBERS WOULD JOIN THE AWARE GROUP IN
15    A MONTH?
16 A.  I HAVE NO IDEA.  COULD BE AS FEW AS TWO OR THREE.
17    IT COULD BE AS MANY AS 20 OR 30.  IT DEPENDS.
18 Q.  DEPENDING ON WHAT?
19 A.  IF WE HAD AN EVENT, YOU KNOW, A SEMINAR.  THAT WAS
20    THE PURPOSE OF THE SEMINARS TO HELP GOOSE UP
21    MEMBERSHIP.  IT WAS ALWAYS AN UPHILL FIGHT.
22 Q.  ABOUT WHAT WAS THE TOTAL MEMBERSHIP OF THE AWARE
23    GROUP?
24 A.  I HAVE NO IDEA.
25 Q.  DO YOU KNOW HOW MANY PEOPLE BOUGHT FREEDOM TRUST

---

**Page 99**

1 GROUP MATERIALS?
2 A.  PROBABLY SOMEWHERE BETWEEN A HUNDRED -- IF I HAD TO
3    PUT A NUMBER, MAYBE A HUNDRED AND FIFTY, TWO HUNDRED
4    MAX, BECAUSE I REMEMBER WE HAD A THOUSAND BOXES FOR
5    THE SOFTWARE MADE.  AND I WOUND UP CRUSHING ALMOST
6    ALL OF THOSE BOXES.
7 Q.  BUT YOU SOLD MORE THAN JUST FREEDOM TRUST GROUP, THE
8    SOFTWARE, AND THEN ALSO MEMBERSHIPS.  YOU SOLD DVDs?
9 A.  YOU MEAN WHEN I WAS WITH HEATHER?
10 Q.  YES.
11 A.  SPECIFICALLY?
12 Q.  WHEN YOU WERE WORKING WITH THE AWARE GROUP AND THE
13    FREEDOM TRUST GROUP ---
14 A.  UH-HUH.
15 Q.  --- DID YOU SELL CDs AND DVDs?
16 A.  YEAH, AT SEMINARS, WE DID.  OR SHE -- WELL, THEY HAD
17    A CATALOG.  YEAH, THAT'S RIGHT.  WE HAD A CATALOG.
18    IT WASN'T A BIG SELLER, I DON'T THINK.
19 Q.  BUT YOU WERE ABLE TO -- BUT YOU WERE TRYING TO SELL
20    SOME OTHER PRODUCTS?
21 A.  YEAH, WE WERE TRYING TO GET BY.
22 Q.  DID I.B.S. HAVE A CHARLES SCHWAB ACCOUNT?
23 A.  UH-HUH.
24 Q.  AND WHAT WAS IN THAT CHARLES SCHWAB ACCOUNT?
25 A.  DON'T KNOW.

---

**Page 100**

1 Q.  YOU HAVE A -- YOU WERE ALSO INTO COIN COLLECTING,
2    CORRECT?
3 A.  YEAH.
4 Q.  SO, DO YOU HAVE A COLLECTION OF COINS?
5 A.  I HAD A COLLECTION OF COINS.
6 Q.  WHAT DO YOU MEAN, HAD?
7 A.  I WAS RELIEVED OF MY COINS A COUPLE OF YEARS AGO.
8 Q.  OKAY.  BY WHOM?
9 A.  I CAN'T BE EXACTLY SURE, BUT I THINK IT WAS A GUEST
10    THAT I HAD IN MY HOUSE FROM NEW YORK.  AND I CAN'T
11    FINGER HIM WITHOUT SEEING IT HAPPEN, BUT HE HAD THE
12    OPPORTUNITY AND THE MOTIVE.
13 Q.  BESIDES THE TWO ACCOUNTS WITH BANK OF TRAVELERS REST
14    THAT WE'VE BEEN DISCUSSING HERE TODAY, DO YOU HAVE
15    ANY OTHER BANKING ACCOUNTS?
16 A.  THEN?
17 Q.  THEN AND NOW.
18 A.  NOW?  I'VE GOT A SOCIAL SECURITY ACCOUNT.
19 Q.  YOU'RE DRAWING SOCIAL SECURITY.  ANY PENSIONS OR
20    I.R.A.s OR ANYTHING OF THAT SORT?
21 A.  NO.
22 Q.  STOCKS OR BONDS?
23 A.  NO.
24 Q.  CERTIFICATES OF DEPOSIT?
25 A.  NO.

---

**Page 101**

1 Q.  SAFETY DEPOSIT BOX?
2 A.  DON'T BELIEVE IN THOSE.
3 Q.  WHEN WAS THE LAST TIME YOU FILED A FORM 1040 WITH
4    THE I.R.S.?
5 A.  PROBABLY THE LATE '80s.
6 Q.  AND WHY HAVEN'T YOU FILED ONE SINCE THE LATE '80s?
7 A.  I DON'T BELIEVE THAT I'M ONE WHO IS LIABLE FOR THAT.
8 Q.  WHY?
9 BY MR. BENNETT:
10    OBJECT AS TO FORM.  CALLS FOR A LEGAL
11    CONCLUSION, BUT YOU CAN ANSWER THE QUESTION.
12 BY THE WITNESS:
13    OKAY.  WE'LL COVER THAT LATER THEN.
14 EXAMINATION RESUMED BY MR. STRONG:
15 Q.  YOU CAN ANSWER THE QUESTION.
16 BY MR. BENNETT:
17    YEAH, YOU CAN ANSWER THE QUESTION.
18 BY THE WITNESS:
19    I CAN ANSWER THE QUESTION?  OH, OKAY.  SAY THAT
20    AGAIN, THEN.
21 EXAMINATION RESUMED BY MR. STRONG:
22 Q.  WHY DIDN'T YOU FILE -- WHY DO YOU FEEL YOU'RE NOT
23    LIABLE FOR, TO FILE AN INCOME TAX RETURN?
24 BY MR. BENNETT:
25    SAME OBJECTION, AND YOU CAN ANSWER THE

---

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                    July 27, 2009

---

Page 102

1    QUESTION.
2  BY THE WITNESS:
3      OKAY.  BECAUSE I DON'T FEEL THAT I'M ONE WHO IS
4  LIABLE.
5  EXAMINATION RESUMED BY MR. STRONG:
6  Q.  YOU STATED THAT.  I ASKED WHY YOU DID NOT FEEL THAT
7      YOU WERE LIABLE.
8  A.  BECAUSE OF ALL THE RESEARCH, ALL THE READING THAT
9      I'VE DONE, ALL THE CASES THAT I'VE BEEN THROUGH AND
10     EVERYTHING.  IT'S BROUGHT ME TO THAT CONCLUSION.
11 Q.  CAN YOU POINT TO WHAT CASES OR ---
12 A.  NO, I CAN'T.  I DON'T HAVE THAT IN MY HEAD.  I'M NOT
13     A COMPUTER, BUT THERE IS A LIBRARY, A WIDE VARIETY
14     OF INFORMATION.  I WILL GIVE ONE EXAMPLE.  THE 63, I
15     DON'T REMEMBER, EITHER 6330 OR 31, WHATEVER IT WAS,
16     THAT THE INTENT TO LEVY.
17 Q.  UH-HUH.
18 A.  WELL, NO, WE ALREADY DISCUSSED THAT.  WHERE THEY
19     LEFT OUT THAT PARAGRAPH A.  WHEN THEY SHOWED IT TO
20     ME, IT MADE ME VERY SKEPTICAL ABOUT EVERYTHING, AND
21     IT'S THAT SKEPTICISM -- BEFORE I FOUND OUT WHAT WAS
22     GOING ON OR WHAT I PERCEIVE IS GOING ON IN THE
23     GOVERNMENT, IT WAS MY GOVERNMENT.  IT WAS LIKE GOD.
24     YOU COULDN'T DO ANYTHING WRONG.  I FOUND OUT THAT
25     WASN'T TRUE.

---

Page 103

1  Q.  HAVE YOU EVER HEARD THE TERM THE 14TH AMENDMENT
2      CITIZEN?
3  A.  UH-HUH.
4  Q.  WHAT DOES THAT MEAN TO YOU?
5  A.  14TH AMENDMENT CITIZEN MEANS SOMEBODY THAT IS A U.S.
6      CITIZEN.
7  Q.  CAN YOU CLARIFY WHAT YOU MEAN BY THAT?
8  A.  OH, YEAH.  AS A MATTER OF FACT, TODAY IS THE
9      ANNIVERSARY OF THE DAY OF THE 15 STATUTES AT LARGE
10     WHERE CONGRESS PUT IN THE RIGHT TO EX PATRIATE.
11     THERE WAS NOTHING TO EX PATRIATE FROM UNTIL THE NEXT
12     DAY, THE THEORETICAL RATIFICATION OF THE 14TH
13     AMENDMENT, WHICH MADE PEOPLE SUBJECT TO THE
14     JURISDICTION THEREOF.
15 Q.  OKAY.  CAN YOU CLARIFY WHAT YOU MEAN BY THAT?
16 A.  WHAT IS IT THAT YOU NEED CLARIFICATION OF?
17 Q.  WHAT DO YOU MEAN THE JURISDICTION THEREOF?
18 A.  THE JURISDICTION THEREOF IS THE UNITED STATES,
19     A.K.A. THE DISTRICT OF COLUMBIA.
20 Q.  SO, THE -- WHEN YOU SAY A U.S. CITIZEN, YOU'RE
21     REFERRING ONLY TO SOMEBODY WHO IS LIVING WITHIN THE
22     DISTRICT OF COLUMBIA?
23 A.  NO, ANYBODY WHO HAS ANY OF THESE ADHESION CONTRACTS
24     AND ALL THESE OTHER CUTE LITTLE WAYS TO DRAW THEM
25     IN.

---

Page 104

1  Q.  SO, SOMEBODY WHO HAS NOT FORMED ONE OF THESE
2      ADHESION CONTRACTS, AS YOU CALL THEM, AND WHO
3      RESIDED OUTSIDE OF THE DISTRICT OF COLUMBIA WOULD
4      NOT BE A U.S. CITIZEN?
5  A.  IT'S NOT POSSIBLE.  THEY DO IT AT YOUR BIRTH.
6  Q.  OKAY.
7  BY MR. STRONG:
8      I HAVE NO FURTHER QUESTIONS, IF YOU WANT TO ---
9  BY MR. BENNETT:
10     MERCIFULLY, I HAVE NO QUESTIONS.
11 (THERE BEING NO OTHER QUESTIONS, THE DEPOSITION WAS
12 CONCLUDED AT THE HOUR OF 3:47 P.M.)

---

Page 105

1      IN THE UNITED STATES DISTRICT COURT
2          DISTRICT OF SOUTH CAROLINA
         C.A. NO. 6:08-CV-3760
3
4  UNITED STATES OF AMERICA,
5      PLAINTIFF,
       VERSUS
6
7  JOHN HOWARD ALEXANDER,
8      DEFENDANT.

       I, JILL BISHOP EDWARDS, A NOTARY PUBLIC FOR THE
9  STATE OF SOUTH CAROLINA, DULY COMMISSIONED AND QUALIFIED
   AS SUCH, DO HEREBY CERTIFY THAT THE FOREGOING 104 PAGES
10 REPRESENT A TRUE AND ACCURATE TRANSCRIPT OF THE FOREGOING
   DEPOSITION OF JOHN HOWARD ALEXANDER TAKEN BY ME ON THE
11 27TH DAY OF JULY, 2009.
       THAT THE DEPONENT WAS DULY PLACED UNDER OATH AND
12 ADMONISHED TO SPEAK THE WHOLE TRUTH.  THAT THE ORAL
   TESTIMONY WAS DULY TAKEN AND TRANSCRIBED AS TO THE
13 QUESTIONS PROPOUNDED AND THE ANSWERS GIVEN.
       THAT ALL OFFERED EXHIBITS, STIPULATIONS AND
14 OBJECTIONS, IF ANY, INVOLVED IN THIS CAUSE ARE DULY
   ATTACHED OR INCLUDED HEREIN.
15     IN WITNESS WHEREOF, I HAVE SET MY HAND AND OFFICIAL
   SEAL THIS 13TH DAY OF AUGUST, 2009.
16
17
18     _____
19     JILL BISHOP EDWARDS
20     NOTARY PUBLIC FOR SOUTH CAROLINA
21     MY COMMISSION EXPIRES: 7-10-2010
22
23 * THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH
24 MATERIAL IS REPRODUCED AS READ OR QUOTED BY THE
25 SPEAKER.

27 (Pages 102 to 105)

4898d016-a8b8-4355-9859-eeb63c142382

John Howard Alexander                              July 27, 2009

Page 106

1  UNITED STATES OF AMERICA,
2      PLAINTIFF,
3

        VERSUS
4

    JOHN HOWARD ALEXANDER,
5

        DEFENDANT.
6
7          ERRATA SHEET
8  I, JOHN H. ALEXANDER, HAVE READ THE FOREGOING 104
9  PAGES OF TESTIMONY GIVEN BY ME ON 7.27.09.
10 THIS TESTIMONY SHOULD BE CORRECTED AS FOLLOWS:
11 PAGE  LINE  CHANGE FROM     CHANGE TO    REASON
12
13
14
15
16 SUBJECT TO THE FOREGOING CORRECTIONS, MY TESTIMONY IS AS
17
18 CONTAINED IN THE DEPOSITION TRANSCRIPT.
19
20 THIS _____ DAY OF _____, 2009
21
22
23 _____   _____
24 DEPONENT SIGNATURE     NOTARY PUBLIC FOR S.C.
25          MY COMMISSION EXPIRES:

4898d016-a8b8-4355-9859-eeb63c142382

Heather Ferguson                                  July 27, 2009

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
C.A. NO. 6:08-CV-3760


UNITED STATES OF AMERICA,

        PLAINTIFF,

              VERSUS

JOHN HOWARD ALEXANDER,

        DEFENDANT.


            DEPOSITION OF HEATHER FERGUSON

     PURSUANT TO NOTICE AND/OR AGREEMENT, THE

DEPOSITION OF HEATHER FERGUSON WAS CALLED BY THE

PLAINTIFF ON THE 27TH DAY OF JULY, 2009, COMMENCING AT

THE HOUR OF 9:29 A.M., AT THE OFFICE OF THE UNITED

STATES ATTORNEY, 105 NORTH SPRING STREET, GREENVILLE,

SOUTH CAROLINA, ATTENDED BY COUNSEL AS FOLLOWS:


            JILL BISHOP EDWARDS

            VERBATIM REPORTER

Heather Ferguson                                July 27, 2009

---

Page 2

1          APPEARANCES
2
3    JAMES C. STRONG, ESQUIRE, OF THE
4    UNITED STATES DEPARTMENT OF JUSTICE
5    POST OFFICE BOX 7238
6    BEN FRANKLIN STATION
7    WASHINGTON, DISTRICT OF COLUMBIA  20044
8    james.c.strong@usdoj.gov
9
10        ATTORNEY FOR THE PLAINTIFF,
11
12
13   JESSICA ANN SALVINI, ESQUIRE, OF THE FIRM
14   SALVINI AND BENNETT
15   101 WEST PARK STREET
16   GREENVILLE, SOUTH CAROLINA  29601
17
18        ATTORNEY FOR THE DEFENDANT.
19
20
21
22
23
24
25        ALSO ATTENDING:    MIKE FERGUSON

---

Page 3

1           I N D E X
2
                 PAGE
3
     NON-WAIVER AND STIPULATIONS............... 4
4
     EXAMINATION BY MR. STRONG................. 4
5
     EXAMINATION BY MS. SALVINI............... 40
6
     RE-EXAMINATION BY MR. STRONG............. 70
7
     CERTIFICATE OF NOTARY PUBLIC............. 78
8
9
10   EXHIBITS:
11   PLAINTIFF'S EXHIBIT NUMBER ONE, MARKED,
12   AFFIDAVIT, ATTACHED...................... 26
13
14   PLAINTIFF'S EXHIBIT NUMBER TWO, MARKED,
15   CLIENT LIST, ATTACHED.................... 28
16
17
18
19   OBJECTIONS:
20    NONE
21
22
23
24
25

---

Page 4

1        PURSUANT TO NOTICE AND/OR AGREEMENT TO TAKE
2    DEPOSITIONS, THE WITHIN VIDEOTAPED DEPOSITION WAS
3    TAKEN BY THE ABOVE-NAMED COURT REPORTER, A NOTARY
4    PUBLIC FOR THE STATE OF SOUTH CAROLINA, BY CONSENT
5    OF ALL PARTIES AT THE OFFICE OF THE UNITED STATES
6    ATTORNEY, GREENVILLE, SOUTH CAROLINA.
7         * * * *  * * * *  * * * *
8    STIPULATIONS:
9        IT IS AGREED BY AND BETWEEN COUNSEL FOR THE PARTIES
10   AS FOLLOWS:
11       1.  THE DEPOSITION IS BEING TAKEN PURSUANT TO THE
12          FEDERAL RULES OF CIVIL PROCEDURE.
13       2.  THE READING AND SIGNING OF THE DEPOSITION
14          TRANSCRIPT ARE RESERVED BY THE WITNESS AND THE
15          PARTIES.
16        * * * *  * * * *  * * * *
17       THE WITNESS WAS DULY SWORN TO TELL THE TRUTH, THE
18   WHOLE TRUTH AND NOTHING BUT THE TRUTH CONCERNING THE
19   MATTER HEREIN:
20        * * * *  * * * *  * * * *
21          HEATHER FERGUSON,
22   BEING FIRST DULY SWORN, TESTIFIED ON HER OATH AS
23   FOLLOWS:EXAMINATION BY MR. STRONG:
24   Q.  GOOD MORNING.
25   A.  MORNING.

---

Page 5

1    Q.  WE'RE HERE TODAY ON -- IT'S JULY 27TH, 2009.  WE'RE
2        HERE ON NOTICE AND SUBPOENA TO DEPOSE HEATHER
3        FERGUSON IN THE CASE OF UNITED STATES VERSUS JOHN
4        ALEXANDER, CASE NUMBER 08:3760 IN THE U.S. DISTRICT
5        COURT FOR THE DISTRICT OF SOUTH CAROLINA.  GOOD
6        MORNING.
7    A.  MORNING.
8    Q.  MS. FERGUSON, HAVE YOU EVER HAD YOUR DEPOSITION
9        TAKEN BEFORE?
10   A.  NO.
11   Q.  WELL, I'M GOING TO EXPLAIN TO YOU A LITTLE BIT ABOUT
12       WHAT GOES ON AND THEN MAKE SURE THAT YOU'RE AWARE.
13       I'M GOING TO ASK YOU A SET OF QUESTIONS.  ANSWER
14       THEM.  OPPOSING COUNSEL THEN WILL HAVE AN
15       OPPORTUNITY TO ASK YOU A SET OF QUESTIONS, AND THEN
16       I'LL HAVE AN OPPORTUNITY TO DO SOME FOLLOW UP ---
17   A.  OKAY.
18   Q.  --- ON THAT.  DO YOU UNDERSTAND?
19   A.  YES.
20   Q.  OKAY.  IF AT ANY TIME YOU NEED A BREAK, YOU KNOW,
21       NEED TO GO TO THE REST ROOM, NEED A GLASS OF WATER,
22       LET ME KNOW, AND WE'LL STOP AND WE'LL DO THAT.  DO
23       YOU UNDERSTAND?
24   A.  YES.
25   Q.  OKAY.  DO YOU -- HAVE YOU TAKEN ANY MEDICATION TODAY

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

## Page 6

1    OR HAD ANY ALCOHOL THAT IT MIGHT AFFECT YOUR
2    TESTIMONY IN ANY WAY TODAY?
3    A.  NO.
4    Q.  OKAY.  WERE YOU PREVIOUSLY MARRIED TO A MAN NAMED
5    JOHN ALEXANDER?
6    A.  YES.
7    Q.  WHEN DID -- WHEN WERE YOU MARRIED?
8    A.  WE WERE MARRIED JUNE, I THINK IT WAS THE 22ND, 1997,
9    AND WE SEPARATED, I BELIEVE IT WAS THE END OF APRIL,
10   THE FIRST PART OF MARCH OF '03, 2003.  OUR DIVORCE
11   WAS FINAL IN '05, 2005, I BELIEVE.
12   Q.  AND WHERE DID YOU LIVE DURING THE MARRIAGE?
13   A.  AT HIS HOME ON WHITE HORSE ROAD IN BEREA.
14   Q.  DO YOU REMEMBER THE ADDRESS?
15   A.  I THINK IT WAS 6350 WHITE HORSE ROAD, I THINK.
16   Q.  AND YOU LIVED ON WHITE HORSE ROAD THE ENTIRE TIME?
17   A.  YES.
18   Q.  DO YOU RECALL HOW THE UTILITIES WERE PAID FOR ON
19   WHITE HORSE ROAD?
20   A.  CASH.
21   Q.  WHO PAID THEM?
22   A.  YOU MEAN PHYSICALLY PAID THEM?  I USUALLY WENT AND
23   PAID THEM.  I HANDLED ALL BILL PAYING.
24   Q.  AND FROM WHAT SOURCE OF INCOME WOULD YOU PAY THE
25   BILLS?

## Page 7

1    A.  THE MONEY HE WOULD GIVE ME.
2    Q.  DO YOU KNOW WHERE THAT MONEY CAME FROM?
3    A.  FROM THE ORGANIZATION THAT HE RAN.
4    Q.  CLARIFY WHICH ORGANIZATIONS.
5    A.  THE AWARE GROUP.
6    Q.  WERE THERE ANY OTHER ORGANIZATIONS?
7    A.  WELL, THERE WAS FREEDOM TRUST GROUP, AND THEN LATER,
8    THERE WAS INTERNATIONAL BUSINESS SYSTEMS,
9    INCORPORATED.
10   Q.  AND TO THE BEST OF YOUR KNOWLEDGE, IS THAT ALL THE
11   SOURCES OF INCOME THAT MR. ALEXANDER AND YOU HAD
12   DURING THAT TIME?
13   A.  YES.  WELL, WE, NOW, WHEN WE WERE MARRIED, YES.
14   WELL, WHEN WE FIRST MET, I WORKED AND STUFF, BUT
15   THEN I QUIT WORK AT HIS REQUEST TO ASSIST HIM.
16   Q.  ARE YOU AWARE IF HE HAD ANY OTHER SOURCES OF INCOME?
17   A.  NO.
18   Q.  BEFORE THE MARRIAGE?
19   A.  NO, NO.  HE WAS DOING THIS WHEN I MET HIM.
20   Q.  DO YOU KNOW HOW LONG HE HAD BEEN WORKING WITH THE
21   AWARE GROUP AND THE FREEDOM TRUST GROUP?
22   A.  WELL, FREEDOM TRUST -- WHEN I MET HIM THE ONLY ONE
23   HAD WAS THE AWARE GROUP.
24   Q.  OKAY.
25   A.  OKAY?  AND AT LEAST A COUPLE OF YEARS.  I DON'T KNOW

## Page 8

1    OFF THE TOP OF MY HEAD HOW LONG.
2    Q.  AND THE AWARE GROUP WAS FORMED WHEN?
3    A.  I DON'T KNOW.
4    Q.  OH, OKAY.
5    A.  IT WAS ALREADY THERE WHEN I MET HIM.
6    Q.  WHEN WAS THE FREEDOM TRUST GROUP FORMED?
7    A.  SOMETIME IN THE LATE '90s.  I DON'T KNOW OFF THE TOP
8    OF MY HEAD.  THIS HAS BEEN A WHILE, SO I DON'T
9    REMEMBER THESE DATES EXACTLY, YOU KNOW.
10   Q.  AND I.B.S.?
11   A.  SOMETIME IN THE LATE '90s, AS WELL.  I'M THINKING
12   '97, '98 BECAUSE I MET -- I MET ALEX, WHICH THAT'S
13   WHAT EVERYONE CALLS HIM.  THAT'S HIS NICKNAME, I
14   GUESS YOU'D SAY.  SO, I MET HIM IN '95 ---
15   Q.  MM-HMM (AFFIRMATIVE RESPONSE).
16   A.  BUT WE WERE MARRIED IN '97.
17   Q.  AND WAS HE WORKING WITH THE AWARE GROUP AS FAR BACK
18   AS 1995?
19   A.  OH, YES.  THAT'S, LIKE I SAID, BEFORE I MET HIM.
20   Q.  DO YOU KNOW A WOMAN NAMED MIRIAM GETZ?
21   A.  YEAH, THAT'S HIS MOTHER.
22   Q.  DO YOU KNOW IF MIRIAM GETZ IS PRESENTLY ALIVE OR ---
23   A.  NO, HE TOLD ME SHE HAD PASSED AWAY SEVERAL YEARS
24   AGO.
25   Q.  DO YOU KNOW WHEN?

## Page 9

1    A.  WITHIN THE LAST FIVE YEARS.  THAT, I KNOW.
2    Q.  AFTER YOUR DIVORCE?
3    A.  OH, YES.  YES.  YEAH, BECAUSE WE WERE MARRIED IN
4    WHAT?  2005?
5    BY MR. FERGUSON:
6             UH-HUH.
7    BY THE WITNESS:
8             NO.  WAIT, IT'S 2009.  LET ME GET MY DATES
9    STRAIGHT.  GIVE ME A SECOND.
10   EXAMINATION RESUMED BY MR. STRONG:
11   Q.  JUST FOR THE RECORD, I GUESS WE'LL PUT IT ON THE
12   RECORD HERE.
13   A.  OH, I'M SORRY.
14   Q.  SHE'S TALKING TO HER HUSBAND, MIKE FERGUSON, WHO'S
15   ALSO IN THE DEPOSITION WITH US.  ALSO, IS JESSICA
16   SALVINI, COUNSEL FOR -- LAW PARTNER OF BRADLEY
17   BENNETT, WHO IS COUNSEL FOR ALEX ALEXANDER.
18   A.  I APOLOGIZE.  LET ME GET MY DATES STRAIGHT REAL
19   QUICK, OKAY?  I LEFT ALEX IN 2003.
20   Q.  OKAY.
21   A.  OUR DIVORCE WAS FINAL IN 2004.  YEAH, BECAUSE WE'VE
22   BEEN MARRIED FIVE YEARS.  YEAH, YEAH.  OKAY.  2004.
23   MS. GETZ DIED AFTER THE DIVORCE WAS FINAL, SO IT WAS
24   2005 OR LATER, I BELIEVE.
25   Q.  BUT AFTER, OKAY, AFTER 2005?

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                      July 27, 2009

---

Page 10

1  A.  YEAH, I'M SORRY.
2  Q.  AFTER YOUR DIVORCE WAS FINAL?
3  A.  I WAS JUST TRYING TO GET ALL MY DATES STRAIGHT IN MY
4      HEAD.
5  Q.  AND THE HOUSE THAT WAS ON WHITE HORSE ROAD, THAT
6      STAYED WITH MR. ALEXANDER AFTER ---
7  A.  YES.
8  Q.  --- AFTER THE DIVORCE?
9  A.  YES, YES BECAUSE IT WAS IN HIS MOTHER'S NAME.  SHE
10     PURCHASED THE HOUSE.
11 Q.  WHEN YOU SAY SHE PURCHASED THE HOUSE, WHAT DO YOU
12     MEAN?
13 A.  FROM WHAT I WAS TOLD BECAUSE THIS WAS ALL BEFORE I
14     EVER EVEN MET HIM, HE WAS IN CALIFORNIA.  HE CAME
15     HERE TO TAKE CARE OF HIS MOTHER, AND SHE PUT THE
16     MONEY DOWN TO PURCHASE THE HOUSE.  THOUGH EACH
17     MONTH, HE MADE THE MORTGAGE PAYMENT, THE HOUSE WAS
18     IN HER NAME.
19 Q.  HAVE YOU EVER HEARD OF AN ENTITY CALLED THE
20     ALEXANDER FAMILY TRUST?
21 A.  NO.  NOT THAT I RECALL, OKAY?  THIS WAS NOT PART OF
22     ALL THIS.  DO YOU KNOW WHAT I'M SAYING?
23 Q.  WELL, WHY DON'T YOU CLARIFY?  WHAT ARE YOU ---
24 A.  WHAT I MEAN IS IT WASN'T PART OF FREEDOM TRUST GROUP
25     AND THE AWARE -- IT WASN'T -- IF HE FORMED A TRUST,

---

Page 11

1      THE ALEXANDER FAMILY TRUST BECAUSE THERE WAS A TRUST
2      THAT HE FORMED AFTER WE SEPARATED OR RIGHT AROUND IN
3      THERE TO PUT THE HOUSE IN THAT I BELIEVE OUR
4      DAUGHTER WAS THE BENEFICIARY OF.  NOW, THIS IS ALL,
5      I COULD BE TOTALLY WRONG ON ALL OF THIS, BUT I
6      REMEMBER SOMETHING BEING FORMED, AND I DON'T KNOW IF
7      THAT'S WHAT IT WAS CALLED.  I COULD BE TOTALLY
8      WRONG, BUT I'M THINKING THAT'S WHAT IT WAS CALLED,
9      BUT I HAD NOTHING TO DO WITH IT, AND I DON'T KNOW
10     ANYTHING BEYOND THAT.  AND LIKE I SAID, I COULD BE
11     TOTALLY OFF BASE ON THIS.
12 Q.  DOES MR. ALEXANDER STILL HAVE CONTACT WITH YOUR
13     DAUGHTER?
14 A.  HE HAS NOT SEEN HER, IN OCTOBER IT WILL BE THREE
15     YEARS WHEN THE GRANDDAUGHTER WAS BORN.  HE HAS HER
16     CONTACT INFORMATION, BUT I DON'T THINK THEY HAVE
17     CONTACT.  SHE'S 21 NOW, SO.
18 Q.  SO, YOU'RE NOT AWARE IF SHE'S STILL THE BENEFICIARY
19     OF ---
20 A.  OH, I DON'T, MM-MM (NEGATIVE RESPONSE).  I DON'T
21     HAVE A CLUE ON ANYTHING, AND SHE CERTAINLY DOESN'T.
22 Q.  CAN YOU TELL ME ABOUT YOUR INVOLVEMENT WITH THE
23     AWARE GROUP?
24 A.  I WAS BASICALLY ALEX'S PERSONAL ASSISTANT.
25 Q.  AND WHAT KIND OF DUTIES WOULD THAT ENTAIL?

---

Page 12

1  A.  TYPING UP STUFF.  PUTTING TOGETHER MATERIAL.  GOING
2      AND PICKING UP TAPES FROM THE TAPE DUPLICATOR OR,
3      YOU KNOW, ANY KIND OF ADMINISTRATIVE ASSISTANT KIND
4      OF ACTIONS.  I SPENT MY DAY AT THE COMPUTER.
5  Q.  DID YOU DO ANY FINANCIAL WORK FOR THE AWARE GROUP?
6  A.  THE AWARE GROUP DIDN'T HAVE ANY FINANCIAL -- THERE
7      WAS NO AWARE GROUP BANK ACCOUNTS.  THERE WAS NO
8      AWARE GROUP FINANCES, SO TO SPEAK, SO I'M NOT REALLY
9      SURE HOW TO ANSWER THAT.
10 Q.  WHERE WERE THE FINANCES DONE?
11 A.  FREEDOM TRUST GROUP HAD A BANK ACCOUNT AT THE BANK
12     OF TRAVELERS REST.
13 Q.  DID YOU DO ANY FINANCIAL WORK FOR THE FREEDOM TRUST
14     GROUP?
15 A.  OH, YES.  WELL, I HANDLED THE DEPOSITS OR WHATNOT.
16 Q.  SO, EXPLAIN -- CAN YOU EXPLAIN TO ME HOW, KIND OF
17     HOW THE INTERACTION BETWEEN AWARE GROUP AND FREEDOM
18     TRUST GROUP WORKED?
19 A.  WELL, FREEDOM TRUST GROUP HAD SOFTWARE THAT THEY
20     SOLD THAT WROTE TRUSTS, THAT PEOPLE COULD USE TO
21     WRITE TRUSTS.  NEVER, TRUSTS WERE NEVER WRITTEN FOR
22     OTHER PEOPLE.  OKAY?  PEOPLE COULD PURCHASE THE
23     SOFTWARE AND THEN WRITE TRUSTS.  AND FREEDOM TRUST
24     GROUP HAD A BANK ACCOUNT.  THEREFORE, AND BECAUSE
25     AWARE DIDN'T, ANY MONIES BASICALLY WENT TO FREEDOM

---

Page 13

1      TRUST GROUP UNTIL INTERNATIONAL BUSINESS SYSTEMS WAS
2      FORMED BECAUSE IT HAD A MERCHANT ACCOUNT AND
3      THEREFORE HAD THE ABILITY TO TAKE CREDIT CARDS.  AND
4      SO, ANYONE WHO WANTED TO USE A CREDIT CARD, IT WAS
5      RAN THROUGH INTERNATIONAL BUSINESS SYSTEMS.  AND LET
6      ME SAY THIS, OKAY?  BECAUSE MR. ALEXANDER AND HIS
7      BELIEFS WOULD NOT HAVE HIS NAME, SOCIAL SECURITY
8      NUMBER, SIGNATURE, OR ANY IDENTIFYING INFORMATION ON
9      ANY KIND OF BANK ACCOUNTS AND STUFF, HE HAD ME DO
10     IT.
11 Q.  SO, YOU RAN -- YOU RAN THE FINANCES, THEN, FOR
12     INTERNATIONAL BUSINESS SYSTEM?
13 A.  I HANDLED, I MANAGED -- WHEN YOU SAY HANDLED THE
14     FINANCES, I MADE SURE, I BALANCED THE CHECK BOOK.
15 Q.  YOU MADE THE DEPOSITS?
16 A.  WELL, THEY WERE MADE OUT OF MY -- WELL, FOR
17     INTERNATIONAL BUSINESS SYSTEMS, 99 PERCENT OF THOSE
18     WERE MADE AUTOMATICALLY BECAUSE IT WAS A MERCHANT
19     ACCOUNT.  YOU KNOW, IT WAS DIRECT DEPOSITED.  BUT
20     BOTH HE AND I WOULD MAKE DEPOSITS, AND HE WOULD, HE
21     ALSO GOT TO THE POINT WHERE HE WOULD MAKE
22     WITHDRAWALS.
23 Q.  HOW WERE THE PRODUCTS THAT EITHER FREEDOM TRUST
24     GROUP OR AWARE GROUP PROVIDED, HOW WERE THOSE
25     DISSEMINATED?  HOW WERE THOSE GIVEN OUT?

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

---

Page 14

1  A.  PEOPLE WOULD ORDER THEM BY THE MAIL OR ONLINE AND
2      THEY WERE SHIPPED.  WELL, THEY HAD -- THERE WAS A
3      MAILBOXES IN THE U.P.S. STORE ON EAST NORTH STREET,
4      AND THEY WERE JUST PACKAGED AND SHIPPED OUT TO
5      PEOPLE ALL OVER THE COUNTRY.
6  Q.  AND WHO WOULD DO THAT?
7  A.  HE OR I.
8  Q.  AND WHAT KIND OF MATERIALS WOULD BE SHIPPED OUT?
9  A.  AUDIO TAPES, VIDEO TAPES, WRITTEN MATERIAL, CD-ROMS.
10     I THINK AT THE END THERE WAS A DVD, BUT YOU KNOW.
11 Q.  WHAT KIND OF -- WELL, LET'S START WITH PERHAPS LIKE
12     THE CDs.
13 A.  OKAY.
14 Q.  WHAT KIND OF CDs WOULD BE MAILED OUT?  WHAT, I MEAN,
15     DO YOU HAVE A TITLE?
16 A.  OH, THE -- OKAY, THERE WAS THE FREEDOM FILES.
17 Q.  MM-HMM (AFFIRMATIVE RESPONSE).
18 A.  OKAY.  THAT WAS WHAT PEOPLE GOT WITH AWARE GROUP
19     MEMBERSHIP, AND IT WAS THE WHOLE BUNCH OF DIFFERENT
20     INFORMATION THAT HE GOT TOGETHER AND WAS PUT ON THE
21     CD REGARDING VARIOUS SUBJECTS THAT HE BELIEVED IN.
22 Q.  SUCH AS?
23 A.  WRIT OF HABEAS CORPUS, HOW TO WRITE TRUSTS, GOING
24     BACK TO THE TRUST ISSUE.  THE U.S. CODE, TITLE 42.
25     BASICALLY, CIVIL RIGHTS SORT OF THINGS, PROTECTING

---

Page 15

1      YOUR CIVIL RIGHTS IF THEY'VE BEEN VIOLATED, THINGS
2      ALONG THAT NATURE.  WHAT SOME PEOPLE WOULD CALL,
3      WELL, FOR A WHILE, THEY CALLED PATRIOT ARGUMENTS OR
4      PATRIOT -- HE WAS HEAVILY INTO THE PATRIOT MOVEMENT
5      OR WHATEVER THEY CALLED IT AT THAT TIME, IN THE
6      '90s, AT LEAST THAT'S WHAT I CALL, I HAVE NO IDEA
7      WHAT THEY CALL IT NOW.
8  Q.  WAS PART OF THE FREEDOM FILES, WAS THERE SOMETHING
9      CALLED THE RELIANCE PACKAGE?
10 A.  YES.
11 Q.  WHAT WAS THE RELIANCE PACKAGE?
12 A.  THE RELIANCE PACKAGE WAS GOING BACK TO THE U.C.C. --
13     WAIT, NO, I'M MISTAKEN.  THAT'S NOT WHAT THAT WAS.
14     WHAT WAS RELIANCE?  RELIANCE PACKAGE, IF I RECALL
15     CORRECTLY, WAS LETTERS WRITTEN BY ATTORNEYS, FORMER
16     I.R.S. AGENTS, VARIOUS OTHER PROFESSIONALS STATING
17     THEIR PROFESSIONAL OPINION ON THE U.S. TAX CODE.
18 Q.  AS PART OF THE FREEDOM FILES, WAS THERE SOMETHING
19     CALLED THE REDEMPTION PACKAGE?
20 A.  YES.  THAT WAS THE U.C.C.
21 Q.  CAN YOU EXPLAIN THAT?
22 A.  IT WAS A BELIEF THAT WHEN SOME, WHEN A U.S., A
23     PERSON IN THE U.S. WAS BORN, THEIR BIRTH CERTIFICATE
24     WAS USED AS A COMMODITY, AND THEREFORE, THEY BECAME
25     CHATTEL PROPERTY AND THROUGH THE REDEMPTION PROCESS

---

Page 16

1      AND UTILIZING A U.C.C. ONE, YOU COULD GET BACK
2      CONTROL OVER YOUR BIRTH CERTIFICATE.
3  Q.  AND WHAT WERE THE ADVANTAGES IN DOING THAT?
4  A.  I DON'T KNOW.  IT WAS SUPPOSEDLY TO, THAT PEOPLE
5      COULD DO THIS AND THEN THEY WOULD BE A REAL PERSON
6      -- WAIT, PERSON WAS A BAD WORD.  THEY COULD BE A
7      HUMAN.  I DON'T, LIKE I SAID, FIRST OF ALL, THIS HAS
8      BEEN MANY, MANY YEARS AGO.  WELL, NOT MANY, MANY,
9      BUT A DECADE.  OKAY?  AND FROM WHAT I RECALL AND
10     STUFF, IT WAS A BELIEF THAT THIS WOULD PUT YOU OUT
11     OF ONE JURISDICTION AND BACK INTO THE NATURAL WORLD
12     OR ORDER OR I DON'T KNOW.  I REALLY DON'T.  I DON'T
13     REMEMBER THE PARTICULARS OF IT.  ALL I DID WAS TYPE
14     UP WHAT I WAS TOLD TO TYPE UP.
15 Q.  DID YOU AND MR. ALEXANDER EVER CONDUCT ANY SEMINARS?
16 A.  YES.
17 Q.  CAN YOU -- HOW MANY SEMINARS?
18 A.  OH, LET ME THINK.  THERE WAS ONE IN OREGON, ONE IN
19     PENNSYLVANIA, ONE IN FLORIDA.  ONE IN, I THINK HERE
20     IN GREENVILLE.  I'M THINKING.  THAT'S ALL I CAN
21     RECALL OFF THE TOP OF MY HEAD.
22 Q.  SO, AT LEAST FOUR SEMINARS?
23 A.  AT LEAST.
24 Q.  AND MAYBE MORE?
25 A.  MAYBE.

---

Page 17

1  Q.  WHAT WAS DISCUSSED AT THESE SEMINARS?
2  A.  ALL OF THESE ISSUES.  THE PATRIOT SUBJECT MATTER,
3      THE REDEMPTION, THE RELIANCE, TRUSTS, WACO.  NO, NOT
4      REALLY THAT MUCH.  NO, IT WAS JUST THEIR BELIEF THAT
5      THE GOVERNMENT WAS IN THE WRONG.  BUT ANYWAY, JUST A
6      WHOLE BUNCH OF CIVIL RIGHTS ISSUES, CIVIL LIBERTY
7      ISSUES.  VARIOUS, VARIOUS SUBJECTS.
8  Q.  DID THE TOPIC OF THE I.R.S. EVER COME UP?
9  A.  OH, YEAH.
10 Q.  IN WHAT CONTEXT?
11 A.  THAT IT WAS UP TO EACH PERSON TO DETERMINE WHETHER
12     OR NOT THEY WERE LIABLE, AND THAT EACH PERSON, BY
13     LAW, HAD THE RIGHT TO REDUCE, THROUGH WHATEVER LEGAL
14     MEANS AVAILABLE, THEIR OBLIGATION, IF THEY HAD ONE.
15 Q.  AND HOW WOULD -- HOW MIGHT THEY GO ABOUT DOING THAT?
16 A.  WELL, UTILIZING A TRUST.  WELL, AND LET'S SEE.  THE
17     TAX ISSUE WAS NOT REALLY AT THE FOREFRONT OF
18     ANYTHING HE DID BECAUSE HIS THING WAS ALWAYS THAT IT
19     WAS HERE'S THE INFORMATION.  IT'S UP TO EACH
20     INDIVIDUAL TO DETERMINE WHAT THEY'RE RESPONSIBLE
21     FOR, WHAT THEY'RE LIABLE FOR.  IT WAS -- AND SO IT
22     WAS NEVER -- NEVER EVER WAS IT SAID YOU DON'T HAVE
23     TO PAY.  OKAY?  THAT WAS NEVER, NO TAX FORMS WERE
24     EVER FILLED OUT FOR ANYBODY.  IT WAS NEVER SAID YOU
25     ARE NOT LIABLE TO PAY TAXES OR DON'T PAY YOUR TAXES.

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                                July 27, 2009

## Page 18

1    NONE OF THAT WAS EVER -- IT WAS, IT WAS ALWAYS,
2    HERE'S INFORMATION.  YOU DETERMINE WITH IT WHAT YOU,
3    HOW YOU FEEL IT APPLIES TO YOU.
4  Q.  BUT WITH REGARDS TO THE TRUSTS ---
5  A.  OKAY.
6  Q.  WERE BLANK FORMS PROVIDED?
7  A.  WELL, IT WAS TEMPLATES.  IT WAS, IT WAS BASICALLY
8    THE BY-LAWS AND INDENTURES OF A TRUST, WHICH WAS
9    PRETTY GENERIC TEXTS, AND THEN THE PEOPLE WOULD GO
10    IN AND THEY WOULD NAME THE TRUSTS AND SET UP THE
11    TRUSTEES AND THE BENEFICIARIES AND ALL OF THOSE
12    PARTS OF IT.
13 Q.  AND WITH THE REDEMPTION MANUAL ---
14 A.  MM-HMM (AFFIRMATIVE RESPONSE).
15 Q.  WERE BLANK FORMS PROVIDED IN CONNECTION WITH ---
16 A.  YEAH, TEMPLATES.
17 Q.  --- THOSE MATERIALS?
18 A.  YES.
19 Q.  ALONG WITH THE RELIANCE MANUAL, WERE BLANK FORMS
20    PROVIDED?
21 A.  WELL, THOSE, NOW THOSE IN RELIANCE, FROM WHAT I
22    RECALL, IT WAS SAMPLES OF LETTERS AND THEN IT WAS
23    CONTACT INFORMATION ON HOW TO CONTACT WHO WROTE
24    THESE LETTERS TO GET THE LETTERS YOURSELF BECAUSE
25    THEY WEREN'T ANY GOOD UNLESS THEY WERE PERSONALIZED

## Page 19

1    TO YOU.
2  Q.  WHAT DO YOU MEAN THEY WEREN'T ANY GOOD?
3  A.  WELL, THESE WERE JUST SAMPLES.  THESE, IT'S LIKE,
4    LIKE IF, LIKE IF YOU HAD AN ATTORNEY THAT YOU
5    PERSONALLY WENT TO AND SAID I NEED A PROFESSIONAL
6    OPINION LETTER AND THEY WROTE A LETTER TO, ADDRESSED
7    TO YOU, OKAY?  THAT'S YOUR, THEIR LETTER TO YOU.
8    OKAY?  THIS WAS LETTERS ATTORNEYS OR OTHER
9    PROFESSIONALS HAD WRITTEN TO OTHER PEOPLE WITH THOSE
10    NAMES REDACTED.  SO, THESE WERE, THESE WERE JUST
11    EXAMPLES OF LETTERS, BUT IF YOU WANTED LETTERS
12    ADDRESSED TO YOU, THEN YOU WOULD NEED TO CONTACT
13    THESE PEOPLE TO GET THEM.  YOU SEE?
14 Q.  WHEN YOU SAY THEY WOULDN'T BE GOOD FOR SOMETHING,
15    WHAT DO YOU ---
16 A.  WELL, I MEAN THEY WOULD HAVE NO PERTINENCE.  THEY
17    WOULD, IT WOULD BE LIKE IF I CAME TO YOU AND SAID,
18    HEY, I GOT A LETTER FROM JOE AND JOE SAID WE'RE
19    GOING TO PARTY ON THE 4TH, WELL, THAT DOESN'T APPLY
20    TO YOU.  SO, YOU WOULD NEED TO GET A LETTER FROM JOE
21    SAYING HEY, WE'RE GOING TO GO PARTY ON THE 4TH FOR
22    YOU TO BE INVITED TO THE PARTY.  I MEAN, I DON'T, I
23    DON'T, MY POINT BEING IS THAT THEY WERE OF NO
24    CONSEQUENCE, AND WHAT CONSEQUENCE THEY WOULD HAVE IF
25    THEY WERE DIRECTED TO YOU, IF THEY WERE ADDRESSED TO

## Page 20

1    YOU, WHICH I THINK IS WHAT YOU'RE TRYING TO ASK ME,
2    CORRECT?
3  Q.  CORRECT.
4  A.  OKAY.  IS THAT THESE LETTERS COULD BE USED AS A FORM
5    OF DEFENSE ON DEFENDING WHERE YOU STOOD AND WHERE
6    YOU THOUGHT YOU WERE LIABLE OR NOT LIABLE FOR
7    CERTAIN TAXES.
8  Q.  WOULD MR. ALEXANDER CHARGE MONEY TO ATTEND THESE
9    SEMINARS?
10 A.  YES.
11 Q.  AND WAS IT ---
12 A.  I'M ALMOST POSITIVE.  I'M ALMOST 100 PERCENT
13    POSITIVE.  I'M TRYING TO THINK BACK.
14 Q.  AND WAS THERE A CHARGE TO GET THE CD OF THE FREEDOM
15    FILES?
16 A.  NO, THE FREEDOM FILES CAME WITH MEMBERSHIP TO THE
17    AWARE GROUP.  YOU WERE PURCHASING MEMBERSHIP AND
18    WITH MEMBERSHIP, YOU GOT A BUNCH OF INFORMATION.
19 Q.  HOW MUCH DID MEMBERSHIP COST?
20 A.  IT CHANGED WITH TIME.  I'M THINKING, THE LAST I
21    REMEMBER WAS 240 OR 295, AND IT WAS LIFETIME.  THERE
22    WAS NO DUES.  THERE WAS NO NOTHING.  IT WAS A ONE-
23    TIME, BUT I COULD BE WRONG BECAUSE I ---
24 Q.  WERE THERE ANY OTHER MATERIALS THAT EITHER AWARE
25    GROUP OR FREEDOM TRUST SOLD?

## Page 21

1  A.  WELL, THERE WERE AUDIOS FROM THE SEMINARS.  THEY
2    WERE RECORDED.  THERE WERE VIDEOS THAT HE GOT FROM
3    OTHER SOURCES.  ALEX'S MAIN THING, THE ONE THING HE
4    ALWAYS SAYS TO ME, SAID TO ME WAS A WISE MAN COPIES
5    AND A FOOL CREATES, AND SO HE WOULD GLEAN
6    INFORMATION FROM VARIOUS OTHER SOURCES AND COMPOUND
7    IT INTO ONE, BUT IT WAS VERY RARE THAT HE CREATED
8    SOMETHING FROM SCRATCH.  THAT MAKE SENSE?
9  Q.  MM-HMM (AFFIRMATIVE RESPONSE).  DID HE EVER CREATE
10    ANY MATERIALS BY SCRATCH THOUGH?
11 A.  WITH JUST WHATEVER -- WELL, OKAY, LIKE THE AUDIO
12    TAPES FROM THE SEMINARS WOULD BE HIM TALKING, SO YOU
13    COULD SAY HE CREATED, YOU KNOW, THOSE AUDIO TAPES,
14    BUT THE MATERIAL HE WAS DISCUSSING, NONE OF -- NONE
15    OF THE MATERIAL HE WENT OVER ORIGINATED WITH HIM.
16 Q.  HOW WERE RECORDS MAINTAINED AT THE AWARE GROUP OR
17    THE FREEDOM TRUST GROUP?
18 A.  THERE WAS A DATABASE, INTELLIMAGIC, OF YOU KNOW, WHO
19    JOINED, AND THERE WAS A NOTE PAD THAT YOU COULD
20    BRING UP AND IT, WHERE WE'D WRITE, YOU KNOW, YOU
21    DATE STAMP IT AND GO, OKAY, ON THIS DATE, RECEIVED
22    SUCH AND SUCH OR WHATEVER AND STUFF, BUT IT WAS NO
23    DETAILED, YOU KNOW, LIKE OH, I HAD A CONVERSATION
24    WITH SO AND SO TODAY AND THIS WAS DISCUSSED.
25    NOTHING LIKE THAT WAS EVER KEPT.

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                          July 27, 2009

---

Page 22

1  Q.  WHO HAD ACCESS TO THAT?
2  A.  HE AND I.
3  Q.  AND WHO MAINTAINED IT?
4  A.  HE AND I.
5  Q.  AND HOW, I MEAN, HOW ARE ENTRIES ENTERED?
6  A.  SAT AT THE KEYBOARD AND ENTERED THEM.  I MEAN, HE
7     AND I.  YEAH.
8  Q.  DAILY?  WEEKLY?  MONTHLY?
9  A.  DAILY.
10 Q.  WERE THOSE THE ONLY SORTS OF RECORDS THAT WERE KEPT
11    AT, BY THE ---
12 A.  WELL, THERE WAS -- NOW, WHEN PEOPLE BECAME AWARE
13    GROUP MEMBERS, THEY HAD TO FILL OUT A MEMBERSHIP
14    FORM AND THEY WOULD SEND THAT IN.  THOSE WERE KEPT.
15 Q.  DO YOU KNOW WHERE THOSE MIGHT BE NOW?
16 A.  THEY'RE DESTROYED.  THEY'RE A PART OF EVERYTHING.
17    LIKE I PUT IN THE STATEMENT THAT I PROVIDED WAS
18    Y'ALL HAD ASKED FOR ALL THIS INFORMATION AND WHEN --
19    WHEN MY CIVIL CASE ENDED WITH THE INTERNAL REVENUE
20    SERVICE AND THE GOVERNMENT AND STUFF, FIRST OF ALL,
21    WHEN IT WAS ONGOING, I PROVIDED THEM WITH COPIES OF
22    EVERYTHING.  I PROVIDED THE I.R.S. WITH COPIES OF
23    EVERYTHING I HAD, EVERY AUDIO SERIES, EVERY VIDEO
24    SERIES, EVERY CD, ALL THE DATABASE, EVERYTHING.
25    OKAY?

---

Page 23

1  BY MS. SALVINI:
2     I'M SORRY.  I MISSED THAT.  COULD YOU REPEAT
3     WHAT YOU SAID?  YOU PROVIDED ALL THIS?  I'M SORRY.
4  BY THE WITNESS:
5     YES, YES.
6  BY MR. STRONG:
7     I'LL ASK HER IN FOLLOW UP TO CLARIFY WHERE WE
8     ARE.
9  BY MS. SALVINI:
10    OKAY.
11 BY THE WITNESS:
12    OKAY.
13 BY MR. STRONG:
14    GO AHEAD AND FINISH.
15 BY THE WITNESS:
16    ALL RIGHT.  SO, WHEN MY CIVIL CASE WAS DONE AND
17    THEY SAID, OKAY, YOU SIGN THIS AFFIDAVIT AND WE'RE
18    DONE AND STUFF, EVERYTHING I HAD EXCEPT FOR
19    FINANCIAL RECORDS FOR TAX PURPOSES, I STILL HAVE ALL
20    THAT, BUT EVERYTHING ELSE, I CHUCKED IN A BIG OLD
21    BARREL AND HAD A BONFIRE BECAUSE ALL I WANTED TO DO
22    WAS PUT THIS MESS, THIS NIGHTMARE BEHIND ME.
23 EXAMINATION RESUMED BY MR. STRONG:
24 Q.  WHAT CIVIL CASE ARE YOU REFERRING TO?  DO YOU NEED A
25    -- DO YOU WANT TO TAKE A BREAK?  LET'S TAKE A BREAK.

---

Page 24

1  BY MS. SALVINI:
2     OKAY.
3     (OFF THE RECORD  9:58 A.M. - 10:03 A.M.)
4  EXAMINATION RESUMED BY MR. STRONG:
5  Q.  OKAY.  WE'RE BACK ON THE RECORD.  CAN YOU REMIND US
6     WHERE WE LEFT OFF?
7  BY THE COURT REPORTER:
8     YOU ASKED WHAT CIVIL CASE WAS SHE REFERRING TO.
9  EXAMINATION RESUMED BY MR. STRONG:
10 Q.  OKAY.
11 A.  WHEN I WAS CONTACTED BY THE I.R.S. SAYING THAT THEY
12    WERE LOOKING AT PURSUING ME CRIMINALLY AND/OR
13    CIVILLY OR WHATEVER, I DON'T REMEMBER, FOR THE
14    ACTIVITIES DONE WHILE I WAS WITH HIM AND WITH THE
15    AWARE GROUP.  THAT'S WHAT I'M REFERRING TO.
16 Q.  WAS THAT BACK IN ABOUT 2006?
17 A.  YEAH.  SOMEWHERE AROUND IN THERE.  LET ME SEE.  IT
18    WAS BEFORE THEN.  MY CONTACT JUST ABOUT POPPED OUT
19    BECAUSE I SIGNED A VITAL, AN AFFIDAVIT ON FEBRUARY
20    OF '06, I THINK.  WELL, HERE'S -- YEAH, IT WAS IN
21    '05.  IT STARTED SOMETIME IN '05.
22 Q.  AND YOU'RE LOOKING AT A LETTER FROM THE I.R.S.
23    THERE?
24 A.  YEAH, FROM THE DEPARTMENT OF TREASURY.
25 BY MS. SALVINI:

---

Page 25

1     CAN WE GO OFF THE RECORD FOR A MOMENT?
2  BY MR. STRONG:
3     SURE.
4     (OFF THE RECORD  10:03 A.M. - 10:04 A.M.)
5  EXAMINATION RESUMED BY MR. STRONG:
6  Q.  ALL RIGHT.  WE'RE BACK ON THE RECORD.  OKAY.  WE
7     WERE DISCUSSING -- WE WERE DISCUSSING YOUR CIVIL
8     SUIT.
9  A.  RIGHT.
10 Q.  BACK ABOUT THREE YEARS AGO.
11 A.  YEAH.  FOUR.  FOUR OR FIVE, ACTUALLY, BECAUSE THIS
12    IS '09, SO '05, AT LEAST.
13 Q.  OKAY.
14 A.  SO, AT LEAST FOUR YEARS AGO.
15 Q.  AND WHAT WAS THE END RESULT OF THAT?
16 A.  THE END RESULT OF THAT WAS THAT THEY ASKED ME TO
17    FILE THE TAXES FROM WHEN I LEFT ALEX WHICH WAS 2003
18    TO 2000 AND WHATEVER, AND SIGN AN AFFIDAVIT, WHICH
19    YOU HAVE A COPY OF, STATING THAT I GAVE FALSE
20    INFORMATION TO CLIENTS LEADING THEM TO BELIEVE THERE
21    WAS NO REQUIREMENT TO FILE FEDERAL INCOME TAXES ON
22    EARNINGS AND STUFF.  AND THEY PROCEEDED TO SCREW ME
23    OVER, BECAUSE I WAS TOLD DIRECTLY BY THE ATTORNEY
24    FROM THE GOVERNMENT AND FROM THE I.R.S. AGENT THAT
25    IF I HELPED THEM, IF I PROVIDED WHAT THEY ASKED FOR,

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

## Page 26

1  THEY WOULDN'T SEEK ANY CIVIL PENALTIES, BUT THEY
2  DID.  LIKE TO THE TERM OF A QUARTER OF A MILLION
3  DOLLARS.  I JUST LOST MY HOME IN FORECLOSURE.  WHERE
4  DO I GET $250,000?  ESPECIALLY WHEN YOU COUNT
5  EVERYTHING ---
6  Q.  ALL RIGHT.  LET'S TAKE ANOTHER BREAK.
7  A.  I'M SORRY.
8  Q.  NO, THAT'S ---
9  BY MS. SALVINI:
10     IT'S OKAY.
11     (OFF THE RECORD 10:06 A.M. - 10:07 A.M.)
12  EXAMINATION RESUMED BY MR. STRONG:
13  Q.  I'M GOING TO SHOW YOU WHAT I'LL HAVE THE COURT
14     REPORTER MARK AS PLAINTIFF'S EXHIBIT ONE.
15  (COURT REPORTER MARKS PLAINTIFFS EXHIBIT ONE, AFFIDAVIT
16     ATTACHED.)
17  EXAMINATION RESUMED BY MR. STRONG:
18  Q.  A COPY HAS ALREADY BEEN PROVIDED TO MS. SALVINI.
19  A.  YES.
20  Q.  YOU WERE TALKING JUST A MOMENT AGO ABOUT AN
21     AFFIDAVIT THAT YOU PROVIDED TO THE I.R.S.
22  A.  YES.
23  Q.  TAKE A MOMENT AND LOOK AT THAT.
24  A.  YES.
25  Q.  IS THAT YOUR SIGNATURE ON THE BOTTOM?

## Page 27

1  A.  YES, IT IS.
2  Q.  DO YOU RECOGNIZE THIS DOCUMENT?
3  A.  YES, I DO.
4  Q.  WHAT DO YOU RECOGNIZE IT AS?
5  A.  THE AFFIDAVIT THAT THE GOVERNMENT DREW UP THAT THEY
6     ASKED ME TO SIGN TO CLOSE MY CASE.
7  Q.  AND YOU'VE READ THIS MATERIAL BEFORE?
8  A.  YES.
9  Q.  AND TO THE BEST OF YOUR KNOWLEDGE, ARE THE
10     STATEMENTS MADE THEREIN STILL ACCURATE?
11  A.  SURE.
12  Q.  DO YOU WANT TO TAKE A MINUTE AND ---
13  A.  NO.
14  Q.  WHEN THE I.R.S. CONTACTED YOU, DID THEY ASK YOU TO
15     PROVIDE INFORMATION ABOUT THE CUSTOMERS OF THE AWARE
16     GROUP?
17  A.  YES.
18  Q.  DID YOU PROVIDE THAT INFORMATION TO THEM?
19  A.  YES.
20  Q.  IN WHAT FORMAT?
21  A.  A CD-ROM WITH THE DATABASE ON IT.
22  Q.  I'M GOING TO HAND YOU NOW WHAT I'M GOING TO ASK THE
23     COURT REPORTER TO MARK AS PLAINTIFF'S EXHIBIT TWO.
24  (COURT REPORTER MARKS PLAINTIFF'S EXHIBIT TWO, CLIENT
25     LIST, ATTACHED.)

## Page 28

1  EXAMINATION RESUMED BY MR. STRONG:
2  Q.  I'M HANDING A COPY OF THIS TO MS. SALVINI.  TAKE A
3     MOMENT AND LOOK THIS OVER.  IT'S A LITTLE BIT OF A
4     LONG DOCUMENT, AND JUST LOOK UP WHEN YOU'RE READY.
5  A.  OKAY.
6  Q.  DO YOU RECOGNIZE THIS DOCUMENT?
7  A.  WELL, I RECOGNIZE SOME OF THE NAMES ON THESE.
8  Q.  WHAT DO YOU MEAN WHEN YOU SAY YOU RECOGNIZE SOME OF
9     THE NAMES?
10  A.  THAT THESE WERE CLIENTS OR MEMBERS OF THE AWARE
11     GROUP OR OTHER ORGANIZATIONS THAT, YOU KNOW, WHICH
12     WE ARE DISCUSSING TODAY.
13  Q.  AND IS THIS SIMILAR TO THE DATABASE THAT YOU WOULD
14     HAVE CREATED FOR THE AWARE GROUP?
15  A.  WELL, IT'S THE NAME AND ADDRESSES, YEAH.
16  Q.  AND WHAT -- DO THE NUMBERS TO THE RIGHT HAND SIDE
17     HAVE ANY SIGNIFICANCE TO YOU?
18  A.  I HAVE NO IDEA WHAT THAT IS.  I DID NOT DO THAT.  I
19     DON'T KNOW WHAT IT MEANS.  LIKE I SAID, I PROVIDED
20     THEM A CD-ROM.  I DIDN'T PROVIDE THEM ANYTHING IN
21     WRITING THAT I CAN RECALL.
22  Q.  WHAT KIND OF PROGRAM WOULD YOU HAVE USED TO CREATE
23     YOUR DATABASE?
24  A.  IT WAS IN A PROGRAM CALLED TELEMAGIC.  THE FORMAT
25     WAS FOXPRO.  THAT WAS THE ACTUAL DATABASE EXTENSION

## Page 29

1  WAS FOXPRO, BUT TELEMAGIC IS THE BRAND THE PROGRAM
2     USED.
3  Q.  AND WERE YOU RESPONSIBLE FOR MAINTAINING THAT
4     DATABASE?
5  A.  WE BOTH WERE.
6  Q.  OKAY.  WHO DID THE DATA ENTRY PRIMARILY?
7  A.  ME.
8  Q.  WHEN YOU WERE TALKING WITH THE I.R.S., DID THEY ASK
9     YOU TO TRY TO ASSIGN CUSTOMERS TO YOURSELF OR MR.
10     ALEXANDER?
11  A.  NOT THAT I -- WELL, YOU MEAN FROM WHEN WE WERE
12     TOGETHER TO WHEN WE WERE APART?  BECAUSE I DON'T
13     REMEMBER.  I DON'T -- I DON'T, I DON'T HAVE A CLUE.
14     THEY COULD HAVE, BUT I DON'T REMEMBER THEM ASKING ME
15     THAT.
16  Q.  DID THEY ---
17  A.  EXCEPT, I DON'T KNOW.  I DON'T KNOW.  I DON'T KNOW.
18  Q.  DID YOU CONTINUE TO HAVE CUSTOMERS AFTER YOU AND MR.
19     ALEXANDER DIVORCED?
20  A.  YES, WE, BECAUSE I HANDLED THE DAY TO DAY OPERATIONS
21     -- WHEN I SAY OPERATIONS, LET ME CLARIFY, OKAY?
22     EVERYTHING THAT WAS DONE WITH ANY OF THESE
23     ORGANIZATIONS WAS DONE BECAUSE THAT'S WHAT HE WANTED
24     AND WHAT HE SAID TO DO.  WHEN I SAY I HANDLED THE
25     DAY TO DAY OPERATIONS, I MEAN LIKE AN ADMINISTRATIVE

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                           July 27, 2009

---

Page 30

1  ASSISTANT, YOU KNOW. I ORGANIZED EVERYTHING AND
2  WHEN I LEFT ALEX, FOR A WHILE, WE TRIED WORKING
3  TOGETHER, BUT OF COURSE IN THAT SITUATION, IT DIDN'T
4  WORK BECAUSE HE HAD NO IDEA. HE HAD NO IDEA HOW I
5  RAN THE DAY TO DAY OPERATIONS OF IT AND SO,
6  THEREFORE, I GAVE HIM THE OPTION. FOR A WHILE, LIKE
7  I SAID, I WORKED FOR HIM AND HE PAID ME TO WORK FOR
8  HIM. OKAY? AND THEN, I GAVE HIM A CHOICE BECAUSE I
9  WAS IN A SITUATION WHERE, YOU KNOW, I HAD A DAUGHTER
10 TO PROVIDE FOR, AND THIS IS ALL I HAD KNOWN FOR
11 EIGHT YEARS, SO I SAID, YOU KNOW, EITHER YOU, AS
12 PART OF THE DIVORCE, YOU CAN EITHER GIVE ME A CASH
13 SETTLEMENT OR YOU CAN GIVE ME THE AWARE GROUP
14 BECAUSE I KNEW HOW TO, HOW TO RUN IT. YOU KNOW, THE
15 ACTUAL DAY TO DAY OPERATIONS OF IT, BUT NOT THE
16 INFORMATION. THE INFORMATION NEVER CHANGED BECAUSE
17 YOU'VE GOT TO UNDERSTAND THAT HE SPENT HIS DAYS
18 READING AND RESEARCHING AND GOING OVER MATERIALS AND
19 DECIDING WHAT WAS NEXT.
20 Q.  AND WHAT DID YOUR DAY LOOK LIKE?
21 A.  SITTING IN FRONT OF THE COMPUTER ENTERING, ENTERING
22     STUFF. ANSWERING EMAILS. PROCESSING ORDERS. YOU
23     KNOW, THE OPERATIONS SIDE OF IT.
24 Q.  AND THE DATABASE THAT YOU REFERRED TO WAS ALSO, WAS
25     THAT ALSO DESTROYED IN THE BONFIRE THAT YOU ---

---

Page 31

1  A.  MM-HMM (AFFIRMATIVE RESPONSE).
2  Q.  --- HAD REFERRED TO EARLIER?
3  A.  MM-HMM (AFFIRMATIVE RESPONSE). OH, YEAH. I HAD NO
4      USE FOR IT.
5  Q.  ARE YOU AWARE IF THERE WOULD BE ANY DUPLICATES OF
6      THOSE RECORDS OR DID YOU HAVE THE ---
7  A.  Y'ALL -- THE I.R.S. SHOULD HAVE A COPY OF IT.
8  Q.  BUT NOBODY OUTSIDE THE GOVERNMENT SHOULD?
9  A.  WELL, ALEX HAD A COPY OF IT BECAUSE PART OF THE
10     AGREEMENT WAS, IS I WAS TO KEEP HIM UPDATED ON THE
11     DATABASE, NOW, UP UNTIL THE POINT WHERE AWARE
12     CEASED. LET ME SAY THAT. OKAY? HE HAD LIKE ALL
13     THESE PEOPLE. HE HAD IT BECAUSE HE HAD TELEMAGIC,
14     TOO. YOU KNOW, SO, HE HAD ALL OF THIS, AND I WAS TO
15     -- PART OF OUR AGREEMENT WAS EVERY MONTH I WAS TO
16     PROVIDE HIM WITH ANY NEW ADDRESSES, YOU KNOW, NEW
17     PEOPLE SO HE COULD CONTACT WHATEVER IT WAS HE WAS
18     DOING. THIS IS AFTER WE DIVORCED OR AFTER WE
19     SEPARATED.
20 Q.  WHAT WAS HE DOING AFTER THE DIVORCE?
21 A.  WELL, HE GOT FREEDOM TRUST GROUP. I HAD, I DIDN'T
22     HAVE ANYTHING TO DO WITH TRUSTS WHEN I TOOK OVER
23     AWARE. HE WAS DOING THAT, AND TO BE HONEST WITH
24     YOU, I DON'T KNOW WHAT ELSE HE WAS DOING. HE HAD --
25     HE TOOK THE TRUSTS AND PUT THEM IN ANOTHER FORMAT, A

---

Page 32

1  SOFTWARE CALLED THE MONEY TRUST, AND IT WAS, THAT
2  WAS ALL THAT I'M AWARE OF.
3  BY MS. SALVINI:
4       JAMES, CAN WE GO OFF THE RECORD FOR A MOMENT?
5       (OFF THE RECORD 10:16 A.M. - 10:17 A.M.)
6  EXAMINATION RESUMED BY MR. STRONG:
7  Q.  ABOUT HOW MANY MEMBERS JOINED THE AWARE GROUP IN AN
8      AVERAGE MONTH?
9  A.  I WOULD SAY FIVE TO TEN. YEAH. ABOUT FIVE TO TEN.
10     SOMETIMES MORE, SOMETIMES LESS. I MEAN, I DON'T, I
11     ---
12 Q.  WOULD ANYTHING AFFECT MORE OR LESS?
13 A.  OH, YEAH. LIKE, IF WE HAD A SEMINAR, YOU KNOW,
14     THERE WOULD BE AN INFLUX. PEOPLE WOULD JOIN AT THE
15     SEMINAR OR THEY WOULD JOIN AFTER THE SEMINAR OR IF
16     HE DID ANY KIND OF PROMOTIONS.
17 Q.  WHAT KIND OF PROMOTIONS MIGHT HE DO?
18 A.  THERE WERE SOME DIRECT MAIL PIECES BECAUSE NOT
19     EVERYONE ON THE DATABASE WAS A MEMBER. OKAY? THERE
20     WAS JUST PEOPLE WHO HAD JOINED THE EMAIL LIST OR
21     REQUESTED A CATALOG OR SOMETHING BECAUSE BEFORE THE
22     INTERNET GOT REAL BIG, YOU KNOW, AND STUFF,
23     EVERYTHING WAS IN THE MAIL. YOU KNOW?
24 Q.  MM-HMM (AFFIRMATIVE RESPONSE).
25 A.  AND STUFF, SO THERE WAS AN ACTUAL HARD CATALOG OF

---

Page 33

1  VIDEOS AND AUDIOS AND WHATNOT AND STUFF, AND PEOPLE
2  WOULD REQUEST THOSE, AND THEN AFTER WE GOT A WEBSITE
3  AND STUFF, EVERYTHING WAS ONLINE, SO THEY WOULD JOIN
4  THE EMAIL LIST AND THERE WAS AN E-ZINE OR LITTLE
5  NEWSLETTER THAT WAS PUT OUT AND STUFF. AND SO HE
6  WOULD GET NAMES AND ADDRESSES THROUGH THAT AND THEY
7  MAY JOIN LATER AND WHATEVER.
8  Q.  DID YOU FOLKS MAINTAIN SEPARATE DATABASES ABOUT,
9      BETWEEN PEOPLE WHO WERE JUST ON THE EMAIL LIST AND
10     FOLKS WHO WERE MEMBERS?
11 A.  WELL, IT WAS ALL IN ONE DATABASE, BUT YOU HAD THE
12     ABILITY IN TELEMAGIC TO FILTER IT. YOU KNOW, SO I
13     COULD PUT IN A CERTAIN COLUMN THAT THEY WERE MEMBERS
14     OR I COULD PUT IN A CERTAIN COLUMN THAT THEY WERE ON
15     THE EMAIL LIST OR WHAT HAVE YOU.
16 Q.  AND YOU WOULD HAVE BEEN ABLE TO -- SO YOU, WOULD
17     HAVE BEEN ABLE TO CREATE MAYBE A SUB LIST ---
18 A.  YEAH.
19 Q.  --- OF JUST CUSTOMERS?
20 A.  YES.
21 Q.  AND A SUB LIST OF JUST PEOPLE ON, WHO WERE JUST
22     RECEIVING EMAILS?
23 A.  YES. YES.
24 Q.  AND WHEN THE I.R.S. CONTACTED YOU ---
25 A.  MM-HMM (AFFIRMATIVE RESPONSE).

9 (Pages 30 to 33)

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

## Page 34

1 Q. --- ABOUT PROVIDING A LIST, DO YOU REMEMBER WHAT
2    SORT OF LIST YOU WOULD HAVE ---
3 A. I GAVE THEM EVERYONE.
4 Q. YOU GAVE THEM EVERYONE?
5 A. EVERYONE.
6 Q. DID YOU MAKE ANY DISTINCTIONS FOR THEM BETWEEN ---
7 A. I DON'T REMEMBER. I REALLY DON'T. I JUST, I DON'T,
8    I DON'T REMEMBER BECAUSE THERE WERE -- WHEN THEY
9    BROUGHT UP THE DATABASE, IF THEY BROUGHT IT UP ON CD
10   BECAUSE I REALLY DON'T REMEMBER IF I GAVE THEM A
11   HARD COPY OR NOT. I KNOW THIS WAS, IF I GAVE THEM A
12   HARD COPY, THIS WASN'T IT BECAUSE THERE WOULDN'T
13   HAVE, I DON'T KNOW WHAT THAT IS, BUT THERE WERE THE
14   ABILITY, YOU HAD THE ABILITY TO PRINT THE NOTES.
15   AND SO, THEREFORE, IN THE NOTES YOU COULD HAVE SEEN
16   A HISTORY OF WHAT THEY DID EXCEPT TELEMAGIC'S A
17   REALLY LOOPY PROGRAM. IT FROZE AND CRASHED ALL THE
18   TIME, AND THIS PERSON'S NOTES WOULD END UP IN THAT
19   PERSON'S NOTES OR THAT PERSON'S NOTES WOULD BE GONE.
20   YOU KNOW, IT'S A WINDOWS PROGRAM, SO YOU KNOW, IT
21   DOES THAT SORT OF THING AND STUFF, SO I DON'T REALLY
22   REMEMBER OTHER THAN GIVING THEM THE CD WITH ALL
23   CONTACTS. I DON'T REMEMBER.
24 Q. WOULD THE DATABASE HAVE INCLUDED INFORMATION ABOUT
25   WHEN PEOPLE JOINED?

## Page 35

1 A. YES. IN THE NOTE PADS, IT WOULD HAVE SAID THAT.
2 Q. WOULD YOU HAVE BEEN ABLE TO FILTER BASED ON THAT?
3 A. I'M SURE YOU COULD HAVE, BUT I DON'T THINK SO. I
4    MEAN, I NEVER DID THAT, SO I DON'T KNOW. I DIDN'T,
5    I NEVER PULLED FROM WITHIN THE NOTE PAD TO FILTER.
6 Q. BUT THE PROGRAM YOU DID INCLUDE WHAT DAY OR WHAT
7    YEAR ---
8 A. MM-HMM (AFFIRMATIVE RESPONSE).
9 Q. WHY DON'T I JUST ASK THE QUESTION HOW? I MEAN,
10   WOULD YOU INCLUDE THE DAY, THE YEAR, THE MONTH, I
11   MEAN ---
12 A. WELL, WHAT IT WAS IS THERE WAS A DATE STAMP. YOU
13   COULD HIT DATE STAMP AND IT WOULD PUT THE DATE AND
14   THE TIME OF WHAT, AND THEN YOU COULD TYPE OUT
15   WHATEVER NOTES YOU WANTED TO PUT IN THERE, AND WE
16   WOULD PUT RECEIVED MEMBERSHIP, OR YOU KNOW, ORDERED
17   A VIDEO OR WHATEVER, YOU KNOW, THAT'S -- WE WOULD
18   DATE IT AND THEN PUT IT IN THERE.
19 Q. OKAY. WHEN YOU AND MR. ALEXANDER WERE TOGETHER, DID
20   EITHER ONE OF YOU MAINTAIN ANY BANK ACCOUNTS?
21 A. OH, YES, I HAD A PERSONAL BANK ACCOUNT I HAD ALWAYS
22   HAD.
23 Q. WITH WHOM?
24 A. WELL, AT THE BEGINNING, IT WAS JUST MINE AND THEN
25   WHEN ALEX WENT THROUGH THIS REDEMPTION PROCESS, HE

## Page 36

1    THEN FELT IT WAS OKAY FOR HIM TO BE ON THE BANK
2    ACCOUNT, SO HE BECAME, HE CAME ON THE BANK ACCOUNT
3    AS WELL. BUT THERE WAS NOTHING REALLY IN THERE.
4 Q. AND YOU HAD MENTIONED BEFORE THAT FREEDOM TRUST
5    GROUP HAD A BANK ACCOUNT.
6 A. YES.
7 Q. AND YOU HAD MENTIONED THAT INTERNATIONAL BUSINESS
8    SYSTEMS HAD A MERCHANT ACCOUNT?
9 A. A MERCHANT ACCOUNT WHERE IT COULD TAKE, WE COULD
10   TAKE CREDIT CARD SALES, AND IT HAD AN ACCOUNT AT
11   CHARLES SCHWAB.
12 Q. WHAT KIND OF ACCOUNT WITH CHARLES SCHWAB?
13 A. A BROKERAGE ACCOUNT THAT WAS TREATED LIKE A BANK
14   ACCOUNT.
15 Q. OKAY. WERE THERE ANY OTHER ACCOUNTS IN ANY OF THE
16   VARIOUS GROUPS THAT YOU TWO HAD?
17 A. NO. NO, THAT WAS IT.
18 Q. OKAY. OTHER THAN THE HOUSE, WERE THERE ANY OTHER
19   ASSETS THAT ---
20 A. CARS.
21 Q. --- YOU TWO SHARED? CARS. NO STOCKS, NO BONDS?
22 A. WELL, THERE WERE -- THERE WERE THREE, AT ONE TIME,
23   THREE LITTLE STOCKS THROUGH THE SCHWAB ACCOUNT.
24   THEY ALL LOST MONEY AND THEY ALL GOT SOLD AND THEY
25   WERE ALL MINIMUM AND IT WAS NOTHING, BUT THAT WAS

## Page 37

1    IT. THAT WAS THE ONLY OTHER STOCKS. THERE WAS NO
2    SAVINGS ACCOUNTS OR NOTHING.
3 Q. NO CDS?
4 A. NO.
5 Q. NO ---
6 A. NOW, HE DID, HE DID AT ONE TIME BUY A CD FOR OUR
7    DAUGHTER AND STUFF, BUT IT WAS A ONE YEAR AND THEN
8    IT GOT CASHED IN, AND IT WAS LIKE $500 OR SOMETHING
9    LIKE THAT.
10 Q. ANY COINS, ANY ---
11 A. YES.
12 Q. CAN YOU DESCRIBE THOSE?
13 A. WELL, ALEX HAS ALWAYS BEEN A COIN COLLECTOR. HE WAS
14   A COMMODITIES BROKER IN THE '70s IN CALIFORNIA AND
15   STUFF, SO HE COLLECTED COINS.
16 Q. WHAT KIND OF COINS?
17 A. GOLD AND SILVER, EITHER THE KIND THAT, EITHER,
18   EITHER LOOSE, YOU KNOW, JUST LIKE CHANGE KIND OF
19   COIN. YOU KNOW WHAT I'M SAYING? OR THOSE THAT ARE
20   IN THE SLABS, THE ONES THAT ARE CERTIFIED BY THE
21   CERTIFIED COMPANIES. WHATEVER THEY'RE CALLED.
22 Q. BUT NOT REGULAR U.S. CURRENCY?
23 A. OH, YOU MEAN LIKE DOLLAR BILLS SORT OF THING?
24 Q. SILVER DOLLARS.
25 A. YEAH, THAT'S WHAT I'M SAYING WHEN I SAY GOLD AND

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

---

Page 38

1    SILVER COINS. THAT'S WHAT I MEAN.
2  Q. OKAY. DID YOU FOLKS PAY THE PROPERTY TAXES ON THE
3     HOUSE ON WHITE HORSE ROAD?
4  A. YES.
5  Q. AND YOU USED THE FUNDS FROM FREEDOM TRUST GROUP TO
6     PAY THE PROPERTY TAXES?
7  A. I'M ASSUMING, UNLESS -- WELL, LET ME REPHRASE THAT
8     BECAUSE I DON'T KNOW IF THE MORTGAGE ON THAT WAS THE
9     TYPE WHERE IT HAD THE ESCROW ACCOUNT WHERE IT PAID
10    THE TAXES OR NOT. I DON'T REMEMBER WHETHER OR NOT
11    WE EVER GOT A TAX BILL. YOU KNOW WHAT I'M SAYING?
12    AND SO, SO I DON'T REALLY KNOW WHICH WAY -- I DON'T
13    REMEMBER WHICH WAY THOSE WERE PAID.
14 Q. DO YOU REMEMBER -- DID THE COUNTY OR THE STATE
15    DEPARTMENT OF TRANSPORTATION EVER HAVE ANY INTEREST
16    IN THE PROPERTY?
17 A. OH, YES. THEY DID. THEY WERE WIDENING WHITE HORSE,
18    AND SO, THEY MADE AN OFFER, YOU KNOW, TO TAKE THAT
19    PART OF THE EASEMENT OR WHATEVER IT'S CALLED. YES.
20    AND THAT WAS USED, THE MONEY THAT WAS USED WAS USED
21    TO PAY OFF THE MORTGAGE.
22 Q. AND WHO -- WHO WORKED WITH THE FOLKS FROM THE
23    DEPARTMENT OF TRANSPORTATION?
24 A. OH, THAT WOULD HAVE BEEN ALEX. YEAH.
25 Q. THE ADDRESS THAT YOU FOLKS USED, 2435 EAST NORTH

---

Page 39

1     STREET ---
2  A. MM-HMM (AFFIRMATIVE RESPONSE).
3  Q. --- WHAT IS THAT?
4  A. THAT'S THE U.P.S. STORE THAT THEY HAD A BOX AT. IT
5     USED TO BE MAILBOXES, ET CETERA, BUT NOW THEY'RE
6     U.P.S. STORES.
7  Q. AND WHERE DID -- WHERE DID AWARE GROUP AND FREEDOM
8     TRUST GROUP OPERATE OUT OF?
9  A. THE HOUSE AT WHITE HORSE ROAD.
10 Q. SO, IT WAS A HOME OFFICE?
11 A. YEAH.
12 Q. DID YOU FOLKS EVER MAINTAIN A SAFETY DEPOSIT BOX?
13 A. NO, NOT THAT I'M AWARE OF.
14 Q. DO YOU RECALL HOW MANY CUSTOMERS AWARE GROUP HAD OR
15    HOW MANY MEMBERS AWARE GROUP HAD, TOTAL?
16 A. NO, NOT EXACTLY, BUT I THINK IT WAS -- IT WAS IN THE
17    UPPER HUNDREDS. HE ALWAYS CLAIMED THERE WERE A LOT
18    MORE THAN THERE ACTUALLY WAS. WELL, HE'D GIVE
19    MEMBERSHIP NUMBERS IN THE THOUSANDS WHEN THEY WERE
20    REALLY LIKE NUMBER 30.
21 BY MR. STRONG:
22    I THINK THAT'S ALL THE QUESTIONS I HAVE FOR MS.
23    FERGUSON. MS. SALVINI WILL HAVE THE OPPORTUNITY TO
24    ASK YOU SOME QUESTIONS NOW.
25 BY MS. SALVINI:

---

Page 40

1     I'VE GOT SOME QUESTIONS. DO YOU NEED TO TAKE A
2     BREAK OR USE THE REST ROOM?
3  BY THE WITNESS:
4     I'M FINE.
5  BY MS. SALVINI:
6     YOU DOING OKAY?
7  BY THE WITNESS:
8     MM-HMM (AFFIRMATIVE RESPONSE).
9  BY MS. SALVINI:
10    ALL RIGHT. AND AGAIN, I JUST WANT TO, YOU
11    KNOW, SAY AGAIN, IF YOU NEED A BREAK, OR YOU KNOW,
12    YOU WANT TO TAKE A BREATHER OR USE THE REST ROOM,
13    PLEASE GO AHEAD AND DO SO.
14 BY THE WITNESS:
15    MM-HMM (AFFIRMATIVE RESPONSE).
16 EXAMINATION BY MS. SALVINI:
17 Q. I'M NOT -- HEATHER, I'M NOT GOING TO TRY TO ASK YOU
18    ANY QUESTIONS TO CONFUSE YOU OR TO TRY TO MISLEAD
19    YOU. IF I ASK A QUESTION AND YOU'RE NOT SURE WHAT
20    IT MEANS ---
21 A. MM-HMM (AFFIRMATIVE RESPONSE).
22 Q. OR YOU DON'T UNDERSTAND IT, PLEASE ASK ME TO CLARIFY
23    IT.
24 A. I WILL.
25 Q. AND MY LAW PARTNER, BRADLEY BENNETT, ACTUALLY

---

Page 41

1     REPRESENTS ALEX, AND I'M GOING TO BE STANDING IN FOR
2     HIM TODAY. SO, I HAVE A GOOD UNDERSTANDING OF THE
3     CASE, BUT I KNOW I DON'T KNOW EVERYTHING ABOUT IT.
4     I'VE JUST BEEN TRYING TO ASSIST, SO IF I ASK A
5     QUESTION THAT SEEMS REDUNDANT OR THAT MAYBE MR.
6     STRONG ALREADY ASKED, I APOLOGIZE. IT'S JUST THAT I
7     MAY NOT ACTUALLY UNDERSTAND A NUANCE IN THE CASE AND
8     SO I WANT TO MAKE SURE I'M GETTING THE CORRECT
9     INFORMATION, OKAY?
10 A. OKAY.
11 Q. ALL RIGHT. SO, I FIRST WANT TO ASK YOU ABOUT THE
12    SOURCES OF INCOME THAT YOU AND ALEX HAD WHILE YOU
13    ALL WERE MARRIED.
14 A. MM-HMM (AFFIRMATIVE RESPONSE).
15 Q. AND I BELIEVE THAT JAMES ASKED YOU ABOUT WHAT
16    SOURCES OF INCOME YOU ALL HAD AND YOU INDICATED THAT
17    IN THE BEGINNING OF THE MARRIAGE, THAT YOU WERE
18    WORKING.
19 A. RIGHT.
20 Q. IS THAT RIGHT?
21 A. RIGHT.
22 Q. WHAT WERE YOU DOING?
23 A. NOT IN THE BEGINNING OF THE MARRIAGE.
24 Q. OKAY.
25 A. IN THE BEGINNING OF THE RELATIONSHIP.

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                      July 27, 2009

---

**Page 42**

1  Q.  ALL RIGHT.
2  A.  BECAUSE WE MET IN '95, BUT WE DIDN'T GET MARRIED
3      UNTIL '97.
4  Q.  OKAY.
5  A.  OKAY?  SO, IN '95 AND '96, I WAS WORKING.
6  Q.  AND WHAT WERE YOU DOING?
7  A.  RETAIL.
8  Q.  OKAY.
9  A.  AND THEN, HE WAS LIKE YOU'RE NOT MAKING ENOUGH TO
10     JUSTIFY DAY CARE AND EVERYTHING ELSE.
11 Q.  MM-HMM (AFFIRMATIVE RESPONSE).
12 A.  COME WORK WITH ME.
13 Q.  OKAY.  AND SO, WHEN DID YOU FINALLY QUIT YOUR JOB IN
14     RETAIL AND WORK WITH ALEX?
15 A.  I THINK IT WAS THE END OF '96.
16 Q.  OKAY.  SO, BEFORE YOU ALL GOT MARRIED ---
17 A.  YES.
18 Q.  --- YOU STOPPED WORKING?
19 A.  YES.
20 Q.  OKAY.  AND THEN, DURING THAT TIME, WAS ALEX EMPLOYED
21     OR WAS IT JUST WITH, WITH THE BUSINESSES THAT WE'VE
22     BEEN TALKING ABOUT?
23 A.  YEAH, HE'S NEVER, THE WHOLE TIME WE WERE TOGETHER HE'
24     NEVER WORKED ANYWHERE BUT WITH THE BUSINESSES WE'RE
25     DISCUSSING.

---

**Page 43**

1  Q.  OKAY.  AND YOU TESTIFIED THAT YOU HAD A BANK
2      ACCOUNT.  WAS THAT AN ACCOUNT THAT YOU HAD BEFORE
3      YOU ALL ---
4  A.  YES.
5  Q.  --- GOT MARRIED AND THAT YOU KEPT AFTER YOU ALL WERE
6      MARRIED?
7  A.  YES.  YEAH, IT WAS JUST A PERSONAL BANK ACCOUNT.
8  Q.  AND WHAT FUNDS WOULD YOU DEPOSIT INTO THAT ACCOUNT?
9  A.  WHEN -- WELL, WHEN I WAS WORKING, MY PAYCHECK.
10 Q.  MM-HMM (AFFIRMATIVE RESPONSE).
11 A.  AND THEN AFTER THAT, IF HE GAVE ME MONEY TO COVER A
12     BILL OR SOMETHING, BECAUSE HE HANDLED -- ANY MONEY
13     IN HOUSE, ANY MONEY THAT CAME IN, IF IT WASN'T MADE
14     OUT TO FREEDOM TRUST GROUP OR IF IT WASN'T MADE OUT
15     TO INTERNATIONAL BUSINESS SYSTEMS, SO YOU KNOW, IT
16     AUTOMATICALLY WENT INTO ONE OF THOSE BANK ACCOUNTS,
17     HE -- HE WOULD TELL ME WHAT TO DO WITH IT OR ELSE HE
18     JUST KEPT IT.
19 Q.  OKAY.  AND WHEN YOU SAID WHEN MONEY WOULD COME IN,
20     WHAT MONEY ARE YOU REFERRING TO?
21 A.  WELL, LIKE, IF SOMEONE ORDERED SOMETHING FROM THE
22     AWARE GROUP OR FREEDOM TRUST GROUP, YOU KNOW, CDs,
23     MEMBERSHIP.
24 Q.  AND WHEN PEOPLE WOULD ORDER CDs OR MEMBERSHIPS,
25     WOULD THEY PAY WITH A CHECK OR A MONEY ORDER OR DO

---

**Page 44**

1      YOU REMEMBER?
2  A.  WELL, IT WOULD JUST REALLY DEPEND.  ONCE WE GOT THE
3      MERCHANT ACCOUNT, THEY COULD PAY BY CREDIT CARD AND
4      STUFF, BUT ALEX'S PREFERRED METHOD OF PAYMENT WAS A
5      MONEY ORDER.
6  Q.  OKAY.  SO, WHEN YOU SAID THAT HE GAVE YOU MONEY, IS
7      THAT THAT HE WOULD GIVE YOU A MONEY ORDER AND THEN
8      YOU WOULD DEPOSIT IT INTO YOUR ACCOUNT?
9  A.  YES.  YEAH.  I MEAN, OCCASIONALLY.  WE DIDN'T, WE
10     DIDN'T HARDLY EVER USE THE PERSONAL ACCOUNT.
11 Q.  OKAY.  AND DID HE TELL YOU EVERY SINGLE TIME HE GAVE
12     YOU A MONEY ORDER WHERE THAT MONEY ORDER CAME FROM?
13 A.  NO.
14 Q.  OKAY.  DID YOU ALL DISCUSS THAT THOSE MONEY ORDERS
15     WERE COMING FROM INDIVIDUALS WHO WERE EITHER MEMBERS
16     OF THE AWARE GROUP OR SOMEBODY WHO HAD PURCHASED
17     SOMETHING FROM ---
18 A.  WELL, I WOULD KNOW THAT BECAUSE I WAS THERE.  YOU
19     KNOW WHAT I'M SAYING AND STUFF?  WE'D OPEN THE MAIL
20     AND GO THROUGH THE MAIL, JUST LIKE ANY BUSINESS.
21     YOU KNOW, YOU GET ORDERS IN, YOU PROCESS THE ORDERS,
22     AND YOU SEND THE ORDERS OUT AND STUFF.  AND SO, YOU
23     KNOW, I, HE WOULDN'T HAVE TO TELL ME WHERE IT CAME
24     FROM.  I KNEW WHERE IT CAME FROM.
25 Q.  OKAY.  DO YOU KNOW IF HIS MOTHER EVER GAVE HIM ANY

---

**Page 45**

1      MONEY?
2  A.  OH, YES.
3  Q.  OKAY.  HOW OFTEN WOULD SHE GIVE HIM MONEY?
4  A.  NOT OFTEN.  AND AFTER WE FIRST GOT TOGETHER, NOT
5      REALLY BECAUSE SHE DIDN'T HAVE ANY.  SHE HAD BLOWN
6      IT ALL AND SPENT IT ALL.
7  Q.  BUT SHE DID GIVE HIM SOME MONEY.
8  A.  WELL, SHE GAVE, SHE PUT THE MONEY DOWN ON THE HOUSE.
9  Q.  OKAY.
10 A.  AND I DON'T REALLY RECALL ANY OTHER TIME WHICH
11     MIRIAM GAVE HIM ANY MONEY.  I MEAN, IT -- NOW, SHE
12     GAVE HIM SOME MONEY TO BUY HER SOME GOLD AND SILVER
13     HERE AND THERE.  I HAVE NO IDEA HOW MUCH OR WHAT
14     HAVE YOU AND STUFF, BUT SORT OF AS AN INVESTMENT.
15     YOU KNOW, FOR FUTURE, AND BUT SHE DIDN'T GIVE,
16     GIVE HIM MONEY REGULARLY OR SHE DIDN'T SUPPORT HIM.
17 Q.  DO YOU KNOW IF SHE MADE ANY OF THE MORTGAGE PAYMENTS
18     ON THE HOUSE THAT SHE PUT THE MONEY DOWN ON AND YOU
19     ALL WERE LIVING IN?
20 A.  NOT WHILE WE WERE TOGETHER.
21 Q.  WOULD YOU HAVE KNOWN IF -- WOULD YOU HAVE KNOWN IF
22     SHE WOULD HAVE GIVEN HIM MONEY?  WOULD HE HAVE TOLD
23     YOU?
24 A.  NOT NECESSARILY.  THERE'S A LOT HE DIDN'T TELL ME,
25     BUT HE DIDN'T NEED HER HELP WHEN WE WERE TOGETHER.

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                        July 27, 2009

---

Page 46

1  Q.  WHY DO YOU SAY THAT?
2  A.  I MEAN, BECAUSE HE HAD MONEY COMING IN WITH THESE
3      BUSINESSES.
4  Q.  WHAT ABOUT AFTER YOU ALL SEPARATED?  YOU SAID THAT
5      YOU CONTINUED TO OPERATE THE AWARE GROUP.
6  A.  THE AWARE GROUP.  HE CONTINUED TO OPERATE FREEDOM
7      TRUST GROUP, AND THEN HE WAS ALWAYS LOOKING FOR THE
8      NEXT THING.  AND I KNOW THAT FOR A WHILE HE WAS, HE
9      TOLD ME THAT HE WAS ASSISTING, LIKE MARKETING WITH
10     SOME MOTORCYCLE COMPANY SOMEWHERE IN THE UPSTATE.  I
11     DON'T REMEMBER WHO OR WHAT BECAUSE LIKE I SAID, WE
12     WEREN'T TOGETHER, SO THESE WERE CASUAL CONVERSATIONS
13     AND STUFF, BUT OTHER THAN THAT, I HAVE NO IDEA.
14 Q.  AND SO, WHILE YOU WERE OPERATING THE AWARE GROUP
15     WERE YOU THEN HANDLING ANY MONEY THAT CAME IN, ANY
16     MEMBERSHIP, I GUESS, FEES THAT PEOPLE WERE PAYING
17     ---
18 A.  OH, YEAH.  I WAS HANDLING IT ALL AND THEN I HAD TO
19     PAY HIM ROYALTIES.
20 Q.  WHAT WERE YOU PAYING HIM?  HOW MUCH WERE YOU PAYING
21     HIM?
22 A.  IT WAS A PERCENTAGE.  I DON'T HAVE THAT INFORMATION
23     IN FRONT OF ME, BUT I DID, FOR, WHILE AWARE WAS
24     THERE, THAT WAS PART OF THE DIVORCE AGREEMENT WAS,
25     AND IT'S IN THE DIVORCE AGREEMENT THAT HE WOULD GET

---

Page 47

1      ROYALTIES, SO EACH MONTH.
2  Q.  AND YOU MENTIONED THE CASE THAT YOU HAD WITH THE
3      I.R.S. ---
4  A.  RIGHT.
5  Q.  DID YOU PROVIDE THE I.R.S. WITH INFORMATION ON HOW
6      MUCH OR WHAT THE PERCENTAGE OF THE ROYALTIES YOU
7      PAID TO ALEX WERE DURING THAT TIME?
8  A.  YES.  YES.
9  Q.  AND SO, THE BILLS FOR THE HOUSE THAT YOU ALL LIVED
10     IN TOGETHER, DID YOU HANDLE THE PAYMENT FOR ALL
11     THOSE BILLS OR DID ALEX?
12 A.  WELL, HE WOULD GIVE ME THE CASH TO GO PAY THEM
13     BECAUSE HE WANTED THEM ALL PAID IN CASH, LIKE THE
14     ONES I COULD PAY IN CASH, LIKE THE LOCAL, LIKE THE
15     POWER BILL AND THE WATER BILL OR ANYTHING LIKE THAT,
16     HE WOULD GIVE ME THE CASH TO GO PAY IT BECAUSE HE
17     KEPT ALL THE MONEY.
18 Q.  OKAY.  DO YOU KNOW IF HE HANDLED ANY FINANCES FOR
19     HIS MOTHER?
20 A.  NO, NOT THAT I -- NOT THAT I RECALL.  SHE HAD HER
21     OWN ACCOUNT AND SHE HAD, AT THE BANK, A DEAR FRIEND
22     OF HERS WHO HELPED HER.  I THINK HER NAME WAS PAT.
23 Q.  DO YOU KNOW IF ALEX WAS ON ANY OF HER BANK ACCOUNTS
24     ---
25 A.  NO.

---

Page 48

1  Q.  --- AS LIKE AN AUTHORIZED SIGNATORY?
2  A.  NO.  NOT THAT, NOT WHILE WE WERE TOGETHER.  NOW,
3      AFTERWARDS, BUT, BUT SEE, IT GOT TO THE POINT WHERE
4      MIRIAM HAD NO MONEY.  SHE WAS IN THE -- SHE WAS IN A
5      NURSING HOME AND ALEX, IT GOT TO THE POINT WHERE FOR
6      A WHILE, ALEX HAD TO PAY FOR THE NURSING HOME AND
7      THEN SHE MOVED OUT OF THE NURSING HOME BECAUSE
8      NEITHER ONE OF THEM COULD AFFORD IT AND SHE MOVED IN
9      WITH HER GRANDSON.  AND THAT'S THE LAST I HEARD.
10     I'VE NOT SPOKEN OR SEEN ALEX IN ALMOST THREE YEARS.
11 Q.  I UNDERSTAND.  I WANT TO ASK YOU ABOUT THE FREEDOM
12     TRUST GROUP AND I.B.S. AND THE AWARE GROUP, AND I
13     WANT TO START WITH THE AWARE GROUP.
14 A.  OKAY.
15 Q.  WHAT WAS YOUR UNDERSTANDING OF WHAT THE AWARE GROUP
16     WAS SUPPOSED TO DO?
17 A.  AWARE GROUP WAS AN INFORMATION PROVIDER FOR PEOPLE.
18     IT WAS -- IT HAD A NICHE.  THOSE WHO WERE INTERESTED
19     IN LIKE WHAT I SAID WAS WHAT, AT THAT POINT IN TIME
20     WAS CALLED THE PATRIOT MOVEMENT ---
21 Q.  MM-HMM (AFFIRMATIVE RESPONSE).
22 A.  AND I SAY IN QUOTES.  THOSE THAT WERE IN IT HATED
23     THAT TERM.  THEY CALLED THEMSELVES FREEDOM PEOPLE.
24     THEY -- PEOPLE WHO WERE LOOKING FOR ALTERNATIVE
25     INFORMATION THAN THAT THAT WAS PROVIDED BY THE MASS

---

Page 49

1      MEDIA.
2  Q.  OKAY.  AND I BELIEVE YOU TESTIFIED TO THIS BEFORE,
3      BUT I WANT TO MAKE SURE I UNDERSTAND.  THE AWARE
4      GROUP ESSENTIALLY HAD MEMBERS THAT WERE MEMBERS FOR
5      LIFE.
6  A.  CORRECT.
7  Q.  OKAY.  AND THOSE MEMBERS, I GUESS AS A RESULT OF
8      THEIR MEMBERSHIP, THEY WOULD RECEIVE INFORMATION ON
9      A CD.
10 A.  CORRECT.  AND SOME AUDIOS AND VIDEOS.
11 Q.  AND WHAT WERE THE REPRESENTATIONS MADE TO THESE
12     MEMBERS AS TO WHAT THAT CD WAS FOR, WHAT IT
13     CONTAINED?
14 A.  GEEZ.  IT WAS INFORMATION ON HOW TO REGAIN YOUR
15     FREEDOM.  INFORMATION THAT SUPPOSEDLY THE GOVERNMENT
16     DIDN'T WANT YOU TO KNOW.  A LOT OF, IT WAS A LOT OF
17     DIFFERENT SUBJECTS, BUT IT WAS ALL BASED ON WHAT,
18     THAT WHAT THEY CALLED THAT PATRIOT MOVEMENT.
19     BELIEVING THAT WE, AS THE CITIZENS OR OF THE PEOPLE
20     OF THE U.S. WERE -- THAT THE GOVERNMENT WAS SUPPOSED
21     TO WORK FOR US.  YOU KNOW, THAT WE WEREN'T SUPPOSED
22     TO WORK FOR THEM, AND THAT EVERYTHING GOT TURNED
23     AROUND AND THAT THE GOVERNMENT WAS NOT AND THIS
24     COUNTRY WAS NOT WHAT THE FOUNDING FATHERS HAD
25     DESIGNED IT TO BE, AND THAT WE WERE NO LONGER UNDER

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                July 27, 2009

---

Page 50

1  THE RULE OF LAW AND THAT -- YOU CAN'T, IT'S NOT A
2  SITUATION WHERE YOU CAN JUST GO IT WAS THIS.
3  Q.  MM-HMM (AFFIRMATIVE RESPONSE).
4  A.  YOU KNOW, IT'S, IT'S, IT WASN'T ONE CERTAIN THING.
5  IT WAS A WHOLE WAY OF THINKING AND A WHOLE WAY OF
6  LIVING.
7  Q.  IN ALL THE DOCUMENTS THAT WERE ON THIS CD FOR
8  MEMBERS TO LOOK AT, THOSE WERE DOCUMENTS PREPARED BY
9  THIRD PARTIES.  IS THAT RIGHT?
10 A.  YES.
11 Q.  INFORMATION THAT ALEX OR YOU FOUND ---
12 A.  THAT HE FOUND.
13 Q.  OKAY.
14 A.  LET ME -- LET ME -- LET ME BE ADAMANT ABOUT THIS.
15 ALEX WAS ALWAYS IN CONTROL.  ALEX IS ALWAYS IN
16 CONTROL IN EVERY ASPECT.  OKAY?  NOTHING WAS DONE
17 WITHOUT HIS SAY SO.
18 Q.  OKAY.
19 A.  OKAY?  I NEVER FOUND ANYTHING.  I NEVER CREATED
20 ANYTHING.  LIKE I SAID, MY -- MY ROLE WAS TOTALLY
21 THAT OF LIKE AN ADMINISTRATIVE ASSISTANT, WHICH IS
22 WHAT I DO NOW.  OKAY?  I'M GOOD AT THAT, BUT HE WAS
23 THE THINKER.  OKAY?  BUT HE NEVER CREATED THESE
24 DOCUMENTS FROM SCRATCH.
25 Q.  MM-HMM (AFFIRMATIVE RESPONSE).

Page 51

1  A.  BUT HE FOUND THEM AND THEN THEY WERE ALTERED OR
2  MANIPULATED OR WHAT HAVE YOU TO WHERE HE COULD THEN
3  USE THEM.
4  Q.  OKAY.  SO, WHEN YOU SAY ALTERED OR MANIPULATED, I
5  BELIEVE THAT WHEN YOU TESTIFIED BEFORE, YOU SAID
6  THAT HE NEVER CREATED ANYTHING ---
7  A.  RIGHT.
8  Q.  SO, DOES THAT MEAN THAT HE WOULD JUST CUT AND PASTE
9  SECTIONS THAT HE THOUGHT ---
10 A.  EXACTLY.
11 Q.  --- WERE APPROPRIATE TO GIVE TO THE MEMBERS ---
12 A.  YEAH.
13 Q.  --- AND THEN PUT IT ON A CD.
14 A.  WELL, WELL, HE WOULD TAKE PARTS OF THIS GUY'S
15 RESEARCH AND THIS GUY'S RESEARCH AND THEN THIS GUY'S
16 RESEARCH AND COMBINE THEM INTO ONE RESEARCH.
17 Q.  OKAY.  AND I WROTE DOWN THAT WHEN YOU WERE
18 TESTIFYING WHEN MR. STRONG WAS ASKING YOU QUESTIONS
19 THAT, THAT THE REPRESENTATIONS THAT WERE MADE IS
20 THAT THEY WERE TO LOOK AT THIS, AND YOU USED THE
21 WORD LEGAL, AND DETERMINE WHAT WAS LEGAL OR
22 APPROPRIATE OR APPLIED TO THEM.  IS THAT RIGHT?
23 A.  RIGHT.
24 Q.  DID YOU BELIEVE THAT WHAT YOU WERE GIVING THEM WAS
25 FALSE INFORMATION?

Page 52

1  A.  I DIDN'T NECESSARILY BELIEVE -- THIS IS MY PERSONAL
2  OPINION.  OKAY?  YOU HAVE TO UNDERSTAND MY MINDSET.
3  Q.  OKAY.
4  A.  I WAS MARRIED TO ALEX.  I WORKED WITH ALEX.  I LIVED
5  WITH ALEX.  I WAS WITH ALEX 24/7.  THE ONLY TIME I
6  WAS BY MYSELF IS I WENT TO THE GROCERY STORE OR WENT
7  YOU KNOW, AND GOT THE MAIL.  IT GOT TO THE POINT
8  WHERE I PRETTY MUCH BELIEVED WHATEVER HE TOLD ME TO
9  BELIEVE.
10 Q.  WELL, BUT THAT'S NOT WHAT I'M ASKING YOU.  I'M
11 ASKING YOU WHETHER OR NOT YOU BELIEVE, AND I'LL BE
12 SPECIFIC, DID YOU EVER TELL ANYBODY THAT THEY DIDN'T
13 HAVE TO PAY FEDERAL INCOME TAXES?
14 A.  OH, NO.
15 Q.  DID ALEX EVER TELL ANYBODY ---
16 A.  NO.
17 Q.  SO, ALEX NEVER TOLD ANYBODY OR REPRESENTED TO
18 ANYBODY HERE'S A BUNCH OF FORMS.  HERE'S A BUNCH OF
19 INFORMATION.  THIS IS GOING TO HELP YOU SO YOU
20 CAN'T, YOU DON'T HAVE TO PAY FEDERAL INCOME TAX?
21 A.  NO.  THAT, IN FACT, HE WENT OUT OF HIS WAY NOT TO
22 SAY THAT.  YOU KNOW, THE WHOLE POINT WAS IS THAT
23 HERE'S THIS INFORMATION.  YOU READ IT.  YOU DECIDE.
24 THIS IS EDUCATIONAL MATERIAL.
25 Q.  MM-HMM (AFFIRMATIVE RESPONSE).

Page 53

1  A.  THIS, YOU KNOW, BUT WHEN YOU'RE DEALING WITH A GROUP
2  OF PEOPLE WHO ALREADY BELIEVE THAT, BUT NO, HE NEVER
3  SAID IT AND I CERTAINLY NEVER SAID THAT.
4  Q.  SO, AND I KNOW THIS MAKES YOU UPSET AND I DON'T WANT
5  TO MAKE YOU UPSET ---
6  A.  I KNOW.
7  Q.  BUT YOU SIGNED AN AFFIDAVIT.
8  A.  YEAH, I KNOW I DID.  AND IT'S NOT ---
9  Q.  IN WHICH YOU SAID, AND I'M LOOKING JUST AT ---
10 A.  MM-HMM (AFFIRMATIVE RESPONSE).
11 Q.  I DON'T WANT TO REPRESENT WHAT THE AFFIDAVIT SAYS.
12 I KNOW IT SPEAKS FOR ITSELF, BUT WHERE YOU SAID THAT
13 YOU REPRESENTED OR LEAD CLIENTS TO BELIEVE ---
14 A.  MM-HMM (AFFIRMATIVE RESPONSE).
15 Q.  THAT THERE IS NO FEDERAL TAX ---
16 A.  MM-HMM (AFFIRMATIVE RESPONSE).
17 Q.  INCOME TAXES TO BE PAID, THAT THEY DIDN'T HAVE TO DO
18 THAT.
19 A.  MM-HMM (AFFIRMATIVE RESPONSE).  WELL, THE
20 INFORMATION WOULD LEAD THEM TO BELIEVE THAT.
21 Q.  WHY DO YOU SAY THAT IF YOU TOLD THEM AND ALEX TOLD
22 THEM THAT WERE TO DETERMINE FOR THEMSELVES HOW IT
23 APPLIED TO THEM AND HOW THEY SHOULD HANDLE IT
24 LEGALLY?
25 A.  BECAUSE THE WHOLE POINT WAS IS THAT IT'S, IT'S A

14  (Pages 50 to 53)

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

---

Page 54

1   VERY FINE LINE. OKAY? AND THE INFORMATION, IF
2   ANYONE WAS TO READ THE INFORMATION PROVIDED, THAT'S
3   WHAT THEY WOULD BE LEAD TO BELIEVE, THAT THEY
4   WEREN'T LIABLE TO FILE, BUT WERE THEY EVER TOLD THEY
5   WERE NOT LIABLE TO FILE? NO. THOSE WORDS NEVER
6   CAME OUT OF HIS MOUTH. THEY NEVER CAME OUT OF MY
7   MOUTH.
8   Q. DID YOU ALL, NOW, I'M GOING TO ASK, I GUESS, MORE
9     SPECIFICALLY, AS OPPOSED TO BEING VAGUE. DID YOU
10    HOLD YOURSELF OUT AS BEING AN EXPERT ON TAXES?
11  A. OH, I DIDN'T, NO.
12  Q. DID YOU HOLD YOURSELF OUT AS BEING A LAWYER OR ---
13  A. NO, NO.
14  Q. SOMEBODY WHO UNDERSTOOD THE CODES OR THE CASE LAW OR
15    THE LETTERS THAT WERE BEING SUBMITTED TO THEM?
16  A. NO.
17  Q. WHAT ABOUT ALEX? DID HE EVER HOLD HIMSELF OUT AS
18    BEING A TAX EXPERT?
19  A. NO.
20  Q. DID HE EVER HOLD HIMSELF OUT AS BEING A LAWYER OR
21    SOMEBODY THAT HE HAD INTERPRETED THESE THINGS AND
22    THIS IS WHAT THEY MEANT?
23  A. HE NEVER REPRESENTED HIMSELF AS AN ATTORNEY.
24  Q. OKAY.
25  A. HE DID REPRESENT HIMSELF AS SOMEONE WHO WAS

---

Page 55

1     KNOWLEDGEABLE OF THE INFORMATION AND THIS WAS HIS
2     BELIEFS AND WHAT THIS INFORMATION MEANT.
3   Q. AND IS THAT WHAT WAS, I GUESS, WHAT WAS STATED AT
4     THE SEMINARS?
5   A. YEAH. YEAH. IT WOULD BE THIS IS WHAT I BELIEVE AND
6     THIS IS WHY I BELIEVE IT.
7   Q. AND THEN, AFTER HE WOULD SAY THAT, WOULD HE TELL,
8     BECAUSE I REMEMBER YOU BEING VERY SPECIFI. , WOULD
9     HE TELL THEM, THEN, THEY WOULD NEED TO DETERMINE HOW
10    THIS INFORMATION APPLIED TO THEM?
11  A. OH, I'M SURE HE DID, BUT I MEAN, THEY HAD THE
12    AUDIOS.
13  Q. AND I WANT -- THAT'S WHAT I WANT TO ASK YOU NEXT.
14    YOU SAID THAT YOU PROVIDED THE I.R.S. WITH
15    EVERYTHING ---
16  A. THAT I HAD.
17  Q. THAT YOU HAD. SO, I WANT TO FIND OUT WHAT THAT IS.
18  A. IT WAS COPIES OF THE AUDIOS FROM THE SEMINARS THAT
19    WE HAD THAT WERE RECORDED. THERE WERE NEVER VIDEOS.
20    HE REFUSED TO BE ON VIDEO.
21  Q. OKAY.
22  A. SO, THEY WAS ALWAYS DONE IN AUDIO FORMAT. IT WAS A
23    VIDEO THAT HE HAD GOTTEN SOMEWHERE, AND I HAVE NO
24    IDEA WHERE IT CAME FROM, CALLED ALL ABOUT TRUSTS.
25  Q. OKAY.

---

Page 56

1   A. WHICH EXISTED BEFORE I CAME INTO THE PICTURE. AND
2     HE HAD NUMEROUS OTHER VIDEOS ON OTHER SUBJECTS LIKE
3     LAND PATENTS AND OTHER THINGS, AND ALL OF THOSE, ALL
4     THE VIDEOS EXISTED BEFORE I CAME ALONG. SO, WHERE
5     THEY ORIGINATED, NO CLUE. MORE THAN LIKELY, THEY
6     WERE BOUGHT IN THE BACK OF, OUT OF A BACK OF A
7     MAGAZINE OR SOMEWHERE THEN DUPLICATED. BUT AND THEN
8     THE FREEDOM FILES CD AND ANY, ANY, YOU KNOW,
9     ANYTHING THAT WE HAD THAT WE SOLD THAT I HAD COPIES
10    OF, I GAVE THEM COPIES OF.
11  Q. OKAY. AND SO, THEN, WHAT DID YOU BURN?
12  A. EVERYTHING I HAD. IF I HAD ANY INVENTORY OF THE
13    DIFFERENT VIDEOS OR ANY CDs I HAD, PAPERWORK I HAD,
14    ALL THE MEMBERSHIP APPLICATIONS, YOU KNOW, THAT I
15    MAY HAVE HAD AND ANYTHING LIKE THAT. I JUST -- MINE
16    WAS DONE AND I WAS DONE WITH IT.
17  Q. I THINK YOU INDICATED THAT YOU THOUGHT THAT ALEX HAD
18    COPIES OF SOME OF THIS STUFF.
19  A. YEAH, I KNOW HE HAD COPIES OF THE FREEDOM -- IN
20    FACT, HE HAD COPIES OF EVERYTHING BECAUSE THAT WAS
21    PART OF THE DIVORCE AGREEMENT WAS HE WOULD -- HE WAS
22    TO BE CONSIDERED TO BE THE FIRST MEMBER OF AWARE.
23    THEREFORE, HE HAD ACCESS TO EVERYTHING AWARE HAD.
24    OKAY? AND SO, THE VIDEOS, THE AUDIOS, THE CDs, ALL
25    THE INFORMATION, HE HAD.

---

Page 57

1   Q. SO, HE WOULD HAVE, HE HAD A COPY OF THAT INFORMATION
2     AND THEN YOU HAD THE INVENTORY AND THE STUFF THAT
3     WAS SENT OUT TO PEOPLE ---
4   A. MM-HMM (AFFIRMATIVE RESPONSE). RIGHT.
5   Q. SO -- OKAY. WHEN YOU SIGNED THIS AFFIDAVIT FOR THE
6     I.R.S. -- LET ME ASK IT LIKE THIS. PRIOR TO SIGNING
7     THIS AFFIDAVIT, DID YOU BELIEVE THAT YOU HAD
8     VIOLATED THE LAW WHEN YOU WERE SUBMITTING, SENDING
9     OUT INFORMATION ---
10  A. NO.
11  Q. --- TO MEMBERS OF THE AWARE GROUP?
12  A. NO. NO. NO. ALL I, ONLY, THE ONLY THING THAT I
13    BELIEVED THAT I HAD DONE WRONG WAS WHEN I WAS WITH
14    ALEX AND THE YEARS RIGHT AFTER I LEFT HIM BECAUSE I
15    REALLY DIDN'T KNOW HOW TO GET OUT OF THE HOLE, SO I
16    DID NOT FILE TAX RETURNS BECAUSE LORD KNOWS, YOU
17    COULD NOT DO THAT WITH ALEX. YOU COULDN'T FILE
18    THEM. AND THEN, WHEN I LEFT HIM, I WAS KIND OF IN
19    THE MINDSET OF, LIKE, WELL, HOW DO I GET BACK? DO
20    YOU SEE WHAT I'M SAYING?
21  Q. MM-HMM (AFFIRMATIVE RESPONSE).
22  A. AND STUFF. BUT NO, I WAS, I WAS NOT UNDER THE
23    BELIEF THAT I HAD BROKEN ANY LAW.
24  Q. WELL, WHEN YOU, I WANT TO SPECIFICALLY FIND OUT HOW
25    YOU DETERMINED WHEN YOU SIGNED THIS AFFIDAVIT THAT,

---

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                        July 27, 2009

## Page 58

1  FOR EXAMPLE ---
2  A.  MM-HMM (AFFIRMATIVE RESPONSE).
3  Q.  THE LAST PARAGRAPH SAYS, THE V.H.S. TAPE ALL ABOUT
4  TRUSTS ---
5  A.  MM-HMM (AFFIRMATIVE RESPONSE).
6  Q.  --- WAS INCLUDED ON MY WEBSITE.  AND THAT WAS
7  REFERRING TO THE AWARE GROUP.
8  A.  MM-HMM (AFFIRMATIVE RESPONSE).
9  Q.  AND THAT LAST SENTENCE, IT SAYS, THE TAPE INCLUDES
10  FRIVOLOUS ARGUMENTS REGARDING I.R.C. SECTION 861-877
11  ---
12  A.  MM-HMM (AFFIRMATIVE RESPONSE).
13  Q.  --- REGARDING THE REQUIREMENTS FOR FEDERAL INCOME
14  TAXES TO BE PAID ON WAGES AND EARNINGS OF A U.S.
15  CITIZEN AND TITLE 26 U.S.C.
16  A.  RIGHT.
17  Q.  END QUOTE.  HOW DO YOU KNOW THAT?
18  A.  I DON'T KNOW THAT.  I DIDN'T WRITE THIS.
19  Q.  WHY DID YOU SIGN IT THEN?
20  A.  BECAUSE WHEN YOU HAVE AGENTS ACROSS THE TABLE FROM
21  YOU SAYING YOU WILL SIGN THIS ---
22  Q.  MM-HMM (AFFIRMATIVE RESPONSE).
23  A.  OR ELSE WE WILL PURSUE YOU CRIMINALLY OR WHATEVER.
24  I JUST WANTED IT TO GO AWAY.
25  Q.  AND I'M NOT TRYING TO MAKE YOU UPSET, HEATHER.  I

## Page 59

1  JUST WANT TO UNDERSTAND WHY YOU WOULD SIGN IT.
2  A.  BECAUSE THAT'S WHAT MY ATTORNEY TOLD ME TO DO
3  BECAUSE I ASKED HIM.  I, WHEN THEY SENT IT
4  ORIGINALLY, I SENT HIM QUESTIONS BACK GOING YOU
5  KNOW, I'M NOT COMFORTABLE WITH THIS.  I'M NOT
6  COMFORTABLE WITH THIS.  I'M NOT COMFORTABLE WITH
7  THIS.  HE SAID THERE'S NO GETTING AROUND IT.  IF YOU
8  WANT THIS TO GO AWAY, YOU'VE GOT TO SIGN THIS.  SO,
9  I SIGNED IT.
10  Q.  SO, YOU DON'T KNOW WHETHER OR NOT THIS ARGUMENT IS
11  FRIVOLOUS ---
12  A.  NO, I DON'T.  I NEVER EVEN SEEN THE VIDEO.
13  Q.  AND I'M ASSUMING, BUT I DON'T WANT TO ASSUME
14  ANYTHING ---
15  A.  OKAY.
16  Q.  BUT THAT THE OTHER REPRESENTATIONS IN HERE THAT, FOR
17  EXAMPLE, SOMETHING VIOLATES A TAX CODE, SOMETHING IS
18  NOT CONSISTENT WITH TITLE 26 ---
19  A.  I WOULDN'T HAVE THE FOGGIEST NOTION AS A MAN IN THE
20  MOON WHETHER OR NOT.
21  Q.  SO, YOU SIGNED IT, YOU SIGNED THE AFFIDAVIT TO MAKE
22  THEM STOP CONTACTING YOU AND TO CLOSE YOUR CASE?
23  A.  YEAH.  TO MAKE THEM GO AWAY.  LIKE, I THINK JUST
24  ABOUT ANYBODY WOULD.  AND BECAUSE THAT'S WHAT MY
25  ATTORNEY TOLD ME TO DO.  AND BECAUSE I WAS, LIKE I

## Page 60

1  SAID BEFORE, WAS LED TO BELIEVE THINGS THAT DIDN'T
2  COME TRUE.
3  Q.  WITH -- WITH THE AWARE GROUP, WHEN YOU WERE
4  OPERATING IT, AND ---
5  A.  YEAH.
6  Q.  AND THEN, AFTER, WHEN YOU ALL SEPARATED, IT SOUNDED
7  LIKE TO ME YOU WERE DOING THE DAY TO DAY ---
8  A.  MM-HMM (AFFIRMATIVE RESPONSE).
9  Q.  BUSINESS OPERATIONS AND THEN JUST PROVIDING ALEX, I
10  GUESS, WITH SORT OF AN UPDATE OR INFORMATION AS TO
11  WHAT WAS GOING ON?
12  A.  RIGHT.  WELL, HE WOULD GET ANY UPDATES BECAUSE HE
13  WAS A MEMBER.
14  Q.  MM-HMM (AFFIRMATIVE RESPONSE).
15  A.  AND THEN, I OWED HIM ROYALTIES BASED ON OUR DIVORCE
16  AGREEMENT AND STUFF, BUT NOTHING -- THE MOMENT I
17  TOOK AWARE OVER AS PART OF OUR DIVORCE AGREEMENT AND
18  STUFF AND HE RETIRED AND STUFF, NOTHING NEW EVER
19  CAME OUT OF THE AWARE GROUP.  IT WAS THE SAME OLD.
20  ALL I DID WAS MAKE CDs AND SEND OUT TAPES AND MAKE
21  CDs AND SEND OUT TAPES.  YOU KNOW, BECAUSE IT WAS A
22  WAY FOR ME TO MAKE A LIVING.
23  Q.  MM-HMM (AFFIRMATIVE RESPONSE).  AND DURING THAT, YOU
24  INDICATED DURING YOUR TESTIMONY THAT ON AN AVERAGE
25  MONTH, THERE COULD BE ANYWHERE BETWEEN FIVE NEW

## Page 61

1  MEMBERS TO TEN NEW MEMBERS.
2  A.  YEAH.
3  Q.  WERE THERE MONTHS WHEN YOU DIDN'T HAVE ANY NEW
4  MEMBERS SIGN UP?
5  A.  PROBABLY.  I DON'T REMEMBER.  YOU KNOW, I DON'T
6  REMEMBER MONTH BY MONTH, BUT I DON'T THINK SO.  I
7  MEAN, MAYBE A MONTH WHEN THERE WAS LIKE ONE OR
8  WHATEVER AND STUFF, BUT I DON'T RECALL THERE WOULD
9  BE ANY BECAUSE -- NO.
10  Q.  OKAY.  BUT THERE WERE MONTHS WHERE THERE WAS AS
11  LITTLE AS ONE PERSON WHO WOULD BECOME A MEMBER?
12  A.  OH, YEAH.  OH, YEAH.
13  Q.  AND THEN, THE INFORMATION, I GUESS, THAT YOU WERE
14  SENDING OUT WOULD HAVE BEEN TO ALL THE EXISTING
15  MEMBERS IF SOMETHING NEW CAME IN OR WERE THEY
16  UPDATED REGULARLY?  HOW DID THAT WORK?
17  A.  WELL, NO, ACTUALLY, NOW, ARE YOU TALKING ABOUT WHEN
18  I TOOK OVER AWARE?
19  Q.  MM-HMM (AFFIRMATIVE RESPONSE).
20  A.  NOW, WHEN I TOOK OVER AWARE, THERE WAS NO NEW
21  INFORMATION.  IT WOULD -- I WOULD GO ONLINE AND FIND
22  ARTICLES THAT I THOUGHT WOULD BE OF INTEREST TO THE
23  PEOPLE ABOUT -- IT SORT OF -- AWARE SORT OF BECAME
24  LIKE A WATCH DOG GROUP, MEANING THAT IF I FOUND
25  ARTICLES ONLINE ABOUT LEGISLATION THAT WAS BEING

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                July 27, 2009

Page 62

1   PASSED OR LIKE WHAT CERTAIN SENATORS ARE DOING, LIKE
2   RON PAUL IN TEXAS IS A, THERE'S A BIG FAN BASE IN
3   THIS GROUP OF PEOPLE, OKAY?
4   Q.  MM-HMM (AFFIRMATIVE RESPONSE).
5   A.  BECAUSE HE STICKS UP FOR THE INDIVIDUAL'S RIGHTS
6   VERSUS THE GOVERNMENT'S RIGHT.  SO, IF I FOUND, YOU
7   KNOW, THAT HE WAS INTRODUCING LEGISLATION OR
8   WHATEVER, I'D SEND THAT OUT OR, YOU KNOW, THAT KIND
9   OF STUFF.  AND AWARE TOOK ON KIND OF A DIFFERENT
10  MEANING WHEN I CAME ABOARD, YOU KNOW, WHEN IT BECAME
11  MINE BECAUSE I DIDN'T KNOW ANYTHING ABOUT ALL OF
12  THIS KIND OF STUFF.  SO, I DIDN'T, YOU KNOW, THERE
13  WAS NO NEW INFORMATION.
14  Q.  AND THEN, WHAT ABOUT BEFORE THE DIVORCE WAS
15  FINALIZED AND YOU TOOK OVER, WERE PEOPLE RECEIVING
16  REGULAR UPDATES OR INFORMATION OR CDs OR HOW DID
17  THAT WORK BECAUSE THERE WAS A LIFETIME MEMBERSHIP
18  AND IT WAS A ONE-TIME FEE, SO ---
19  A.  RIGHT, NOW, WELL, RIGHT, WELL, ONCE EVERYTHING WENT
20  ONLINE AND ONCE THEY BECAME A MEMBER, IT'S LIKE IF
21  WE CAME UP WITH NEW INFORMATION, YOU KNOW, THAT CAME
22  OUT, YOU KNOW, LIKE THIS REDEMPTION STUFF WAS ADDED
23  LATER.  YOU KNOW, THAT WAS ONE OF THE LAST THINGS
24  AND STUFF.  IF YOU WERE A MEMBER, YOU COULD GET,
25  WE'D BY EMAIL, WE'D SEND OUT UPDATES OR ANYTHING.

Page 63

1   YOU KNOW, THE NEWSLETTER WENT OUT, YOU KNOW, ONLINE,
2   AND OCCASIONALLY, ONE WENT OUT IN PRINT.  LIKE, BUT
3   IT WAS SO EXPENSIVE TO DO SO, SO IT WAS LIKE ONCE A
4   YEAR.  BUT, YEAH, THEY WOULD RECEIVE UPDATES.
5   Q.  WHAT, WHAT DID INTERNATIONAL BUSINESS SYSTEMS DO?
6   WHAT WAS YOUR UNDERSTANDING ---
7   A.  IT WAS A JUST A WAY, A WAY TO -- INTERNATIONAL
8   BUSINESS SYSTEMS IS A CORPORATION THAT WAS SET UP IN
9   NEVIS, THE COUNTRY OF NEVIS.  IT'S AN OFFSHORE
10  CORPORATION, THOUGH IT NEVER HAD ANY OFFSHORE BANKS,
11  NO OFFSHORE NOTHING.  THE ONLY ACCOUNT IT EVER HAD
12  WAS CHARLES SCHWAB.  OKAY?  AND ALL INTERNATIONAL
13  BUSINESS SYSTEMS DID WAS HANDLE THE MERCHANT
14  ACCOUNT.  YOU KNOW, THERE WAS, INTERNATIONAL
15  BUSINESS PER SE NEVER HAD MERCHANDISE.  YOU KNOW
16  WHAT I'M SAYING?  OR ANYTHING LIKE THAT.  IT WAS
17  JUST, IT WAS ALMOST LIKE A D/B/A.  YOU KNOW, IT WAS
18  ALMOST LIKE THE AWARE GROUP DOING D/B/A, BUT I MEAN,
19  NOT THAT IT -- IT WAS NEVER CLASSIFIED THAT WAY, BUT
20  THAT'S WHAT IT ENDED UP BEING.  YOU KNOW, THAT WAS
21  JUST A PLACE TO PUT THE MONEY, SO THAT WE COULD TAKE
22  CREDIT CARDS BECAUSE IF YOU GOT THEM, YOU KNOW,
23  BUSINESS SPEAKING WISE, IF YOU WANT TO INCREASE YOUR
24  BUSINESS, YOU NEED THE ABILITY TO TAKE MERCHANT, YOU
25  KNOW, CREDIT CARDS.

Page 64

1   Q.  MM-HMM (AFFIRMATIVE RESPONSE).
2   A.  AND STUFF, SO HE SET UP INTERNATIONAL BUSINESS
3   SYSTEMS AND THEN WENT TO CHARLES SCHWAB AND, OF
4   COURSE, THEY USED MY SOCIAL SECURITY NUMBER BECAUSE
5   LORD KNOWS, HE WASN'T GOING TO USE HIS AND STUFF.
6   SO, THAT'S THE REASON WHY I'M TIED TO ALL THESE
7   ACCOUNTS.  OF COURSE, ALL THESE, WELL, I DON'T KNOW
8   ABOUT FREEDOM TRUST GROUP'S ACCOUNT BECAUSE HE KEPT
9   THAT AND STUFF, BUT INTERNATIONAL BUSINESS SYSTEM'S
10  ACCOUNT HAS BEEN CLOSED.
11  Q.  AND WHAT WAS YOUR UNDERSTANDING OF WHAT FREEDOM
12  TRUST GROUP DID?
13  A.  THAT WAS THE TRUST, THE TRUST SOFTWARE.
14  Q.  SO, AND DID IT PROVIDE -- WHO WAS PROVIDED WITH
15  THAT, THAT TRUST SOFTWARE?  DO YOU KNOW?
16  A.  WHAT DO YOU MEAN WHO WAS PROVIDED WITH THAT?
17  Q.  WELL, LIKE ---
18  A.  YOU MEAN CUSTOMERS?
19  Q.  MM-HMM (AFFIRMATIVE RESPONSE).  FOR EXAMPLE, WAS IT
20  PEOPLE, MEMBERS OF THE AWARE GROUP?
21  A.  NO.  NO, NO, NO.  IT WAS -- IT WAS SEPARATE.
22  FREEDOM TRUST GROUP WAS A TOTALLY SEPARATE THING AND
23  IT HAD SOFTWARE AND YOU COULD PURCHASE THE SOFTWARE
24  AND IT HAD FIVE DIFFERENT TYPES OF TRUSTS WHERE YOU
25  COULD WRITE YOUR OWN TRUST, AND THEN THERE WAS A

Page 65

1   MANUAL ON, YOU KNOW, HOW TO PROPERLY SET UP TRUSTS.
2   Q.  AND WHERE DID THAT SOFTWARE COME FROM?
3   A.  WELL, IT WAS, IT WAS -- THE TRUST ORIGINALLY STARTED
4   AS HARD COPIES, AND THEN WHEN THE COMPUTER STARTED
5   YOU KNOW, YOU'VE GOT TO THINK THIS WAS THE EARLY
6   '90s, MID-'90s ---
7   Q.  THAT'S TRUE.
8   A.  AND STUFF, THAT THEY THEN WENT ON TO JUST BEING
9   DOCUMENTS ON A FLOPPY AND THEN THEY WENT TO
10  DOCUMENTS BEING ON CDs, AND THEN HE HIRED A
11  PROGRAMMER TO MAKE IT INTO A PROGRAM AND JUST LIKE
12  THE FREEDOM FILES BECAME, THE AWARE STUFF ENDED
13  UP ON A CD CALLED THE FREEDOM FILES THAT HAD A
14  LITTLE SCREEN WITH A MENU AND STUFF.  ALL THAT WAS
15  DONE BY A PROGRAMMER THAT HE HIRED.
16  Q.  AND SO, WHEN MR. STRONG WAS ASKING YOU ABOUT
17  TEMPLATES ---
18  A.  MM-HMM (AFFIRMATIVE RESPONSE).
19  Q.  IS THAT WHAT THE PROGRAMMER DID, IS HE MADE A
20  TEMPLATE THAT THEY COULD ---
21  A.  RIGHT.  RIGHT.
22  Q.  --- ENTER INFORMATION?
23  A.  LIKE, THERE WOULD BE A SCREEN THAT THEY COULD FILL
24  IN WITH LIKE THE NAME OF THE BENEFICIARY AND THE
25  NAME OF THE TRUSTEES OR THE NAME OF THE TRUST OR

17 (Pages 62 to 65)

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                    July 27, 2009

Page 66

1    COUNTY OR WHATEVER AND STUFF AND HIT A BUTTON AND IT
2    WOULD INSERT IT INTO THE DOCUMENT.  IT WOULD
3    COMPLETE THE DOCUMENT, SO THEN ALL THEY'D HAVE TO DO
4    IS PRINT IT OUT.
5    Q.  AND WHAT WAS THE REPRESENTATION MADE TO CUSTOMERS
6        WHO PURCHASED THOSE, THAT SOFTWARE, THOSE TEMPLATES?
7    A.  IT WAS JUST A FORM OF ASSET PROTECTION.  IT WAS
8        LIKE, IT, LIKE THE STORY THAT WAS USED WAS THAT
9        YOU'RE IN A CAR ACCIDENT, YOU KNOW, AND THEY SUE
10       YOU, YOU KNOW.  A LOT OF TIMES HE USED THE TED
11       KENNEDY, MARY JO KOPECHNE STORY ABOUT GOING OFF THE
12       BRIDGE IN MASSACHUSETTS OR WHEREVER IT WAS AND
13       STUFF, THAT HER FAMILY WENT TO SUE THE KENNEDYS BUT
14       FOUND OUT THEY DIDN'T OWN ANYTHING BECAUSE
15       EVERYTHING WAS OWNED BY A TRUST AND IT'S ASSET
16       PROTECTION.  YOU KNOW, PROTECTING, IT'S LIKE IF
17       YOU HAD AN L.L.C. OR SOMETHING YOU SET UP, YOU KNOW,
18       TO PROTECT YOURSELF.  AND IT WAS NEVER, IT WAS NEVER
19       PRESENTED AS A FOR -- OKAY, LET ME -- I DON'T KNOW
20       ABOUT ON THE VIDEO BECAUSE I NEVER SAW THE VIDEO,
21       BUT PERSON TO PERSON AND EVERYTHING ELSE, THE TRUSTS
22       WERE NEVER PRESENTED AS TAX HAVENS OR TAX AVOIDANCE
23       OR ANYTHING LIKE THAT.  IT WAS PRESENTED AS ASSET
24       PROTECTION, AS A WAY TO PROTECT YOURSELF SO THAT IF
25       JOE SHMOE FELL ON YOUR PROPERTY AND WANTED TO SUE

Page 67

1    YOU, YOU, YOU KNOW, THE ONLY THING IN THIS TRUST WAS
2    THIS HOUSE, AND YOU KNOW, AND THINGS SUCH AS THAT.
3    Q.  AND DID ALEX OR DID YOU REPRESENT THAT BY FILLING IN
4        THAT TEMPLATE, THAT THAT WOULD BE A VALID TRUST?
5    A.  IF, IF THE RULES WERE FOLLOWED BECAUSE IT'S JUST A
6        CONTRACT.  IT'S JUST A DOCUMENT, BUT YOU KNOW, THERE
7        ARE RULES OR A TRUST ISN'T VALID.
8    Q.  AND THEN, HOW WOULD A PERSON WHO WAS USING THAT
9        TEMPLATE DETERMINE WHAT THE RULES WERE?
10   A.  THERE WAS A BOOK THAT WENT WITH IT.  AT FIRST, THE
11       BOOK WAS IN WRITING, WAS HARD COPY, BUT THEN IT JUST
12       GOT PUT ONTO IT AND THEY COULD PRINT IT OFF.
13   Q.  AND WHO CREATED THAT BOOK?
14   A.  IT WAS A PLETHORA OF INFORMATION FROM VARIOUS
15       SOURCES THAT ALEX FOUND.  IT WAS ARTICLES.  IT WAS
16       INFORMATION.  IT WAS CODE.  IT WAS JUST, AND IT CAME
17       FROM ALL OVER THE PLACE.  THERE WAS NO ONE SOURCE
18       FOR ANYTHING THAT ANY OF THESE ENTITIES PROVIDED.
19   Q.  EXPLAIN TO ME WHAT, I UNDERSTAND THAT YOU HANDLED
20       THE DAY TO DAY OPERATIONS ---
21   A.  MM-HMM (AFFIRMATIVE RESPONSE).
22   Q.  --- OF THINGS.  I WROTE DOWN THAT YOU SAID THAT
23       ALEX'S DAY TO DAY WAS HE WOULD JUST READ ---
24   A.  HE WOULD RESEARCH.
25   Q.  --- INFORMATION AND RESEARCH.

Page 68

1    A.  AND THEN TELL ME WHAT TO DO WITH IT.  YOU KNOW, IT'S
2        LIKE HE SPENT HIS DAYS STUDYING, STUDYING.  HE HAD
3        AMGER, HE HAD A NUMBER OF TAX BOOKS.  HE HAD BLACK'S
4        LAW DICTIONARIES.  HE WAS ALL ABOUT THE BLACK'S LAW
5        DICTIONARIES AND THE DEFINITIONS.  HE REMINDED ME OF
6        BILL CLINTON, WHAT THE DEFINITION OF IS IS, BUT HIS
7        -- HIS DAYS WERE SPENT ON THE PHONE SELLING OR
8        TALKING TO PEOPLE OR RESEARCHING AND READING AND
9        COMING UP WITH IDEAS AND NEW THINGS OR INFORMATION
10       TO SEND OUT OR THAT SORT OF STUFF.
11   Q.  AND I THINK YOU TOLD MR. STRONG THAT HE DID AT LEAST
12       FOUR SEMINARS.
13   A.  YEAH, AT LEAST.
14   Q.  BUT YOU SAID THERE ALSO COULD BE MORE.
15   A.  YEAH.  I JUST, THOSE ARE JUST THE ONES I REMEMBER
16       BECAUSE I SET THEM UP.  LIKE I SAID, AS AN ASSISTANT
17       SORT OF ROLE, YOU KNOW, I WOULD SET UP THE SEMINARS.
18       YOU KNOW, ARRANGE THE HOTEL, AND YOU KNOW THAT SORT
19       OF THING.
20   Q.  COULD THERE HAVE BEEN MORE THAN TEN SEMINARS?
21   A.  NO.
22   Q.  OKAY.  SO, LESS THAN TEN ---
23   A.  YEAH, I ---
24   Q.  --- BUT AT LEAST, FOUR.
25   A.  YEAH.  BECAUSE I KNOW THERE WAS ONE IN ORLANDO AND I

Page 69

1    KNOW THERE WAS ONE IN OREGON.  AND I KNOW THERE WAS
2    ONE IN PENNSYLVANIA.  NOT PENNSYLVANIA.
3    PHILADELPHIA.  WELL, THAT IS PENNSYLVANIA.  AND
4    THEN, THERE WAS ONE IN GREENVILLE.  AND I KNOW HE
5    SPOKE AT SOMEONE ELSE'S SEMINAR.  I'M THINKING IT
6    WAS EITHER IN CHARLOTTE OR ATLANTA OR THE BEACH.
7    SOMEWHERE IN THE CAROLINAS OR GEORGIA, BUT THAT'S
8    ALL I CAN REMEMBER OFF THE TOP OF MY HEAD, AT LEAST
9    WHILE WE WERE TOGETHER.
10   Q.  OKAY.  AND HOW WOULD YOU ALL, I GUESS, ADVERTISE OR
11       GET PEOPLE TO ATTEND THE SEMINAR?
12   A.  SEND IT OUT THROUGH THE DATABASE.
13   Q.  SO, LIKE A MASS MAILING OR A MASS EMAIL, I GUESS ---
14   A.  MM-HMM (AFFIRMATIVE RESPONSE).  YES.
15   Q.  WHEN YOU ALL WERE FINALLY ELECTRONIC ---
16   A.  AND ALSO PUT AN ANNOUNCEMENT ON THE WEBSITE.
17   Q.  I THINK I'M ALMOST DONE.  JUST GIVE ME ONE MOMENT.
18   BY MS. SALVINI:
19       I THINK THAT'S ALL I HAVE, JAMES.
20   BY MR. STRONG:
21       WHY DON'T WE TAKE, CAN WE TAKE A COUPLE MINUTE
22       BREAK HERE?  I'M JUST GOING TO LOOK AND THEN I'LL
23       HAVE JUST A FEW MORE QUESTIONS ---
24   BY THE WITNESS:
25       OKAY.

18 (Pages 66 to 69)

Heather Ferguson                                                    July 27, 2009

---

Page 70

1  BY MR. STRONG:
2      AND THEN WE'LL BE DONE FOR THE DAY.
3  BY THE WITNESS:
4      OKAY.
5    (OFF THE RECORD 11:02 A.M. - 11:04 A.M.)
6  RE-EXAMINATION BY MR. STRONG:
7  Q.  I JUST HAVE A COUPLE OF FOLLOW UP QUESTIONS ON WHAT
8      MS. SALVINI ASKED YOU.  YOU TOLD MS. SALVINI THAT
9      ALEX WOULD NOT ALLOW YOU FOLKS TO FILE TAX RETURNS
10     WHILE YOU WERE MARRIED.
11 A.  RIGHT.
12 Q.  DO YOU KNOW THE REASON FOR THAT?
13 A.  BECAUSE HE, HE DIDN'T WANT TO COME UNDER THE
14     JURISDICTION.
15 Q.  CAN YOU EXPLAIN WHAT YOU MEAN BY THAT?
16 A.  LET ME, LET ME, LET ME, ALL RIGHT, LET ME SAY THIS.
17     LET ME BACK UP A MINUTE.  IT WAS UNDERSTOOD THAT WE
18     WOULD NOT BE FILING TAXES BECAUSE ALEX WAS OF THE
19     BELIEF THAT HE WAS NOT LIABLE.
20 Q.  DO YOU KNOW WHY HE BELIEVED THAT?
21 A.  IT ALL GOES BACK TO ALL THIS, ALL HIS RESEARCH.
22     EVERYTHING HE HAD READ, EVERYTHING HE HAD STUDIED
23     HAD LED HIM TO BELIEVE THAT.
24 Q.  IS THERE ANYTHING SPECIFIC THAT LED HIM TO BELIEVE
25     THAT?

---

Page 71

1  A.  I DON'T KNOW.  HE HAD THIS OPINION BEFORE I MET HIM.
2  Q.  YOU TESTIFIED REGARDING THE MONEY THAT WAS COMING IN
3      FROM THE GROUPS WAS WHAT YOU AND ALEX LIVED ON.
4  A.  MM-HMM (AFFIRMATIVE RESPONSE).
5  Q.  THAT'S CORRECT?
6  A.  RIGHT.
7  Q.  HOW MUCH INCOME WAS COMING IN?
8  A.  WELL, I DID MY TAXES BASED OFF OF THE BANK
9      STATEMENTS, WHICH OF COURSE, THE I.R.S. HAS, AND FOR
10     THOSE YEARS, 2003, THEY HAD ME DO HALF OF THE INCOME
11     BECAUSE HE AND I WERE STILL TOGETHER IN '03.  OKAY?
12     BECAUSE I LEFT HIM IN PART OF '03 AND STUFF, AND
13     HALF OF THAT WAS, THIS IS OFF THE TOP OF MY HEAD.
14     IT WAS OVER A HUNDRED THOUSAND.
15 Q.  WELL, LET ME ASK THE QUESTION A DIFFERENT WAY.
16 A.  OKAY.
17 Q.  HOW WOULD YOU CHARACTERIZE YOUR STANDARD OF LIVING
18     WHILE YOU WERE FOLKS WERE OPERATING THESE BUSINESSES
19     TOGETHER?
20 A.  WE WERE COMFORTABLE.  WE DIDN'T TAKE EXOTIC
21     VACATIONS.  WE ATE OUT A LOT.  HE DID BUILD A DECK
22     OFF THE BACK OF THE HOUSE, BUT MOST INCOME, MOST
23     MONIES COMING IN WERE TRANSFERRED INTO OTHER ASSETS
24     AND PUT AWAY.
25 Q.  WHAT OTHER ASSETS?

---

Page 72

1  A.  GOLD AND SILVER.
2  Q.  DID YOU -- SO, YOU FOLKS WEREN'T LIVING HAND TO
3      MOUTH?
4  A.  NO.  NO.  WE WEREN'T WORRIED.  WE WERE NOT, WE WERE
5      BY NO MEANS RICH, BUT WE WERE COMFORTABLE.
6  Q.  AND WAS THAT PRETTY CONSISTENT THROUGHOUT THE
7      RELATIONSHIP?
8  A.  YES, IN FACT, IT GOT BETTER THE LONGER WE WERE
9      TOGETHER BECAUSE AS THE BUSINESS GREW, BUSINESS
10     GREW.
11 Q.  SO, YOU WERE EARNING MORE AND MORE MONEY OVER ---
12 A.  YES.
13 Q.  OVER TIME?
14 A.  YEAH.
15 Q.  YOU TESTIFIED THAT PART OF ALEX'S DAY WAS ALSO SPENT
16     ON THE PHONE SELLING.
17 A.  RIGHT.
18 Q.  WHAT WAS HE SELLING?
19 A.  AWARE STUFF.
20 Q.  WHO WAS HE SELLING IT TO?
21 A.  WHOEVER WOULD CALL IN.  PEOPLE THAT, I MEAN, I
22     DON'T, YOU KNOW, IT WAS PEOPLE THAT ARE IN THE
23     DATABASE, YOU KNOW.
24 Q.  HE WASN'T MAKING COLD CALLS, THOUGH?
25 A.  NO.  NO, NO, NO, NO, NO, NO.  THESE WERE ALWAYS

---

Page 73

1      PEOPLE WHO CALLED HIM OR ASKED HIM TO CALL THEM.
2      NO, NO, HE NEVER -- HE DIDN'T NEED TO COLD CALL.
3  Q.  BECAUSE THE INCOME THAT WAS COMING IN WAS ---
4  A.  MM-HMM (AFFIRMATIVE RESPONSE).  AND ENOUGH PEOPLE
5      WERE CALLING.  HE WOULD, WHEN WE WERE FIRST
6      TOGETHER, HE WOULD HAVE ME HAVE THE WORK PHONE IN
7      THE BEDROOM AND IF SOMEONE CALLED AT THREE O'CLOCK
8      IN THE MORNING, THE PHONE WAS SUPPOSED TO BE
9      ANSWERED.
10 Q.  YOU ALSO TESTIFIED THAT HE WOULD CONSULT TAX BOOKS.
11 A.  MM-HMM (AFFIRMATIVE RESPONSE).  ACTUAL FEDERAL
12     BOOKS.
13 Q.  DO YOU RECALL THE TITLE OF ANY OF THESE OR ---
14 A.  WHATEVER THE CODE IS FOR THE I.R.S., WHATEVER THE
15     I.R.S. CODE IS, TITLE WHATEVER ---
16 Q.  OKAY.  SO, HE WAS CONSULTING THE ACTUAL ---
17 A.  YEAH, YEAH.  I'M TALKING ABOUT THE ACTUAL CODES.
18 Q.  OKAY.  WHEN YOU PREPARED THIS AFFIDAVIT THAT WE HAVE
19     BEEN DISCUSSING, PLAINTIFF'S EXHIBIT ONE IN FRONT OF
20     YOU.  YOU CONSULTED WITH AN ATTORNEY THOUGH ---
21 A.  YES.
22 Q.  --- BEFORE YOU SIGNED THAT.
23 A.  YES.
24 Q.  AND HE, YOU FELT COMFORTABLE WITH HIS, WITH YOUR
25     REPRESENTATION OF YOU?

19 (Pages 70 to 73)

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                      July 27, 2009

Page 74

1  A.  OH, YEAH.  WITH HIS REPRESENTATION, YEAH, IT WAS
2      FINE.
3  Q.  YOU TESTIFIED THAT ALEX OR MR. ALEXANDER DID NOT
4      HOLD HIMSELF OUT AS AN ATTORNEY.
5  A.  NO.
6  Q.  DID HE HOLD HIMSELF OUT, THOUGH, AS AN AUTHORITY ON
7      THESE PATRIOT TOPICS?
8  A.  OH, YES.
9  Q.  AND DID HE HOLD HIMSELF OUT AS, YOU KNOW, AS THIS IS
10     INFORMATION THAT IS, THAT HE'S RESEARCHED?
11 A.  YES.
12 Q.  AND THAT HE CONCLUDED WAS VALID?
13 A.  YES.
14 BY MR. STRONG:
15     I THINK THAT'S ALL I HAVE.
16 BY THE WITNESS:
17     CAN I SAY SOMETHING?
18 BY MR. STRONG:
19     PLEASE.
20 BY THE WITNESS:
21     BECAUSE I WANT THIS CLARIFIED BECAUSE THIS HAS
22     BEEN OUT THERE FOREVER AND IT HAS ALWAYS BEEN WRONG,
23     AND THAT HE OR I EVER FILLED OUT TAX FORMS FOR OTHER
24     PEOPLE.  NEVER, EVER, EVER WAS THAT DONE, AND I WANT
25     THAT CLARIFIED THAT, AND I WANT IT ON THE RECORD

Page 75

1      THAT WE NEVER FILED TAXES FOR ANYBODY, NOT EVEN
2      OURSELVES, MUCH LESS, MUCH LESS ANYBODY ELSE.  LIKE
3      THERE WAS A BIG ARGUMENT, THE BIG THING WAS THE ZERO
4      RETURN SO THEY COULDN'T GET YOU FOR NOT FILING AND
5      SO, NEVER, NOTHING, WAS THAT EVER DONE, SO I JUST
6      WANT THAT CLARIFIED AND ON THE RECORD.  THAT WAS
7      NEVER DONE WHILE WE WERE TOGETHER.
8  BY MS. SALVINI:
9      THAT'S ALL I HAVE.
10 BY MR. STRONG:
11     OKAY.  BEFORE MS. SALVINI GOT HERE, I HAD
12     EXPLAINED TO YOU YOUR RIGHT TO WAIVE OR TO REVIEW
13     AND SIGN YOUR DEPOSITION.
14 BY THE WITNESS:
15     MM-HMM (AFFIRMATIVE RESPONSE).
16 BY MR. STRONG:
17     DO YOU RECALL THAT CONVERSATION?
18 BY THE WITNESS:
19     RIGHT.
20 BY MR. STRONG:
21     DURING THAT TIME, I HAD SAID THAT ONCE THE
22     COURT REPORTER FINISHES YOUR DEPOSITION TRANSCRIPT
23     ---
24 BY THE WITNESS:
25     MM-HMM (AFFIRMATIVE RESPONSE).

Page 76

1  BY MR. STRONG:
2      -- YOU'LL HAVE, IF YOU ELECT TO, YOU'LL HAVE 30
3      DAYS, THE OPPORTUNITY TO REVIEW THAT INFORMATION --
4  BY THE WITNESS:
5      MM-HMM (AFFIRMATIVE RESPONSE).
6  BY MR. STRONG:
7      CHECK IT FOR ACCURACY.  LET HER KNOW IF THERE
8      ARE ANY ERRORS IN TESTIMONY OR WHATNOT.
9  BY THE WITNESS:
10     RIGHT.
11 BY MR. STRONG:
12     OR YOU CAN WAIVE THAT.
13 BY THE WITNESS:
14     RIGHT.
15 BY MR. STRONG:
16     WE SAID WE WOULD WAIT UNTIL THE END OF THE
17     DEPOSITION ---
18 BY THE WITNESS:
19     RIGHT.  YEAH.  I WOULD LIKE A COPY OF IT AND TO
20     REVIEW IT BEFORE I SIGN IT.
21 BY MR. STRONG:
22     OKAY.  SHE WILL, SHE WILL NEED YOUR ADDRESS ---
23 BY THE WITNESS:
24     RIGHT.
25 BY MR. STRONG:

Page 77

1      YOU CAN GIVE THAT AFTER, AFTER THE ---

2  BY THE WITNESS:

3      OKAY.

4  BY MR. STRONG:

5      AFTER THE DEPOSITION.  THANK YOU.

6  BY THE WITNESS:

7      THANK YOU.

8  (THERE BEING NO OTHER QUESTIONS, THE DEPOSITION WAS

9  CONCLUDED AT THE HOUR OF 11:10 A.M.)

c77b1608-3dad-41b3-b76e-97be2fcee833

Heather Ferguson                                July 27, 2009

Page 78

1        IN THE UNITED STATES DISTRICT COURT
         DISTRICT OF SOUTH CAROLINA
2              C.A. NO. 6:08-CV-3760
3
4   UNITED STATES OF AMERICA,
5        PLAINTIFF,
6          VERSUS
7   JOHN HOWARD ALEXANDER,
8        DEFENDANT.
9
        I, JILL BISHOP EDWARDS, A NOTARY PUBLIC FOR THE
10  STATE OF SOUTH CAROLINA, DULY COMMISSIONED AND QUALIFIED
    AS SUCH, DO HEREBY CERTIFY THAT THE FOREGOING 75 PAGES
11  REPRESENT A TRUE AND ACCURATE TRANSCRIPT OF THE FOREGOING
    DEPOSITION OF HEATHER FERGUSON TAKEN BY ME ON THE 27TH
12  DAY OF JULY, 2009.
        THAT THE DEPONENT WAS DULY PLACED UNDER OATH AND
13  ADMONISHED TO SPEAK THE WHOLE TRUTH.  THAT THE ORAL
    TESTIMONY WAS DULY TAKEN AND TRANSCRIBED AS TO THE
14  QUESTIONS PROPOUNDED AND THE ANSWERS GIVEN.
        THAT ALL OFFERED EXHIBITS, STIPULATIONS AND
15  OBJECTIONS, IF ANY, INVOLVED IN THIS CAUSE ARE DULY
    ATTACHED OR INCLUDED HEREIN.
16     IN WITNESS WHEREOF, I HAVE SET MY HAND AND OFFICIAL
    SEAL THIS 11TH DAY OF AUGUST, 2009.
17
18     _____
19          JILL BISHOP EDWARDS
20          NOTARY PUBLIC FOR SOUTH CAROLINA
21          MY COMMISSION EXPIRES: 7-10-2010
22
23  * THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH
24  MATERIAL IS REPRODUCED AS READ OR QUOTED BY THE
25  SPEAKER.

Page 79

1   UNITED STATES OF AMERICA,
2        PLAINTIFF,
3
          VERSUS
4
    JOHN HOWARD ALEXANDER,
5
          DEFENDANT.
6
7           ERRATA SHEET
8   I, HEATHER FERGUSON, HAVE READ THE FOREGOING 77
9   PAGES OF TESTIMONY GIVEN BY ME ON 7.27.09.
10  THIS TESTIMONY SHOULD BE CORRECTED AS FOLLOWS:
11  PAGE  LINE   CHANGE FROM      CHANGE TO    REASON
12
13
14
15
16  SUBJECT TO THE FOREGOING CORRECTIONS, MY TESTIMONY IS AS
17
18  CONTAINED IN THE DEPOSITION TRANSCRIPT.
19
20  THIS _____ DAY OF _____, 2009
21
22
23  _____   _____
24  DEPONENT SIGNATURE       NOTARY PUBLIC FOR S.C.
25          MY COMMISSION EXPIRES:

c77b1608-3dad-41b3-b76e-97be2fcee833

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Case No.  6:08-cv-3760-GRA |
| v. | ) | |
| | ) | |
| | ) | |
| JOHN HOWARD ALEXANDER, | ) | ANSWER OF JOHN-HOWARD |
| a/k/a HOWARD IRA SMALL, | ) | ("ALEX") ALEXANDER, a/k/a |
| individually and as TRUSTEE OF THE | ) | HOWARD IRA SMALL and as |
| ALEXANDER FAMILY TRUST | ) | THE TRUSTEE OF THE |
| | ) | ALEXANDER FAMILY TRUST |
| | ) | TO PLAINTIFF'S |
| | ) | INTERROGATORIES, SET ONE |
| Defendant. | ) | |
| | ) | |

PROPOUNDING PARTY:    Plaintiff, UNITED STATES OF AMERICA

RESPONDING PARTY:    Defendant, JOHN HOWARD ALEXANDER

SET NUMBER:    ONE

Plaintiff hereby initially responds pursuant to the Federal Rules of Civil Procedure to the Interrogatories propounded by Plaintiff as follows.

**RESERVATION OF RIGHTS**

1. Responding to the Interrogatories, Defendant does not waive any objections which may be appropriate to (a) use by Defendant or any answer to these Interrogatories for any purpose or (b) the materiality of any of the Interrogatories to any issue in the case.

2. Defendant specifically reserves all right to objections which may otherwise be available to him and further states that no response should be deemed as an admission of relevancy, materiality or admissibility into evidence (of any particular interrogatory or the response thereto).  Defendant further reserves the right to alter or amend his answers to be more accurate if other information becomes available to him at a subsequent time.

1

3. The answers herein are subject to the rights of Defendant to object and not be bound at any time to a demand for further response to these or other interrogatories or other discovery procedures.

## GENERAL OBJECTIONS

1. Defendant objects to responding to any Interrogatory that seeks information which constitutes confidential attorney-client communications or which falls within the scope of the attorney work-product doctrine.

2. Defendant objects to responding to any Interrogatory that exceeds the scope and limits of discovery set forth in the Federal Rules of Civil Procedure.

## ANSWERS TO INTERROGATORIES

1. Identify the person answering these interrogatories and requests for production of documents.

   ANSWER:   John Howard Alexander, with the assistance of his attorney, Bradley Bennett (and Jessica Salvini, Mr. Bennett's law partner).

2. Identify each individual likely to have discoverable information that you may use to support your claims or defenses.

   ANSWER:

   a.  Defendant, John Howard Alexander

   b.  Heather Alexander Ferguson
       Former Spouse of Defendant
       Address & Telephone Number Unknown
       864-967-3238 (Sister's, Kelly's, Telephone Number)

   c.  Marc J. Winter
       Bankruptcy Attorney
       Taylor, Simonson & Winter
       144 North Indian Hill Blvd.
       Claremont, CA 91711
       (714) 625-4785

   Defendant reserves the right to supplement his response to this interrogatory.

3. If you dispute the accuracy of the income tax assessments against you as set forth in paragraph 9 of the complaint, please state the facts and identify any documents in your

2

possession or under your custody and control or in the possession or custody and control of anyone other than you to support your position.

ANSWER:

Defendant disputes the income tax assessments set forth in paragraph 9 of the Complaint. The basis of Defendant's objection is that he did not have any employment or other source of revenue from 1990 through 1995. Further, Defendant filed for Bankruptcy on or about June 3, 1991. During those years, Defendant's mother supported him financially. Defendant does not have any documents in his possession to support his claims herein. However, Defendant asserts his mother's bank records from BB& T and her account at the South Carolina Telco Credit Union will support his claim that his mother financially supported him.

Defendant reserves the right to supplement his response to this interrogatory.

4. If you dispute the accuracy of the civil penalty assessments against you as set forth in paragraph 45 of the complaint, please state the facts and identify any documents in your possession or under your custody and control or in the possession or custody and control of anyone other than you to support your position.

ANSWER:

Defendant disputes the income tax assessments set forth in paragraph 45 of the Complaint. The basis of the Defendant's objection is that he asserts there is no basis for the government to assess a civil penalty against Defendant. Defendant does not have any documents in his possession to support his objection. However, as stated herein above, Defendant's mother's bank records will support his claim that his mother supported him.

Defendant reserves the right to supplement his response to this interrogatory.

5. Identify all bank accounts, mutual funds, investment funds, and other financial and commercial accounts in which defendant has or has had an interest at any time since January 1, 2000. For each account, provide the financial institution's name and address, the name on the account, and the account number.

ANSWER:

Defendant did not have any personal bank accounts (until on or about December 2008 or January 2009), mutual funds, or investment funds.

a. Bank Account:  John Howard Alexander
                 Account Number Will Be Made Available

3

Bank of Travelers Rest
42 Plaza Drive
Greenville, SC

b.  Bank Account:  John Howard Alexander
Freedom Trust Group
Account No. 10105030920

Bank of Travelers Rest
42 Plaza Drive
Travelers Rest, SC 29690

c.  Bank Account:  John Howard Alexander
Aware Group
Account Number Unknown

Bank of Travelers Rest
42 Plaza Drive
Travelers Rest, SC 29690

d.  Bank Account:  John Howard Alexander
Absolute Solutions
Account No. 105030920

Bank of Travelers Rest
42 Plaza Drive
Travelers Rest, SC 29690

Defendant cannot recall having any other bank accounts; but states that if he did have an account or an interest in any accounts it would have been at the Bank of Travelers Rest in South Carolina.  However, Defendant may have had signing authority on his former spouse's (Heather Ferguson's) bank account(s).  Defendant does not recall the banking institutions in which Heather Ferguson maintained an account.

Defendant reserves the right to supplement his response to this interrogatory.

6.  Identify, by name, taxpayer identification number (i.e. Social Security number or employer identification number), address, telephone number, and e-mail address all defendant's customers who purchased tax-related products, including pure trusts, the "Reliance Defense" package, and the "Redemption" program from January 1, 2000 to December 31, 2005.

4

ANSWER:

Defendant does not have any information to be able to identify by name, identification number, address, telephone number and/or email address Defendant's purported customers who purchased tax-related products: the "Reliance Defense" package, and/or the "Redemption" program from January 1, 2000. Defendant states that his former spouse, Heather Ferguson, maintained all records on her computer, which is not in Defendant's possession.

7. To the extent that you contend that persons whom you assisted in forming trusts are entitled to federal income tax benefits through the use of trusts, state the basis for your contention.

ANSWER:

Defendant's position is that the value of a contract of trust is that an individual may be able to protect assets from identity theft through the use of trusts. There may or may not be federal tax consequences or benefits from the use of a contract of trust. Defendant has never represented that individuals who formed contract of trusts are entitled to federal income tax benefits through the use of a contract of trust. Rather, Defendant informed individuals he assisted they would have to consult a tax professional or their Certified Public Accountant regarding their tax issues and/or potential tax issues.

8. Explain why you contend that the "Reliance Defense" letters you sold provided a basis for your customers' exemption from taxation or a defense to criminal tax offenses.

ANSWER:

Defendant does not maintain nor can he disavow that the "Reliance Defense" letters formed a basis for his purported customer's to be exempt from taxation or a defense to criminal tax offenses. Defendant provided his purported customers with information that appeared to have some basis of legitimacy.

9. Explain in detail the "Redemption" program sold by defendant through the Aware Group or the Freedom Trust Group.

ANSWER:

Defendant states that the "Redemption" program was a program that for every individual born in the United States there are two identities for that person: the living breathing person and a "straw man" for that individual and how the United States assert jurisdiction over those two identities.

5

Defendant reserves the right to supplement his response to this interrogatory.

10. Explain in detail defendant's contention that individuals earning U.S. source income are not required to file income tax returns to pay federal taxes.

ANSWER:

Defendant cannot respond to this interrogatory without a definition from the Plaintiff's of the term "income" and the term "United States."

11. Identify all tax-related seminars in which defendant participated from January 1, 1997.

ANSWER:

Defendant states that he did not participate in any tax-related seminars. Defendant asserts that he participated in seminars, but those seminars were over all "freedom related" questions, issues and information sharing.

12. Describe in detail the services and products Defendant provided to customers of the Aware Group, the Freedom Trust Group and International Business Systems.

ANSWER:

Defendant states that the International Business Systems did not provide any purported customers with any products. International Business Systems was a referral service.

Defendant states the Aware Group had Freedom File CD's that contained information that was motivational, had case law, trust information, land tax, Redemption, Reliance Letters, and other miscellaneous info. that was provided to individuals. Defendant also would review information or documents provided to Defendant by individuals.

Defendant states the Freedom Trust Group provided a CD that had contract templates regarding establishing a contract of trust. No other "services" were provided.

13. Identify all sources of income that defendant has had, including the amounts of income, at any time: a( between January 1, 1989 and December 31, 1994 and b) since January 1, 2000.

ANSWER:

Defendant cannot respond to this interrogatory without the Plaintiff defining the term "income."

6

14. Identify any trust in which defendant has had an interest of fiduciary duty as trustee. Identify by name, taxpayer identification number (i.e. Social Security number or employer identification number), address, telephone number, and e-mail address all settlers, trustees, and beneficiaries of the trust. Identify the property of the trust.

ANSWER:

Defendant had an interest in or had a fiduciary duty in the following contract of trusts:

    a. Alexander Family Trust:  Real Property identified in the Complaint.

    b.   Associated Management Trust:  No contract of trust property in existence; formed on or about 1994.  Defendant is the Trustee for this contract of trust.

15. Identify any real property in which defendant has had an interest or fiduciary duty as trustee. For each parcel of property, identify by count and state and provide a legal description and street address.

ANSWER:

Defendant states the only interest he has in any real property is the interest in the contract of trust of the Alexander Family Trust as Trustee.


Respectfully Submitted this 26th day of June, 2009,

s/John Howard Alexander
John Howard Alexander

Westlaw.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

H

United States District Court, D. Minnesota, Third
Division.
James L. NOSKE and Joan M. Noske, Plaintiffs,
v.
UNITED STATES of America, Defendant.
**No. 3-92 CIV 169.**

Jan. 14, 1993.

ORDER

ALSOP, District Judge:

**\*1** This matter came before the Court on December
11, 1992, on the plaintiffs' Motion for Injunctive
Relief pursuant to 26 U.S.C. § 6703(c)(1).

I. BACKGROUND

On December 16, 1985, the Internal Revenue Ser-
vice (the "IRS") sent to each of the plaintiffs, James
and Joan Noske (the "Noskes"), a notice assessing a
$186,000 penalty under 26 U.S.C. § 6700 "for pro-
moting an abusive tax shelter." This section of the
Internal Revenue Code provides, in relevant part,
that any person promoting abusive tax shelters
"shall pay a penalty equal to the greater of $1000 or
20 percent of the gross income derived or to be de-
rived by such person from such activity." 26 U.S.C.
§ 6700. The $186,000 assessments were calculated
by multiplying 186 trust transactions by $1000.
This method of calculating a penalty is commonly
referred to as a "transactional" or "per sale" assess-
ment.

The Noskes contested these assessments by paying
$150 each and filing administrative claims. After
the IRS failed to respond to these administrative
claims, the Noskes filed civil actions in federal
court, challenging the assessments and seeking a re-
fund of the sums they had paid. The IRS argued

that the Noskes had not filed administrative claims,
which are a prerequisite to the district court's juris-
diction, and, for that reason, these lawsuits were
dismissed. The IRS eventually found the claim
forms and admitted in a "Declaration ... Re: Newly
Discovered Evidence" that they had been timely
filed. In this declaration, although the government
admitted that it had found the Noskes' claim forms,
it still insisted that subject matter jurisdiction did
not exist because the Noskes' claim forms did not
specifically set forth the legal and factual basis for
their claims. Therefore, the government argued, the
original civil actions should not be reinstated, and
the Noskes should have to file new administrative
claims to properly invoke the district court's juris-
diction.

Joan Noske paid an additional $850 to the IRS and
James Noske paid an additional $2850 to the IRS,
and, on January 15, 1986, they each filed a second
administrative claim. The IRS did not respond to
these claims, and the Noskes filed civil refund ac-
tions in district court on June 10, 1987. See *Joan
M. Noske v. United States* [88-2 USTC ¶ 9582], No.
6-87-399 (D.Minn.) and *James L. Noske v. United
States* [88-2 USTC ¶ 9582], No. 6-87-400
(D.Minn.) (collectively referred to as "the refund
actions").

To invoke the jurisdiction of the district court in a
refund action, a person that has been assessed a tax
penalty normally must first pay the full amount of
the assessment. However, because the Noskes' as-
sessments had been calculated on a
"per-transaction" basis, they were able to invoke
the jurisdiction of the district court by each paying
the assessment for one transaction.

In their refund actions, the Noskes challenged the
assessed penalties and sought a refund of the sums
they paid to the IRS. In response, the government
admitted that the Noskes had properly invoked the
jurisdiction of the district court and counterclaimed
against each of the Noskes for the balance of the as-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

sessments.

**\*2** On May 15, 1989, while the Noskes' refund actions were pending in district court, the Eighth Circuit held that a section 6700 penalty must be assessed on the basis of the greater of $1000 or 20% of the tax shelter income and that a $1000 penalty may not be assessed on a transactional or "per sale" basis. See *Gates v. United States* [89-1 USTC ¶ 9328], 874 F.2d 584, 586-87 (8th Cir.1989).

On June 22, 1989, the IRS notified the Noskes that, in light of *Gates,* it would recalculate their penalties using the percentage-of-gross-income method.

On August 29, 1989, the district court, *sua sponte,* dismissed the Noskes' refund actions for lack of subject matter jurisdiction. Because *Gates* held that section 6700 penalties are not divisible into separate transactions, the court reasoned that the Noskes were each required to pay the full assessment ($186,000) to properly invoke the district court's jurisdiction. The Noskes had not paid the full assessments, and, therefore, the court dismissed the refund actions for lack of subject matter jurisdiction.

The Noskes appealed this order of dismissal, and the Eighth Circuit reversed. See *Noske v. United States* [90-2 USTC ¶ 50,449], 911 F.2d 133, 137 (8th Cir.1990). Specifically, the Eighth Circuit held that "the *Gates* non-divisibility holding should not be applied retroactively to divest the district court of subject matter jurisdiction." *Id.* at 136. The Noskes' refund actions were reinstated in the district court.

On November 6, 1989, the IRS notified the Noskes that their penalties had been recalculated under the "percentage-of-gross-income" method authorized by *Gates.* The Noskes were each assessed the additional amount of $304,174, for a total assessment of $490,174 each.

On February 27, 1992, the government obtained an *ex parte* order that (1) stayed the civil proceedings

in the refund actions pending disposition of a criminal investigation and (2) granted the government a protective order that stayed all discovery in the refund actions.[FN1] On March 11, the refund actions were transferred to the undersigned United States District Judge.

On March 16, 1992, the Noskes began this lawsuit ("the injunction action") by filing a "Complaint for Injunctive Relief." In this action, the Noskes ask this Court for injunctive relief against the IRS' collection activities on the section 6700 penalties.

The Noskes brought a motion in the refund actions on May 29, 1992, to vacate the *ex parte* order and lift the stay. On July 28, 1992, this Court issued an order in the refund actions that kept the stay in place on the condition that the government refrain from any collection activities against the Noskes with respect to the section 6700 penalties. The order also granted the Noskes permission to renew their motion to lift the stay in six months.

The government brought a motion on May 29, 1992, to dismiss the Noskes' injunction action for lack of subject matter jurisdiction. The Court issued an order on July 28, 1992, denying that motion. In large part, this order resulted from the government's untenable argument that it should be allowed to proceed with collection activities on the section 6700 penalties while the Noskes' refund actions should remain stayed.

**\*3** On December 11, 1992, the Noskes brought their present motion for injunctive relief from the government's collection activities. The Noskes ask this Court for an order requiring the government to remove tax lien notices that have been filed against them.[FN2]

## II. ANALYSIS

The Noskes seek relief under 26 U.S.C. § 6703(c)(1). This section of the Internal Revenue Code allows a person assessed a penalty under section 6700 to stay certain types of government col-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

lection activity by paying fifteen percent of the as- sessed penalty and filing an administrative claim. The government argues that the Noskes are not en- titled to protection under section 6703(c)(1) be- cause they did not pay the requisite fifteen percent of their $186,000 penalties before filing their ad- ministrative claim.FN3 The Noskes admit that they have not paid fifteen percent of that amount, but they argue that the Eighth Circuit, in *Noske v. United States* [90-2 USTC ¶ 50,449], 911 F.2d 133 (8th Cir.1990), held that they had nonetheless prop- erly invoked the jurisdiction of the district court un- der section 6703(c). To properly resolve this mo- tion, it is first necessary to step back and examine the law applicable to both the Noskes' refund ac- tions and this injunction action.

Federal district courts are granted subject matter jurisdiction for tax penalty refund actions by 28 U.S.C. § 1346(a)(1), which provides that "[t]he dis- trict courts shall have original jurisdiction ... of [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority." To invoke a district court's jur- isdiction under this statute, a plaintiff is normally required to pay the full amount of the tax or penalty before filing a refund action (the "full payment rule"). See *Flora v. United States* [58-2 USTC ¶ 9606], 357 U.S. 63, 75 (1958), *aff'd on reh'g* [ 60-1 USTC ¶ 9347], 362 U.S. 145 (1960). However, a judicially-created exception to this rule exists when a plaintiff is challenging a "divisible" assessment. In that circumstance, the plaintiff may invoke the district court's jurisdiction by paying one of the di- visible assessments (the "divisible penalty excep- tion"). *Flora* [60-1 USTC ¶ 9347], 362 U.S. at 171 n. 37, 175 n. 38.

Section 6703(c) of the Internal Revenue Code provides a statutory exception to the full payment rule and establishes special procedures that are available to individuals assessed penalties under 26 U.S.C. § 6700. See *Thomas v. United States* [85-1

USTC ¶ 9263], 755 F.2d 728, 729 (9th Cir.1985). In relevant part, section 6703(c) reads as follows:

**(c) Extension of period of collection where per- son pays 15 percent of penalty.**

**(1) In general.** If, within 30 days after the day on which notice and demand of any penalty under section 6700 ... is made against any person, such person pays an amount which is not less than 15 percent of the amount of such penalty and files a claim for refund of the amount so paid, no levy or proceeding in court for the collection of the re- mainder of such penalty shall be made, begun, or prosecuted until the final resolution of a proceed- ing begun as provided in paragraph (2). Notwith- standing the provisions of [the Anti-Injunction Act], the beginning of such proceeding or levy during the time such prohibition is in force may be enjoined by a proceeding in the proper court....

**\*4 (2) Person must bring suit in district court to determine his liability for penalty.** If, within 20 days after the day on which his claim for re- fund of any partial payment of any penalty under section 6700 ... is denied (or, if earlier, within 30 days after the expiration of 6 months after the day on which he filed the claim for refund), the per- son fails to begin a proceeding in the appropriate United States district court for the determination of his liability for such penalty, paragraph (1) shall cease to apply with respect to such penalty, effective on the day following the close of the ap- plicable 30-day period referred to in this para- graph.

*Id.* To summarize, a person assessed penalties un- der section 6700 may stay "any levy or proceeding in court for collection" by paying fifteen percent of the penalty and filing an administrative claim for a refund. 26 U.S.C. § 6703(c)(1). If this claim is denied, the claimant must bring a civil action in dis- trict court within twenty days, or the stay will be lifted. 26 U.S.C. § 6703(c)(2). If the IRS does not respond to the claim within six months, the stay will be lifted unless the claimant files a civil action

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

in district court within thirty days. *Id.*

In 1985, when the Noskes were first assessed penalties under section 6700, the IRS calculated these assessments on a transactional basis. The Noskes' penalties were, therefore, "divisible" for purposes of the divisible penalty exception. Accordingly, the Noskes could have invoked the jurisdiction of the district court in two different ways.[FN4] The Noskes could have each paid fifteen percent of their respective $186,000 penalties and invoked the special protection of section 6703(c)(1), or they could have each paid one of the divisible assessments and invoked the district court's jurisdiction through the divisible penalty exception.

The Noskes elected to proceed under the divisible penalty exception.[FN5] In 1989, however, the Eighth Circuit held that section 6700 penalties are not divisible and should not be assessed on a "per-transaction" basis. See *Gates v. United States* [89-1 USTC ¶ 9328], 874 F.2d 584, 586 (8th Cir.1989).[FN6] This meant that the divisible penalty exception could not be used to invoke the jurisdiction of the district court for a refund suit challenging a section 6700 penalty. The district court subsequently dismissed the Noskes' refund actions for lack of subject matter jurisdiction because they had relied on the divisible penalty exception to invoke the court's jurisdiction.

When the Eighth Circuit reversed the district court's dismissal of the Noskes' refund actions, it decided a narrow question of law. The Eighth Circuit noted that the *Gates* court had "not applied its non-divisibility ruling to divest the district court of subject matter jurisdiction," and it declined to do so with regard to the Noskes. *Noske v. United States* [90-2 USTC ¶ 50,449], 911 F.2d 133, 137 (8th Cir.1990). In other words, if a plaintiff originally invokes the jurisdiction of the district court under the divisible penalty exception, that plaintiff's lawsuit will not be dismissed when it is later established that the penalty he or she was assessed is not divisible.

**\*5** Although the applicability of section 6703(c) to the Noskes' refund actions was not before the Eighth Circuit in *Noske,* it was discussed in dictum. The court first rejected the Noskes' argument that they could establish jurisdiction under section 6703(c)(2) upon payment of any amount, even if it was less than fifteen percent of the assessed penalty. *Noske* [90-2 USTC ¶ 50,449], 911 F.2d at 136. The court then inserted a footnote that both the Noskes and the government cite in support of their positions in the present motion. This footnote reads as follows:

> After *Gates* ..., taxpayers like the Noskes who have been assessed a § 6700 penalty must pay 15% of the full amount of the penalty assessed before they can stop collection proceedings, file an administrative claim and file a refund suit. In the present case neither Joan M. Noske nor James L. Noske has paid either 15% of the initial penalty assessment (15% of $186,000 = $27,900) or the reassessment (15% of $490,174 = $73,526.10) necessary to invoke jurisdiction under this exception.

*Id.* at 136 n. 2. On the basis of this footnote, the Noskes argue that the Eighth Circuit held that they had properly invoked the district court's jurisdiction under section 6703(c). The Noskes focus on the first sentence in the footnote and argue that the phrase "[a]fter *Gates*" implies that, because their refund actions were filed before *Gates,* they do not have to pay fifteen percent of their assessed penalties to invoke section 6703(c)(1) protection. The government focuses on the second sentence in the footnote and argues that the Eighth Circuit expressly found that the Noskes did not meet the statutory requirements of section 6703(c)(1).

Although this footnote is somewhat confusing, the two apparently contradictory sentences can be reconciled if they are read in the context of the procedural history of the Noskes' refund actions. As the Court has previously explained, when the Noskes began their refund actions, they had the option of either paying fifteen percent of the penalty and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

proceeding under section 6703(c) or paying a divisible penalty and invoking the jurisdiction of the district court through the divisible penalty exception. In the first sentence of the footnote, the court simply recognized that, after *Gates,* the second option is no longer viable because section 6700 penalties are not divisible. In the second sentence, the court noted that the Noskes had not met the requirements of section 6703(c). Therefore, the Noskes' refund actions would have been properly dismissed, but for the Eighth Circuit's decision that *Gates* should not be applied retroactively to divest district courts of subject matter jurisdiction. This Court concludes that the Eighth Circuit did *not* hold that the Noskes had invoked the jurisdiction of the district court under section 6703(c).

In their supporting memoranda, the Noskes argue that the government should be foreclosed from arguing that the Noskes have not met the requirements of section 6703(c) because it previously admitted in the refund actions that they had properly invoked the jurisdiction of the district court. This argument fails to recognize that an individual contesting a tax penalty can invoke the jurisdiction of the district court in several different ways. The individual could pay the full penalty and satisfy the full payment rule. If the penalty is assessed under section 6700, he or she could also pay fifteen percent of the penalty and utilize the exception created in section 6703(c). If the penalty is divisible, he or she could pay one divisible assessment and utilize the divisible penalty exception. The government previously admitted that the Noskes properly invoked the jurisdiction of the district court through the divisible penalty exception. It did not admit, and has not admitted, that the Noskes fulfilled the requirements of section 6703(c). If the Noskes had actually invoked the district court's jurisdiction under section 6703(c) for their refund actions, this separate "injunction action" would be unnecessary because the Noskes could simply move this Court for injunctive relief in their refund actions.

**\*6** At oral argument, the Noskes also argued that an

annotation of the Eighth Circuit's *Noske* decision provided by West Publishing Company in the *United States Code Annotated* supports their position. Although annotations are intended only as legal research aids and are in no way authoritative, the Court recognizes that, in this case, the annotation may have caused some confusion and, therefore, the Court will address the Noskes' argument. The annotation reads as follows:

> Ruling that penalty for promoting abusive tax shelters was nondivisible could not be applied retroactively to divest district court of subject matter jurisdiction in action for tax refund, on grounds that taxpayer had not paid 15% of total penalty assessed.

The wording of the annotation can be reconciled with that case's procedural history. If the *Gates* ruling had been retroactively applied, the district court would not have had jurisdiction because the Noskes had not paid fifteen percent of the penalty to meet the jurisdictional requirements of section 6703(c). The annotation is misleading, however, because it is included in the annotations for section 6703 under the subheading of "jurisdiction." As the Court previously stated, the Eighth Circuit's *Noske* opinion can not be read for the proposition that the Noskes properly invoked jurisdiction under section 6703(c).

Because the Noskes have not met the statutory requirements for section 6703(c) protection, their motion for injunctive relief under that section must be denied. It is therefore unnecessary for this Court to reach the government's argument that the bar on collection activities under section 6703(c)(1) does not apply to filing lien notices.

Furthermore, because this injunction suit was brought under section 6703(c)(1) and the Court has found that the Noskes have not met that section's statutory requirements, the Court concludes that it does not have subject matter jurisdiction over this action. The Federal Rules of Civil Procedure state that "[w]henever it appears ... that the court lacks

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087
**(Cite as: 1993 WL 78311 (D.Minn.))**

jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Dismissal of this action is therefore appropriate, although in no way does it effect the stay on collection proceedings ordered in the Noskes' refund actions.

Accordingly, based upon a review of all the files, records, and proceedings herein,

IT IS HEREBY ORDERED That:

1. The plaintiffs' Motion for Injunctive Relief is DENIED.

2. This action is DISMISSED for lack of subject matter jurisdiction.

FN1. In its memorandum, the government refers to the district court's action as "*sua sponte.*" This characterization is a misrepresentation of what actually occurred. The court's February 27, 1992 order makes it clear that the order was issued upon the government's motion.

FN2. The Court feels compelled to comment on the government's conduct with regard to the briefing schedule for this motion. After receiving the Noskes' reply memorandum, the government filed a motion for leave to file a supplemental memorandum, claiming that the Noskes had raised "new points" in their reply memorandum. Rather than submitting its proposed supplemental memorandum under separate cover or in a separate envelope, the government stapled the memorandum to its moving papers. The Court views this procedure as inappropriate. The Court denied the government's motion for leave to file a supplemental memorandum, and, therefore, the arguments put forth in the proposed supplemental memorandum have not been read or considered in the resolution of this motion.

FN3. Although the government made this same argument in its previous motion to dismiss, it only utilized a single paragraph in its supporting memorandum to develop the argument. This inadequate presentation, along with the government's untenable position, resulted in the denial of the previous motion.

FN4. The Court assumes that a third option, paying the entire penalty to satisfy the full payment rule, was not a feasible alternative for the Noskes.

FN5. See Theodore D. Peyser, *Is Full Payment Always Required Before Filing a Refund Suit?* 74 J. Tax'n 162 (1991) (discussing *Noske v. United States*) ("The taxpayers declined to follow the Section 6703 rules permitting payment of 15% followed by the filing of a refund claim and the institution of a suit in district court. Instead, one taxpayer paid $1,000 and the other $3,000, after which they filed claims and then sued for refunds.").

The Noskes originally attempted to invoke section 6703(c) protection by paying $150 and arguing that the maximum amount they could be penalized under section 6700 was $1000, rather than $1000 per transaction (15% of $1000 = $150). As previously explained, the Noskes' first refund suits were dismissed when the government argued that administrative claims had not been filed.

Before the Noskes filed the refund actions currently pending, Joan Noske paid an additional $850, James Noske paid an additional $2,850, and they each filed a second administrative claim. In paragraph IX of the complaints in the Noskes' civil refund actions, the Noskes state that "[t]o come within this Court's jurisdiction a second time, what is called

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087

**(Cite as: 1993 WL 78311 (D.Minn.))**

the 'Pay and Sue Rule' controlled." Therefore, the Noskes "had to pay full penalties of $1000 rather than 15% of this amount."

The record before the Court does not explain why James Noske paid $3000 rather than the $1000 paid by Joan Noske. The government admitted, however, that the Noskes properly invoked the jurisdiction of the district court by paying divisible portions of the penalties.

FN6. After *Gates* was decided, Congress amended section 6700 to make it clear that penalties under this section could be assessed on a "per transaction" basis. The precedential value of *Gates* is, therefore, quite limited.

D.Minn.,1993.

Noske v. U.S.

Not Reported in F.Supp., 1993 WL 78311 (D.Minn.), 71 A.F.T.R.2d 93-989, 93-1 USTC P 50,087

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

H

United States District Court,
M.D. Florida.
UNITED STATES OF AMERICA, Plaintiff,
v.
Eddie Ray KAHN, a/k/a Eddie Ray, a/k/a Eddie
Ray: House of Kahn; Milton Hargraves Baxley II;
Bryan Malatesta; Kathleen Kahn, a/k/a Kookie
Kahn; David Stephen Lokietz, a/k/a David Stephen,
a/k/a David-Stephen: House of Lokietz; American
Rights Litigators, a purported trust; Guiding Light
of God Ministries, a purported corporation sole;
and Eddie Kahn and Associates, a purported limited
liability corporation. Defendants.
**No. 5:03CV-436-OC-10GRJ.**

March 30, 2004.

Anne Norris Graham, Evan J. Davis, U.S. Depart-
ment of Justice, Tax Division, Washington, DC, for
Plaintiff.

Eddie Ray Kahn, Sorrento, FL, pro se.

Milton Hargraves Baxley, II, Gainesville, FL, pro
se.

Bryan Malatesta, Cleburne, TX, pro se.

Kathleen Kahn, Sorrento, FL, pro se.

David Stephen Lokietz, Mount Dora, FL, pro se.

*FINDINGS OF FACTS AND ORDER TO SHOW
CAUSE*

HODGES, J.

**\*1** This case is before the Court for consideration
of the Government's motion for an order to show
cause (Doc. 47) and to adjudicate each of the De-
fendants in civil contempt (Doc. 46) for their fail-
ure to comply with this Court's injunctive order

(Doc. 29). The injunction prohibits the Defendants
from engaging in certain conduct violative of 26
USC §§ 6700 and 6701 of the Internal Revenue
Code and further requires the performance of spe-
cific affirmative acts. A hearing on the matter was
held on February 24, 2004, which all Parties atten-
ded except for Defendant Bryan Malatesta. Accord-
ingly, upon due consideration, the Government's
motion for a show cause order (Doc. 47) is due to
be granted. The Defendants shall have ten (10) days
in which to respond to this Order, and the Govern-
ment another ten (10) days to reply, after which the
Court will enter an appropriate ruling.

Background and Facts

The Court has previously found that the Defend-
ants, through the business entities American Rights
Litigators ("ARL"), Guiding Light of God Minis-
tries ("GLGM"), and Eddie Kahn & Associates and
through various websites, organize and sell several
"abusive tax schemes" designed to obstruct or frus-
trate the Internal Revenue Service in carrying out
its duty to enforce the internal revenue laws. These
abusive tax schemes include such outlandish mach-
inations as: (1) counterfeit checks and bonds pur-
porting to draw on fictitious accounts held by the
Treasury in the customer's name; (2) false UCC fin-
ancing statements and related documents purporting
to create a security interest in favor of the customer
in the customer's own name, birth certificate, prop-
erty, and even in the customer's own person; (3)
corporations sole used to shelter assets and income
from creditors and the IRS; and (4) "Individual
Master File" or "Business Master File" decoder
packages ("IMF/BMF decoder") purporting to
"decode" and "correct" IRS records to reflect that
the customer is not subject to taxation. Further, the
Defendants interfere with the administration of the
internal revenue laws by frivolous and harassing
letters to the IRS or third parties, false and frivol-
ous complaints to the Treasury Inspector General
for Tax Administration ("TIGTA"), burdensome

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

Freedom of Information Act ("FOIA") and Privacy Act requests, assisting customers in hiding assets in corporations sole, advising customers to obstruct IRS examinations and collections efforts, and advising customers not to file federal tax returns or pay federal taxes.

The Court concluded that a preliminary injunction was warranted and, pursuant to 26 USC §§ 7408 and 7402(a), enjoined the Defendants from engaging in the activities described above.[FN1] The Court also directed the Defendants to take two affirmative actions: (1) produce to the Government "any records in their possession or to which they have access identifying by name, Social Security numbers, and address the members of ARL/GLGM and the persons who have purchased Defendants' abusive tax shelters, plans, arrangements or programs"; and (2) "prominently and conspicuously display on the first page of any internet website maintained by them a complete copy of this preliminary injunction."

> FN1. Specifically, the injunctive order (Doc. 29) reads:
>
> The Court ORDERS and DECREES pursuant to 26 USC § 7408 that each of the Defendants, their agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are hereby preliminarily enjoined, directly or indirectly from:
>
> 1. Preparing or assisting in the preparation of correspondence to the IRS on behalf of any other person or entity;
>
> 2. Preparing or assisting in the preparation of UCC forms purporting to give the customer a security interest in his or herself, own name, own birth certificate, or own property;

3. Selling or organizing any business arrangement, including corporations sole, that encourages noncompliance with the income tax laws, misrepresents the tax savings realized by using the arrangement, or conceals the receipt of income; or selling any purported draft check, bond or other similar instrument to be used by the purchaser to pay federal taxes;

4. Preparing or assisting in the preparation of complaints to the TIGTA;

5. Preparing or assisting in the preparation of FOIA and Privacy Act requests on behalf of any other person or entity;

6. Representing any other person or entity before the IRS;

7. Preparing or assisting in the preparation of documents purporting to "decode" IRS files;

8. Falsely advising anyone that they are not require to file federal tax returns or pay federal taxes; and

9. Engaging in other similar conduct that substantially interferes with the administration and enforcement of the internal revenue laws.

The Court further ORDERS pursuant to I.R.C. § 7402(a) that Defendants produce to the United States any records in their possession or to which they have access identifying by name, Social Security numbers, and address the members of ARL/GLGM and the persons who have purchased Defendants' abusive tax shelters, plans, arrangements or programs. The individual Defendants must each file a sworn certificate of compliance stating that he or she has complied with this portion of the Order, within

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

twenty (20) days of the date of this Or-der.

The Court further ORDERS pursuant to 26 USC § 7402(a) that Defendants jointly and/or individually, and their rep-resentatives, agents, servants, employ-ees, attorneys and those persons in active concert or participation with them, prominently and conspicuously display on the first page of any internet website maintained by them a complete copy of this preliminary injunction. The indi-vidual Defendants must each file a sworn certificate of compliance stating that he or she has complied with this portion of the Order, within twenty (20) days of the date of this Order.

Civil Contempt Standard

*2 District courts possess the inherent power to en-force compliance with their lawful injunctive orders through civil contempt.[FN2] The party seeking a contempt order has the initial burden of proving by clear and convincing evidence that the alleged con-temnors have failed to comply with an unambigu-ous and lawful order of the court.[FN3] Once the moving party presents a prima facie case by clear and convincing evidence, the burden shifts to the alleged contemnors "to show a present inability to comply that goes beyond a mere assertion of inabil-ity"[FN4] and establish that they have "made in good faith all reasonable efforts to meet the terms of the court order."[FN5] While the inability to com-ply is a defense to a contempt action, it is unavail-able where the inability to comply was self-im-posed.[FN6]

FN2. *Gunn v. Univ. Comm. to End War in Vietnam,* 399 U.S. 383, 389, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970); *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).

FN3. *Riccard v. Prudential Ins. Co.,* 307

F.3d 1277, 1296 (11th Cir.2002); *Mc-Gregor v. Chierico,* 206 F.3d 1378, 1383 (11th Cir.2000); *Commodity Futures Trad-ing Comm'n v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir.1992); *Jordan v. Wilson,* 851 F.2d 1290, 1292 n. 2 (11th Cir.1988).

FN4. *Howard Johnson Co. v. Khimani,* 892 F.2d 1512, 1516 (11th Cir.1990) (internal quotations omitted).

FN5. *Wellington Precious Metals, Inc.,* 950 F.2d at 1529; *United States v. Hayes,* 722 F.2d 723, 725 (11th Cir.1984).

FN6. *In re Lawrence,* 279 F.3d 1294, 1300 (11th Cir.2002); *Pesaplastic, C.A. v. Cin-cinnati Milacron Co.,* 799 F.2d 1510. 1521 (11th Cir.1986).

The focus of the court's inquiry regarding civil con-tempt is whether the alleged contemnors complied with the order at issue, and not the subjective belief or intent of the contemnors in complying with the order.[FN7] However, conduct that evidences "substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance."[FN8] In mak-ing this determination, the order is subject to reas-onable interpretation and may not be expanded bey-ond the meaning of its terms.[FN9]

FN7. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949) ("The absence of wilfulness does not relieve civil contempt.... Since the purpose is remedial, it matters not with what intent the defendant did the prohib-ited act."); *Khimani,* 892 F.2d at 1516.

FN8. *Khimani,* 892 F.2d at 1516.

FN9. *Id.*

District courts are afforded wide discretion in fash-ioning a remedy for civil contempt.[FN10] However,

Page 4

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

this discretion is not unfettered, as sanctions cannot be any greater than necessary to ensure compliance.[FN11] In fashioning a remedy, the Court must consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."[FN12] "The district court must make a determination in each case whether there is a realistic possibility that the contemnor will comply with the order."[FN13] Appropriate sanctions for civil contempt include: (1) a coercive fine; (2) a compensatory fine; (3) attorney's fees and costs; and (4) coercive incarceration.[FN14]

> FN10. *McGregor,* 206 F.3d at 1385 n. 5.

> FN11. *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1304 (11th Cir.1991) ("Sanctions may be imposed to coerce the contemnor to comply with the court's order, but may not be so excessive as to be punitive in nature."); *United States v. City of Miami,* 195 F.3d 1292, 1298 (11th Cir.1999) ("[A] District Court may not use the civil contempt power to impose what amounts to a criminal contempt sanction.").

> FN12. *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

> FN13. *In re Lawrence,* 279 F.3d 1294, 1300 (11th Cir.2002).

> FN14. *Watkins,* 943 F.2d at 1304.

Discussion

The Government cites the following conduct on the part of the Defendants as being contumacious of the Court's lawful injunctive order:

1. failing to "prominently and conspicuously display" the injunctive order on the first page of the websites: *www.eddiekahn.com, www.glgm.org,*

*www.eddiekahnoverseer.org, www.taxtruthnews.com,* and *www.cpe4me.com;*[FN15]

> FN15. Throughout this Order, reference to *www.cpe4me.com* includes reference to *www.cpeforme.com.*

2. with respect to Defendant Malatesta, preparing or assisting in the preparation of FOIA and Privacy Act requests and IMF/BMF decoding through the website *www.cpe4me.com;*

3. providing form letters on *www.eddiekahn.com* for persons to complete and send to the IRS in response to IRS letters;

4. continuing to promote or advertise abusive tax schemes on *www.eddiekahn.com* and *www.taxtruthnews.com;*

5. falsely advising through postings on *www.eddiekahn.com* and *www.taxtruthnews.com* that individuals are not required to file a federal tax return or pay federal taxes; and

**\*3** 6. failing to provide to the Government any records in their possession or to which they have access identifying the members of ARL/GLGM or the persons who have purchased their abusive tax shelters, plans, arrangements, or programs.

A. *www.eddiekahnoverseer.org, www.eddiekahn.com, www.glgm.org,* and *www.taxtruthnews.com*

As of the writing of this Order, *www.eddiekahnoverseer.org* has ceased to be a valid web-address. The website *www.eddiekahn.com* continues to exist; however, its entire content, including the form letters to the IRS, has been removed and replaced with a brief explanation of the pending litigation, the first page of the injunction, and links to the other pages of the injunction. The site *www.glgm.org* contains a similar display of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
(Cite as: 2004 WL 1089116 (M.D.Fla.))

injunctive order, but also contains a link to the site's pre-injunction content. The Court finds that *www.eddiekahn.com* and *www.glgm.org* are in compliance with a reasonable interpretation of the injunctive order.

The Court also finds, however, that *www.taxtruthnews.com* is not compliant. This site has remained essentially unchanged since these proceedings were commenced. The injunctive order is not displayed on any page, and the website continues to make available to its paying members the "Tax Truth Newsletter"-a bi-weekly, online newsletter containing descriptions of numerous, often fraudulent, schemes designed to avoid paying taxes. Most, if not all, of the articles are devoted to the exploits of Defendant Eddie Kahn and ARL/GLGM and their interaction with the IRS. In fact, the site boasts that it is "dedicated to bringing the latest updates from Eddie Kahn." Until very recently, the main page of *www.taxtruthnews.com* displayed a picture of Defendant Kahn and the caption, "Never miss another Eddie Kahn update." Tellingly, the picture and caption were removed after the Government moved for contempt.

The Government avers, perhaps correctly, that Defendant Kahn directly or indirectly maintains and controls the content of *www.taxtruthnews.com* and uses the site as his "mouthpiece." While this might be so, at present the Government offers little evidence to establish Kahn's control. The site is registered to Jeromy Shephard, a known member of ARL/GLGM, and although the injunctive order is broad enough to subject Mr. Shephard to its proscriptions (provided he first receives proper notice), Mr. Shephard has, thus far, not been the focus of the Government's motions. Accordingly, at this time the Government has not established by clear and convincing evidence that Defendant Kahn or any other Defendant has the ability to bring *www.taxtruthnews.com* into compliance with the injunction.

B. Defendant Bryan Malatesta

The Court finds by clear and convincing evidence that Defendant Bryan Malatesta is currently in violation of multiple provisions of the injunctive order. First, Malatesta has failed to produce to the Government any records in his possession or to which he has access identifying the members or customers of ARL/GLGM. Second, Malatesta has failed to prominently and conspicuously display the injunctive order on the first page of his website, *www.cpe4me.com*. Third, Malatesta continues to prepare or assist in the preparation of FOIA and Privacy Act requests through *www.cpe4me.com,* and, in particular, through the "online FOIA generator" available on that website. Fourth, Malatesta continues to prepare or assist in the preparation of IMF/BMF decoding through *www.cpe4me.com.*

**\*4** The Government has submitted convincing evidence that Defendant Malatesta, a licensed CPA, entered into an arrangement whereby, in exchange for compensation, he permitted ARL/GLGM to affix his signature to documents, including more than one-thousand powers of attorney, which were then transmitted by ARL/GLGM to the IRS or third parties on behalf of members or customers. [FN16] The circumstances of this arrangement suggest that, at a minimum, Defendant Malatesta has the right to require ARL/GLGM to produce to him any records identifying those persons on whose behalf it created and transmitted documents bearing his signature. There is nothing in the record showing that Defendant Malatesta made any effort to obtain such records from ARL/GLGM. The Defendant has made no explanation of his deficiency in this regard.

FN16. Doc. 7, tabs 18, 22, 23, 24, 33; Doc. 6, at tab. 7, p. 70.

The Government has also presented clear and convincing evidence that Defendant Malatesta is in violation of the injunction by virtue of his control over the website, *www.cpe4me.com.* Through this website, the Defendant continues to prepare or assist in the preparation of FOIA and Privacy Act requests and IMF/BMF decoding. In further contradiction of the clear and unambiguous terms of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

Court's order, *www.cpe4me.com* contains no mention of the injunction.

Although the Defendant denies having the ability to control *www .cpe4me.com,* the Government has presented sufficient evidence that Defendant Malatesta is intimately involved with the maintenance and operation of this site so that he currently possesses the ability to alter the content of *www.cpe4me.com* in order to bring about its compliance. As late as January 15, 2004, one month before the injunctive order was issued, Malatesta was the registered owner of the domain name "cpe4me.com" and his name, email address, and business address were listed on *www.cpe4me.com* as the site's contact information.[FN17] On January 21, 2004, one week before the motion for contempt was filed,[FN18] the contact information on *www.cpe4me.com* suddenly changed. Defendant Malatesta was no longer listed as the contact person; however, the contact address remained Malatesta's business address.[FN19] As of February 26, 2004, the contact information on *www.cpe4me.com* ceased altogether to list a mailing address.[FN20] Also by that date, the registered owner of the domain name "cpe4me.com" was changed to Kevin Phelps, apparently a resident of Australia.[FN21] The originating servers, one of which is operated by Malatesta's employer,[FN22] remained the same, and Thomas Selgas continued to be listed as the administrative and technical contact.

> FN17. Doc. 50, exh. A at 6. A "domain name" is a series of alphanumeric fields, or "domains," separated by periods, or "dots," which corresponds to a unique Internet Protocol (IP) address assigned to each computer on the Internet. The domain name system is used because domain names are much easier for users to remember than the numeric IP addresses to which they correspond. When one types *"www.cpe4me.com"* into a web browser, the computer performs an "address query" whereby it searches various other computers known as "domain name servers" for the information needed to match the domain name to the IP address. A domain name is broken into several levels that tell the computer how to search for the matching information. The ".com" of the web-address is known as the first or top-level domain name. The address query is directed to the ".com" top-level domain file zone where information about ".com" files are located and is then directed to the file corresponding to the second-level domain name, "cpe4me.com," where the information is retrieved. *See e.g., Thomas v. Network Solutions, Inc.,* 176 F.3d 500, 503-04 (D.C.Cir.1999). The "www" is not technically a part of the domain name.

> FN18. The Government notified the Defendants on January 21, 2004, pursuant to Local Rule 3.01(g), of its intention to move for contempt. Doc. 49.

> FN19. Doc. 50, exh. C at 6.

> FN20. Doc. 77, exh. A at 7.

> FN21. Doc. 72, attachment 2.

> FN22. Docs. 50, exh. A; Doc.72, attachment 2. One of the named servers for the domain name "cpe4me.com" is listed as "NS2.ARROWPLASTICS.COM." Defendant Malatesta is listed as the CPA for Arrow Custom Plastics. Doc. 77 exh. B.

The Defendant attempts to explain that, although he owned the second-level domain name "cpe4me.com,"[FN23] he never controlled the third-level domain name, *www.cpe4me.com.*[FN24] In an attempt to further distance himself from *www.cpe4me.com* and thereby establish his inability to comply, Malatesta maintains that his ownership of "cpe4me.com" lapsed on January 18, 2004 and was subsequently transferred to Phelps.[FN25]

> FN23. For a brief explanation of domain

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

names see *supra* note 17.

> FN24. Malatesta claims that *www.cpe4me.com* is controlled by someone he refers to only as "witness 2." Doc. 72.

> FN25. Curiously, http://cpe4me.com's only content continues to read "Preliminary Injunction Issued to Bryan Malatesta" even though the Defendant swears that he no longer controls this site.

**\*5** The Court is not persuaded. Indeed, the Court finds the Defendant's explanation incredible and unsubstantiated. For one thing, the "www" part of a web-address is not technically part of a domain name, and it certainly does not have to be registered along with the second-level domain name. More importantly, it is clear from the information once displayed on *www.cpe4me.com* that Malatesta has some degree of control over its content. Considering the totality of the evidence, it is apparent that the Defendant has done little more than attempt to avoid the proscriptions of the injunction by masking his control of this website.

### C. Defendant Milton Baxley II

The Government has presented clear and convincing evidence that Defendant Baxley, a licensed attorney,FN26 entered into an arrangement with ARL/GLGM similar to the arrangement between ARL/GLGM and Defendant Malatesta. Like Malatesta's arrangement, Baxley received compensation for permitting ARL/GLGM to affix his signature to documents, including over one-thousand powers of attorney, which were then transmitted by ARL/GLGM to the IRS and third parties on behalf of members or customers.FN27 At a minimum, Defendant Baxley has the actual or implied contractual right to require ARL/GLGM to produce to him the names of those persons on whose behalf it created and transmitted documents bearing his signature. To date, Baxley has not produced any such records

to the Government. Defendant Baxley has done little more than make an assertion of his inability to comply, which is insufficient to avoid compliance with the injunction.

> FN26. Doc. 8, at tab 24, Doc. 5, at tab 4. On October 24, 2003, an administrative law judge disbarred Defendant Baxley from practicing law before the IRS. *See* Doc. 5, at tab 5. The judge found by clear and convincing evidence that Baxley committed fourteen counts of misconduct centering around his filing of frivolous claims and pleadings on behalf of his clients. Similarly, in 1996, Judge Paul of the Northern District of Florida imposed Rule 11 sanctions against Baxley for filing frivolous pleadings in a matter involving the IRS. *Nutt v. United States,* No. 1:96-cv-96-MMP, 1996 WL 741592 (N.D.Fla. Oct.7, 1996).

> FN27. Doc. 2, at tab 13; Docs. 5-8, at tabs 4, 7, 8, 18, 22-25, & 31. Defendant Eddie Kahn characterized the compensation Baxley and Malatesta received in this arrangement as "gifts." Doc. 6, at tab. 7 p. 70.

### D. Defendant David Stephen Lokietz

Defendant Lokietz admits that he was the "Executive Trustee and General Manager" of ARL, a purported trust. In his affidavit he states that on December 18, 2003, days after the complaint and motion for preliminary injunction were filed, ARL was dissolved by unanimous decision of the trustees and ceased to exist.FN28 According to the Defendant, all of ARL's records were then transferred to Defendant Eddie Kahn, the head of GLGM.FN29 He relies on these events as demonstrating his present inability to comply with the injunctive order. However, inability to comply is not a defense to contempt if, as the Court finds to be the case with Defendant Lokietz, the inability was self-imposed in an effort to avoid compliance.FN30 By

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

law, the Defendant was required to make all reasonable efforts to gain access to the ARL member records and thereby accomplish compliance. Defendant Lokietz has not done so.

FN28. Doc. 65.

FN29. Doc. 82, at 50.

FN30. *Pesaplastic, C.A.,* 799 F.2d at 1521; *In re Lawrence,* 279 F.2d at 1300.

### E. Defendant Eddie Kahn

Defendant Kahn is the self-described "Presiding Overseer" of GLGM, a purported corporation sole, and the "Executive Trustee" of ARL, a purported trust. FN31 The Defendant initially refused to comply with the injunction, flippantly conditioning his compliance on the Government's ability to produce a "notice of acceptance" evidencing its jurisdiction over his property. FN32 It was only after the Defendant's frivolous jurisdictional argument was confuted and the Government's ensuing motion for contempt was filed that the Defendant submitted his first certificate of compliance. FN33 In this certificate, the Defendant swore that, despite the fact that he had yet to produce any ARL/GLGM membership records, he was in compliance with the injunction. It was not until the contempt hearing that he finally produced a compact disc containing, or at least purporting to contain, the GLGM member list. The Defendant explained his tardiness as "simply inadvertent." FN34

FN31. Doc. 82, at 40; Doc. 6, at tab 7.

FN32. Doc. 35.

FN33. Doc. 63.

FN34. Doc. 82 at 34.

**\*6** However, the Defendant's state of mind is irrelevant to these proceedings. Moreover, production of the GLGM member list is not sufficient to complete compliance with the clear and unambiguous language of the injunction which requires the production of not only the GLGM member list, but also ARL's member list. Further, the injunction unambiguously calls for the production of the identities of persons who have purchased the Defendant's abusive tax shelters, plans, arrangement, and programs. This means that Defendant Kahn must produce to the Government any records in his possession or to which he has access identifying those persons who, regardless of their affiliation *vel non* with ARL/GLGM, purchased or for whom was prepared a corporation sole, UCC financing statements or other related documents, draft checks or bonds, FOIA or Privacy Act requests, TIGTA complaints, IMF/BMF decoders, or any other correspondence to the IRS or third parties regarding a member's or customer's tax matters. To date, the Defendant has produced no such list and given no valid excuse for his non-performance.

### Conclusion

Accordingly, upon due consideration, it is adjudged that the Government's Motion for Show Cause Order (Doc. 47) is GRANTED, and the following Order to Show Cause is hereby issued to Defendants Bryan Malatesta, Milton Baxley II, David Lokietz, and Eddie Kahn. FN35

FN35. Because the Government has produced insufficient evidence that Defendant Kookie Kahn, Defendant Eddie Kahn's wife, is currently in violation of the injunction, she is not subject to the Order to Show Cause.

### *ORDER TO SHOW CAUSE*

Defendant Bryan Malatesta is ORDERED to show cause by sworn written pleading within ten (10) days of the date of this Order why he should not be adjudicated in contempt of this Court's injunctive order (Doc. 29) for:

1. failing to produce to the Government any records

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

in his possession or to which he has access identifying by name, Social Security numbers, and address the members or customers of ARL/GLGM, in particular, those members or customers on whose behalf his signature was used;

2. failing to prominently and conspicuously display a complete copy of the injunctive order (Doc. 29) on the first page of the website *www.cpe4me.com* or *www.cpeforme.com;* FN36

> FN36. The Court has found that the manner in which the injunction is displayed on *www.eddiekahn.com* and *www.glgm.org,*-prominently and conspicuously displaying the complete first page of the injunction on the first page of the site together with links to the remaining pages of the injunction-is adequate to achieve compliance.

3. preparing or assisting in the preparation of FOIA and Privacy Act requests on behalf of other persons or entities through *www.cpe4me.com* or *www.cpeforme.com,* and, in particular, through the online FOIA generator available on that site; and

4. preparing or assisting in the preparation of documents purporting to decode IRS files through *www.cpe4me.com* or *www.cpeforme.com.*

FURTHER, Defendant Milton Hargraves Baxley II is ORDERED to show cause by sworn written pleading within ten (10) days of the date of this Order why he should not be adjudicated in contempt of this Court's injunctive order (Doc. 29) for failing to produce to the Government any records in his possession or to which he has access identifying by name, Social Security numbers, and address the members or customers of ARL/GLGM, in particular, those members or customers on whose behalf his signature was used.

**\*7** FURTHER, Defendant David Stephen Lokietz is ORDERED to show cause by sworn written pleading within ten (10) days of the date of this Order why he should not be adjudicated in contempt of

this Court's injunctive order (Doc. 29) for:

1. failing to produce to the Government any records in his possession or to which he has access identifying by name, Social Security numbers, and address the member or customers of ARL/GLGM;

2. failing to produce to the Government any records in his possession or to which he has access identifying by name, Social Security numbers, and address persons who, regardless of their affiliation *vel non* with ARL/GLGM, purchased or for whom was prepared a corporation sole, UCC financing statements or other related documents, draft checks or bonds, FOIA or Privacy Act requests, TIGTA complaints, IMF/BMF decoders, or any other correspondence to the IRS or third parties regarding a member's or customer's tax matters.

FURTHER, Defendant Eddie Ray Kahn is ORDERED to show cause by sworn written pleading within ten (10) days of the date of this Order why he should not be adjudicated in contempt of this Court's injunctive order (Doc. 29) for:

1. failing to produce to the Government any records in his possession or to which he has access identifying by name, Social Security numbers, and address members or customers of ARL; and

2. failing to produce to the Government any records in his possession or to which he has access identifying by name, Social Security numbers, and address persons who, regardless of their affiliation *vel non* with ARL/GLGM, purchased or for whom was prepared a corporation sole, UCC financing statements or other related documents, draft checks or bonds, FOIA or Privacy Act requests, TIGTA complaints, IMF/BMF decoders, or any other correspondence to the IRS or third parties regarding a member's or customer's tax matters.

FURTHER, the Government shall have ten (10) days from the date of the filing of the individual Defendants' responses, if any, in which to reply. The Court will then enter its ruling.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759
**(Cite as: 2004 WL 1089116 (M.D.Fla.))**

IT IS SO ORDERED.

### ORDER

This case is before the Court for consideration of the Government's Request for Entry of Default (Doc. 58) against the pro se Defendants Eddie Kahn, Kathleen Kahn, David Lokietz, Bryan Malatesta, American Rights Litigators, Guiding Light of God Ministries, and Eddie Kahn & Associates for their failure to timely answer the complaint. Rule 55(a) of the Federal Rules of Civil Procedure provides for the entry of default when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules."

The entry of default is viewed with disfavor in the Eleventh Circuit.<sup>FN1</sup> Instead, there is a strong policy of determining cases upon their merit. Upon reviewing the record, the Court finds that the entry of default is not warranted at this time. However, the Defendants will be directed to answer the Government's complaint.

> FN1. *In re Worldwide Web Sys. Inc.,* 328 F.3d 1291, 1295 (11th Cir.2003); *Florida Physician's Ins. Co. v. Ehlers,* 8 F.3d 780, 783 (11th Cir.1993).

**\*8** Accordingly, upon due consideration, it is adjudged that:

(1) the Government's Request for Entry of Default (Doc. 58) is DENIED; and

(2) Defendants Eddie Kahn, Kathleen Kahn, David Lokietz, Bryan Malatesta, American Rights Litigators, Guiding Light of God Ministries, and Eddie Kahn & Associates are directed to answer the complaint within ten (10) days from the date of this Order. The Defendants' answers must be in accordance with the applicable provisions of Rules 7-16 of the Federal Rules of Civil Procedure and Rule 1.05 of the Local Rules of the Middle District of Florida.

IT IS SO ORDERED.

M.D.Fla.,2004.
U.S. v. Kahn
Not Reported in F.Supp.2d, 2004 WL 1089116 (M.D.Fla.), 93 A.F.T.R.2d 2004-1926, 17 Fla. L. Weekly Fed. D 759

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

GOVERNMENT
EXHIBIT

3

2006072150    SAT/MTG
              2 PGS
Book:SAT 336  Page:1253-1254

July 27, 2006  01:05:49 PM
Rec:$5.00    Cnty Tax:$0.00    State Tax:$0.00

FILED IN GREENVILLE COUNTY, SC

(W)BOOK 4057 PAGE 36

GREE...

2003 OCT 16 A II: 46

MORTGAGE OF REAL ESTATE

REG.ST...  ...E.. S

**State of South Carolina** )
)
**County of Greenville** )

**Mortgagee's Address:  2435 East North Street, Suite 105,  Greenville, SC 29615**

WHEREAS, Miriam Getz (hereinafter called the Mortgagor), in and by her certain Note of even date herewith stands firmly held and bound unto John-Howard Alexander (hereinafter called the Mortgagee), for the payment of the full and just sum of Sixty One Thousand One Hundred Fifty Three and NO/100 ($61,153.00), with the entire balance, if not sooner paid, being due on August 1, 2018, with interest, as in and by the Note, reference being had thereto, will more fully appear. AND IT IS AGREED, by and between the parties that this Mortgage shall represent a valid lien on said property.

AND IT IS AGREED, this security instrument secures to lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Motgaror's covenants and agreements under this Security Instrument and the Note. For this purpose, Mortgagor does hereby mortgage, grant and convey to Mortgagee and Mortgagee's successors and assigns, the following described property located in the County of Greenville State of South Carolina:

**See Attached Exhibit A for Legal Description.**

which currently has the address of: 6350 Whitehorse Road, SC 29611

TO HAVE AND TO HOLD this property unto Mortgagee and Mortgagee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. This security instrument shall also cover all replacements and additions. All of the foregoing is referred to in this Security Instrument as the "Property."

MORTGAGOR COVENANTS that Mortgagor is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the property is unencumbered, except for encumbrances of record. Mortgagor warrants and will defend generally the title to the property against all claims and demands, subject to any encumbrances of record.

AND IT IS AGREED, by and between the parties that the Mortgagor, his heirs and successors and assigns, shall keep any building erected on the property insured against loss and damage by fire for the benefit of the Mortgagee, for an amount not less than the sum shown above, with such company as shall be approved by the Mortgagee, his successors, heirs and assigns, and shall deliver the policy to the Mortgagee; and in default thereof, the Mortgagee, his successors, heirs or assigns may effect such insurance and reimburse themselves under this Mortgage for the expense thereof, together with interest thereon at the rate provided in the Note from the date of its payment. And it is further agreed, in the event of other insurance and contribution between the insurers, that the Mortgagee, his successors, heirs and assigns, shall be entitled to receive from the aggregate of the insurance monies to be a sum equal to the amount of the debt secured by this Mortgage.

AND IT IS AGREED, by and between the parties, that if the Mortgagor, his heirs and successors or assigns, shall fail to pay all taxes and assessments upon the property when they shall first become payable, then the Mortgagee, his successors, heirs or assigns, may cause the same to be paid, together with all penalties and costs incurred thereon, and reimburse themselves under this Mortgage for the sum so paid, with interest thereon at the rate provided in the Note from the date of such payment.

122162

US00293

BOOK **4057** PAGE **368**

PROVIDED ALWAYS, NEVERTHELESS, and it is the true intent and meaning of the parties, that if the Mortgagor does and shall well and truly pay, or cause to be paid, unto the Mortgagee, his successors, heirs and assigns, the debt or sum of money aforesaid, with interest thereon, and if any shall be due according to the true intent and meaning of the Note and this Mortgage, then this Mortgage shall cease, determine, and be utterly null and void; otherwise it shall remain in full force and virtue.

AND IT IS AGREED, by and between the parties, that the Mortgagor should hold and enjoy the premises until default or payment shall be made.

Any reference in this instrument to the plural shall include the singular, and any reference to the neuter shall include the male and female, the male shall include the female, and vice versa.

WITNESS the hand and seal of the Mortgagor(s) this 10 day of October, 2003.

_____     _October 14th, 2003_
Miriam Getz

**SIGNED, SEALED AND DELIVERED**
in the presence of:

_____ 10/14/3     _____ 10/14/03
Witness                      Witness

State of South Carolina          )
                                 )          **PROBATE**
County of Greenville             )

**PERSONALLY APPEARED BEFORE ME** the undersigned witness and made oath that (s)he saw the within-named sign, seal, and, as their act and deed, deliver the within-written Mortgage of Real Estate, and that (s)he, with the other witness subscribed above, witnessed the execution thereof.

SWORN to before me this _14_ day of
_October_, 2003
_____ (SEAL)     _____
Notary Public for South Carolina             Witness
My Commission Expires: _7-4-2013_     Ronnie Stewart

_____
Witness

FILED FOR RECORD IN GREENVILLE COUNTY, SC ROD
2006072150     Book:SAT 336     Page:1253-1254
July 27, 2006   01:05:49 PM

_Timothy L Kenney_

US00294

GOVERNMENT
EXHIBIT

2

BOOK 4 0 5 7 PAGE 366

GREE

| State of South Carolina | ) |
| | ) |
| County of Greenville | ) |

2003 OCT 16 A 11: 46
**MORTGAGE OF REAL ESTATE**

REGISTER OF DEEDS

**Mortgagee's Address:  2435 East North Street, Suite 105,  Greenville, SC 29615**

WHEREAS, Miriam Getz (hereinafter called the Mortgagor), in and by her certain Note of even date herewith stands firmly held and bound unto John-Howard Alexander (hereinafter called the Mortgagee), for the payment of the full and just sum of Sixty One Thousand One Hundred Fifty Three and NO/100 ($61,153.00), with the entire balance, if not sooner paid, being due on August 1, 2018, with interest, as in and by the Note, reference being had thereto, will more fully appear.  AND IT IS AGREED, by and between the parties that this Mortgage shall represent a valid lien on said property.

AND IT IS AGREED, this security instrument secures to lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Motgagor's covenants and agreements under this Security Instrument and the Note. For this purpose, Mortgagor does hereby mortgage, grant and convey to Mortgagee and Mortgagee's successors and assigns, the following described property located in the County of Greenville State of South Carolina:

**See Attached Exhibit A for Legal Description.**

which currently has the address of:  6350 Whitehorse Road, SC 29611

TO HAVE AND TO HOLD this property unto Mortgagee and Mortgagee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  This security instrument shall also cover all replacements and additions. All of the foregoing is referred to in this Security Instrument as the "Property."

MORTGAGOR COVENANTS that Mortgagor is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the property is unencumbered, except for encumbrances of record. Mortgagor warrants and will defend generally the title to the property against all claims and demands, subject to any encumbrances of record.

AND IT IS AGREED, by and between the parties that the Mortgagor, his heirs and successors and assigns, shall keep any building erected on the property insured against loss and damage by fire for the benefit of the Mortgagee, for an amount not less than the sum shown above, with such company as shall be approved by the Mortgagee, his successors, heirs and assigns, and shall deliver the policy to the Mortgagee; and in default thereof, the Mortgagee, his successors, heirs or assigns may effect such insurance and reimburse themselves under this Mortgage for the expense thereof, together with interest thereon at the rate provided in the Note from the date of its payment.  And it is further agreed, in the event of other insurance and contribution between the insurers, that the Mortgagee, his successors, heirs and assigns, shall be entitled to receive from the aggregate of the insurance monies to be a sum equal to the amount of the debt secured by this Mortgage.

AND IT IS AGREED, by and between the parties, that if the Mortgagor, his heirs and successors or assigns, shall fail to pay all taxes and assessments upon the property when they shall first become payable, then the Mortgagee, his successors, heirs or assigns, may cause the same to be paid, together with all penalties and costs incurred thereon, and reimburse themselves under this Mortgage for the sum so paid, with interest thereon at the rate provided in the Note from the date of such payment.

10-16-2003 01:01:24:23

RECORDING FEE     10.37

122162

BOOK 4057 PAGE 367

AND IT IS AGREED, by and between the parties that "Interest in the Property" means any legal or beneficial interest in the property, including, but not limited to those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Mortgagor at a future date to a purchaser.

If all or any part of the property or any interest in the property is sold or transferred without Mortgagee's prior written consent, Mortgagee may require immediate payment in full of all sums secured by this security instrument. However, lender shall not exercise this option if applicable law prohibits such exercise.

If Mortgagee exercises this option, Mortgagee shall give Mortgagor notice of acceleration. This notice shall provide a period of not less than 30 days from the date the notice is given within which Mortgagor must pay all sums secured by this security instrument. If Mortgagor fails to pay these sums prior to the expiration of this period, Mortgagee may invoke all remedies permitted by this security instrument without further notice or demand on Mortgagor.

AND IT IS AGREED, by and between the parties that upon any default being made in the payment of the Note or of the insurance premiums, or of the taxes, or of the assessments hereinabove mentioned, or failure to pay any other indebtedness which constitutes a lien upon the real property when the same shall severally become payable, then the entire amount of the debt secured or intended to be secured hereby shall become due, at the option of the Mortgagee, his successors, heirs or assigns, although the period for the payment thereof may not then have expired.

AND IT IS AGREED, by and between the parties that should legal proceedings be instituted for the collection of the debt secured hereby, then the Mortgagee, his successors, heirs or assigns, shall have the right to have a receiver appointed of the rents and profits of the premises, who, after deducting all charges and expenses attending such proceedings, and the execution of the trust as receiver, shall apply the residue of the rents and profits towards the payment of the debt secured hereby.

AND IT IS FURTHER AGREED, by and between the parties that should legal proceedings be instituted for the foreclosure of this Mortgage, or should the Mortgagee become a party to any action by reason of this Mortgage, or should the debt secured hereby be placed in the hands of an attorney at law for collection, by suit or otherwise, all costs and expenses incurred by the Mortgagee, including a reasonable attorney's fee, shall thereupon become due and payable as a part of the debt secured hereby, and may be recovered and collected hereunder.

BOOK **4057** PAGE **368**

PROVIDED ALWAYS, NEVERTHELESS, and it is the true intent and meaning of the parties, that if the Mortgagor does and shall well and truly pay, or cause to be paid, unto the Mortgagee, his successors, heirs and assigns, the debt or sum of money aforesaid, with interest thereon, and if any shall be due according to the true intent and meaning of the Note and this Mortgage, then this Mortgage shall cease, determine, and be utterly null and void; otherwise it shall remain in full force and virtue.

AND IT IS AGREED, by and between the parties, that the Mortgagor should hold and enjoy the premises until default or payment shall be made.

Any reference in this instrument to the plural shall include the singular, and any reference to the neuter shall include the male and female, the male shall include the female, and vice versa.

WITNESS the hand and seal of the Mortgagor(s) this 10 day of October, 2003.

_____     October 14th, 2003
Miriam Getz

**SIGNED, SEALED AND DELIVERED**
in the presence of:

_____ 10/14/3     _____ 10/14/03
Witness                          Witness

State of South Carolina        )
                               )                    **PROBATE**
County of Greenville           )

PERSONALLY APPEARED BEFORE ME the undersigned witness and made oath that (s)he saw the within-named sign, seal, and, as their act and deed, deliver the within-written Mortgage of Real Estate, and that (s)he, with the other witness subscribed above, witnessed the execution thereof.

SWORN to before me this 14 day of
October 2003
_____ (SEAL)
Notary Public for South Carolina
My Commission Expires: 7-4-2013

_____
Witness

Ronnie Stewart

_____
Witness

BOOK 4057 PAGE 369

EXHIBIT A

ALL that certain piece, parcel or lot of land, situate, lying and
being in the State of South Carolina, County of Greenville,
being known and designated as Lot No. 1 and a part of Lot
No. 2 on a plat of Farmington Acres recorded in the Office
of the Register of Deeds for Greenville County, South
Carolina, in Plat Book GGG at Page 183 and on a more
recent survey prepared by Freeland & Associates dated
October 25, 1979 and recorded in Plat Book 7-K at Page 92,
reference to said plat is hereby craved for a complete metes
and bounds description.

THIS BEING the same property conveyed unto Miriam Getz
by deed of Jackie Lee Hammack dated November 3, 1994
and recorded November 4, 1994 in the Register of Deeds
Office for Greenville County South Carolina in Book 1588 at
Page 816.

FILED FOR RECORD IN GREENVILLE
COUNTY SC R.O.D. OFFICE AT 11:46 AM
10 16 03 RECORDED IN MORTGAGE
BOOK 4057 PAGE 0366 THRU 0369
DOC # 2003122162

US00156

GOVERNMENT
EXHIBIT
4

BOOK 2059 PAGE 1459

STATE OF SOUTH CAROLINA

COUNTY OF GREENVILLE

FILED
GREENVILLE.
2003 OCT 16  A 11: 5

(NO TITLE EXAM)
TITLE TO REAL ESTATE

KNOW ALL MEN BY THESE PRESENTS, that Miriam Getz. in consideration of Five and 00/100 ($5.00) Dollars Love and Affection and NO OTHER CONSIDERATION, the receipt of which is hereby acknowledged, has granted, bargained, sold, and released, and by these presents do grant, bargain, sell and release unto **John-Howard Alexander as Trustee for The Alexander Family Trust** his successors and assigns, forever:

ALL that certain piece, parcel or lot of land, situate, lying and being in the State of South Carolina, County of Greenville, being known and designated as Lot No. 1 and a part of Lot No. 2 on a plat of Farmington Acres recorded in the Office of the Register of Deeds for Greenville County, South Carolina, in Plat Book GGG at Page 183 and on a more recent survey prepared by Freeland & Associates dated October 25, 1979 and recorded in Plat Book 7-K at Page 92, reference to said plat is hereby craved for a complete metes and bounds description.

THIS conveyance is subject to all restrictions, set-back lines, roadways, zoning ordinances, easements and rights-of-way, if any, affecting the above-described property.

THIS BEING the same property conveyed unto Miriam Getz by deed of Jackie Lee Hammack dated November 3, 1994 and recorded November 4, 1994 in the Register of Deeds Office for Greenville County South Carolina in Book 1588 at Page 816.

Grantee specifically assumes and agrees to pay that certain mortgage in favor of John-Howard Alexander in the original amount of $61,153.00 dated Oct 14, 2003 and recorded Oct 16, 2003 in the ROD office for Greenville County, SC in Book 4057, Page 366.

**Grantees Address: 2435 East North St., Suite 105, Greenville, SC 29615**

Together with all and singular the rights, members, hereditaments and appurtenances to said premises belonging or in any wise incident or appertaining; to have and to hold all and singular the premises before mentioned unto the grantee(s), and the grantee's(s') heirs or successors and assigns, forever.   And, the grantor(s) do(es) hereby bind the grantor(s) and the grantor's(s') heirs or successors, assigns, executors and administrators to warrant and forever defend all and singular said premises unto the grantee(s) and the grantee's(s') heirs or successors and assigns and against every person whomsoever lawfully claiming or to claim the same or any part thereof.

10-16-2003 01:22:662

RECORDING FEE

BOOK **2059** PAGE **1460**

WITNESS the grantor's hand and seal this *October 14,* , 2003.

SIGNED, sealed and delivered
in the presence of:

_____
(Witness)

_____
(Witness)

_____
Miriam Getz

**STATE OF SOUTH CAROLINA**          )
                                     )          **PROBATE**
**COUNTY OF GREENVILLE**             )

Personally appeared the undersigned witness and made oath that (s)he saw the within named grantor sign, seal and as the grantors' act and deed, deliver the within written deed and that (s)he, with the other witness subscribed above, witnessed the execution thereof.

SWORN to before me this
*October 14* , 2003.

_____ (SEAL)
NOTARY PUBLIC for South Carolina
My Commission Expires: ~~12/11~~ 7/4/13

(WITNESS) _____
(Ronnie Stewart)
_____
witness

DEF-00075

GOVERNMENT
EXHIBIT

5

# Benefits of Pure Trusts

- **Perfectly** Legal

- **Inexpensive** to Manage

- Lawful to **Own, Buy & Sell** Anything

- **Easy to Exchange** Property

- Into used for **Business and Assets**

- **Simple Do it Yourself Process**

- Protection of **Retirement**

- **Liability Protection**

- **Estate Engineering**

- **Privacy**

- **No** Reporting Requirements

- Pays **Reduced Taxes**

- May **Operate Businesses**

- **Continues** after Death of Grantor



# WHO CAN USE A PURE TRUST?

Any person or type of business, regardless of the nature, size or current form of organization, is eligible to operate a Pure Trust Organization.

For example: *The Fidelity Magellan Fund*, one of the largest mutual fiends in America, was reorganized in 1984 as a Pure Trust Organization:

# Candidates for Pure Trusts
### Short List

| | |
|---|---|
| Any Self-employed Person | Manufacturers |
| Apartment Buildings | Ministers |
| Artist & Writers | Multilevel Sales People |
| Attorneys | Opticians |
| Chiropractors | Professional Services |
| Churches | Property Owners/Managers |
| Day Care Operators | Agencies/Agents |
| Dentists | Recreational Businesses |
| Doctors | Restaurant Owners |
| Franchise Operator | Rental Property |
| Health Practitioners | Sole Proprietors |
| Hotel/Motel Owners | Shop Owners |
| Independent Contractors | Service Providers |
| Insurance Brokers/Agents | Sports & Gun Dealers |

# Trust Hall of Fame



**THE 8 COMMANDMENTS**
**ABOUT YOUR RELATIONSHIP WITH A PURE TRUST**

**1. THOU SHALL NOT SAY,** "I HAVE A TRUST," "MY TRUST," "MY COMPANY". A PURE TRUST OR L.L.C (Limited Liability Corporation). ARE NEITHER YOU, NOR YOURS. THEY ARE ENTITIES OF THEIR OWN, AND OPERATE INDEPENDENTLY FROM YOU.

**2. THOU SHALL SAY,** "I AM THE MANAGER OR TRUSTEE". "I HAVE BEEN APPOINTED TO DO THE FOLLOWING BY THE BOARD OF TRUSTEES." BASICALLY YOU MAY SAY ANYTHING THAT DOES NOT IMPLY OWNERSHIP OR TOTAL CONTROL.

● **3. THOU SHALL MAKE SURE** THAT THE RECORDS AT ALL TIMES REFLECT THAT YOU ACT AS AN AGENT FOR THE TRUST, OR AS A MANAGER OR TRUSTEE, AND THAT YOU, PERSONALLY, ARE SUBORDINATE TO SOMETHING OR SOMEONE OTHER THAN YOURSELF.

**4. THOU SHALL KEEP** GOOD AND ACCURATE RECORDS. IRS AUDITOR TOM HEALY WAS QUOTED AS SAYING. "THE REASON THAT THIS TYPE OF TRUST WORKS FOR CONCERNS LIKE THE ROCKEFELLER'S AND NOT FOR YOUR MAIN STREET BUSINESSMEN, IS BECAUSE THE ROCKEFELLER'S HAVE MANAGERS"

*THE IMPORTANCE OF PROPER MANAGEMENT AND RECORDS*
*CANNOT BE OVEREMPHASIZED!*

**5. THE TRUST SHALL NOT** PAY FOR ANYTHING OUT OF ITS BANK ACCOUNT FOR ANYTHING THAT YOU PUT IN OR ON YOU. EXAMPLE: PERSONAL OR FAMILY CLOTHING, FOOD, GROCERIES, ETC. REMEMBER, <u>YOU AND THE TRUST ARE SEPARATE ENTITIES.</u> IF YOU DO NOT WANT IT TO BE DECLARED YOUR ALTER EGO, THEN YOU MUST NOT ACT AS IF IT IS YOU!

**6. THOU SHALL NOT** ANSWER ANY QUESTIONS FROM ANY GOVERNMENTAL AGENCY, STATE OR FEDERAL, ABOUT THE TRUST. <u>FORWARD ALL QUESTIONS,</u> AND PEOPLE WITH QUESTIONS, <u>TO THE TRUSTEE,</u> IN WRITING, AND NOT BY PHONE.

**7 THOU SHALL REMEMBER** THAT YOU DO NOT OWN THE ASSETS IN THE TRUST, BUT USE OR MANAGE THEM UNDER CONTACT WITH THE BOARD OF TRUSTEE.

**8. THOU SHALL ALSO REMEMBER** TO USE THE TRUST'S E.I.N. NUMBER FOR EVERYTHING, AND <u>NEVER</u> YOUR SOCIAL SECURITY NUMBER.

In our research we scrutinized hundreds of court decisions to find out what qualities made certain types of Trusts un-penetrable by judges, the IRS and other creditors. The Trusts have been structured after Contracts of Trust that have been challenged and tested to withstand the most intense scrutiny of the Courts, the IRS and Creditors and still remain intact. We researched all IRS Regulations regarding Trusts. We also thoroughly researched American Jurisprudence, the American Law Review plus volumes of other law books and documents on Trusts and Contracts of Trust.

The contract in Pure Trust Form comes under the realm of equity under Common Law. This is the type of asset protection that the wealthiest people in the world use. While Statutory Trusts rely upon statutes that can be changed at the whim or greed of the legislators, the contract of Pure Trust takes its protections from the Constitution, and any law contrary to it is NULL and VOID. There is NO higher earthly law.

## Other Types of Trust Organizations

**UNINCORPORATED BUSINESS ORGANIZATION (UBO) OR CONTRACTUAL COMPANY**

A UBO combines the greatest benefits of a Sole Proprietorship, Partnership and Corporation, without the restrictions of either entity. The problem with a corporation is that, because it is a creation of the corporate State, it can be regulated and taxed by it. A Corporation is an "artificial entity," owing its existence to the charter power of the corporate state, and does NOT have "unalienable" Constitutional Rights. It only has very limited *"granted"* rights.

The tax burdens and regulatory requirements of a corporation are overwhelming. A Limited Liability Company is also a Statutory entity providing few benefits over a corporation. A sole Proprietorship or partnership leave the personal; assets of the principals exposed. A UBO is a creation of the Sovereign and has **no duty to the state** and CANNOT be regulated by it! It is a PRIVATE way for private Citizens

o do business without governmental red tape or interference.

**FAMILY PRESERVATION ORGANIZATION**

A separate Family Preservation Organization is an intelligent way to protect property as you accumulate it. _Dividing assets into different Trusts provides the maximum in asset protection._ Although, he assets in the Contract of Pure Trust are contractually non-attachable (*except in the case of crime or fraud*), multiple Contracts of Trusts provide an added layer of protection, especially for property that has potential of creating a liability. Remember, if in a worse case scenario a Trust is penetrated, nothing outside of that particular Contract of Trust can be taken. For that reason, property that may be particularly vulnerable to suits should be placed in separate Contracts of Trusts. Also, a UBO should always contain a minimum of assets (*i.e. a desk, a chair, and a typewriter*).

**SAFE HAVEN TRUST**

There should also be a Trust that is absolutely separate from you. In this Trust, rather than transferring property from your name into the name of the Trust, you merely purchase new property directly in the name of the Trust. Do not write checks from your personal account or accounts attached to you to this Trust. *(you can use the Banking Trust for that)* This will provide an extra safe haven for your assets.

# PURE TRUST DEFINITIONS

Below, are some specific items that you may or may not have a need to deal with in working with Trusts. Most of the items are pretty self-explanatory and you should understand the reasoning behind each one.

<u>No. of copies of document:</u> Although most officers will want a copy for their records, it is really not necessary or required to provide all officers with their own copy of the TRUST document. There is only one copy that is considered to be the official "copy" and that one is always held by the Trust Officer for the First Trustee. That copy, along with all future Minutes that are recorded, should be always kept in a safe place. If stored electronically, always save a back-up copy off-site.

<u>Situs Address:</u> The Situs address is one that establishes what laws and jurisdiction prevails over the establishment of the Declaration of Trust. You may use your own mailing location, or some professionals prefer locations such as Belize or Cayman Islands, etc. You are always free to move the Situs of the TRUST. Because of the way the document is written, that would reestablish the governing rules for the TRUST to that new location. Depending on your particular situation and desires, that could be advantageous.

<u>Mailing Address:</u> The mailing address is assumed to be the Situs address unless specifically changed with an appropriate Minute. The mailing address does not have to be the same as the Situs address. For best results, you could consider leaving the Situs address as your mailing location and then draft a Minute, changing the mailing address if you find it necessary.

<u>Name of Trust:</u> The name of the TRUST is unimportant as long as it is established as a Declaration of Trust. Some people like to use a name with the suffix "Holding Trust", "Management Trust",etc.... Others prefer suffixes like "Foundation or Group", etc. You can not, however, make it appear as a

banking or traditional financial institution. Most people simply choose a name of a city, town, product or service as the basis of the TRUST name.

One thing to watch out for is you don't want to use the words "Corporation", "Company", "Partnership", etc. It would imply this is something other than a Declaration of Trust which is a Contractual Agreement organizing to do business. The proper terminology for the identification of this TRUST is a 'Declaration of Trust". It is also known as an Unincorporated Trust Organization by Contract.

**SETTLER, First Trustee and Beneficiary:** There are three main parties to a TRUST. The SETTLOR, First Trustee and the Beneficiary(ies). The SETTLOR and the First Trustee contract amongst themselves to start the TRUST for the benefit of the third party, the Beneficiary. The SETTLOR is someone that is protecting the Beneficiary's interests, and wants to donate the initial $100.00 into the account of the TRUST. This $100.00 is a total gift by the SETTLOR and is now considered principal of the TRUST, until such time that it is paid out as income to the Beneficiary.

The SETTLOR decides who the Beneficiaries are and how the TRUST is structured, but beyond that, the First Trustee takes over day-to-day operations of the TRUST. The First Trustee now has the right to bring on additional Trustees, called Secondary Trustees, to help oversee the operation of the TRUST or to run specific aspects of it.

The Beneficiaries of the TRUST are the ultimate recipients of any and all income derived from the TRUST activities so be sure how you place people in this position. The easiest structure to setup is one where you become the First Trustee. A very close friend or coworker is signed on as the SETTLOR and your children become the beneficiaries. This is an example of how a Trust is generally setup, but you by no means have to follow this guideline.

One rule to watch out for. The three parties must be separate individuals or entities. You can not be the Beneficiary of a TRUST in which you are the First Trustee. That is a highly precarious situation. One in which you don't want to become involved. Everyone knows one or two individuals they can trust well enough to place assets in their care. The reasoning is that you want to CONTROL everything but not to OWN anything. Therefore, if you control the TRUST, which owns all of the assets, you control what was the assets you used to own. What is the difference in doing that and you owning your assets and controlling them? Nothing, except for now, you're judgment proof. No one can sue you and win something that is not yours, right?

One word about Grantor-Trustee. A SETTLOR is presumed to be giving the initial assets to the Beneficiaries. If it is shown that the SETTLOR still retains control of the assets, it will be judged that the SETTLOR is in fact a Grantor-Trustee. The income from the TRUST assets will then be taxable to the SETTLOR even while the assets remain in the possession of the TRUST. This is why we said it would be safe to choose a close friend to be the SETTLOR. The SETTLOR has initial desires and wishes to make a gift, but beyond that, they relinquish all control over that gift to the First Trustee. Also, a SETTLOR can not have any financial interest in any present or future endeavor that the TRUST embarks upon. Be careful who you choose for the SETTLOR position.

**Secondary Trustees:** Any Secondary Trustees must sign the Minute pertaining to their appointment.

**Trust Certificate Unit Holders:** The Beneficiaries are the Trust Certificate Unit Holders. Wherever you refer to and place beneficiaries in this document, always remember to list those names with the proper

number of T.C.U.s that are issued. There are always no more and no less than 100 T.C.U.s issued at any time. It is the Settlor's initial choice to divide these up in any way they want.

**Signatures:** Anywhere there is a space for a Witness' signature, you must find a witness to sign.

**Declaration of Trust, Trust Indenture, Trust Bylaws and Meeting Minutes:** These headings are pretty self-explanatory. The Declaration of Trust is the general guideline or set of rules that is established as the basis for the TRUST. The Trust Indenture is a more detailed version of the preceding information. The Trust Bylaws are the specific rules that govern the TRUST. They spell out some detailed do's and don'ts of what is allowed. The Meeting Minutes are the documentation of the day-to-day activities of the running of the TRUST.

**First Secretary, Trust Manager:** You may appoint a First Secretary. This title is placed here for those times when you can not or choose not to be listed as the First Trustee. You have a couple of options. One is to be signed on as the First Trustee or take the position as General Trust Manager. You'll notice that if a Trust Manager is appointed, they take over day-to-day activities. Whereas, a First Secretary simply watches over everything and can literally veto anything they don't like.

The best position is still the First Trustee. As you'll read in the trust document, the First Trustee can not be terminated whereas the other positions can be. REMEMBER THIS!

**Meetings:** The Bylaws briefly mention the various meetings that would be called from time to time. These are required for a Trust to be legal. It is here that it is established that all meetings can be held anywhere in the World. This is a great benefit to have. Any restricted version of this clause would need to be addressed in a Minute.

**Privacy:** The Bylaws grants the Beneficiaries immunity from disclosure. Under no circumstances will a TRUST officer be allowed to disclose the identities of the Beneficiaries. Therefore, no non-officer shall be permitted to view any documents of this Trust Organization except for the "Declaration of Trust" and the "Trust Indenture" sections of the original formation agreement.

The Meeting Minutes grant you the privacy you need to conduct your business affairs the way you see fit. Any additions to the TRUST assets, beyond the initial $100.00, must be documented with appropriate Minutes. Therefore, anything this TRUST does from here on out, will be private and against the wishes of the SETTLER and the Board to be disclosed to anyone without just cause or demand.

**Successor-Trustee:** It is highly advisable to immediately find a Successor-Trustee. Don't delay this appointment very long. It could be crucial to the ongoing, uninterrupted nature of this Trust organization.

**Additional Structures / Layers of Protection:** Some astute business persons choose to add layers of protection by setting up additional Trusts. They'll use a combination of the Family and Management Programs to create an intermingled diversion of entities. Sometimes, these additional layers can provide the extra protection to totally render yourself judgement-proof.

**Fraudulent Conveyance:** The one thing to remember in a scenario of Fraudulent Conveyance is that the creditors will want to set-aside or disallow any transfer of assets which could have been used as collateral for a debt owed them. If you are going to transfer assets out of your possession, into a Trust, for reasons of avoiding present creditors, you will need to show that your "transfer" was an attempt to settle a debt with a creditor. It's not your fault there's not enough assets to go around to settle up with all the creditors.

f there were, you wouldn't be in this predicament, now would you?

You need to arrange to have another Trust to place a lien against your assets with a monetary value that will exceed the value of merchandise being transferred. This will clearly show that your transfer was in un( mpt to clear a lien. Just be very careful who operates that other Trust and how their names are tied o the present operating Trust you are setting up. Those Trust officers should be totally different, if possible.

If you want total protection from disclosure of transfer information to any official authorities of ANY country, you'll want to set up an Offshore Trust. No matter what the reason for the transfer, places such as Belize will not allow any documents to be placed into the hands of inappropriate parties. Since this document is NOT recorded in any state, country or registrar, there is built-in protection from improper disclosure. The offshore Trust's situs can be directed to offshore if you wish. You will need to change the jurisdiction of the Trust in an appropriate Minute.

**Multilayered Trusts:** In creating multiple Trusts and multilayered Trusts, the main objective is to create a diversion of paperwork and closed doors for an outsider trying to pry into your affairs. Therefore you need to understand the simple basics of outlining these structures.

The easiest way to understand this is to think of each Trust as a real person. When drawing out your examples on paper, outlining the flow of funds, etc. use real person's names for your example Trusts to clearly understand their relationship with each other.

The easiest example to use for creating an information trail that eventually closes off is having a second Trust be the Beneficiary of the first Trust. Then you could have a third Trust be the Beneficiary of the second Trust and so on until you've created enough of a stair-step that prevents any information leaks from disclosing any identities that should remain discreet. The principal parties, whose identities you're trying to keep a secret would be placed as the Beneficiary of the last Trust in the chain.

**Parent/Underlying Trusts: In** the example of a Parent/Underlying Trust, the scenario is that one Trust is either the overall umbrella (*or Parent, if you will*) that is the parent/controlling entity over all the other Trusts. This works if one Trust wants to diversify and yet have some of the same officers running the subordinate Trusts. In this example, the Parent Trust could be the SETTLOR of the subordinate Trusts. You could use the same or some of the same Trustees for the Subordinate Trusts. This allows you to name different Beneficiaries for different business purposes.

An Underlying Trust is one that is named as Beneficiary of several Trusts. All the Trusts are created for the ultimate benefit of the one Trust. This can be used if someone has limited family and wants to diversify. All the diverse business activities will eventually benefit the one Beneficiary, who himself, operates as a Trust entity as well.

**Brother/Sister Trusts:** Brother/Sister Trusts are ones in which they share managing directors or Trustees. They may have different Settlor's and/or different Beneficiaries but essentially, these are the diverse Business Trusts that will eventually funnel down to an Underlying entity. They are also the diverse Trusts that may have the same SETTLOR as in the Parent Trust. These Trusts are usually the "w .ing" Trusts that generate most of the revenues for either a Parent or Underlying entity. Since they may have some of the same directors/Trustees, be very careful as to how they relate to each other so that none of the Trust officers jeopardizes their fiduciary relationships with their respective Beneficiaries.

**Fee Simple:** Estate in which an owner and his heirs have unconditional power of disposition. (*The Pure Trust Organization holds the real and/or personal property in "fee simple".*)

**Fiduciary Capacity:** When the business which one transacts, or the money or property which one has, is not his own or for his benefit, but for the benefit of another person. (*This term is similar to the word "trust", which is defined as Property which is held for the benefit of another I. The primary difference between these two terms is that Fiduciary capacity" refers to a transaction which one does for another, while "trust" is related to the holding of property for the benefit of another.*)

**Indenture:** A written contract or agreement. (*The Pure Trust document is the "indenture".*)

**Inure:** Resulting; to result.

**Tenants in Common:** Where two or more hold the same property under different names. (*The certificate Holders may hold the units as Tenants in commons.*)

## A FEW COURT DECISIONS ON TRUSTS

1. CALDWELL Vs. HILL, 176 SE 383 (1934) - U.S. ADOPTED COMMON LAWS OF ENGLAND WITH THE CONSTITUTION.

2 ELLIOT Vs. FREEMAN, 220 U.S. 178 (1911) - A TRUST IS NOT DEPENDENT ON THE STATUTORY LAW.

3. BURNETT Vs. SMITH, 240 SE 1007 (1922) - A TRUST IS A LEGAL ENTITY.

4. SCHUMANN-HEINK Vs. FOLSOM, 159 NE 250 (1927) - IF IT IS FREE OF CONTROL BY TRUST CERTIFICATE UNIT HOLDERS, THEN IT IS A PURE TRUST

5. BERRY Vs. MCCOURT, 204 NE 2ND 235 (1965) - A PURE TRUST IS A CONTRACTUAL RELATIONSHIP IN TRUST FORM.

6. GOLDWATER Vs. OTTMAN, 292 P 624 (1930) - A BUSINESS TRUST IS LAWFUL WHEREVER CONTRACTS ARE LAWFUL.

7. BAKER Vs. STERN, 58 AIR 462 - A TRUST IS A VALID BUSINESS ORGANIZATION.

8. REEVES Vs. POWELL, 267 SW 328 - A TRUST IS A VALID BUSINESS ORGANIZATION.

9. EDWARDS Vs. CIR, 415 F. 2D 573 - A CONTRACT CANNOT BE SET ASIDE BECAUSE IT SAVES ON TAXES.

10. WILLIAM Vs. CITY OF MILTON, 102 NE 355 - CLASSIC OLD CASE ON TRUSTS

11. BARNETTE Vs. MCNULTY, 516 P. 2D 583, AND CARRILLO Vs. TAYLOR, 299 P. 2D 188 - ESSENTIAL ELEMENTS OF A TRUST ARE A COMPETENT SETTLOR AND TRUSTEE; CLEAR